UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ X

THOMAS G. DONLON,

Plaintiff

**FIRST AMENDED COMPLAINT**

-against-

Docket Number:

CITY OF NEW YORK, ERIC ADAMS, TANIA KINSELLA, Individually, JEFFREY MADDREY, Individually, JOHN CHELL, Individually, KAZ DAUGHTRY, Individually, TARIK SHEPPARD, Individually, MICHAEL GERBER, Individually, PAUL SARACENO, Individually, and ANTHONY MARINO, Individually

Defendants

_____ X

Pursuant to Rule 1.D of the Court's Individual Rules and Practices in Civil Cases, "[a]ny amended or corrected filing (including but not limited to amended pleadings) shall be filed with a redline showing all differences between the original and revised filing." By **August 1, 2025**, Plaintiff shall file the required redline.

SO ORDERED.

*Jennifer H. Rearden*

Jennifer H. Rearden, U.S.D.J.
Dated: July 29, 2025

Plaintiff THOMAS G. DONLON, by his attorneys, Law Office of John A. Scola, PLLC, complaining of the Defendants respectfully submits his First Amended Complaint as follows:

PRELIMINARY STATEMENT

1. The New York City Police Department ("NYPD"), under the direction of Defendant ADAMS, functions as a racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. Senior leadership abandoned lawful governance and engaged in outright malfeasance by using the NYPD to consolidate political power, obstruct justice, and punish dissent.

2. A coordinated criminal conspiracy took root at the highest levels of City government—carried out through wire fraud, mail fraud, honest services fraud, obstruction of justice, and retaliation against whistleblowers. This enterprise—the NYPD—was criminal at its core. The Defendants engaged in a coordinated pattern of racketeering activity that was deliberate, sustained, and directed from the highest levels of the NYPD and City Hall. As

detailed throughout this Complaint, the Defendants obstructed justice in violation of 18 U.S.C. § 1503 by sabotaging internal oversight efforts—canceling Donlon's meetings, altering his schedule, spying on his communications, and systematically excluding him from operational decisions.

3. They manipulated the Internal Affairs Bureau to prevent disciplinary referrals and block investigations into executive misconduct. The Defendants used Donlon's official Police Commissioner stamp without authorization to forge internal documents that were then used to promote unqualified, politically connected officers over those who had earned advancement through merit. This corruption triggered a massive, unlawful transfer of public wealth—millions of dollars in unearned salary increases, overtime eligibility, pension enhancements, and post-retirement benefits. The Defendants committed wire and mail fraud under §§ 1341 and 1343 by disseminating materially false information through official City systems, including promotional lists and internal communications. They engaged in honest services fraud under § 1346 by subverting the promotion process— trading public trust for loyalty, silence, and political protection. And they retaliated against whistleblower Thomas G. Donlon in violation of § 1513 by dismantling his authority, orchestrating his removal, and targeting his wife with unlawful arrest and defamatory leaks.

4. These predicate acts were not isolated—they were coordinated and systemic, forming an unlawful scheme to preserve power, punish dissent, and defraud the public. As part of the relief sought, Plaintiff demands the appointment of an independent federal monitor with full authority to oversee and report on NYPD disciplinary processes, whistleblower

protections, and promotion decisions, to ensure compliance with law and prevent further abuse.

5.  Defendant ADAMS publicly appointed Plaintiff Thomas G. Donlon—a distinguished former Senior Executive in the Federal Bureau of Investigation ("FBI")—as interim Police Commissioner amid a wave of criminal investigations targeting his administration.

6.  But the appointment was illusory. In reality, Donlon was Commissioner in name only. True authority remained with Defendant ADAMS's corrupt inner circle: Defendants First Deputy Commissioner TANIA KINSELLA, Chief of Department JEFFREY MADDREY, Chief of Patrol JOHN CHELL, Deputy Commissioner KAZ DAUGHTRY, Deputy Commissioner of Public Information TARIK SHEPPARD, and Deputy Commissioner of Legal Matters MICHAEL GERBER.

7.  These individuals exercised unchecked power while Donlon was sidelined and used as a public relations shield. The Defendants undermined Donlon's authority by blocking his merit-based promotions and instead elevating unvetted individuals of their choosing. The Defendants then fraudulently used Donlon's official Police Commissioner stamp—without his consent—to legitimize and carry out their corrupt scheme.

8.  Upon assuming his position, Donlon quickly uncovered systemic corruption and criminal conduct being perpetrated by the NYPD's executive leadership. He reported these findings directly to Defendant ADAMS.

9.  Specifically, Donlon informed Defendant ADAMS of fabricated promotions, systemic fraud, retaliatory policing, and the obstruction of internal investigations by high-ranking

officials—most notably Defendant SHEPPARD, who had a documented history of unlawful violence, including the tasering and false arrest of protestors, resulting in civil rights lawsuits and monetary settlements. Defendant ADAMS took no action in response. Instead, he condoned the misconduct and allowed the NYPD to function as a criminal enterprise.

10. As a direct result of Defendant ADAMS's failure and unwillingness to manage the NYPD, Defendant SHEPPARD fraudulently orchestrated his own promotion—granting himself greater authority and a higher salary.

11. Donlon confronted Defendant SHEPPARD directly, denouncing the act as "stolen valor," but the rebuke had no deterrent effect. When Donlon demanded accountability for the NYPD Defendants' collective misconduct, they turned against him. He was frozen out of operational and administrative decisions, stripped of real authority, and ultimately removed from his role as interim Police Commissioner in retaliation for his internal complaints to Defendants ADAMS concerning the corruption, dereliction of duty, and criminal misconduct he had witnessed.

12. From the outset, Donlon's mission was clear: to protect and guide the honest rank-and-file officers and supervisors who had been abandoned by a leadership class rotting from the top.

13. He sought to restore integrity, raise morale, and defend those who risk their lives daily to protect and serve. These officers had been betrayed by corrupt high-level executives and a

mayor more interested in political loyalty than public safety. Donlon tried to be that leader. For this, he was unlawfully targeted.

14. The retaliation extended beyond professional consequences. In a calculated and deeply personal act of vengeance, Defendants DAUGHTRY, SHEPPARD, and GERBER orchestrated the false arrest and unlawful detention of Donlon's wife, Mrs. Deirdre O'Connor-Donlon—a private citizen[1] with no connection to his official duties—by NYPD officers under their control. This was not a mistake. It was a deliberate abuse of power designed to punish and intimidate Donlon for exposing their misconduct. Mrs. Donlon-O'Connor was handcuffed behind her back, subjected to a full-body and personal-effects search at the 17th Precinct, and told by Officer Vargas that she would be transported to Central Booking. This coordinated humiliation was a direct warning: the NYPD Defendants would stop at nothing to silence and personally destroy Donlon, even if it meant violating the constitutional rights of his spouse.

15. Donlon received press calls within minutes of his wife's release. Donlon received a call on his personal cell phone from a New York Post reporter asking for comment—followed by a call to Mrs. Donlon-O'Connor. The source of the leak was soon revealed: the Office of the Deputy Commissioner for Public Information (DCPI), which is led by Defendant SHEPPARD, had disseminated the Donlons' personal phone numbers and intimate family details to the press. By 11:06 PM, a vicious and factually incorrect article was published, complete with home addresses, dates of birth, and other private information, syndicated across multiple media outlets. This malicious media leak could only have come from inside

---

[1] It should be noted that Mrs. Deirdre O'Connor-Donlon is a retired New York State Supreme Court Attorney who dedicated 28 years of public service to NYS and its people.

the NYPD. Despite the egregious abuse of authority and the widespread coverage it generated, neither Defendant ADAMS nor Police Commissioner Tisch ever contacted Donlon or his wife to explain or apologize. For Donlon and his wife—who have always held the NYPD in the highest regard—this incident marked a devastating betrayal by a department they once trusted.

16. Collectively, these acts of unlawful arrest, unauthorized disclosure of private data, obstruction of internal probes, and a leadership that rewards silence comprise a pattern of racketeering under RICO. In collusion with Defendant ADAMS's office and NYPD command, promotions and favors were allegedly traded to suppress dissent and bury accountability. It was known that this matter was discussed with the Mayor and his Administration and also by the NYPD Police Commissioner, but no contact was made with Donlon or his wife.

17. The Defendants leveraged governmental authority and infrastructure to commit crimes, cover up misconduct, and retaliate against internal dissenters. Their conduct meets the legal definition of a RICO enterprise: an association-in-fact engaged in a pattern of racketeering activity through public channels.

18. With New York City and NYPD under the control of Defendants ADAMS and MADDREY, respectively, promotions were traded for silence. Investigations were obstructed. Dissent was punished. Accountability was buried.

19. As a direct and proximate result of these RICO violations by all the Defendants, Donlon suffered extensive financial harm. He lost his income, pension eligibility, and career

prospects, both in the law enforcement and intelligence communities, along with positions in the private and public sectors. His professional reputation—built over decades of federal and state law enforcement and intelligence service—was deliberately destroyed. The emotional toll of the retaliation against his entire family was and is incalculable. These were precisely the kinds of injuries RICO was designed to remedy, and this Complaint seeks redress for Donlon, whose unwavering aspiration from the beginning was to protect and serve the NYPD's Finest.

# TABLE OF CONTENTS

| **Heading** | **Page #** |
|---|---|
| Preliminary Statement | 1 |
| Table of Contents | 8 |
| Jurisdiction | 15 |
| Venue | 15 |
| Jury Demand | 15 |
| Parties | 15 |

1.  **BASIS FOR RACKETEER INFLUENCED AND
    CORRUPT ORGANIZATIONS ACT ("RICO")
    18 U.S.C. § 1961 et seq. CLAIMS** — 25
        A.  RACKETEERING SCHEME WITHIN THE NYPD
           AND CITY HALL — 25
        B.  OVERVIEW OF RICO (18 U.S.C. § 1962(c)) CLAIMS — 26
        C.  OVERVIEW OF RICO CONSPIRACY(18 U.S.C. § 1962(d)) — 31
        D.  CIVIL RICO PREDICATE CHART — 34

2.  **FACTUAL ALLEGATIONS PREDATING PLAINTIFF
    THOMAS G. DONLON'S EMPLOYMENT AS POLICE
    COMMISSIONER** — 35
    A.  A Systemic Criminal Enterprise Within City Hall and the NYPD — 35
    B.  A Culture of Impunity: The NYPD Fails to
    Punish the Many Disciplinary Issues of the Individual
    Defendants — 38
    C.  Defendant Maddrey's Admitted Dishonesty and the NYPD's
    Double Standard — 42
    D.  Proven Sexual Misconduct Results in Rewards for NYPD Bad Actors — 44
    E.  Defendant ADAMS Consolidates Power and Elevates Loyalists — 45
        a.  City Hall's Takeover of NYPD Leadership — 45
        b.  A Shadow Chain of Command: Banks and Pearson
           Control Promotions — 48
        c.  Defendant ADAMS Continues to Reward Bad

**Heading**                                                                        **Page #**

      Actors in the NYPD                                                51

F. The Critical Response Team (CRT): A Rogue Unit Created to

Project Power, Not Ensure Safety                                                     54

   a. Formation of CRT Outside of Lawful Oversight Channels          54

   b. Patterns of Unconstitutional Policing and Excessive Force       56

   c. Public Endorsement of Lawlessness by Defendant ADAMS            57

G. Retaliation, Suppression, and First Amendment Violations                       58

   a. Retaliation Against Whistleblowers Within the NYPD             58

   b. Weaponization of the Internal Affairs Bureau and Legal

    Processes                                                         60

H. City of New York's Liability Under Monell and Federal Civil Rights Law         61

   a. A Policy and Practice of Protecting Abusers and Punishing

    Reformers                                                         61

   b. Tim Pearson Exerts Unlawful Influence Over NYPD

    Operations and Promotions                                         63

   c. CRT's Unconstitutional Reign of Violence and Abuse

    Spreads Across New York City                                      65

I. Mismanagement, Retaliation, and Corruption Continue Unchecked—

Defendant ADAMS Takes No Action                                                      68

J. Plaintiff's Counsel Warns Defendants of First Amendment

Retaliation; City Responds With Further Indifference                                70

K. Captain Promoted Following Sexual Harassment and City

Payout, Then Arrested for Violent Felony                                             73

L. Defendant ADAMS Rewards and Further Emboldens the Defendants                   74

M. The Sexual Misconduct Within the Administration Becomes

Fully Known; Again No Disciplinary Action Is Taken                                   76

N. The Defendants Attempt to Distract the Public From Defendant

ADAMS's Escalating Legal Troubles                                                    79

O. Defendant ADAMS Allows Defendants CHELL, DAUGHTRY,

and SHEPPARD to Openly Defy the New York City Council and

| **Heading** | **Page #** |
|---|---|
| Violate Ethics Rules | 82 |
| P.  Defendant ADAMS Forces the Law Department to Break Policy to Indemnify Co-Conspirator Tim Pearson, Forcing the Resignation of the City's Highest-Ranking Attorney | 84 |
| Q.  As Repeated Lawsuits Continue to Be Filed, NYPD Defendants Are Rewarded by Defendant ADAMS | 86 |
| 3.  **FACTUAL ALLEGATIONS FOLLOWING PLAINTIFF THOMAS G. DONLON'S EMPLOYMENT AS INTERIM POLICE COMMISSIONER** | **90** |
| A.  The Scope of the Criminal Investigations and Potential Criminal Activity Surrounding Defendant ADAMS's Appointees Becomes Known | 90 |
| B.  Defendant ADAMS Uses Donlon's Credibility to Legitimize a Corrupt Administration, Then Targets Him When He Refuses to Stay Silent | 92 |
| C.  Donlon Is Named Interim Police Commissioner Based on His Concerns With the Position | 95 |
| D.  Donlon's Attempt to Discuss and Provide Guidance on NYPD Social Media Guidelines and Procedures | 100 |
| E.  Donlon Immediately Undermined by Defendant ADAMS | 104 |
| F.  Following a Police Officer Being Shot in the Line of Duty, Commissioner Donlon Discovers Widespread Incompetency in the Highest Ranks of the NYPD | 111 |
| G.  Defendant SHEPPARD Interferes With the Police Commissioner's Security Detail | 115 |
| H.  The Culture of Corruption: How Donlon Was Sabotaged by a Corrupt Command Staff Enabled by Defendant ADAMS | 120 |
| I.  Donlon Gains Knowledge of the Defendant's First RICO Predicate Felony and Tells Defendant ADAMS, Who Does Nothing | 122 |
| J.  Defendant ADAMS Is Indicted on Corruption Charges | 125 |

|  **Heading** | **Page #** |
|---|---|

K.  The NYPD Roosevelt Avenue Task Force Is Created as a
Result of a Dream of Defendant DAUGHTRY ............ 126

 L.   Defendant DAUGHTRY's Arrogance and the Politicization of the
NYPD Drone Program ............ 130

M. Contrary to Their Stated Goals of Reducing Crime Along the Roosevelt
Avenue Corridor, the Defendants Refused Federal Assistance
Through Dereliction of Duty ............ 133

N.  The Incompetence of People Running Operation Restore Roosevelt
Results in Failure ............ 138

O.  Defendant ADAMS Further Solidifies Donlon's Lack of
Authority as the Defendants Maneuver for Control ............ 139

P.  Actual Police Work and Public Safety Are a Secondary Concern
for the Defendants ............ 141

Q.  Defendant SHEPPARD Undercuts and Embarrasses Donlon ............ 142

R.  The Promotion Process Is Hijacked by Corruption and Collusion,
Resulting in Several RICO Predicate Acts ............ 144

S.  Forgery, Fraud, and the Theft of Command Authority ............ 146

T.  Retaliation and Conspiracy to Silence a Whistleblower ............ 147

U.  Defendant ADAMS Refuses to Act, Further Undermines Donlon ............ 147

V.  A Toxic Environment Engineered by Defendant ADAMS ............ 148

W. NYPD Leadership Acts to Shield Compromised Personnel and
Obstruct Federal Corruption ............ 150

    a.   Defendant GERBER's Pattern of Deception, Retaliation,
and Hostility Toward Collaboration With Federal Agencies ............ 150

    b.   Defendant MADDREY Uses Strategically Placed Spies,
Like Defendant GERBER, in the NYPD Legal Bureau to
Prevent Donlon From Doing His Job as Police Commissioner ............ 153

    c.   Sergeant Venus Overrules the Police Commissioner Over His
Holiday Party ............ 155

**Heading**                                                                                    **Page #**

    d.  Defendant MADDREY Alters Donlon's Schedule Without
        Permission                                                                      159

    e.  IT Technician in Donlon's Office Exposes Venus and
        Defendant MADDREY                                                                160

    f.  Former Chief of Staff, Raul Pintos, Also Uses Venus to
        Gather Information on Donlon                                                     161

    g.  Exposing Defendants MADDREY and SARACENO                                         162

X.  Internal Espionage and Institutional Sabotage                                          163

    a.  Defendant SHEPPARD Spreads False Narrative to NYPD
        Police Foundation to Undermine Donlon                                            163

    b.  Donlon's Conversation With and Warnings From Chief Pintos                        164

    c.  WPIX Interview Organized by Defendant SHEPPARD                                   164

    d.  Defendant SHEPPARD's Devious Insubordination of Donlon                           167

Y.  Donlon Complains Directly to Defendant ADAMS, Who Takes
  No Action                                                                              168

Z.  Donlon Discovers Glaring Problems in the NYPD Evidence
  Warehouses: A Crisis of Neglect and Failed Leadership                                  169

AA.    Madison Square Rally, NYC, for Presidential Candidate
       President Donald J. Trump                                                       174

BB.    Defendant SHEPPARD Publicly Makes Terroristic
       Threats (Another Felony) Toward Donlon, Which Are Covered Up
       by the Defendants                                                               178

CC.    Donlon Complains to Defendant ADAMS About
       Defendant SHEPPARD's Crime—but No Action Is Taken                               181

DD.    Defendants KINSELLA and MADDREY Scold
       Donlon for Reporting Crimes                                                     182

EE.    Donlon Has His Transfers Rescinded, Suffering Further
       Retaliation                                                                     184

FF.    President Trump Wins the 2024 Presidential Election                               187

GG.    Overtime Scandal in the Office of Defendant MADDREY                               187

**Heading**                                                           **Page #**

HH.    Defendant MADDREY Unlawfully Manipulates the NYPD
       Promotional List, Usurping the Authority of the Police
       Commissioner                                                   188

II.    The Betrayal of the Badge: Corruption at the Top of the NYPD   191

JJ.    Donlon Is Terminated as Police Commissioner, Replaced
       by Tisch                                                       198

KK.    Donlon Is Relegated to City Hall, Where He
       Works in Public Safety, a Demotion                             200

LL.    Donlon's Security Is Further Punished                          201

MM.    Donlon Repeatedly Attempts to Contact
       Commissioner Tisch but Is Ignored                              203

NN.    Additional RICO-Predicate Criminal Acts Uncovered by
       Defendants                                                     206

OO.    Defendant ADAMS Asks Defendant MADDREY to
       Submit His Retirement Papers, and He Refuses                   210

PP.    DOI Determines Community Response Team Had No
       Oversight                                                      211

QQ.    Donlon's Wife, Deirdre O'Connor-Donlon, Is Falsely Arrested    212

RR.    Defendant MADDREY's Sexual Abuse and Overtime
       Violations Exposed                                             223

SS.    Department of Investigation Finds Social Media Abuse
       Similar to Donlon's Prior Determinations                       225

TT.    After the Incident, the NYPD Destroys Evidence of the Summons
       Issued to Mrs. O'Connor-Donlon and Retaliates Against Donlon   227

UU.    Donlon Is Placed in an Administrative Position and
       Set Up to Fail                                                 228

VV.    Final Retaliation Against Donlon—Termination of Employment From
       Defendant CITY                                                 229

| **Heading** | **Page #** |
| --- | --- |

## Causes of Action

| | |
| --- | --- |
| Count I – Civil RICO (18 U.S.C. § 1962(c)) | 233 |
| Count II – RICO Conspiracy (18 U.S.C. § 1962(d)) | 235 |
| Count III – First Amendment Retaliation (42 U.S.C. § 1983) | 235 |
| Count IV – Municipal Liability Under Monell (42 U.S.C. § 1983) | 236 |
| Count V – Substantive Due Process Claim (42 U.S.C. § 1983) | 238 |
| Count VI –Violations of Right to Freedom of Intimate Association (42 U.S.C. § 1983) | 239 |
| Count VII – Whistleblower Retaliation Under Civil Service Law § 75-b | 240 |
| Prayer for Relief | 242 |

## JURISDICTION

20. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First and Fourteenth Amendments to the United States Constitution.

21. This Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

22. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343.

## VENUE

23. Venue is properly assigned, U.S. District Court for the Southern District of New York under 28 U.S.C. §1391(b), in that this is the district in which the claim arose.

## JURY DEMAND

24. Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

25. Plaintiff Thomas G. Donlon is a resident of New York City, New York.

26. Donlon began his distinguished public service career in October 1981 when he was appointed as a Special Agent with the FBI.

27. During his tenure with the FBI, Donlon held a high-level National Security role at FBI Headquarters, located in Washington, D.C. (Senior Executive Service), last serving as Section Chief, National Threat Center Section ("NTSC"), Washington, D.C. (Senior Executive Service), top 1 percent; and prior to this executive position, Assistant Special Agent in Charge, Counter-Terrorism Division ("CTD"), Joint Terrorism Task Force ("JTTF") New York Office ("NYO"); Coordinating Supervisory Special Agent ("CSSA")

NYO, CTD; and SSA, CTD, NYO International and Domestic Terrorism, Supervisory Special Agent ("SSA"), CTD, NYO.

28. SSA, assigned to the Violent Crimes Section, Safe Streets Unit, FBIHQ, Washington, D.C. In this role, Donlon was responsible for the Northeast section of the nation, specifically New York City, which was and remains a critical intelligence hub for evaluating and responding to domestic and international violent crimes.

29. While assigned to the JTTF, NYO, Donlon closely worked with all the JTTF agencies, primarily in conjunction with the NYPD, coordinating and investigating some of the most critical and high-profile terrorism cases in the USA and abroad. Donlon interacted with approximately forty-three federal, state, and city law enforcement and intelligence agencies assigned to the JTTF, NYO.

30. Donlon served as a co-case Special Agent on the Manila Air case before transferring to FBIHQ, a widely known and publicized case of the NYO, JTTF, alongside Special Agent Francis J. Pellegrino. This case revolved around "Project Bojinka," a plot masterminded by Ramzi Yousef (also the mastermind of the first attack on the World Trade Center in February 1993) and his co-conspirator, Abdul Hakim Murad, intending to simultaneously bomb 11 U.S. airliners while en route over the Pacific Ocean.

31. Donlon and Pellegrino, along with the SDNY prosecutors, successfully secured and extradited Murad from the Philippines. While en route to the USA, Pellegrino and Donlon obtained a confession in which Murad implicated himself and Yousef. Moreover, Murad provided specific details of Project Bojinka. At the time of Murad's extradition, Yousef fled to Pakistan, where he was captured months later. Both were ultimately convicted for their roles in the Project Bojinka plot.

32. Donlon, while assigned as Section Chief, NTCS, played a foundational role in developing the FBI's Guardian Software Database, now known simply as "E-Guardian," the FBI's first centralized counterterrorism database, still used today by U.S. federal, state, and local law and intelligence agencies nationwide. Donlon's NTCS-initiated CT Watch Unit also initiated and managed the FBI's Terrorism Watch List ("TWL"), one of the most sensitive and consequential responsibilities in federal law enforcement. Donlon, with the NTCS personnel, created the Guardian system after discovering, in the aftermath of the 9/11 attacks, that there was no unified database that captured all domestic and international threats. The system was designed to enable the FBI, JTTF, and other federal, state, local law enforcement, and intelligence agencies nationwide to input and access threat information relevant to their jurisdictions. This is an example of the nationwide FBI (JTTF) sharing information with all members/agencies and other federal, state, and local agencies, not assigned to the JTTF. The database has remained in operation and continues to be a critical tool in the successful apprehension of terrorists, contributing to hundreds of arrests and terrorism investigations.

33. Donlon served as the co-case Special Agent in the aftermath of the February 1993 World Trade Center bombing, the first time a terrorist attack was perpetrated by radicalized Islamic terrorists on U.S. soil. The investigation resulted in five federal convictions and reshaped the nation's approach to International Terrorism.

34. After retiring from the FBI in 2005, Donlon served as Global Security Director for two major financial institutions, applying his expertise to protect critical infrastructure from emerging threats.

35. In 2009, Donlon was appointed by then-New York State ("NYS") Governor David Paterson to serve as Director of the NYS, Office of Homeland Security. In that role, Donlon oversaw statewide emergency preparedness and counterterrorism initiatives, distributing funding to police departments, fire departments, first responders, emergency medical units, Offices of Emergency Management, and other public safety agencies to improve response efforts for both natural and human-made disasters. These funds by NYS Homeland Security were distributed pursuant to the submission and review of applications filed by the above state entities, who were in desperate need of funding to protect and serve their respective communities.

36. Furthermore, Donlon was responsible for disseminating millions of dollars in NYS funding, including critical funding for the initial establishment of the Lower Manhattan Security Initiative ("LMSI"). After Donlon was named as the NYPD's interim Police Commissioner, then-Sanitation Commissioner Tisch, who previously worked in the NYPD Information and Technology Bureau, attended a joint NYPD/Sanitation Department press conference with Donlon regarding the "ghost-plate[2] investigation." Before the press conference, a grateful Tisch stated to DONLON: "Without your NYS funding we ("NYPD") would have been unable to establish the LMSI." Donlon thanked Tisch and was very appreciative of her kind words. Donlon expressed gratitude for his long career working with the NYPD and JTTF and his utmost respect and honor working with past and present JTTF members. ADAMS is well aware of this NYS funding provided to the NYPD, as ADAMS was an NYS Senator (Brooklyn) and then Chairman of Homeland Security representing NYS Senators, at the time of the financial distribution to the NYPD.

---

[2] Ghost plates are the phony paper license plates affixed to motor vehicles.

37. Donlon exercised broad discretion over the allocation of these funds, including directing monies not only to the NYPD but also to the FDNY, EMTs, NYCOEM, First Responders, etc. to bolster their terrorism concerns, first responder equipment, and public safety capabilities, along with the overall distributions of NYS funds to the other NYS-wide agencies, as described above.

38. Shortly before the press conference, Donlon would be appointed and employed by the NYPD and the Defendant CITY of New York as interim Police Commissioner from September 13, 2024, through November 24, 2024. After his removal as interim Police Commissioner, Donlon was assigned to the role of Senior Advisor, Office of Public Safety, under Defendant ADAMS.

39. On April 25, 2025, Donlon was notified by a Human Resources ("HR") employee, assigned to the Mayor's Office, that Donlon's last day as Senior Advisor would be May 9, 2025. When Donlon inquired as to the reason for said termination, Donlon was advised by the HR individual that his Senior Advisor position was "being eliminated." Donlon inquired as to the reason, and no explanation was provided to him. Donlon asked for documentation and was told by the above HR person that none would be provided to him. Donlon was told that ADAMS's office, as mentioned before, had eliminated his position as the Senior Advisor. This position involved working closely and coordinating with the Public Safety Agencies (NYPD, FDNY, NYCOEM, MOCJ, CORRECTIONS, and PROBATION). The duties and responsibilities encompassed assisting the agencies with their direct submission of applications seeking available funding from the U.S. federal and NYS Grant programs. Donlon and James Gunn had produced a first-ever booklet outlining the entire application process, along with the numerous links and names of the available

funding for the above-mentioned public agencies. It should be noted that the submission of the agencies' applications would be individually submitted by Donlon and Gunn, along with their own research. As set forth throughout this Complaint, Donlon's abrupt and unexplained termination was not a legitimate personnel decision—it was a clear act of retaliation.

40. Donlon's service as interim Police Commissioner was carried out amid a daily and constant onslaught of personal attacks and professional sabotage committed by the indignation, inexperience, and insubordination of the NYPD top executives who were making critical decisions that defied logic, common decency, and professionalism. Moreover, the shocking display of immorality and indecency by the collective Defendants ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, SARACENO, and MARINO was an affront to the core moral and professional values always demonstrated by Commissioner Donlon.

41. The collective conduct of the Defendants was nothing short of deliberate acts of resistance and corruption. Donlon did not remain to serve these corrupt and power-hungry individuals, but rather to support the dedicated men and women of the NYPD who were being systematically neglected by their superiors' incompetence, hypocrisy, corruption, self-interest, and abusive exercise of authority. Donlon stayed not out of self-interest, but out of duty to expose and combat the rampant corruption and destructive leadership that threatened to dismantle the greatest police force in the world. Donlon was driven by a moral imperative to protect those who truly uphold the oath to serve, not to be served.

42. Donlon's commitment to the NYPD was rooted in something far deeper than professional obligation. As a boy, Donlon walked the halls of many precincts with his father, who

worked for the NYPD as a carpenter, assigned to the Building and Repair Bureau. Donlon's father would usher him into station houses and say, "I want you to meet good people." These early encounters with police officers, detectives, supervisors, and all NYPD personnel helped shape Donlon as he witnessed the officers quietly radiating purpose. Donlon saw not just uniforms, but humanity. That legacy became his compass, and decades later, it was this same clarity of purpose that anchored him in office amid "chaos," a word Defendant ADAMS frequently used to describe Donlon's interaction with Defendants. Donlon stayed not for power or self-aggrandizement, but to honor the institution his father revered, to stand with the good people who still believed in the badge, and to resist those who sought to destroy it from within. The main objective of Donlon was to serve all the NYPD Members of Service (MOS), not those in executive positions who abused their authority and public trust with the support and protection of Defendant ADAMS.

43. Defendant CITY OF NEW YORK ("CITY") is a municipal corporation organized under the laws of the State of New York. The CITY maintains and oversees the NYPD, a duly authorized law enforcement agency, as well as the Department of Citywide Administrative Services (DCAS), which includes employment structures related to the Office of Public Safety.

44. Defendant ERIC ADAMS was, at all relevant times, the Mayor of the City of New York. ADAMS possessed final policymaking and operational authority with respect to all New York City government agencies to include, in particular, the NYPD and Defendant CITY.

45. Defendant TANIA KINSELLA was, at all relevant times, the NYPD's First Deputy Commissioner.

46. Defendant JEFFREY MADDREY was, at all relevant times, the NYPD's Chief of Department.

47. Defendant JOHN CHELL was, at all relevant times, the NYPD's Chief of Patrol. He was later promoted to Chief of Department following Donlon's departure as Police Commissioner.

48. Defendant KAZ DAUGHTRY was, at all relevant times, either the NYPD's Deputy Commissioner of Operations or then was promoted by Defendant ADAMS to the Deputy Mayor of Public Safety after Donlon departed as Police Commissioner.

49. Defendant TARIK SHEPPARD was, at all relevant times, the NYPD's Deputy Commissioner of Public Information, an Assistant Chief, and temporary Chief of Staff to the Police Commissioner. Defendant SHEPPARD fraudulently promoted himself to the latter title by unlawfully using Donlon's official Police Commissioner rubber stamp signature and sending the memo to the NYPD Chief of Personnel.

50. Upon information and belief, Defendant MARINO provided said rubber stamp signature to Defendant SHEPPARD. Per NYPD rules and protocol, only the person serving as the Deputy Chief (Defendant MARINO) in the Office of the Police Commissioner has sole control (as also advised by Defendant MARINO to Donlon), possession, and authority to utilize said rubber stamp signature with, of course, consultation with the Police Commissioner.

51. Defendant MICHAEL GERBER was, at all relevant times, the NYPD's Deputy Commissioner of Legal Matters.

52. Defendant PAUL SARACENO was, at all relevant times, an Inspector or Deputy Chief in the NYPD. The latter title was conferred upon Defendant SARACENO by Defendant

MADDREY immediately after Donlon's departure from the NYPD. Furthermore, and for clarity, Defendant SARACENO had already been forced to retire in 2022, for an egregious disciplinary matter, by NYPD Executives, Internal Affairs Bureau ("IAB"). After over one year in retirement, as advised by Defendant SARACENO, Defendant MADDREY offered Defendant SARACENO an opportunity to return to the NYPD as an Inspector, his final level upon retirement, to serve under Defendant MADDREY as his Chief of Staff.

53. Defendant MADDREY's administrative decision to reinstate Defendant SARACENO to his last position after his forced retirement and disciplinary record was unprecedented, as advised by NYPD Executives. Additionally, Defendant MADDREY violated all NYPD policies, protocols, procedures, and Code of Conduct and likely federal and state law in fraudulently promoting Defendant SARACENO to Deputy Chief under new Police Commissioner Tisch.

54. Curiously, Defendant MADDREY emphatically advised Donlon in front of MOS, specifically Defendants KINSELLA and MARINO, that while reviewing and selecting MOS for promotions, he (Defendant MADDREY) always "takes these promotions very seriously." Defendant MADDREY advised Donlon that he conducts a proper and thorough review of the past and recent performances of his proposed promoted before rendering a final decision. It should be noted that from a prior review of Defendant MADDREY's promotions by Donlon, it was quite obvious that Defendant MADDREY did not promote MOS based on performance.

55.  Defendant ANTHONY MARINO was, at all relevant times, a Deputy Chief in the NYPD, assigned to the Police Commissioner's office. After Donlon's departure, MARINO was assigned to the NYPD Detective Bureau.

56. At all relevant times, the above Defendants, either personally or through the people who reported to them, acted under color of state law and in accordance with the policies, customs, and practices of the City of New York and the State of New York.

57. All acts alleged herein, including the many illegal acts, were undertaken by the Defendants and were performed while employed and with the direct knowledge of the City of New York.

1. **BASIS FOR RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1961 et seq. CLAIMS**

A. **RACKETEERING SCHEME WITHIN THE NYPD AND CITY HALL**

58. Donlon witnessed firsthand a racketeering enterprise operating within the NYPD and City Hall. This criminal enterprise was orchestrated by high-ranking officials including Defendants CITY, ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO, each of whom occupied senior command positions within the NYPD. These individuals acted in concert and under the protection and direction of Defendant ADAMS, using their official positions to engage in a pattern of fraud, retaliation, obstruction, and abuse of power in furtherance of their criminal enterprise.

59. This enterprise was not haphazard. It was deliberate, hierarchical, and ongoing. Its core function was to shield loyalists and silence internal critics through a calculated regime of favoritism, retaliation, and concealment. Promotions and assignments were manipulated to reward obedience rather than merit. Misconduct was buried rather than addressed. Time and again, Donlon raised alarms about rampant corruption, fraudulent promotions, "stolen valor" (in particular, by Defendant SHEPPARD), false public messaging, and internal retaliation. Rather than investigate, the enterprise moved against him with surgical precision: stripping his authority, systematically excluding him from core decision-making processes, continually and consistently lying to Donlon, and ultimately eliminating his Police Commissioner position. Donlon's integrity was viewed as a threat—and the enterprise responded accordingly.

60. The predicate acts of racketeering included wire fraud, mail fraud, obstruction of justice, whistleblower retaliation, and honest services fraud—all carried out under the guise of

legitimate governance. These acts were not isolated but were committed as part of a coordinated scheme to defraud the public, suppress the truth, and punish those—like Donlon (and later Donlon's wife, Mrs. Donlon-O'Connor)—after Donlon refused to acquiesce to the corruption. Public resources, government infrastructure, and electronic communications were weaponized to serve the enterprise's unlawful goals.

61. The enterprise engaged in a closed-ended pattern of racketeering over a substantial period, with the same actors participating in multiple, related acts of misconduct. It also presents an open-ended threat to public integrity, as these same tactics continue to be deployed against internal critics. Donlon's career was not simply derailed—it was deliberately destroyed. His position was unjustly eliminated, as stated by HR. His reputation was systematically tarnished, and his decades-long career in law enforcement, intelligence communities, and the private and public sectors was extinguished in retaliation for one simple act: refusing to participate in fraud. That destruction constitutes injury to business and property under RICO.

**B.  OVERVIEW OF RICO (18 U.S.C. § 1962(c)) CLAIMS**

62. Defendants CITY, ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO, acting in concert and under Defendant ADAMS's protection, formed an association-in-fact enterprise with the purpose of consolidating power, retaliating against whistleblowers, concealing misconduct within the NYPD, and distributing public appointments, promotions, and authority as political rewards.

63. The enterprise operated within the City of New York and engaged in interstate commerce through the use of electronic communications, federal funds (fraudulently used to pay

unmerited overtime), wire transfers, and the misuse of public infrastructure. It was continuous, coordinated, and driven by the shared objective: to preserve influence, punish dissent, and shield members from scrutiny and accountability.

64. This enterprise failed to merely preserve political power—it became a vehicle for personal enrichment. Senior officials in both the NYPD and the Mayor's office (which encompasses Public Safety, where Banks and Pearson were assigned) used their control over public appointments, discretionary promotions, permanent promotions, and law enforcement contracts to reward allies, secure loyalty, and extract financial gain for themselves and their friends and associates. Promotions that should have been earned through merit and civil service testing were instead knowingly criminally provided as political favors, resulting in unearned raises, inflated pensions, and enhanced access to overtime and benefits with absolutely no NYPD oversight. The value of these illicit promotions ran into the millions of dollars. Bluntly, public funds were misappropriated for private benefit.

65. Regrettably, the officers whose names and ranks Donlon approved and forwarded, on three separate promotion lists, were systematically removed—without his knowledge or consent—by Defendants MADDREY, SHEPPARD, MARINO, and most disturbingly, with the approval of Defendant ADAMS. The men and women whom Donlon recognized and approved for promotion had earned their promotions through tireless dedication: protecting the public, saving lives, solving complex cases, making critical arrests, and preventing future crimes. Yet their hard-won recognition was callously discarded by Defendant ADAMS and the NYPD Defendants.

66. The Members of Service (MOS) whose names were approved and forwarded by Donlon for promotion—based on their consistent dedication, lifesaving actions, successful arrests,

and crime prevention efforts—were deliberately discarded and excluded by Defendant ADAMS and the Individual Defendants. Despite being fully aware of the misconduct and injustice committed against these officers, neither Defendant ADAMS nor Police Commissioner Tisch has taken any steps to remedy this gross abuse of power. These deliberate and deceitful acts not only harmed the MOS professionally, but also caused significant financial and emotional harm to them and their families. The officers lost salary increases, enhanced pension benefits, and future advancement opportunities within the NYPD. When Donlon later spoke with several of the impacted officers, he learned that beyond the financial damage, the emotional toll was profound. These officers—who once took great pride in their service and believed in the integrity of the department—felt betrayed, demoralized, and diminished as they watched their rightful promotions stolen and handed to politically connected individuals who had not earned the recognition.

67. What compounds this injustice is that Defendant ADAMS, the collective NYPD Defendants, and current Police Commissioner Tisch's administration are fully aware of this injustice, yet have done nothing to correct it. Upon information and belief, Defendant ADAMS confessed privately to unidentified colleagues that he recognized the wrongdoing and intended to "make good" on these promotions. No action by Defendant ADAMS has occurred, nor most likely will it ever. Donlon himself informed Defendant ADAMS via email and in person that his, Donlon's, proposed promotions had been dismissed specifically by Defendants MADDREY and SHEPPARD. The officers recognized by Donlon have had their careers stunted without explanation or recourse.

68. The consequences of this fraud committed by Defendant ADAMS and the collective NYPD Defendants extend far beyond wounded pride and loss of self-esteem. These

officers and their families face real financial losses. Their higher salaries, enhanced pensions, and future promotional opportunities were all tragically lost because of deliberate concealment, dishonesty, and fraud committed by the Defendants. Yet, the deepest wound is emotional: these "forgotten" officers took immense pride in their work, investing countless hours in investigations, community initiatives, and public safety. To have that dedication first acknowledged by Donlon and unmentioned honorable NYPD Executives, and then so abruptly stripped away—is a betrayal that hurts and torments them daily.

69. Despite repeated public assurances from Defendant ADAMS, current Police Commissioner Tisch, and other senior NYPD leaders that they stand firmly against injustice and champion the NYPD's finest, their inaction on this issue speaks louder than any pledge. If they truly cared for the men and women who serve this city, they would immediately restore the promotions these officers earned. Leadership demands more than rhetoric; it requires courage to right a profound wrong. The time has come for our city's leaders to deliver on their promises, correct this grave injustice, and honor the commitment of those who have faithfully protected New York's five boroughs.

70. Upon information and belief, the enterprise further exploited confidential City data, U.S. federal and New York State grant funding, and municipal procurement processes to steer contracts and public resources to individuals and entities aligned with Defendant ADAMS's inner circle. Public reports and investigative findings have revealed that close allies of the Mayor—including Tim Pearson and Phillip Banks—have come under federal scrutiny for schemes involving contract fraud, kickbacks, and protection payments. These were not isolated incidents; they were components of a broader, systemic pattern of corruption coordinated from within City Hall.

71. Upon information and belief, the enterprise also manipulated federally funded overtime systems by deliberately entering false or misleading grant codes to divert U.S. Department of Homeland Security and Department of Justice funds to officers favored by the Mayor's political allies. This fraudulent coding scheme allowed Defendants to siphon federal grant money in real time—rewarding loyalty with illicit overtime and distorting official deployment records. Rather than allocate federal resources based on operational need or lawful criteria, the enterprise used the NYPD's internal timekeeping and grant reimbursement systems as a vehicle for political patronage and personal enrichment. This abuse of federal funding mechanisms represents not only theft of public funds, but a deliberate subversion of the safeguards intended to prevent precisely this kind of corruption.

72. This deliberate misuse of municipal power, public funding, and law enforcement authority for personal enrichment and political favoritism constitutes racketeering activity within the meaning of RICO. The conduct described herein reflects an ongoing criminal enterprise operating under color of law, with City Hall and NYPD infrastructure weaponized to advance the financial interests and political agendas of Defendant ADAMS and his associates.

73. While the full scope of Banks's and Pearson's criminal activity is not yet known, Donlon personally witnessed multiple RICO predicate acts committed by the named Defendants during his tenure at the NYPD.

74. The Defendants' Racketeering Acts Include but are not limited to:

- **Wire and Mail Fraud (18 U.S.C. §§ 1341, 1343):**
  Dissemination of materially false information about public safety appointments, promotional qualifications, internal investigations, and official communications—all designed to deceive the public and consolidate power.

- **Retaliation Against a Witness or Informant (18 U.S.C. § 1513):**
  Systematic dismantling of Donlon's authority, exclusion from operational decision-making, and elimination of his position—all in direct retaliation for his whistleblowing.

- **Obstruction of Justice (18 U.S.C. § 1503):**
  Concealment or destruction of incriminating evidence, intimidation of potential witnesses, and fabrication of pretexts to justify adverse employment actions against Donlon and others.

- **Bribery and Honest Services Fraud (18 U.S.C. §§ 201, 1346):**
  Granting of unearned promotions, favored assignments, and other benefits to individuals who supported or ignored the enterprise's illegal conduct—trading public trust for silence and loyalty.

75. The full extent of contract bid rigging and illegal contracting by the Defendants is yet to be uncovered, but upon information and belief, further violations of federal law are ongoing and will be added as they are discovered by the FBI.

76. These actions were not random, nor were they aberrational. They constitute a sustained and systemic pattern of criminal conduct that continues to threaten public safety and institutional integrity. The enterprise still operates—silencing dissenters, manipulating public trust, and obstructing justice with impunity.

77. As a direct and proximate result of the Defendants' racketeering, Donlon suffered severe harm: he lost his income, career trajectory, and pension eligibility. His professional reputation—built over decades—was irreparably harmed. These injuries represent a concrete loss of business and property under 18 U.S.C. § 1964(c), entitling Donlon to treble damages, attorney's fees, and all other relief available under law.

C. **OVERVIEW OF RICO CONSPIRACY (18 U.S.C. § 1962(d))**

78. Defendants CITY, ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO, along with others known and unknown, knowingly and willfully conspired to violate 18 U.S.C. § 1962(c) by agreeing to

conduct and participate, directly and indirectly, in the affairs of an enterprise through a pattern of racketeering activity.

79. Each Defendant knowingly aligned with the enterprise's central purpose: to consolidate political power, shield misconduct, suppress dissent, criminally misuse U.S. federal funds, and exploit public authority for private and political gain. This was not a passive association. Each Defendant took active steps to further the conspiracy, including:

- disseminating fraudulent communications,
- executing retaliatory employment decisions,
- fraudulently promoting NYPD officers through forgery,
- obstructing internal investigations, and
- weaponizing promotions and assignments as tools of control and intimidation.

80. The Defendants entered into this agreement with full knowledge that the enterprise would rely on criminal means to achieve its objectives, including wire and mail fraud, obstruction of justice, whistleblower retaliation, and honest services fraud. These actions were not anomalies. They were foreseeable, orchestrated, and essential to the conspiracy itself.

81. Donlon was selected by Defendant ADAMS due to his stellar and accomplished reputation in law enforcement and intelligence communities in both the public and private sectors. Donlon became a primary target of the collective NYPD Defendants because he refused to comply with their criminal conduct. His efforts to expose institutional fraud, abuses of authority, and systemic corruption directly threatened the enterprise's continued operation. In response, the Defendants, individually and collectively:

- stripped him of all responsibility,
- prevented him from making direct decisions within the NYPD,
- were insubordinate by ignoring his orders, and
- ultimately eliminated his position entirely.

82. These retaliatory acts were not incidental. They were coordinated and deliberate, fully consistent with the conspiracy's aim to protect itself at all costs.

83. As a direct and proximate result of the Defendants' conspiracy, Donlon suffered significant injury to his business and property. These injuries include, but are not limited to:

- the loss of salary and pension benefits,

- the destruction of future earning capacity, and

- irreparable harm to his professional reputation.

84. These damages fall squarely within the scope of civil RICO liability and entitle Donlon to treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

85. The full extent of damages incurred by Donlon is to be determined at trial.

**D.  CIVIL RICO PREDICATE ACTS CHART**

| Date/Timeframe | Defendants Involved | Predicate Act | Description |
|---|---|---|---|
| Sept 2023 – May 2025 | Adams, Daughtry, Sheppard, Maddrey, Kinsella, Chell, Saraceno, Gerber, Marino | Wire Fraud (18 U.S.C. § 1343) | Dissemination of materially false information via electronic communications regarding promotions, qualifications, and the Internal Affairs Bureau, intended to deceive the public and consolidate power. |
| Sept 2023 – Nov 2024 | Adams, Daughtry, Sheppard, Maddrey, Kinsella, Chell, Marino | Mail Fraud (18 U.S.C. § 1341) | Use of official NYPD and City infrastructure, including interoffice and external mail, to circulate knowingly false and misleading documentation related to investigations, promotions, and personnel decisions |
| Nov 2024 – May 2025 | Adams, Sheppard, Saraceno | Retaliation Against a Witness (18 U.S.C. § 1513) | Systematic dismantling of Donlon's role and responsibilities, followed by termination, in direct retaliation for his whistleblowing about corruption, credential fraud, and misconduct at the highest levels of the NYPD. |
| Sept 2024 – May 2025 | Adams, Sheppard, Maddrey, Daughtry | Obstruction of Justice (18 U.S.C. § 1503) | Suppression of internal misconduct reports, failure to refer cases for discipline, and direction of witnesses to withhold cooperation with ongoing investigations |
| 2023 – 2025 | Adams, Banks, Pearson, Maddrey, Sheppard, Marino | Honest Services Fraud (18 U.S.C. § 1346) | Promotions and discretionary appointments awarded based on loyalty and political favors rather than merit, resulting in denial of honest services to the public and financial enrichment of favored insiders. |

2.  **FACTUAL ALLEGATIONS PREDATING PLAINTIFF THOMAS G. DONLON'S EMPLOYMENT AS POLICE COMMISSIONER**

A.  **A SYSTEMIC CRIMINAL ENTERPRISE WITHIN CITY HALL AND THE NYPD**
    **(FACTS FOR MONELL CLAIM)**

86. A municipality may be held liable under 42 U.S.C. § 1983 where constitutional violations stem not from isolated misconduct, but from official policies, widespread customs, or deeply rooted practices. This doctrine, established by *Monell v. Department of Social Services*, 436 U.S. 658 (1978), imposes liability when systemic abuses are perpetrated or tolerated by policymakers with final authority. The facts set forth below establish such liability against the City of New York.

87. While the challenges within the NYPD long predate Defendant ADAMS, his administration allowed systemic dysfunction to metastasize into something far more dangerous: weaponized criminality. Rather than working to reform or stabilize the Department, Defendant ADAMS empowered individuals with known histories of abuse and misconduct, while dismantling the careers and credibility of those who spoke out. Under his leadership, the machinery of public safety was not used to serve the people of New York City—it was repurposed to protect political allies and punish internal dissent. Whistleblowers were marginalized, retaliated against, and in many cases, forced out of the Department altogether.

88. This failure of leadership does not reflect the values or commitment of the thousands of NYPD officers who serve with integrity. It is a reflection of the corrosive influence of City Hall under Defendant ADAMS, which allowed a proud institution to be bent for personal and political gain.

89. This was not a string of isolated incidents. What follows is a deliberate and sustained pattern of unlawful conduct, some of it plainly criminal, all of it unconstitutional or ethically indefensible. Together, these actions reflect a blueprint for institutional decay that was not only tolerated, but actively orchestrated by the failed leadership within the NYPD and the Administration at City Hall.

90. The City of New York (Defendant CITY), under Defendant ADAMS, did not merely fail to prevent misconduct—it encouraged, rewarded, and institutionalized it, despite the harm inflicted on individual officers, the public trust, and the integrity of Defendant City.

91. Under Defendant ADAMS, high-ranking NYPD officials with well-documented histories of violence, dishonesty, sexual misconduct, and civil rights violations were not investigated or disciplined. They engaged in retaliation, cover-ups, and political intimidation and were rewarded with power, protection, and promotion. These individuals never faced accountability for their actions, and no disciplinary actions were taken against them. If any of the rank-and-file officers acted in this manner, they would face disciplinary action resulting in transfers, termination, and perhaps, in all likelihood, criminal charges. Those who upheld the law, including Donlon, were isolated, stripped of authority, and driven out. Defendant ADAMS's meddling often resulted in Donlon being improperly excluded from promotional, operational, administrative, and investigative decisions.

92. These are not managerial lapses. They are the predictable result of a municipal policy that prizes loyalty over legality and silences truth tellers rather than confronting misconduct. The examples that follow, including public lawsuits, audit findings, and detailed patterns of abuse, demonstrate a widespread, deliberate practice of constitutional violations. The Defendant CITY, under Defendant ADAMS, is not merely negligent, it is complicit.

93. Donlon accepted the role of interim Police Commissioner with full knowledge of the sordid records of many top officials, which included Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, and SHEPPARD. Donlon accepted the position not out of naivety, political alignment or personal gain, but out of loyalty to the rank-and-file officers who, in spite of failed leadership, risked their lives each day to protect the public. The mission of Donlon was clear: restore administrative and operational integrity, improve interagency collaboration, and raise morale within a department bereft of competent, fair, and lawfully acting leadership.

94. Donlon, with his documented and significant experience working with U.S. Federal, State, and local law enforcement and intelligence agencies nationwide, entered the administration of Defendant ADAMS with a mandate to ensure the NYPD operated at its highest level. What he found instead was a deeply entrenched criminal enterprise, engineered by Defendant ADAMS and his political operatives, that used public office to extract loyalty, reward silence, and retaliate against internal dissent. Donlon, after having identified significant egregious, unprofessional, and, in his view, criminal conduct by the named NYPD Defendants, believed it was in the best interest of the NYPD and the public to remove these individuals from their positions, specifically, Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, and SHEPPARD. Defendant ADAMS continued, even after Donlon advised Defendant ADAMS of the crimes he witnessed, to allow them (NYPD Defendants) each a direct line to his (ADAMS's) office. Donlon repeatedly was given strict instructions by Defendant ADAMS: "I want you to work with them." By the time Donlon fully understood the scale of the corruption surrounding him, he had already been marked for removal. Donlon felt compelled to remain with the NYPD, even after the

individual Defendants' true unlawful motives and the criminal enterprise were exposed, in order to try to protect the rank-and-file NYPD officers who fell under the NYPD Defendants' unlawful reign.

B. **A Culture of Impunity: The NYPD Fails to Punish the Many Disciplinary Issues of the Individual Defendants**

95. For years prior to and continuing through Defendant ADAMS's administration, the NYPD maintained a systemic pattern of shielding officers with serious disciplinary histories— promoting and rewarding them despite repeated warnings, internal complaints, lawsuits, and costly settlements. These decisions were not made in ignorance but with full knowledge of the underlying misconduct. This entrenched pattern created a policy and practice of protecting abusers, undermining accountability, and enabling the very constitutional violations at issue in this case.

96. Rather than reversing course, Defendant ADAMS perpetuated and expanded this practice—choosing to elevate known abusers into positions of greater power and influence. This deliberate failure to discipline or remove problematic officers—despite overwhelming notice—directly links the City of New York's policymaking officials to the misconduct alleged herein.

97. The long history of misconduct by the Individual Defendants herein is presented in chronological order.

98. On July 28, 2007, while on duty, Defendant DAUGHTRY pointed his firearm at a civilian on a motorcycle and threatened, "TURN OFF THE BIKE OR I WILL FUCKING KILL YOU." He was later issued Charges and Specifications for this incident.

99. In 2008, Defendant DAUGHTRY pled guilty to the above-mentioned misconduct and was docked ten (10) vacation days. Despite conduct that constituted the crime of

menacing under New York State law, no criminal referral was made, and he avoided an NYPD trial.

100.    Also in 2008, Defendant DAUGHTRY was issued a Schedule "B" Command Discipline for "Computer Misuse," a disciplinary action reserved for more serious internal violations.

101.    That same year, U.S. Federal District Court Judge in Manhattan, Judge John E. Sprizzo, found Defendant DAUGHTRY not credible when testifying under oath in a gun arrest case. The Brooklyn District Attorney's Office publicly confirmed it would begin reviewing his other arrests for improprieties. At the time of this instant filing, the Brooklyn District Attorney's Office has yet to produce any documents or reports regarding this inquiry. (This should have also included an investigation by IAB, NYPD.)

102.    In 2008, Defendant CHELL, at the time holding the rank of Lieutenant, fatally shot a fleeing suspect, Ortanzso Bovell, in the back. No disciplinary action was taken. No firearms retraining was ordered. He remained in good standing with the Department, and no charges were filed.

103.    In January 2012, Defendant DAUGHTRY received another Schedule "B" Command Discipline after failing to notify a Patrol Supervisor of an incident involving an off-duty NYPD employee. He was docked eight (8) vacation days. Upon information and belief, as a result of the discipline, Defendant DAUGHTRY was not transferred, removed from street enforcement, had his weapons confiscated, nor was he given remedial training over the incident.

104.     In March 2012, Defendant DAUGHTRY received yet another Schedule "B" Command Discipline. The nature of the infraction and the number of days docked remain unknown.

105.     In 2012, a federal jury awarded $2,500,000 to the family of Ortanzso Bovell for the fatal shooting by Defendant CHELL. That verdict was later reduced through settlement to $1,500,000.

106.     Upon information and belief, despite a jury verdict (pursuant to a civil lawsuit filed by Bovell's family) that Defendant CHELL was responsible for the death of Bovell, Defendant CHELL received no remedial firearms training, was not transferred, and was not stripped of his service weapon.

107.     It is incredulous and defies logic that Defendant CHELL was allowed to remain a law enforcement officer after a civil jury found him responsible for the shooting death of a civilian.

108.     Also in 2012, Defendant CHELL was investigated, initially by the Internal Revenue Service ("IRS"), which then passed its information to the NYPD's IAB, for falsely utilizing the tax identification numbers and identities of some of his family members when he, Defendant CHELL, performed and was paid for employment outside the NYPD. He was specifically working as a basketball referee. His use of the tax identification data of others caused the actual individuals to realize an increase in their taxable income, and they were responsible for paying the appropriate taxes.

109.     Ultimately, the IRS did not bring federal criminal charges, but Defendant CHELL was issued internal disciplinary charges for the tax fraud. On May 29, 2013, Defendant CHELL pled guilty to willfully attempting to evade or defeat a federal tax in the NYPD

trial room and receiving income for the period of time he worked off-duty under the name of a family member for tax deferral purposes.

110.       It is extremely unlikely that Defendant CHELL had permission to work off-duty under a different name. NYPD policy is clear that all off-duty employment must be authorized beforehand, utilizing one's true identity.

111.       Similarly to when Defendant CHELL was allowed to remain in his NYPD position after he was found to have unconstitutionally killed a civilian, the City of New York continued to protect high-ranking officials despite serious misconduct. It is incredulous— and deeply troubling—that any law enforcement officer would retain their job after admitting to federal tax fraud. Yet under Defendant ADAMS's administration, such conduct is not only tolerated but shielded. These actions reflect a broader policy of rewarding loyalty over legality and protecting political allies regardless of their violations of public trust.

112.        After he pled guilty to lying and committing tax fraud, Defendant CHELL was only docked ten (10) vacation days by the NYPD and was allowed to continue his upward career trajectory without any obstacles related to his unlawful actions. It is not erroneously speculative to believe that if any other MOS, possessing a lower rank, were involved in any of the above-mentioned incidents, MOS would certainly have been more severely disciplined or terminated. This illustrates why a great majority of NYPD MOS are disgusted and suffer from low morale, as there is a different set of rules of discipline and termination outcomes based on rank/title and personal connections.

C. **Defendant Maddrey's Admitted Dishonesty and the NYPD's Double Standard**

113.    In 2016, Defendant MADDREY began a sexual relationship with Detective Tabatha Foster, a subordinate. The relationship led to a physical altercation between them, wherein Defendant MADDREY "punched" Detective Foster, and then failed to report the violent altercation.

114.    On May 5, 2016, Defendant MADDREY gave inaccurate and misleading statements during an official interview with IAB when questioned about his relationship with Detective Foster.

115.    On February 1, 2017, Defendant MADDREY again provided false and misleading statements during an NYPD IAB interview, including false denials of the altercation.

116.    In 2017, Defendant MADDREY was issued formal disciplinary charges for: (a) engaging in a physical altercation with someone known to the Department, (b) failing to notify a supervisor, (c) impeding an NYPD investigation, and (d) providing false statements.

117.    Defendant MADDREY pled guilty to the internal NYPD charges. His punishment: the loss of 45 vacation days. He was not suspended, demoted, or referred for criminal prosecution.

118.    If a rank-and-file police officer pled guilty to lying to IAB regarding the same offense, they would certainly be terminated for lack of candor. Defendant MADDREY faced no real discipline for his admitted lies and was allowed to continue his upward career trajectory without any obstacles related to his unlawful actions.

119.    Similarly, in the FBI, or any other Federal law enforcement agency, if a Special Agent or civilian employee is shown/proven to have lied, they are in all likelihood

immediately terminated for lack of candor and face possible federal criminal charges for violations of 18 U.S.C.§ 1001 et seq. The obvious question is why this case involving Defendant MADDREY was not opened as a Federal Civil Rights investigation.

120.    Upon information and belief, despite pleading guilty to serious disciplinary charges, Defendant MADDREY received no remedial firearms training as a result of the discipline.

121.    Defendant MADDREY, despite the admitted lack of candor on several occasions involving off-duty and on-duty actions, along with his horrific documented behavior, was surprisingly promoted to Chief of the Department. Donlon was certainly surprised and disappointed, having worked with many highly talented NYPD executives who were not selected over MADDREY for this prestigious position.

122.    The Defendant CITY allowed a known sexual predator, Defendant MADDREY, to remain employed within the NYPD, enabling him to continue harming women under the color of authority.

123.    On October 26, 2020, then-Inspector Defendant SARACENO pled guilty to misusing Department time, falsifying Department records, and failing to submit required executive reports in a timely manner. He was allowed to retire instead of the NTPD pursuing a criminal case. His pension was preserved, and he forfeited only thirty (30) vacation days and his remaining leave balances. As referenced above, after nearly one year of retirement, Defendant MADDREY reinstated Defendant SARACENO to the NYPD at the rank of Inspector.

124.    On June 3, 2020, Defendant SHEPPARD violently assaulted a female protester during a demonstration and ordered the false arrest of a civilian witness, Ernesto Lopez, who filmed the incident. The NYPD later settled with Mr. Lopez for $400,000.

125.    On June 4, 2020, Defendant SHEPPARD again engaged in violent misconduct. He tasered protestor Destiny Strudwick without cause and ordered her false arrest. Mrs. Strudwick was hospitalized due to her injuries. The City of New York later paid her $99,000 in settlement.

126.    In May 2019, Defendant DAUGHTRY was again disciplined through a Schedule "B" Command Discipline for failing to safeguard his NYPD-issued body-worn camera.

127.    In May 2020, despite this growing record of violations, Defendant DAUGHTRY was given a discretionary promotion to Detective 2nd Grade.

D.  **Proven Sexual Misconduct Results in Rewards for NYPD Bad Actors**

128.    In February 2021, Captain Sharon Balli sued the Defendant CITY and senior NYPD officials for sexual harassment and retaliation, which received widespread news coverage. Her allegations included multiple male supervisors making sexually explicit comments in front of her and attempting to access the bathroom while she was showering. One officer even bragged about masturbating at her desk. These acts were reported but ignored.

129.    When Captain Balli filed a sexual harassment complaint with the NYPD's Office of Equal Employment Opportunity, it was sent to Captain James Kobel, who immediately alerted the officers she had named, placing her at greater risk. Rather than protect Captain Balli, the NYPD retaliated against her until she was forced to resign.

130.     Shortly after the complaint, which was leaked by Captain Kobel, he was rewarded by the NYPD's Office of Equal Employment Opportunity, where he oversaw all of the discrimination and retaliation investigations in the NYPD.

131.     In December 2021, the City of New York settled Balli's lawsuit for $800,000. Despite the size and seriousness of the settlement, none of the accused officers were disciplined. To the contrary, they were each rewarded with promotions, commanding officer positions, and/or lucrative assignments within the NYPD.

132.     In January 2022, Deputy Inspector Andrew Arias, one of Captain Balli's harassers, was promoted to Commanding Officer of the Hate Crimes Task Force. In January 2023, another accused officer, Captain Hariton Marachilian, was made Commanding Officer of the 90th Precinct, just 13 months after the Defendant CITY paid out nearly a million dollars for his prior conduct.

133.     The promotions of these individuals are an embarrassment not only for the NYPD, but for law enforcement as a whole. The NYPD is known as the preeminent municipal law enforcement agency in the United States of America, and for it to reward these egregious individuals with promotions is embarrassing and just plain wrong.

E.   **Defendant ADAMS Consolidates Power and Elevates Loyalists**

   a.   **City Hall's Takeover of NYPD Leadership**

134.     On January 1, 2022, Defendant ADAMS was sworn in as Mayor of the City of New York.

135.     From the outset, Defendant ADAMS's administration stripped the NYPD of independent leadership and centralized power in a tight-knit circle of political loyalists, many of whom had already been implicated in prior misconduct.

136.     That same day, Defendant ADAMS appointed Keechant Sewell as the 45th Police Commissioner of the NYPD. Her tenure, however, was undermined from the beginning. Defendant ADAMS installed two of his longtime allies, Phillip Banks and Timothy Pearson, as de facto overseers of the Department, bypassing her authority.

137.     Phillip Banks was appointed Deputy Mayor for Public Safety despite previously being named an unindicted co-conspirator in an FBI corruption investigation and having $300,000 in unaccounted-for money (per media reporting) in his bank account. Tim Pearson, known for a history of sexual misconduct, which included on-duty sexual incidents and accusations of sexual abuse and harassment, was simultaneously brought into City Hall as a Senior Advisor for Public Safety. Though neither held formal command positions within the NYPD, they began directing NYPD operations through shadow influence.

138.     Under this structure, fomented and condoned by Defendant ADAMS, Banks and Pearson effectively led the NYPD. They regularly overruled Police Commissioner Sewell and assumed control of promotional decisions, assignments, and strategic operations. As a result, the NYPD ceased to function through the long-established chain of command. Power was wielded based not on rank, merit, or civil service law, but on personal allegiance to Defendant ADAMS.

139.     The NYPD's discretionary promotions, which under the NYC Administrative Code § 14-114 are supposed to be made solely by the Police Commissioner, were taken over by Banks and Pearson. Promotions below the rank of captain (e.g., Detective grades, Sergeant Special Assignment, Lieutenant Special Assignment) were controlled by Pearson. Promotions above the rank of captain (e.g., Deputy Inspector, Inspector, Bureau

Chief) were finalized by Banks. It was subsequently reported that the Police Commissioner had little to no meaningful input in the discretionary promotional process or who received the benefit.

140. These discretionary promotions came with substantial financial benefits, including salary increases, overtime eligibility, and pension enhancements, often totaling hundreds of thousands of dollars per officer. Banks and Pearson used this power to reward loyalty, punish dissent, and entrench their control over the Department.

141. This arrangement constituted a direct violation of the law. It also created a promotional economy where corruption, not competence, dictated advancement. The consequence was devastating. Qualified officers were sidelined while unqualified loyalists with disciplinary records were vaulted into leadership.

142. In practice, final promotion lists were sent from the NYPD to City Hall, then reviewed and edited by Banks and Pearson. Promotions were often contingent on political connections, loyalty to Defendant ADAMS, or willingness to ignore misconduct. This backroom system gutted the NYPD's credibility and created a shadow structure of power wholly detached from public accountability.

143. Banks and Pearson made no secret of their authority. They regularly met with NYPD personnel across all ranks and inserted their allies into key command roles. Police Commissioner Sewell was repeatedly overruled or bypassed entirely. Even high-ranking chiefs deferred to the political operatives instead of their lawful superior.

144. These acts usurped the statutory powers of the Police Commissioner and transferred them to unelected, unaccountable individuals under Defendant ADAMS's personal direction. The NYPD was no longer a paramilitary institution governed by a

chain of command. It had become a political patronage machine, serving the personal interests of City Hall rather than the public good.

145.     This structural breakdown of lawful authority was not theoretical. It had tangible and dangerous effects. Discretionary promotions became rewards for silence or complicity. Loyalty to the Mayor's circle was prioritized over integrity, experience, or constitutional compliance. Senior leadership positions were filled with individuals known for abuse, retaliation, and dishonesty.

146.     The result was a law enforcement agency being led by officials who had no lawful claim to their roles and no accountability to the people they served. The NYPD's command structure was no longer based on merit or civil service; it was built on cronyism, coercion, and personal allegiance to a political regime.

147.     The illegal consolidation of power under Defendant ADAMS, Banks, and Pearson created the precise environment that allowed the retaliation against Donlon to flourish. It also violated the statutes and civil service rules designed to prevent political interference in law enforcement. These were not minor infractions. They were structural and deliberate, setting the stage for the constitutional violations that followed.

   **b.  A Shadow Chain of Command: Banks and Pearson Control Promotions**

148.     Banks and Pearson operated as political enforcers within the NYPD, routinely overriding or sidelining the Police Commissioner. Promotional decisions, command assignments, and disciplinary outcomes were no longer made by the Commissioner as required under New York City Charter § 435 and Administrative Code § 14-114. Instead, these decisions flowed through the Mayor's inner circle.

149.    Under this unlawful scheme, promotions below the rank of captain, such as Detective 2nd and 1st Grade, Sergeant Special Assignment (SSA), and Lieutenant Special Assignment (LSA), were reviewed and finalized by Pearson. Promotions at the rank of captain and above, including Deputy Inspector, Inspector, Deputy Chief, and Bureau Chief, were controlled by Banks.

150.    The promotional process was entirely corrupted. Recommendations were sent to City Hall, where Banks and Pearson modified the lists based on political loyalty, favoritism, and personal agendas. Commissioner Sewell was routinely forced to sign off on pre-selected candidates, stripping her of statutory discretion and rendering her office a façade.

151.    As reported in several media outlets, numerous high-ranking officers personally witnessed Banks and Pearson dictating promotions and commanding officer assignments. Multiple sources had confirmed to reporters that senior staff within the Office of the Police Commissioner were instructed to defer to Banks and Pearson rather than follow internal NYPD protocol. In several instances, Commissioner Sewell was completely bypassed in operational decision-making.

152.    Sewell herself raised concerns. According to internal communications and reporting, she protested this interference and attempted to reassert her authority. In response, Banks and Pearson further marginalized her and used back channels to direct senior NYPD staff without her input.

153.    This deliberate consolidation of power violated New York City law, undermined public safety, and transformed the Department's internal governance into a patronage

system. Promotions were granted not on merit, but on loyalty to allies of Defendant ADAMS.

154.    Many of these discretionary promotions conferred financial benefits, such as increased pay, access to overtime, and pension enhancements. By controlling the process, Banks and Pearson gained personal influence and political capital through a system that directly impacted salaries, career advancement, and post-retirement benefits.

155.    This conduct likely constitutes honest services fraud under 18 U.S.C. § 1346. Banks and Pearson used their positions to orchestrate a pay-to-play promotion scheme, depriving the public of the NYPD officials' honest services by corruptly influencing official acts for personal and political advantage.

156.    These were not abstract abuses. Qualified officers were bypassed, retaliated against, or pushed out, while unqualified loyalists, including individuals with documented disciplinary histories, were rewarded. The command structure of the NYPD was no longer grounded in law, merit, or public interest; it had become a shadow government operating at the discretion of Defendant ADAMS.

157.    These actions had cascading effects throughout the Department: morale collapsed, transparency disappeared, and the rule of law was subordinated to political expediency. The systematic sidelining of the Police Commissioner made it clear that integrity and independent oversight would not be tolerated. The same actions were repeated under Donlon's administration as interim Police Commissioner.

158.    The City of New York (Defendant CITY) cannot escape liability for these actions. It knowingly permitted unelected, unvetted political actors to commandeer the largest

50

municipal police force in the United States, an enterprise that now functioned in direct

violation of the City Charter, civil service rules, and federal law.

**c.   Defendant ADAMS Continues to Reward Bad Actors in the NYPD**

159.      On January 4, 2022, Edward Caban was appointed First Deputy Commissioner of

the NYPD, the second highest-ranking position in the Department, subordinate only to

the Police Commissioner. This promotion came despite Caban's extensive disciplinary

history, including formal punishment for using his NYPD-issued vehicle for personal

errands on at least 96 occasions.

160.      At the time of his appointment, Defendant ADAMS and senior NYPD leadership

were aware of Caban's past misconduct. Nevertheless, he was elevated to the most

powerful position in New York City law enforcement.

161.      Just one month later, in February 2022, Defendant ADAMS, either directly or

through his proxies, placed Captain Andrew Arias in command of the NYPD's Hate

Crimes Task Force. Arias had been a central figure in the sexual harassment and

retaliation claims raised by Captain Sharon Balli, whose lawsuit against the NYPD and

multiple officers resulted in an $800,000 settlement by the City of New York less than

three months earlier.

162.      Despite his documented involvement in a hostile and retaliatory work

environment, Arias faced no disciplinary consequences. Instead, he was rewarded with a

high-profile assignment typically made at the discretion of the Police Commissioner.

Under normal circumstances, Commissioner Sewell would have been credited with that

decision if, of course, Arias merited it. However, under Defendant ADAMS, such

appointments were routinely directed by Banks and Pearson.

163.     Arias's promotion exemplifies the administration's pattern of protecting and elevating officials implicated in civil rights and sexual misconduct cases, provided they remained politically loyal.

164.     On May 8, 2022, the New York Post reported troubling new allegations that emerged against Caban. Through Freedom of Information Law Requests, the Post learned that Caban had been accused of cheating on his sergeants examination and had been disciplined in four other misconduct cases. Caban had been accused of engaging in multiple inappropriate sexual relationships with female subordinates. Reports alleged that Caban had had "several sexual encounters" with NYPD employees and that he provided preferential treatment to officers with whom he had had sexual relationships.

165.     These actions constituted serious violations of NYPD policy, civil service rules, and federal workplace protections. Yet, neither the NYPD nor Defendant CITY took action. Instead, the allegations were actively suppressed, protecting Caban and insulating the Department from public accountability.

166.     The failure to investigate or discipline Caban, despite credible claims that he engaged in sexual acts with subordinates while on duty and in a position of supervisory authority, demonstrates a deliberate pattern of concealment and complicity. Caban has never faced formal charges or disciplinary review for these acts.

167.     What makes this all the more egregious is that this conduct was known to Defendants ADAMS and CITY at the time of Caban's promotion to First Deputy Commissioner. His advancement, despite serious, disqualifying misconduct, exemplifies the administration's policy and practice of rewarding those accused of sexual misconduct and rights violations, as long as they remained within the Mayor's political circle.

168.     On July 22, 2022, the City of New York (Defendant CITY) agreed to pay $99,000 to settle a federal civil rights lawsuit filed by New York City residents Destiny Strudwick and Yasmin Geurts against the Defendants CITY, SHEPPARD, and several other NYPD officers. The suit stemmed from a 2020 protest in which Defendant SHEPPARD tasered and falsely arrested Ms. Strudwick, causing injuries that required hospitalization.

169.     Despite the severity of the allegations and the City of New York's monetary settlement, Defendant SHEPPARD was not disciplined. Instead, he was later promoted to Deputy Commissioner of Public Information (DCPI) on November 17, 2022. This is another example of advancement in the face of known misconduct orchestrated by Pearson and the collective Defendants.

170.     In January 2023, Hariton Marachilian, another officer named in Captain Balli's sexual harassment lawsuit, was promoted to Commanding Officer of the 90th Precinct. This promotion occurred just thirteen (13) months after the City of New York settled the case for $800,000. Rather than face any consequences, Marachilian was elevated, further demonstrating the City of New York's policy of protecting and rewarding those accused of physical and sexual harassment.

171.     Marachilian's promotion was approved under the watch of Defendant MADDREY, then Chief of Department, and Defendant ADAMS. Both were aware of the lawsuit and its resolution. The elevation of Marachilian, despite such serious allegations, reinforced the message that sexual misconduct would not only be tolerated but rewarded if politically convenient.

172.     The NYPD's failure to investigate, discipline, or even acknowledge the misconduct described above is not a series of isolated lapses; it is a sustained and

deliberate policy. These acts reflect not negligence, but a conscious municipal choice to reward loyalty over legality and suppress dissent over transparency.

F. **The Critical Response Team (CRT): A Rogue Unit Created to Project Power, Not Ensure Safety**

a. **Formation of CRT Outside of Lawful Oversight Channels**

173.    In the fall of 2022, the NYPD, under the direction of Defendant DAUGHTRY, began publicly promoting the newly formed Community Response Team ("CRT") through a series of stylized videos posted on the NYPD's website, which is operated by the Defendant CITY.

174.    These videos showcased aggressive street enforcement tactics, unconstitutional stops, and unlawful vehicle pursuits, many of which likely violated the Fourth and Fourteenth Amendments. The CRT videos made it clear that the unit operated without legal constraint and with full backing from the Mayor's Office.

175.    On paper, CRT was described as an elite crime-fighting unit launched under Defendant ADAMS. In practice, it was a rogue enforcement team that operated outside the NYPD's traditional chain of command, answerable only to City Hall. During his tenure, Donlon was never informed of CRT's existence or history, nor was the unit mentioned in weekly executive meetings involving the NYPD's top-ranking two- and three-star Chiefs. Typically, the Police Commissioner would be debriefed on the actions of an enforcement unit like CRT and its accomplishments, but Donlon was kept in the dark.

176.    This secrecy was deliberate. CRT's activities were intentionally concealed from Donlon by Defendants MADDREY, CHELL, and DAUGHTRY despite their presence at the same executive meetings. The exclusion of the Police Commissioner (orchestrated by

those in Defendant ADAMS's inner circle) from oversight of a citywide enforcement unit reflects a profound breakdown in command accountability.

177.    Defendant DAUGHTRY, who had no prior administrative or operational experience as a Commanding Officer, was placed in charge of flawed CRT. DAUGHTRY treated the unit as a personal fiefdom, allowing officers to pursue both real and imagined suspects at high speed through city streets, frequently in violation of NYPD policy. These pursuits often resulted in serious injury and, in some cases, death.

178.    Defendant CHELL, a key leader within CRT, stated publicly: "Our Mayor had given us the mandate to start playing offense out here." That statement was not a metaphor. CRT was used to harass, injure, and violate the rights of civilians, particularly in communities of color, with no regard for constitutional safeguards.

179.    On or about October 5, 2022, Defendant DAUGHTRY pled guilty to making misleading official statements to the Civilian Complaint Review Board (CCRB) on February 21, 2021, and July 29, 2021. For the admitted lack of candor, Defendant DAUGHTRY was only docked twenty (20) vacation days.

180.    If a rank-and-file police officer pled guilty to lying to IAB, they would be terminated or suspended for lack of candor. Defendant DAUGHTRY faced no real discipline for his admitted lies and was allowed to continue in his employment with Defendant CITY without any obstacles related to his unlawful actions.

181.    On December 2, 2022, despite CRT's growing record of abuse, Defendant CHELL was promoted to Chief of Patrol by Defendant ADAMS. Three weeks later, on December 23, 2022, Defendant DAUGHTRY was promoted to Detective First Grade, a rare and highly coveted honor, despite his history of unconstitutional policing.

b. **Patterns of Unconstitutional Policing and Excessive Force**

182.      In early 2023, a scathing internal audit by retired NYPD Chief Matthew Pontillo found that CRT officers were systematically conducting unlawful stops, failing to file stop reports, and ignoring internal documentation policies. The audit concluded that the CRT was operating in open defiance of both NYPD rules and constitutional law.

183.      Rather than curtail CRT's activities, Defendant ADAMS took to Instagram in a public relations stunt, posing in CRT's khaki uniform and writing: "Turning out with the team." His post came just weeks after the audit's release and was widely interpreted, correctly, as a direct rebuke to efforts to hold CRT accountable.

184.      In effect, CRT reported directly to Defendant ADAMS and City Hall. When higher-ranking officers attempted to intervene or raise objections, they were overruled. Defendants CHELL and DAUGHTRY maintained a direct line to Defendant ADAMS, who personally intervened to preserve CRT's autonomy and shield its actions from scrutiny. The CRT lacks any meaningful policies, guidelines, or procedures. There is no indication that the NYPD Legal Bureau approved or even saw the techniques being used by Defendants CHELL and DAUGHTRY with CRT.

185.      Due to the absence of oversight, the CRT appeared to operate with impunity, haphazardly assaulting the public without any goals, objectives, or accountability mechanisms.

186.      According to investigative reporting by ProPublica, Defendant ADAMS had direct access to CRT officers' body-worn camera footage, an extraordinary and irregular level of control that bypassed standard NYPD oversight mechanisms.

### c.  **Public Endorsement of Lawlessness by Defendant ADAMS**

187.    In one particularly egregious instance, a senior NYPD attorney raised legal objections to CRT's unconstitutional conduct. Rather than heed the legal advice, Defendant ADAMS demanded to know whether the objections were based upon "law or opinion," and angrily insisted that the actions proceed, permitting Defendant DAUGHTRY to ignore the attorney's guidance and continue with the unlawful policing operation.

188.    CRT's methods, implemented by ADAMS, mirrored the more outrageous behavior of the disbanded Anti-Crime Unit, which Defendant ADAMS has previously stated that the Anti-Crime teams were disbanded  to avoid discriminatory tactics in anti-crime efforts, aiming for a more targeted and less harmful approach. ADAMS was concerned about discriminatory policing within the NYPD, leading to continued oversight.

189.    However, once in power, Defendants ADAMS, MADDREY, CHELL, and DAUGHTRY allowed CRT to operate without any formal operational plan that included policies, procedures, and guidelines.

190.    CRT lacked operational plans, accountability structure, or legal review. CRT targeted minority communities in precisely the same issues that led to the dismantling of the original Anti-Crime Unit concept by ADAMS.

191.    Upon assuming the office as the Mayor of New York City, Defendant ADAMS sought to bring back the Anti-Crime Units that had been previously eliminated due to the abuse that these Units caused, their engagement in racially motivated policing, and their known tendency to trample on the constitutional rights of New York City residents. While

in office, Defendant ADAMS has brought back the Anti-Crime Unit as an "anti-gun unit" that targets illegal firearms and gang activity, utilizing officers selected and trained to prevent discriminatory practices. This effort was not sustained.

192.      Under Defendant DAUGHTRY, as cited above, the anti-gun unit morphed into the CRT. Essentially, Defendants ADAMS and DAUGHTRY resurrected the former Anti-Crime handbook with new guidelines and procedures, rebranding it CRT. Defendant ADAMS, who had publicly identified the constitutional issues surrounding the former Anti-Crime Unit during his campaign for Mayor (such as racial profiling, unlawful searches, seizures, and stops), welcomed and continues to welcome the unlawful techniques and practices of the CRT.

193.      The brutality of CRT operations was not accidental; it was the predictable outcome of a lawless mandate given by Defendant ADAMS himself. CRT became the enforcement arm of Defendant ADAMS's political strategy: a tool for projecting "tough on crime" optics at the expense of civil rights and constitutional law.

194.      As the City of New York's highest-ranking policymaker, Defendant ADAMS's endorsement of CRT—despite ongoing civil rights audits—demonstrates more than indifference. It reflects a calculated effort to normalize unconstitutional policing.

195.      These actions support Monell liability by establishing an official policy or custom that violates New Yorkers' constitutional rights. Despite media reports exposing CRT's abuses, no new guidelines or reforms have been implemented.

   G.   **Retaliation, Suppression, and First Amendment Violations**

   a.   **Retaliation Against Whistleblowers Within the NYPD**

196.    On April 11, 2023, a civilian NYPD employee filed a civil lawsuit alleging that Lieutenant Widler Lucas, then serving as Integrity Control Officer for the NYPD's Property Clerk Unit, had sexually assaulted her in his office while on duty. The allegation was particularly alarming given Lucas's role as an internal accountability officer responsible for departmental integrity.

197.    Despite the seriousness of the allegation, which described an on-duty sexual assault by an officer tasked with internal oversight, Defendant CITY failed to take even basic precautionary measures. Lieutenant Lucas was not placed on desk duty, nor was his firearm removed, both of which are standard protocol when serious misconduct allegations are substantiated.

198.    The inaction was so pronounced that the victim was forced to seek a family court order of protection just to compel the NYPD to disarm Lucas. This unprecedented step underscores the Department's complete abdication of responsibility in handling serious workplace sexual violence.

199.    Just months later, in June 2023, the limits of the Police Commissioner's authority were exposed when then-Commissioner Sewell sought to discipline then-Chief of Department, Defendant MADDREY, for a separate serious act of misconduct.

200.    In that incident, Defendant MADDREY appeared in person at the 73rd Precinct in Brownsville, Brooklyn and ordered officers to null and void a gun-related arrest involving a former NYPD officer with whom Defendant MADDREY had a personal connection. The order was a blatant abuse of authority and a direct violation of NYPD policy.

201.    The Civilian Complaint Review Board investigated the incident and substantiated the misconduct. Commissioner Sewell determined that discipline was warranted and intended to act accordingly.

b.  **Weaponization of the Internal Affairs Bureau and Legal Processes**

202.    In spite of the determination made by then Commissioner Sewell, Defendant ADAMS and his senior aides intervened to block any meaningful discipline. They lobbied Police Commissioner Sewell directly to ignore the CCRB's findings and protect Defendant MADDREY from accountability. This is further evidence of the Mayor's (Defendant ADAMS's) control over disciplinary outcomes in cases involving political loyalists.

203.    Ultimately, under pressure from City Hall, Commissioner Sewell issued a token penalty: docking Defendant MADDREY ten days' pay. Upon information and belief, the decision reflected not only her independent judgment, but also the Mayor's (Defendant ADAMS's) refusal to permit discipline of his inner circle, even in the face of clear policy violations.

204.    This episode highlighted what was already becoming apparent across the NYPD: the Police Commissioner no longer held true disciplinary authority. Defendant ADAMS, acting as both political overseer and de facto final arbiter of NYPD discipline, had stripped the office of the Police Commissioner of meaningful power when it came to holding high-ranking officers accountable, particularly those officers whom Defendant ADAMS viewed as loyalists and his protectors.

205.    The NYPD's failure to disarm an accused sexual predator (Lucas), combined with the egregious interference of Defendant ADAMS in a case involving a clear case of abuse

of power by the Chief of Department, reflects a pattern of deliberate inaction and political protectionism that violates constitutional norms and emboldens further misconduct.

206.      In or about May 2023 (one month prior to the departure of Commissioner Sewell), Deputy Inspector Andrew Arias was promoted to Deputy Chief in the NYPD despite his active participation in the incidents that gave rise to the Captain Sharon Balli sexual harassment lawsuit which the Defendant CITY paid $800,000 to resolve.

H.   **City of New York's Liability Under Monell and Federal Civil Rights Law**

a.   **A Policy and Practice of Protecting Abusers and Punishing Reformers**

207.      On June 16, 2023, NYPD Police Commissioner Keechant Sewell resigned from her post after enduring months of systemic obstruction and unlawful and political interference by Defendant ADAMS and his senior aides.

208.      Like Plaintiff Donlon, Commissioner Sewell had been stripped of the core authority required to lead the Department. Key decisions, including disciplinary measures, promotions, transfers, and public messaging, were micromanaged or outright dictated by City Hall. Commissioner Sewell was regularly bypassed by Defendant ADAMS and his inner circle at City Hall and the NYPD, rendering her title functionally meaningless.

209.      Upon information and belief and subsequent media reports, the only logical conclusion surrounding the departure of Commissioner Sewell was not that she voluntary resigned but that she was forced out. As a result, her resignation was a constructive discharge, driven by Defendant ADAMS's sustained campaign to strip Commissioner Sewell of her institutional power and undermine her efforts to hold senior NYPD officials

accountable. Any reasonable person in her position would have felt forced to resign under such conditions.

210.     Commissioner Sewell's resignation came just days after Defendant ADAMS's intervention to block her efforts to discipline Chief of Department, Defendant MADDREY, for misconduct, a clear demonstration that her authority as Commissioner had been hollowed out to protect politically connected insiders.

211.     On July 17, 2023, Defendant ADAMS appointed Edward Caban as her replacement, despite Caban's extensive and well-documented history of sexual misconduct.

212.     These allegations were widely reported in the New York Post and other media and were known to NYPD leadership and City Hall at the time of Caban's appointment. Yet no investigation was initiated, and Caban faced no meaningful consequences. Instead, he was rewarded with the highest position in the NYPD.

213.     The refusal by Defendant ADAMS and Defendant CITY to discipline Commissioner Caban, or even acknowledge the seriousness of the allegations, demonstrates a deliberate policy of protecting senior officials who engage in sexual misconduct, provided they remain politically loyal to the administration of Defendant ADAMS.

214.     On the same day that Caban was appointed Commissioner, the New York Post published a revealing exposé stating that Defendant DAUGHTRY, then a Detective First Grade, was widely viewed as "the real boss" of the NYPD. The article reported that senior NYPD brass routinely bypassed the Commissioner and went directly to Defendant DAUGHTRY to request transfers, promotions, and other key decisions.

215.     Despite having no official authority over such matters, Defendant DAUGHTRY had effectively supplanted the Commissioner's role, functioning as Defendant ADAMS's political enforcer within the NYPD and directly undermining the chain of command.

216.     Rather than correct this unlawful power structure, Defendant ADAMS formally rewarded it. On July 17, 2023, the same day Caban was elevated to Commissioner, Defendant DAUGHTRY was promoted to Assistant Commissioner, despite his troubling disciplinary history and complete lack of qualifications for the role.

217.     The assignment of Defendant DAUGHTRY to the position of Assistant Commissioner, despite having no supervisory experience, was as incredulous as it was irresponsible. In this major role of responsibility within the NYPD, the position typically requires an extensive supervisory skill set to make operational and administrative decisions. To have placed someone like Defendant DAUGHTRY in this position is not only detrimental to the NYPD, but also places MOS in difficult and potentially life-threatening positions and the public in harm's way.

218.     These appointments were not based on merit or experience and were not in the best interest of the NYPD. They were political rewards for loyalty and silence, part of a broader pattern of the City of New York to shield wrongdoers and dismantle lawful oversight structures within the Department.

   b.   **Tim Pearson Exerts Unlawful Influence Over NYPD Operations and Promotions**

219.     On July 22, 2023, Tim Pearson—despite holding no official NYPD role—conducted an interview for the senior leadership position of Deputy Commissioner of Public Information (DCPI). Pearson's involvement was a clear overreach of authority.

220.     The DCPI role falls under the Police Commissioner, not an unelected advisor like Pearson. This exemplifies the inappropriate political interference at the NYPD's highest levels.

221.     Pearson's involvement was not an anomaly. It was part of a broader pattern in which high-level NYPD promotions were controlled, not by the Police Commissioner, but by City Hall operatives loyal to Defendant ADAMS. Pearson's de facto authority over hiring decisions reflected the erosion of lawful procedures and institutional independence within the NYPD.

222.     On August 1, 2023, just days after Pearson conducted the interview, Lieutenant Widler Lucas was formally indicted by the Kings County (Brooklyn) District Attorney for two counts of a criminal sexual act, as well as charges of sexual misconduct and aggravated harassment. These charges stemmed from an on-duty sexual assault of a subordinate NYPD employee, allegations the Department had been aware of for months.

223.     At that time, Defendant CITY had a clear and lawful pathway to discipline Lucas: he could have been suspended with pay pending the outcome of the criminal trial and then terminated through internal disciplinary proceedings. This process, if followed, would have triggered pension forfeiture upon conviction.

224.     Instead, the Defendant CITY, with the approval of then Police Commissioner Edward Caban, permitted Lucas to quietly retire with full vesting of his seventeen-year pension, despite the severity of the charges and the potential twenty-year prison sentence he still faced.

225.     Upon information and belief, allowing an officer who has been indicted on sex charges to retire with his pension is unprecedented. No formal explanation was provided

for this departure from standard procedure. The lack of disciplinary follow-through, particularly for a senior officer facing violent sex crime charges, was so unusual and improper that it demands comprehensive investigation.

226.    Just six days after Lucas's indictment, on August 7, 2023, then Commissioner Caban formally promoted Defendant SHEPPARD to the position of DCPI, placing him in charge of managing the NYPD's public messaging and media relations.

227.    Defendant SHEPPARD's appointment—facilitated by Pearson and rubber-stamped by Commissioner Caban—highlighted the NYPD's politicized promotions. Positions were awarded not based on merit, but on political loyalty.

228.    Upon his assuming the DCPI role, the division nearly doubled in size, growing from 46 to 86 officers, despite patrol shortages. This unchecked expansion illustrates gross mismanagement and a lack of oversight, implicating both ADAMS and Caban.

c.    **CRT's Unconstitutional Reign of Violence and Abuse Spreads Across New York City**

229.    On August 16, 2023, in response to a growing number of reckless and dangerous police chases, Defendant MADDREY issued an internal memorandum to at least six top NYPD officials, including Defendants CHELL and DAUGHTRY, reminding them that all officers must adhere to the NYPD's written policy on vehicular pursuits.

230.    The memorandum emphasized that "a vehicle pursuit must be terminated whenever the risks to members of the service and the public outweigh the danger to the community if the suspect is not immediately apprehended." This was not a discretionary guideline, it stemmed from the NYPD's legal and constitutional duty to safeguard both civilians and officers from unnecessary harm.

231.    The directive followed two particularly disturbing incidents. On August 12, 2023, five Staten Island based police officers were injured during a high-speed pursuit of a suspected minivan thief. Just days later, a second pursuit ended in disaster when the fleeing suspect crashed into an SUV, flipping the vehicle and injuring two children, ages 1 and 5, who were passengers.

232.    On August 15, 2023, a 54-year-old woman riding a bicycle was hit and critically injured by a suspect fleeing from detectives investigating illegal firearms. The woman was left fighting for her life due to the CRT's reckless chase tactics.

233.    These back-to-back incidents reflected a broader pattern of CRT-led operations that violated not only NYPD policy, but also basic standards of public safety and constitutional policing. No operational plans governed CRT's actions. Unchecked abuses continued without any discipline or consequence.

234.    Rather than issue a corrective statement, Defendant CHELL publicly bragged about the tactics. In a subsequent interview, he said: "We're pretty good at it, and we're going to continue stopping cars and bikes that are breaking the law." His statement reflected not just defiance, but a complete disregard for the violence and legal violations carried out under his watch.

235.    Multiple other incidents further illustrated the CRT's dangerous and lawless behavior:

236.    In one instance captured on a body-worn camera, an NYPD officer, while pursuing an unlicensed motorcyclist, swerved into the fleeing motorcyclist and caused the motorcyclist's death.

237.     In another, an NYPD Commander was caught on cell phone video punching and kicking an unlicensed motorcyclist in the head.

238.     In yet another, NYPD officers stopped a civilian without any apparent legal basis.

239.     In one particularly egregious case, a CRT officer repeatedly grabbed a male civilian's genitals during a stop, without conducting a search elsewhere on the body. That same civilian was later issued a summons for littering.

240.     When the man attempted to complain about the sexual assault and unlawful stop, a CRT officer slammed him into a nearby window.

241.     These are not isolated incidents; they are the foreseeable result of a policing culture encouraged and protected by Defendant ADAMS. At every turn, Defendant ADAMS condoned the CRT's excessive and unconstitutional tactics, refusing to impose oversight or discipline.

242.     On May 31, 2024, the City of New York agreed to pay $400,000 to settle a federal lawsuit brought by Ernesto Lopez, who alleged that Defendant SHEPPARD violated his constitutional rights. Despite this substantial payout and the seriousness of the allegations, Defendant SHEPPARD faced no disciplinary action or punishment whatsoever. This is another example of his being protected by MADDREY and ADAMS. Certainly a lower-ranked MOS would not have been as fortunate.

243.     The absence of accountability and lack of control and defined goals in the face of clear, repeated constitutional violations (some of which resulted in serious injury and death), demonstrates Defendant CITY's established custom, policy, and practice of condoning unlawful police conduct when carried out by loyalists within Defendant ADAMS's administration.

I. **Mismanagement, Retaliation, and Corruption Continue Unchecked—Defendant ADAMS Takes No Action**

244.    In September 2023, NYPD Officer Hieu Tran was involved in a violent road rage shooting in southern New Jersey after a day of heavy drinking. During a seemingly random traffic encounter, Tran inexplicably opened fire on a young businessman, leaving the man permanently paralyzed. The shooting was senseless, unprovoked, and entirely preventable.

245.    At the time of the shooting, Officer Tran was under the direct command of Defendant SHEPPARD.

246.    Defendant SHEPPARD had long been aware of Officer Tran's serious struggles with alcoholism and prior alcohol-related misconduct. Rather than initiate intervention, mandate treatment, or remove Tran from active duty, Defendant SHEPPARD deliberately concealed the issue, allowing a clearly impaired officer to remain armed and on the streets.

247.    This supervisory negligence created a foreseeable and extreme risk to public safety. Defendant SHEPPARD's deliberate indifference to a known threat directly enabled the events that led to the shooting. Now, as a result of his failure, Defendant CITY faces potential legal liability that could cost taxpayers millions of dollars.

248.    Despite this grave failure of leadership and oversight, Defendant SHEPPARD has faced no discipline or professional consequences for his role in this tragedy. The Defendant CITY's refusal to act underscores the entrenched policy of shielding misconduct when perpetrated by individuals loyal to Defendant ADAMS.

249.     On or about September 7, 2023, a female NYPD Sergeant filed a lawsuit under New York's Adult Survivors Act, alleging that NYPD Detective First Grade Neftali Cruz raped, stalked, and terrorized her during and after their romantic relationship.

250.     Despite the seriousness of these allegations—which included violent sexual assault, stalking, and intimidation—the Defendant CITY OF NEW YORK and the NYPD permitted Cruz to quietly retire in early November 2023, retaining his full pension, department-issued firearm, and a "good guy" letter, which is often used to secure future employment in law enforcement or security.

251.     Under NYPD policy, the IAB, and the Department Advocate's Office are granted thirty (30) days from the date an officer submits retirement papers to initiate disciplinary proceedings. Despite the gravity of the rape allegations, NYPD attorney-prosecutors informed the Sergeant's counsel that thirty days was not enough time to investigate the matter and bring internal charges.

252.     This was not an isolated incident. Just a few months earlier, the same NYPD attorney-prosecutors permitted Lieutenant Jonathan Lucas to retire with full pension benefits—even after he was formally indicted for serious sex crimes and making violent threats while stationed at the NYPD Property Clerk Warehouse. Once again, no internal charges were brought, and Lucas was allowed to exit the Department without consequences.

253.     In November 2023, the corruption surrounding Defendant ADAMS reached a new level of visibility. A Summons with Notice was filed in New York County Supreme Court under the Adult Survivors Act, accusing Defendant ADAMS himself of sexual misconduct.

254.     On November 6, 2023, FBI Special Agents executed a federal search warrant at City Hall and seized Defendant ADAMS's electronic devices as part of a wide-ranging corruption investigation.

255.     When Defendant ADAMS was asked by the FBI Special Agents for the passwords to his electronic devices, Defendant ADAMS falsely claimed he had forgotten the password to one of his phones, an implausible excuse meant to obstruct the investigation. Data recovered from the device revealed that Defendant ADAMS had lied about the phone's location and availability.

256.     Upon information and belief, in the aftermath of the search, certain NYPD officials provided Defendant ADAMS with an untraceable "burner phone" enabling continued communication with the NYPD Defendants and other members of his political inner circle.

257.     Upon information and belief, the provision of this burner phone by NYPD officials was done to shield Defendant ADAMS's ongoing misconduct and allow the continuation of what now appears to be a coordinated criminal enterprise involving senior leadership in the employ of Defendant CITY and NYPD.

258.     Also on November 6, 2023, FBI agents executed a search warrant on the home of Brianna Suggs, a longtime aide to Defendant ADAMS, as part of the same corruption investigation. This further confirmed the breadth and seriousness of the misconduct surrounding Defendant ADAMS's administration.

J.    **Plaintiff's Counsel Warns Defendants of First Amendment Retaliation; City of New York Responds With Further Indifference**

259.    On November 25, 2023, the New York Post published a story on the lawsuit of Officer Ahmed Elmenshawy, who had been removed from the NYPD's Personnel Bureau after allegedly "speaking too much Arabic." The removal raised serious concerns of discrimination and retaliation.

260.    After the story broke, Elmenshawy received a call from the office of the First Deputy Commissioner, Defendant KINSELLA, inviting him in to discuss his lawsuit.

261.    However, when Elmenshawy arrived, he was not met by NYPD leadership for a constructive dialogue. Instead, he was confronted by Defendant SHEPPARD, who berated him for exercising his First Amendment rights by speaking publicly about his legal claims.

262.    The beratement of NYPD officers by Defendant SHEPPARD is typical of the way he interacted with subordinates in the NYPD.

263.    This bait-and-switch tactic, luring in a whistleblower under false pretenses, ostensibly for a meeting to have a "gentleman's discussion" regarding the lawsuit and then retaliating against him using the power of the office of Defendant SHEPPARD, constitutes direct and unlawful First Amendment retaliation.

264.    Elmenshawy amended his lawsuit shortly thereafter to add Defendant SHEPPARD as a named Defendant, citing this blatant retaliatory act.

265.    The incidents described above reflect an unbroken chain of constitutional violations, retaliatory abuse, and deliberate inaction by Defendant CITY and its highest officials. Defendant ADAMS, despite mounting scandals and criminal inquiries, has taken no action to curb the corruption or misconduct within his administration. Instead, he has enabled and protected it at every turn.

266.     On December 1, 2023, counsel for Officer Ahmed Elmenshawy, attorney John Scola, emailed Defendants KINSELLA, MADDREY, and GERBER and David Goldfarb, Miguel Iglesias, and Wendy Garcia, formally placing them on notice of unlawful First Amendment retaliation within the NYPD.

267.     The email informed City of New York and NYPD leadership that Defendant SHEPPARD had been added as a named Defendant in Elmenshawy's pending civil rights lawsuit for engaging in direct retaliatory conduct, including berating the officer for public speech about his legal claims.

268.     The email served as a cease-and-desist notice, demanding that Defendant CITY and its officials immediately cease all forms of retaliation against Officer Elmenshawy and any other employees engaged in protected speech, including media communications and by filing a lawsuit.

269.     Despite this clear warning, the Defendant CITY took no corrective action. Defendant SHEPPARD was neither investigated nor disciplined. No accountability followed. This failure to act sent an unmistakable message: retaliation for protected First Amendment activity would be tolerated, if not implicitly endorsed, at the highest levels of the NYPD and City Hall.

270.     Defendant CITY further entrenched this retaliatory culture by indemnifying Defendant SHEPPARD for his unlawful conduct, protecting him from personal liability despite clear evidence of unconstitutional retaliation.

271.     That same month, in December 2023, the Defendant CITY quietly settled the civil lawsuit stemming from Lieutenant Widler Lucas's on-duty sexual assault for $1,200,000.

272.     Defendant CITY declined to provide Lucas with legal representation during the civil proceedings, acknowledging that his conduct, sexual assault of a subordinate while on duty, was criminal and outside the scope of employment.

273.     Nevertheless, Defendant CITY exercised its discretionary authority to allow Lucas to leave the NYPD without facing internal discipline and to retire with his full pension intact, effectively shielding him from employment consequences while his criminal prosecution remained pending in Kings County Criminal Court. This course of action is highly unusual and is rarely, if ever, done in this manner. As a result of the NYPD's misguided "kindness," Lieutenant Lucas, who had been arrested for sexually assaulting an NYPD civilian while on duty, was allowed to retire with his pension benefits.

274.     These incidents, taken together, show how the Defendant ADAMS's administration weaponized policy discretion to reward loyalty, protect abusers, and silence whistleblowers, while ignoring constitutional obligations and public trust.

### K. Captain Promoted Following Sexual Harassment and City of New York Payout, Then Arrested for Violent Felony

275.     On December 7, 2023, NYPD Captain Hariton Marachilian, previously promoted under the authority of Defendant ADAMS despite well-known allegations of misconduct, was arrested in Passaic County, New Jersey. He was charged with first-degree kidnapping, assault, criminal restraint, and criminal coercion.

276.     The charges arose from a shocking and violent incident in which Captain Marachilian allegedly kidnapped a fellow NYPD female Captain, slammed her head into the dashboard of his car, and, when she attempted to flee, chased her down, caught her, and body slammed her onto the concrete.

277.     The brutality of the assault underscores the dangerous consequences of Defendant CITY's repeated decisions to promote known sexual abusers into positions of authority and public trust.

278.     His prosecution is ongoing as of the filing of this complaint and Captain Marachilian remains incarcerated in New Jersey.

279.     Marachilian's elevation to Commanding Officer of the 90th Precinct came despite multiple red flags. Defendant CITY, through the actions of its top officials, was fully aware of prior allegations against him, including sexual harassment and inappropriate conduct that previously led to a substantial civil rights settlement. Conversely, the female Captain who he harassed was forced to resign from the NYPD and relocated to a different state to escape the abuse.

280.     Nevertheless, rather than investigate or discipline Marachilian, Defendants ADAMS, MADDREY, and others rewarded him with a high-profile command, prioritizing personal loyalty and internal politics over public safety, professional ethics, and the well-being of NYPD personnel.

L.  **Defendant ADAMS Rewards and Further Emboldens the Defendants**

281.     The pattern of rewarding misconduct continued on February 6, 2024, when Defendant DAUGHTRY was promoted to Deputy Commissioner of Operations. This promotion came despite Defendant DAUGHTRY's well-documented record of civil rights violations, excessive force, and policy infractions. His elevation sends an unmistakable message: constitutional abuses are not only tolerated but also rewarded.

282.     Defendant DAUGHTRY continued to be promoted despite his lack of credentials, experience, or operational experience. The repeated promotion of officers like Defendant

DAUGHTRY, who lack qualifications for their promotions, is irresponsible and an affront to all the hardworking employees of the NYPD and the public.

283.    Just three weeks later, on February 29, 2024, Defendant SHEPPARD used his public NYPD social media platform on X (formerly known as Twitter) to launch a politically motivated and baseless attack on the judiciary. In a now-notorious Tweet, Defendant SHEPPARD falsely accused New York State Supreme Court Judge J. Machelle Sweeting of improperly releasing a civilian charged with possession of stolen property and narcotics.

284.    Defendant SHEPPARD not only mischaracterized the charges and the circumstances of the release, but he also identified the wrong judge. His inflammatory post publicly misled the public, threatened judicial independence, placed the Judge's life and safety in jeopardy, and reflected grossly unprofessional conduct by a high-ranking NYPD official.

285.    In response to the false public accusations, Al Baker, spokesperson for the New York State Office of Court Administration, issued a formal rebuke: "The recent social media posts from NYPD officials criticizing a recent bail decision not only indicated that the crime allegedly took place in the wrong county, but it also named a judge that did not preside over the case."

286.    Despite the gravity of this misconduct, which included misinformation, public intimidation of the judiciary, and abuse of official power, Defendant SHEPPARD faced no disciplinary action of any kind. This stands in stark contrast to the treatment of lower-ranking NYPD employees, who would almost certainly face consequences for far less egregious behavior.

287.     Upon information and belief, to date, Defendant SHEPPARD has not apologized for his mistakes related to this social media post.

288.     In March 2024, another longtime close advisor to Defendant ADAMS, Winnie Greco, had her home searched by FBI agents. The search was reportedly related to corruption investigations implicating City Hall, and a further indication of the lawless climate that has flourished under Defendant ADAMS's leadership.

M.  **The Sexual Misconduct Within the Administration Becomes Fully Known; Again No Disciplinary Action Is Taken**

289.     On March 21, 2024, Defendant ADAMS was formally accused of sexual assault by a former co-worker stemming from his time as an NYPD officer.

290.     Rather than recuse himself from involvement or follow proper protocols, Defendant ADAMS demanded representation by the New York City Law Department, a request that, under standard guidelines, should have been denied as the conduct allegedly fell well outside the scope of official duties. Nevertheless, the Law Department was coerced into compliance.

291.     That same month, on March 21, 2024, retired NYPD Sergeant Roxanne Ludemann filed a civil lawsuit alleging rampant sexual harassment and retaliation. Her complaint named senior mayoral aide Timothy Pearson, Defendant CITY, Defendant MADDREY, and IAB Group 1 Commanding Officer Joseph Profeta as Defendants.

292.     Despite the gravity of the allegations, Defendant ADAMS refused to initiate disciplinary action against Pearson or any of the individuals named in the lawsuit, furthering a well-established culture of silence and protection for high-level abusers.

293.    Ludemann alleged that, between December 2022 and April 2023, she was repeatedly sexually harassed by Pearson, who leveraged his power over discretionary promotions, including a pending "Sergeant Special Assignment" designation, as a coercive tool to solicit sexual favors.

294.    NYPD Chief Miltiadis Marmara personally witnessed Pearson touching Ludemann inappropriately. So serious was the conduct that Marmara was forced to restructure office operations to ensure Pearson was never alone with a woman on staff.

295.    Despite Ludemann's proven qualifications and placement on the promotional list, Pearson removed her name and instead advanced a less qualified male colleague, Patrick Gordon, who had personal ties to Pearson.

296.    This promotion manipulation exemplifies the NYPD's long-standing pattern of elevating for loyalty over merit, integrity, or professional qualifications.

297.    Pearson's actions appear to constitute not only civil violations, but also potential honest services fraud and other criminal acts. The full extent of which is still unfolding.

298.    After Chief Marmara confronted Pearson about the harassment, Marmara was stripped of his elite outside agency position, and sent back to NYPD, a clear act of retaliation.

299.    Pearson then coordinated with Defendant MADDREY and Profeta to retaliate against Ludemann, Sergeant Michael Ferrari, Lieutenant George Huang, and Chief Marmara for challenging his conduct.

300.    Pearson ordered NYPD Chief of the Internal Affairs Bureau Miguel Iglesias to open retaliatory investigations into all three male supervisors and Ludemann. These

investigations had no legitimate basis and were instead designed to punish those who had exposed Pearson's sexual misconduct.

301.    Pearson even went so far as to secretly record a meeting with Marmara, seeking evidence to support the fabricated investigations and shield himself from accountability.

302.    Over the course of 2023, these retaliatory campaigns intensified, forcing Ludemann and Ferrari into early retirement.

303.    This abuse of authority, where the NYPD was weaponized to silence whistleblowers and protect a close political ally, violated the constitutional rights of both Defendant CITY employees and civilians alike.

304.    Defendant ADAMS was fully aware of the retaliatory campaign but took no action to stop it, continuing a pattern of complicity and protectionism that defined and still defines his administration.

305.    As a result, Sergeant Ferrari and Lieutenant Huang filed their own lawsuits against Defendant CITY, Defendant MADDREY, and Pearson, alleging unlawful sexual harassment and retaliation.

306.    Even after these additional legal actions, Defendant ADAMS continued to shield the perpetrators from discipline.

307.    Defendant MADDREY faced no consequences for his repeated involvement in retaliatory misconduct, including in the Ludemann case and others.

308.    The continued employment benefits and protections afforded to Defendant MADDREY and Pearson, despite multiple lawsuits and well-substantiated misconduct, further establish that Defendant CITY, Defendant ADAMS, and the NYPD Defendants knowingly condoned these constitutional violations and failed to take corrective action.

309.     Defendant ADAMS's repeated refusal to hold his inner circle accountable has emboldened illegal conduct at the highest levels of City of New York government and law enforcement, further entrenching the Defendant CITY's use of the NYPD as a tool for personal and political retaliation.

### N.  **The Defendants Attempt to Distract the Public From Defendant ADAMS's Escalating Legal Troubles**

310.     In March 2024, as public scrutiny over Defendant ADAMS's alleged sexual misconduct intensified, Defendant CHELL engaged in a series of confrontational exchanges with journalists on Twitter, now known as X.

311.     Rather than uphold standards of professionalism, Defendant CHELL was allowed, if not encouraged, to use his public platform to attack reporters who covered the NYPD and its leadership critically.

312.     These online attacks, which targeted the free press, were not only tolerated but publicly condoned by Defendant ADAMS.

313.     Among those targeted were New York Daily News reporter Graham Rayman and journalist Harry Siegel, a columnist, Senior Editor and podcast co-host of FAQ NYC.

314.     Defendant CHELL even created his own Instagram account which, coupled with the Twitter accounts of several high-ranking NYPD officials, including the individual Defendants herein, blurred the line between private and NYPD business.

315.     Defendant CHELL's combative posture appeared calculated to redirect public attention from the growing scandals facing Defendant ADAMS and senior aides like Tim Pearson, both of whom were facing serious allegations of sexual misconduct.

316.     In April 2024, Defendants CITY, ADAMS, MADDREY, CHELL, and DAUGHTRY were named as Defendants in a federal lawsuit filed in the Eastern District of New York. The complaint alleged that these officials weaponized confidential information about a plaintiff's 2017 rape to retaliate against her for publicly criticizing violent policing tactics, particularly those employed by a controversial Deputy Inspector of the 73rd Precinct in the Brownsville section of Brooklyn, N.Y.

317.     The plaintiff had originally sought assistance from Defendant MADDREY and had been encouraged to file a police report.

318.     Thereafter, the plaintiff alleged that NYPD officials cut off her nonprofit organization's access to precincts in Brooklyn and instructed local Commanders not to engage with her.

319.     Ultimately, sensitive and confidential details about her sexual assault were leaked and circulated among community advocates, deliberately mixed with misinformation suggesting that she had fabricated the attack and had falsely accused a Black man of rape.

320.     This retaliatory conduct highlights a deeply rooted pattern within the NYPD and City Hall: the use of state power to suppress, intimidate, and discredit both internal whistleblowers and external critics.

321.     The weaponization of trauma, specifically the leaking of sexual assault details to silence dissent, is not an isolated incident. It reflects a broader custom and practice of retaliating against protected speech and civil rights activity.

322.     Despite the severity of the allegations, no action was taken to discipline Defendants MADDREY, CHELL, or DAUGHTRY, confirming that such conduct remains officially condoned by the City of New York.

323.    On March 30, 2024, President Donald Trump spoke outside the funeral home where the wake of NYPD Detective[3] Jonathan Diller, who was killed in the line of duty, was being held.

324.    From various sources, it was widely known that Defendant SHEPPARD ordered NYPD officers to stay far away from President Trump so they would not be seen in the background of photographs and media videos of President Trump speaking.

325.    Specifically, Defendant SHEPPARD ordered the present NYPD MOS to remain outside the funeral home; he did not want any NYPD uniformed personnel surrounding or in the background of President Trump's press conference. Upon information from reliable sources, Defendant SHEPPARD stated, to wit: "We don't want to show any NYPD solidarity with Trump." Many of the NYPD officers who received Defendant SHEPPARD's Order followed it, while others felt the Order violated their civil rights.

326.    On April 10, 2024, in an extraordinary and deeply unethical move, without prior notice to or approval by the NYC Corporation Counsel, Defendant ADAMS bypassed the New York City Law Department and hired a private attorney, using public funds, to represent him in the aforementioned sexual harassment lawsuit.

327.    This self-serving use of taxpayer money underscores Defendant ADAMS's willingness to exploit public resources in order to protect himself and his inner circle from accountability for illegal acts.

328.    Despite the clear breach of the Defendant CITY's protocol, Defendant ADAMS was allowed to act unchallenged and violated well-established procedures without any repercussions.

---

[3] Police Officer Diller was posthumously promoted from Police Officer to Detective 1st Grade.

329.     Defendant ADAMS had no checks and balances over his unlawful actions and used the NYC taxpayer funds to shield the criminal enterprise he controls from being exposed.

330.     Defendant ADAMS's actions revealed a persistent pattern: disregard for legal norms, abuse of power, and public manipulation, all in service of shielding a corrupt and retaliatory enterprise from scrutiny.

O.  **Defendant ADAMS Allows Defendants CHELL, DAUGHTRY, and SHEPPARD to Openly Defy the New York City Council and Violate Ethics Rules**

331.     On May 3, 2024, several New York City Council members urged Defendant ADAMS to discipline the NYPD Defendants herein for their repeated violations of ethical laws, but he again refused to act.

332.     On May 10, 2024, following months of disrespectful social media posts attacking journalists covering the NYPD, the New York City Council held a formal hearing over the issue.

333.     At issue were the NYPD Defendants' repeated tweets labeling protestors as "garbage" and attacking a New York City elected official, whom they stated should be voted out of office.

334.     These social media posts amounted to personal attacks on private citizens and elected officials, conduct that was plainly unethical and entirely unbecoming of NYPD leadership.

335.     New York City Council Speaker Adrienne Adams stated at the hearing that the conduct of Defendant CHELL and others was "dangerous, unethical, and unprofessional,"

noting that "included in the department's mission is to preserve the peace, protect the people, and reduce fear."

336.     Further, New York City ethics laws and internal NYPD standards, guidelines, and protocols bar police officials from using New York City resources, such as NYPD social media accounts, for blatantly political purposes.

337.     Despite being subpoenaed, Defendants CHELL, DAUGHTRY, and SHEPPARD defiantly did not attend the morning budget hearing with permission from Defendant ADAMS, thereby avoiding public accountability for their misconduct. Donlon was not surprised at ADAMS's abhorrent and disrespectful behavior toward the Speaker and the entire NYC COUNCIL, as ADAMS, along with CHELL, DAUGHTRY, and SHEPPARD, routinely showed no respect to others but always demanded respect.

338.     Defendant ADAMS permitted the individual Defendants to routinely violate Defendant CITY's rules, regulations, and policies and disregard oversight efforts by the New York City Council, which is statutorily charged with monitoring the increasingly unrestrained operations of the NYPD.

339.     Defendant ADAMS failed to discipline the Defendants herein for their repeated ethical and legal violations, thereby condoning their misconduct and emboldening further abuses.

340.     The many failures of Defendant ADAMS, which often rewarded select individuals for disrespectful behavior and contempt, sends the wrong message to the rank-and-file officers of the NYPD. Donlon advised that this behavior and demeanor was well known by MOS of all ranks.

341.     The distorted message was that one does not have to take responsibility for their

actions. They do not have to adhere to or show respect for the NYPD's rules and policies,

and moreover, writ large, the procedures, policies, and guidelines long established and

enshrined by New York City. This further undermined the NYPD, which is tasked with

working and communicating with the New York City Council to ensure communities

within New York City are safe and protected.

### P.    **Defendant ADAMS Forces the Law Department to Break Policy to Indemnify Co-Conspirator Tim Pearson, Forcing the Resignation of the City of New York's Highest-Ranking Attorney**

342.     On May 31, 2024, the New York City Corporation Counsel, the Honorable Sylvia

Hinds-Radix, resigned from her position as head of the Law Department due to mounting

internal conflict over the Defendant CITY's decision to represent and indemnify Pearson

in multiple sexual harassment lawsuits.

343.     It was later revealed through the reporting of Politico that Defendant ADAMS

personally intervened to force the Law Department to indemnify Pearson, despite

credible, corroborated allegations of sexual misconduct, including eyewitness testimony

from senior NYPD officials.

344.     This decision was in direct violation of longstanding New York City policy, which

governs when indemnification and legal representation are appropriate. The misconduct

alleged against Pearson, including sexual harassment for personal gain, was plainly

outside the scope of his official duties and therefore disqualifying under established Law

Department guidelines.

345.     The controversy was further compounded by reports that the rift began when

Defendant ADAMS similarly forced the Law Department to represent him in a separate

sexual assault lawsuit, again, despite the allegations falling well outside the scope of his public employment.

346.     Defendant ADAMS has repeatedly compelled Defendant CITY to finance the legal defenses of himself and his inner circle, even when their conduct clearly violated the law and ethical norms.

347.     These decisions reflect a broader abuse of public funds and power. By using taxpayer money to shield himself and his allies from accountability, Defendant ADAMS has undermined the independence of the Law Department and corrupted the purpose of public indemnification.

348.     During this time, the Law Department was also actively investigating the sexual harassment claims brought by Sergeant Roxanne Ludemann. That investigation revealed that the Defendant CITY had direct knowledge of Pearson's misconduct since at least December 2022 and had failed to stop it or put an end to these clear and concise claims.

349.     Despite Defendant CITY's internal awareness and corroborating testimony, including testimony from Chief Miltiadis Marmara, who reported and witnessed Pearson's inappropriate conduct, Pearson was never disciplined. Instead, he was allowed to remain in his powerful post as Senior Advisor to the Mayor.

350.     Following these events, Politico reported that Corporation Counsel Hinds-Radix's resignation was directly caused by the Defendant CITY's insistence on defending Pearson despite corroborated allegations of sexual misconduct.

351.     The testimony confirming Pearson's misconduct included multiple recorded interviews with high-ranking officials like Chief Marmara, whose statements left no doubt as to the veracity and seriousness of the harassment.

352.    In forcing the Law Department to break its own ethical standards to protect himself and his close ally, Defendant ADAMS fundamentally compromised the integrity of the City of New York's legal apparatus and deepened the public harm already caused by Pearson's actions.

Q.    **As Repeated Lawsuits Continue to Be Filed, NYPD Defendants Are Rewarded by Defendant ADAMS**

353.    For Defendant CITY employees, who are willing to go along with the unlawful conduct of the Defendants herein, the rewards are obvious.

354.    Joseph Profeta, a Defendant in the Ludemann lawsuit and a key factor in shielding Lieutenant Lucas from discipline following credible allegations of sexual assault, was granted a discretionary promotion to Inspector on May 31, 2024.

355.    This promotion was delivered personally by Defendant ADAMS on the NYPD's promotional stage, a ceremonial privilege rarely granted and clearly symbolic of political favoritism.

356.    On July 16, 2024, Captain Gabrielle Walls commenced a lawsuit against the Defendant CITY, Assistant Chief and Commanding Officer of Patrol Borough Brooklyn North Scott Henderson, and Defendant MADDREY. Captain Walls had been sexually harassed by Defendant MADDREY for several years and by Chief Henderson following her promotion to Captain and assignment to a Brooklyn North command.

357.    Captain Walls's complaint describes years of sexual harassment by Defendant MADDREY, including repeated unwanted advances and attempts to kiss her. These repeated attempts occurred at various holiday parties and regularly when Captain Walls worked as a Lieutenant in the 88th Precinct. The repeated harassment commenced when

now Captain Walls was promoted to Lieutenant in 2015 and continued until she filed her lawsuit.

358.    Captain Walls was forced to hide in her office in the 88th Precinct with the lights off to avoid Defendant MADDREY, reflecting the severity of the harassment and the unsafe working environment created by NYPD leadership. After getting promoted to Captain, Chief Henderson, emboldened by his mentor and sexual predator Defendant MADDREY, also tried to kiss Captain Walls at work in the normal course of their employment. Captain Walls was horrified by the unwanted sexual harassment, yet powerless to stop it as Defendant MADDREY was running the NYPD.

359.    The Defendant CITY had actual notice of these events by July 16, 2024, if not earlier, yet failed to take any action to protect Captain Walls or discipline the perpetrators.

360.    Assistant Chief Scott Henderson is a childhood friend and protégé of Defendant MADDREY. After Captain Walls objected to the sexual harassment, she was denied a Commanding Officer position and discretionary promotion to Deputy Inspector. When she confronted Chief Henderson about the clear mistreatment, Henderson told her that other women were promoted "because they are willing to do things you aren't."

361.    Despite these allegations, Henderson remained the Chief of Brooklyn North, the highest command in that patrol borough and just two ranks below NYPD Chief of Department, until he was forced to resign for lying in internal interviews with IAB related to the accommodation he gave a woman officer to work from home for fifteen months in June 2025.

362.    Under the Defendants' collective leadership, unlawful conduct, criminal acts, and workplace retaliation are not punished. They are rewarded.

363.    On July 30, 2024, Chief Miltiadis Marmara filed a lawsuit against the Defendant CITY, Pearson, Defendant MADDREY, and Defendant CHELL.

364.    In that suit, Marmara attested that he personally witnessed Pearson inappropriately touching Sergeant Ludemann, who was Marmara's Chief of Staff.

365.    After confronting Pearson, Marmara was stripped of his prestigious assignment and targeted for retaliation. This is a clear example and part of the broader culture of silencing dissent within the NYPD.

366.    Despite this corroborating testimony by Marmara, the Defendant CITY failed to discipline Pearson in any meaningful way.

367.    Following the lawsuit, Defendant CHELL, well known throughout the NYPD and the outside communities for his heavy usage of alcohol, telephonically contacted Chief Marmara while intoxicated and berated him for filing the lawsuit.

368.    Defendant CHELL's retaliatory behavior didn't end there. At a meeting of the NYPD's most senior officers, including Bureau Chiefs and Assistant Chiefs, CHELL publicly disclosed the existence of Marmara's complaint and declared that he looked forward to being deposed.

369.    During the same meeting, CHELL emphasized that he worked under Defendant MADDREY, insinuating allegiance and retaliatory intent, effectively placing a target on Marmara's back in front of the NYPD's highest-ranking officials.

370.    No disciplinary action was taken against Defendant CHELL for this obvious act of intimidation and retaliation, reflecting a pattern of misconduct and deliberate indifference that runs from precinct-level retaliation to the highest ranks of City Hall.

371.    The examples detailed above demonstrate a pervasive and deeply entrenched municipal custom and policy, tolerating and, in fact, rewarding misconduct, that foreseeably resulted in the retaliation, silencing, and constitutional violations suffered by Donlon.

372.    Each of the foregoing paragraphs is incorporated by reference and submitted in support of Plaintiff's Monell claim under 42 U.S.C. § 1983.

### 3. FACTUAL ALLEGATIONS FOLLOWING  PLAINTIFF THOMAS G. DONLON's EMPLOYMENT AS INTERIM POLICE COMMISSIONER

**A.  The Scope of the Criminal Investigations and Potential Criminal Activity Surrounding Defendant ADAMS's Appointees Becomes Known**

373.    On or about September 4, 2024, the FBI searched the homes of multiple senior members of Defendant ADAMS's administration and NYPD leadership, including those of Police Commissioner Edward Caban, Timothy Pearson, Phillip Banks, David Banks, Terrence Banks, and First Deputy Mayor Sheena Wright. Federal agents seized electronic devices and cash as part of a sweeping investigation into alleged bribery, corruption, and misconduct related to City of New York contracts and NYPD discretionary promotions.

374.    Commissioner Caban's home was reportedly searched in connection with criminal allegations involving his twin brother, James Caban, who was alleged to be collecting protection money from nightclubs in exchange for police intervention. In addition, Former Commissioner Edward Caban is under investigation by the IRS, per news media, for illegal conduct tied to discretionary promotions within the NYPD.

375.     Phillip Banks, already notorious for being an unindicted co-conspirator in a prior FBI federal corruption case involving $300,000 in unexplained income, as reported in the media, also had his phones confiscated pursuant to a court order. Banks avoided prior criminal charges, likely due to cooperation with federal investigators.

376.    Banks's brothers, David and Terrence Banks, were likewise subjected to electronic seizures by federal authorities, suggesting a broader pattern of coordinated misconduct within the Defendant CITY's highest ranks.

377.    Sheena Wright, First Deputy Mayor to Defendant ADAMS, similarly had her phone confiscated and is under federal investigation. This further underscores the pervasiveness of potential criminal activity among Defendant ADAMS's inner circle.

378.    Despite these serious and credible allegations, Defendant ADAMS took no meaningful action to remove or discipline any of the individuals implicated in these federal investigations. This inaction reflects a deliberate effort to shield his allies from accountability and reinforces the appearance of a coordinated and corrupt enterprise within the Defendant CITY.

379.    Following the execution of the search warrant on the residence of Commissioner Caban, the highest-ranking official within the NYPD at the time, public speculation intensified over his imminent resignation.

380.    Upon information and belief, Defendant MADDREY also had search warrants executed by the FBI, who seized his electronic devices, and seized and searched his residence.

381.    Upon information and belief, Defendant MADDREY did not disclose that he was under investigation in order to remain in charge of the criminal enterprise which he ran, the NYPD.

382.    On September 10, 2024, amid these unfolding events, Defendant SHEPPARD responded to a request for comment from a New York Post reporter by calling the journalist a "fucking scum bag," a vulgar and unprofessional remark that once again went unpunished by Defendant ADAMS.

383.    On September 12, 2024, Commissioner Caban was ultimately forced to resign from his position as Police Commissioner.

384.     Before resigning, Commissioner Caban issued a disciplinary ruling that exemplified the NYPD's protection of insiders. Captain Antonio Pagan was found guilty of a sustained campaign of sexual harassment.

385.     Despite the Trial Commissioner's recommendation for termination, Caban reduced the penalty to the loss of 60 vacation days. Pagan was allowed to quietly retire with a full pension and benefits.

386.     This wasn't an exercise of discretion—it was a calculated act of protection. Caban's decision, rendered after a federal search warrant had been executed but before his abrupt resignation, reflects a deliberate effort to shield connected officers from meaningful accountability. It underscores the same institutional rot that targeted Donlon: a criminal enterprise where misconduct is tolerated, discipline is manipulated, and anyone who threatens to expose the truth—like Donlon—is removed and retaliated against.

387.     Even after Caban's resignation, the remaining close associates of Defendant ADAMS, all under federal investigation, were allowed to retain their employment with the Defendant CITY without any discipline or public acknowledgment of wrongdoing.

388.     Immediately after Caban's resignation, Plaintiff Thomas G. Donlon was contacted by person(s) mutually known to Donlon and Defendant ADAMS.

**B.   Defendant ADAMS Uses Donlon's Credibility to Legitimize a Corrupt Administration, Then Targets Him When He Refuses to Stay Silent**

389.     Donlon was informed by a third party that "Eric" (Defendant ADAMS) told him to call Donlon and inform him that Defendant ADAMS is considering Donlon for the Police Commissioner position and requested that Donlon interview for the position, which in fact he did.

390.    Given the turmoil surrounding the FBI search warrants executed within the NYPD

and Defendant CITY, including indictments, arrests, and resignations of many NYPD and

Public Safety officials, along with publicly improper treatment of public officials by

NYPD top Executives, Donlon was concerned. Donlon was also concerned about the

situation concerning the last two short-term Police Commissioners who resigned.

Following the interview, Donlon stated he would only come in as an interim Police

Commissioner.

391.    Donlon was very much concerned and was told by many individuals that the four

top Executives, Defendants MADDREY, CHELL, DAUGHTRY, and SHEPPARD, all

wanted to be appointed as Police Commissioner and were disappointed when Donlon was

named. Donlon was also concerned about not being legacy NYPD; his appointment would

also be met with animosity and resentfulness.

392.    After accepting the interim Police Commissioner appointment, Donlon's initial

primary objective was to develop a close working relationship with the Mayor (Defendant

ADAMS), Chief of the Department (Defendant MADDREY), and all the Bureau

executives. He began to do this during the regularly scheduled Monday morning weekly

meetings discussing NYPD citywide administration and operational matters.

393.    Donlon felt it was critical for him to join the organization and work closely with

the top executives; he brought added value with his domestic and international law

enforcement and intelligence experience.

394.    Donlon was very confident and excited about working closely with the NYPD. He

felt his experience with the JTTF, NYS Homeland Security, Section Chief would make

for an easy transition.

395.     Despite the interim title, Donlon's objective was to support the Mayor, his administration, and the hierarchy of the NYPD, and he wholeheartedly supported the rank-and-file officers. Donlon's primary objective was to bolster the development of all ranks, establish a program to mentor and instill confidence in a structured environment where veteran officers and supervisors actively developed tomorrow's NYPD leaders.

396.     Donlon's concern was also that the NYPD executives who were close to Defendant ADAMS avoided any accountability or repercussions from City Hall, due to their respective long-standing relationships with Defendant ADAMS.

397.     Specifically, Donlon was concerned about the top executives, Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, and SHEPPARD, and their troubling and adverse reputations.

398.     The many unchecked missteps and mistreatment of NYPD personnel by all of the above-mentioned Defendants were of great concern to Donlon.

399.     Although his title was temporary, his overarching objective was unwavering: to restore the NYPD's integrity, guarantee equal treatment for all officers, and reinforce support for the rank-and-file officers. At the same time, he recognized that, as an outsider without a legacy NYPD background, his appointment might be met with animosity and resentment.

400.     Unfortunately, the Monday morning meetings were largely unproductive.

401.     At each meeting, Donlon would ask Defendant CHELL for an update on the status of operations within the NYPD. Defendant CHELL would respond by stating, "Nothing to report."

402.     Donlon was taken aback by the lack of effort by Defendant CHELL, who seemed to do as little work as possible.

403.     Following multiple meetings, Donlon pulled Defendant CHELL aside to inform him that, as Chief of Patrol, he should have information to report at the meetings.

404.     Defendant CHELL continued in his lackadaisical approach.

**C. Donlon Is Named Interim Police Commissioner Based on His Concerns With the Position**

405.     Donlon was named the interim NYPD Police Commissioner on September 12, 2024, which was made official on September 23, 2024.

406.     Despite his reticence and title distinction, Donlon believed he was taking the full position of Police Commissioner and all the responsibilities that came with it, including making final decisions with input from experienced and competent Executives. (Legally, there is no difference or distinction in power or authority between an interim, acting, or permanent Police Commissioner.)

407.     After being named interim Police Commissioner, Donlon quickly learned he had the position in name only and had no authority, control, or sole decision-making.

408.     This realization came to Donlon gradually as described herein.

409.     As a result of his lack of decision-making power and authority, despite his title, every statement made by Donlon contained herein, past or present, is made as a civilian and not within the scope of employment.

410.     A public employee is speaking as a private citizen when their speech is outside the scope of their employment in order to expose the rotting corruption and ineptitude within a public organization.

411.    Defendant ADAMS never intended to allow Donlon to actually function as the Police Commissioner, interim or otherwise.

412.    As a result of Defendant ADAMS's premeditated intentions, Donlon's job duties as interim Police Commissioner were virtually non-existent, with Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO truly managing and operating the Police Department and disregarding all edicts on orders issued by and/or assigned by Donlon.

413.    Each time Donlon expressed dissatisfaction about the unlawful actions of Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO to Defendants ADAMS, being the Chief of the Department, he was speaking as a private citizen, as he was the Police Commissioner in name only, as described above.

414.    Again, Donlon's position as Police Commissioner was purely a figurehead position.

415.    At all times herein, Donlon's speech is protected under the First Amendment to the United States Constitution.

416.    After being named the interim Police Commissioner, Donlon met Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, and SHEPPARD on the first day.

417.    It did not take long for Donlon to fully understand, and unfortunately, it was confirmed that the Defendants were going to be extremely problematic and not offer any support or respect toward him.

418.    The collective NYPD Defendants were determined for Donlon to fail and deliberately employed measures to do so, always complaining to Defendants ADAMS or his immediate staff.

419.    Donlon learned immediately from trusted sources within and out of the NYPD, that Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, and SHEPPARD were each angry and highly distraught that they were not named NYPD Police Commissioner.

420.    Defendant SHEPPARD, more than the other NYPD Defendants, was particularly openly hostile and resentful toward Donlon for not being selected by Defendant ADAMS and quite clearly made his feelings known to Defendant ADAMS.

421.    Instead, Defendant SHEPPARD embarked on a pattern of behavior to sabotage, publicly undermine, and embarrass Donlon.

422.    Defendant SHEPPARD's hostility toward Donlon stemmed from his failure to be named Police Commissioner. Defendant SHEPPARD's activities were done in a desire to curry further favor with Defendant ADAMS, in order to prove to Defendant ADAMS that the selection of Donlon was in error.

423.    After spending time with each of them, Donlon found that Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, and SHEPPARD were unmanageable, insubordinate, inexperienced, and ineffective in their past and current roles.

424.    While Donlon could tolerate personal discourtesy, the actions of Defendant SHEPPARD's blatant disregard for the office of the Police Commissioner were unacceptable. Both Defendants ADAMS and MADDREY were fully aware of Defendant

SHEPPARD's behavior, yet did not address his actions or discipline him. After a while, directly confronting Defendant SHEPPARD proved pointless.

425.    Defendant ADAMS—who had the leadership authority—never arranged meetings to address differences in the NYPD while disallowing Donlon to lead the NYPD.  Instead, Defendant ADAMS let the situation fester. It was both embarrassing and demoralizing for Donlon to endure Defendant SHEPPARD's public display of disrespect and misconduct. Under normal circumstances, Donlon would not have tolerated such behavior, and many retired NYPD MOS and federal, state, and city Task Force members can attest to that. However, Donlon tolerated the lying, cheating, and sneaky behavior in order to be there for the rank-and-file officers.

426.    Shortly after Donlon became Police Commissioner, the legal adviser to Defendant ADAMS, Lisa Zornberg, a distinguished former federal prosecutor, abruptly resigned from the administration of Defendant ADAMS.

427.    It is subsequently reported that Zornberg decided to resign after Defendant ADAMS refused her advice to terminate Tim Pearson, Phillip Banks, and Winnie Greco. Mrs. Greco was an aide to Defendant ADAMS and separately was under federal investigation at that time.

428.    Upon assuming his duties, Donlon brought three NYPD officers of various ranks to join his staff. Shortly thereafter, literally within a month, Defendant ADAMS informed Donlon to remove these three MOS individuals from the Police Commissioner's staff.

429.    Weeks later, Defendant ADAMS informed Donlon that Defendant SHEPPARD would serve as Donlon's "temporary" Chief of Staff, while maintaining his permanent DCPI role.

430.    During this time, Donlon also worked closely with a respected and experienced NYPD Chief who aided his transition. The Chief's knowledge of policy and deep relationships both inside and outside the NYPD were invaluable.

431.    Donlon had no desire for Defendant SHEPPARD to be assigned as his temporary Chief of Staff, but he complied with the directive from Defendant ADAMS. Given Defendant SHEPPARD's prior hostility toward Donlon and others, working with him posed significant challenges.

432.    Despite this, Donlon followed Defendant ADAMS's order. ADAMS claimed that SHEPPARD had experience "putting these types of operations together," referring to the Police Commissioner's Office—but provided no examples to support the claim.

433.    Defendant ADAMS again stated, "I want you to work with him," as he previously stated about working with Defendants KINSELLA, MADDREY, CHELL, and DAUGHTRY. As always, Donlon advised Defendant ADAMS that he had no issues with or reason not to cordially work with Defendant SHEPPARD or any of the above-mentioned Defendants.

434.    While Donlon tolerated personal discourtesy, Defendant SHEPPARD's open disrespect for the office of Police Commissioner was unacceptable. Defendants ADAMS and MADDREY were fully aware of Defendant SHEPPARD's behavior, yet failed to intervene.

435.    Donlon made multiple attempts to confront Defendant SHEPPARD directly, but these proved futile. Defendant ADAMS, despite his authority, never convened a joint meeting to resolve the conflict. When Donlon attempted communication, Defendant SHEPPARD would either walk away or respond with a violent outburst.

436.     It was both embarrassing and demoralizing to endure Defendant SHEPPARD's conduct. Under normal circumstances, Donlon would not have tolerated such behavior, and in their positions, Defendants ADAMS and MADDREY certainly had the power and personal relationship with Defendant SHEPPARD—and the responsibility—to end it but refused to intercede as leaders and rectify this continuous matter. Donlon would have done so immediately.

437.     Defendant ADAMS also informed Donlon that he was not allowed to schedule any media interviews unless they were known and authorized by Defendant SHEPPARD.

**D. Donlon's Attempt to Discuss and Provide Guidance on NYPD Social Media Guidelines and Procedures**

438.     Donlon did not seek to limit the collective NYPD Defendants' ability to give media interviews on behalf of the NYPD, but he also wanted to end the reckless and highly disrespectful social media practices that were proving to be an embarrassment to the NYPD.

439.     Donlon informed all the present Assistant, Deputy, and Bureau NYPD Chiefs, along with other high-level uniformed and civilian employees, at Donlon's first weekly Monday meeting that their individual public statements on social media outlets (Instagram, X, emails) were reflective of  NYPD official public statements as an institution. Accordingly, prior to sending out individual messages on social media, it is required to first obtain the approval of the Legal Bureau. Donlon instructed all attending this regularly scheduled Monday morning meeting to exercise caution when using social media and to strictly comply with the NYPD's written policies requiring Legal Bureau

pre-clearance for outgoing official communications. Donlon reiterated that all media and social media engagements must be professional and representative of the NYPD's values.

440.    Donlon emphasized the necessity of a unified voice for the Department on social media to address the growing problems caused by unchecked and unprofessional posts.

441.    After the meeting, Donlon spoke privately with Defendants MADDREY, CHELL, DAUGHTRY, and SHEPPARD concerning their social media posts, in particular, those made by Defendants CHELL and DAUGHTRY. Donlon advised them that many of their social media posts to the news media, politicians, and the public regarding NYPD investigations and positions on NYPD matters were unprofessional, unauthorized, and controversial. Donlon explained and presented to them the official NYPD policies, procedures, and guidelines manual, which must be adhered to before any NYPD information is released. Donlon advised the above that they needed to simply forward their proposed posts to the NYPD Legal Bureau for their review and final approval. Donlon reiterated that there needed to be one voice enforcing the NYPD policies, procedures, and guidelines in order to prevent embarrassment to the NYPD from outside entities, public and private sectors, media, political figures, etc.

442.    Donlon reiterated and clarified to all the attendees at the Monday meeting, including Defendants MADDREY, CHELL, DAUGHTRY, and SHEPPARD, that this directive "does not prohibit you" from speaking with the media, political figures, or representatives of the public and private sectors. Although Sheppard attended the initial meeting, he offered no comments about the dissemination of information, which was quite surprising as he held the position of Deputy Commissioner of Public Information (DCPI) and interacted with the media, etc. on a daily basis. (Incidentally, Defendant SHEPPARD

seldom attended the weekly Monday morning executive meetings, nor did he designate a delegate. In practice, Defendant SHEPPARD acted entirely on his own terms. Defendant SHEPPARD made it abundantly clear to Donlon, on numerous occasions, and the entire command that he had neither respect for nor interest in Donlon's authority nor the Police Commissioner position and what it represents. Defendant SHEPPARD rarely attended these weekly scheduled executive Monday morning meetings, nor did he send someone in his place, which Donlon was made aware of when Defendant SHEPPARD failed to attend. In essence, Defendant SHEPPARD did as he pleased, when he wanted and was incorrigible and unmanageable.

443.    It was quite apparent to Donlon and all the MOS who witnessed his demeanor, especially the three and two star Chiefs, along with the NYPD civilian personnel at the Monday meetings that Defendant SHEPPARD had absolutely no respect or time for Donlon. Despite the overt hostility, Donlon always approached Defendant SHEPPARD with the utmost respect, attempting to develop a cordial relationship.

444.    Unfortunately, Defendants ADAMS and MADDREY were fully aware of Defendant SHEPPARD's behavior and allowed it to continue. Arguing or verbally fighting with him was pointless. Defendant ADAMS knew exactly what was happening and continued to let it fester as he made virtually no attempt to stop Defendant SHEPPARD's behavior. It was extremely embarrassing for Donlon to tolerate Defendant SHEPPARD's behavior, and it was demoralizing to Donlon to have Defendant SHEPPARD act in this manner. Under normal conditions and circumstances, Donlon would have never tolerated Sheppard's behavior. As leaders, Defendants ADAMS and MADDREY had the authority to end his behavior but condoned it instead.

445.    In the Social Media meeting, Defendants CHELL and DAUGHTRY became rather defensive and asked Donlon to show them the documents and posts he was referring to. Donlon clearly stated, "I have a couple of folders in my office. Would you like to see them?" Defendants CHELL and DAUGHTRY did not respond.

446.    Donlon further instructed Defendant DAUGHTRY that he should not disable the feature on his software that does not allow recipients of communications to provide any positive or negative comments to the posts. The person responding in general may have very valuable information for the NYPD, and turning off comments prevents the sharing of information.

447.    Donlon was very concerned about the improper interference by Defendant ADAMS with his staff, which undermined the policy enforcements of Donlon and enabled continued misconduct.

448.    Leading by example, Donlon sought approval of social media posts from the Legal Bureau prior to their being disseminated to the public and hopefully avoid misconduct by the individual NYPD Defendants.

449.    This misconduct was later substantiated by an official report issued by the New York City Department of Investigation, cited below.

450.    Donlon focused particular attention on Defendants MADDREY, CHELL, and DAUGHTRY, holding a private meeting with them to underscore the importance of compliance with the policy.

451.    Donlon's intervention was prompted by rampant social media abuses, including verbal attacks by NYPD officials on members of the media, political figures, in particular, NYC Council Speaker, Adrienne Adams, and individuals in the private and public sectors.

Prior to Donlon's appointment as the interim Police Commissioner, these unprofessional posts had already led to a public announcement that the Department of Investigation was investigating Defendants CHELL, DAUGHTRY, and the NYPD for misuse of social media.

452.    Defendants MADDREY, CHELL, and DAUGHTRY resisted Donlon's directives, claiming the policy improperly limited their ability to engage with the public and private sectors.

453.    Donlon clarified that the policy applied solely to official communications and the NYPD Legal Bureau review, which was standard NYPD departmental procedure and not a new restriction placed by Donlon.

454.    To illustrate his concerns, Donlon referenced documented examples of prior problematic posts for their review.

455.    Donlon spoke directly with Defendant CHELL about how the Department of Investigation was investigating him for his rude and unprofessional comments.

**E.  Donlon Immediately Undermined by Defendant ADAMS**

456.    Within an hour of the above-mentioned meeting concerning social media, Defendants MADDREY, CHELL, DAUGHTRY, and SHEPPARD went directly to Defendant ADAMS separately to undermine Donlon, alarmingly, on his initial day as interim Police Commissioner.

457.    This usurping of power was indicative of the relationship between Donlon and the Individual Defendants from this point forward. No matter what Donlon tried to do to rein in the abuse of power, the Individual Defendants were allowed to ignore Donlon's Orders as they had direct access to Defendant ADAMS.

458.    Shortly thereafter, Defendant ADAMS called Donlon to City Hall for a meeting in his office. At the meeting, Defendant ADAMS ordered Donlon to "back off these guys. They are my best three guys who are keeping crime down."

459.    Donlon was shocked since he knew countless other NYPD personnel who were more intelligent and knowledgeable about police tactics and administration. In Donlon's assessment, each of the individual Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, and SHEPPARD lacked the skills and police experience to serve in their appointed positions.

460.    There were other knowledgeable, experienced, and successful NYPD Executives known to Donlon. He was unable or not permitted to directly contact and consider any of these high-level executives who possessed tangible experience while managing large-scale law enforcement and intelligence operations.

461.    Unfortunately, these individuals sought by Donlon were unable even to attain positions or promotions because of the actions of Defendants ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, and SHEPPARD. The aforementioned NYPD Defendants lacked, in Donlon's assessment, the intelligence and essential administrative and operational experience required for the positions they held.

462.    Specifically, Donlon immediately saw that the individual Defendants mentioned by Defendant ADAMS as his "best guys" had little successful police experience (i.e., arrests, court testimony), and virtually no experience in major police operations or administration. Donlon had reviewed the backgrounds of the top-tier executives of the NYPD (the NYPD Defendants) prior and when he assumed the post of interim Police Commissioner and was mortified by their lack of experience.

463.    Defendant SHEPPARD, for instance, according to the NYPD website, had only effectuated fifteen misdemeanor arrests, five felony arrests, and issued two violations in his entire twenty-year career, according to the NYPD Portal. Defendant ADAMS, while attaining the rank of NYPD Captain, also had very limited arrests and no Task Force experience in or history of handling major investigations.

464.    Defendant DAUGHTRY had no leadership experience and even stated that he failed the NYPD's civil service sergeant's examination.

465.    Specifically, at a dinner attended by Donlon and several other NYPD Executives, in which Defendant DAUGHTRY was receiving a leadership award from one of the NYPD's fraternal organizations, Defendant DAUGHTRY, unprompted, announced that he was a "leader even though I failed the sergeant's examination," repeating twice, "I am a leader."

466.    Defendant CHELL, during a chase, shot a civilian in the back, fatally killing him. He was exonerated but was civilly found guilty.

467.    When Donlon became interim Police Commissioner and spent time assessing and closely working with Defendants MADDREY, CHELL, DAUGHTRY, and SHEPPARD, he wanted to replace them due to their lack of experience in handling and managing investigations, but was not allowed by Defendant ADAMS.

468.    Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, and SHEPPARD were essentially allowed to do whatever they wanted due to their personal relationship with Defendant ADAMS.

469.    By meeting with Defendants CHELL, DAUGHTRY, and SHEPPARD, Defendant ADAMS undermined Donlon within days of his assuming the position.

470.     As a result of their ability to circumvent the chain of command without consequence, Defendants CHELL, DAUGHTRY, and SHEPPARD went directly to Defendant ADAMS to complain about Donlon's Executive Orders etc. Essentially, Donlon had no power or authority to make decisions or transfer and promote MOS within the NYPD.

471.     When Donlon attempted to make changes within the Police Department, he was completely prevented from doing so by the Defendants herein, and in particular, Defendant GERBER of the NYPD Legal Bureau.

472.     Donlon, as stated and implied throughout this Complaint, is of the belief that all of his communications and meetings with Defendant ADAMS were essentially those of a civilian speaking to a politician, and not those of a duly appointed interim Police Commissioner speaking with a duly elected Mayor (Defendant ADAMS). Donlon was the interim Police Commissioner in name only and lacked the authority, as authorized by law, to carry out his official duties.

473.     Donlon was not given the authorization by Defendant ADAMS to make any major decisions or properly manage the Police Department. Additionally, Donlon did not have the authority to supervise or discipline Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, SARACENO, and MARINO when they refused to follow his Orders or report back to Donlon with expected answers. This was a direct result of Defendant ADAMS not supporting the Police Commissioner. There has never been any recent Mayor who has not backed or supported the Police Commissioner.

474.     It should be noted that Donlon had no real choice in accepting the role of legitimate Police Commissioner under Defendant ADAMS—a leader who appeared to lack even the

most basic sense of ethics, integrity, or moral responsibility. The gross mismanagement of the nation's largest police department under Defendant ADAMS devastated morale and performance across the NYPD. Rank-and-file supervisors patrolling the streets, as well as those in Transit and Housing, were left without guidance or support. Even the Department's highest-ranking uniformed leaders—Assistant and Bureau Chiefs—were routinely undermined and abandoned by the ADAMS administration.

475.    At every turn, Donlon attempted to raise concerns about police corruption directly with Defendant ADAMS. Although Donlon repeatedly requested formal meetings, Defendant ADAMS was consistently unavailable. In contrast, Defendant MADDREY met with and advised Defendant ADAMS on a daily basis. Defendant MADDREY, the known sexual predator,  acted as a gatekeeper, telling Donlon he would relay his concerns to Defendant ADAMS and deliver any messages on his behalf. Despite Donlon's good-faith efforts to improve NYPD operations and address systemic corruption, Defendant ADAMS—shockingly and without justification—retaliated against him for his objections to the corruption. Defendant ADAMS diminished Donlon's authority, spread internal and external rumors that he would be fired, and ultimately carried out an unlawful termination in direct response to Donlon's efforts to hold the Department accountable.

476.    The NYPD is a paramilitary organization that operates under a chain of command structure to ensure maximized efficiency.

477.    As a result of Donlon's lack of authority and power, and the ability of the individual Defendants to speak directly to the Mayor, Defendant ADAMS, this chain of command structure was intentionally dismantled by Defendant ADAMS. To allow Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER,

SARACENO, and MARINO to unlawfully control the entire NYPD is egregiously dangerous and unprecedented.

478.    Moreover, Donlon was repeatedly told that the individual Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO resented the FBI and Donlon's federal background and did not want to work with federal law enforcement authorities, as voiced by CHELL and DAUGHTRY.

479.    Throughout his time working as the interim Police Commissioner, Donlon's Orders were disobeyed or ignored by Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO. As previously stated, the above-mentioned Defendants were essentially in control of the entire NYPD, in conjunction with ADAMS, from the time of Donlon's appointment as the interim Police Commissioner in September 2024 until Donlon was retaliatorily terminated as Police Commissioner in November 2024.

480.    When Donlon first met Defendant KINSELLA, she was cordial and expressed a willingness to support him in addressing NYPD-wide administrative and operational matters. She claimed she would bring forward valuable ideas, initiatives, and projects to improve the Department's overall efficiency and morale—particularly among patrol officers and frontline supervisors. Despite these assurances, Defendant KINSELLA never once offered tangible assistance or presented any of the initiatives she had promised. This included key concerns repeatedly raised by all NYPD unions, such as tour scheduling and morale.

481.     Donlon requested that each of the Bureau Chiefs submit funding requests to the New York City Police Foundation in order to offset shortfalls in funding. Donlon provided the funding applications to the Chiefs. The only Chief who submitted the form was the Chief of ESU, who submitted a request for $550,000 in funding, while the remaining Chiefs failed to submit applications. To date, it appears that none of the Chiefs took advantage of the application process and thus did not receive funding.

482.     This failure to utilize resources not only harms the NYPD as a whole, but also directly harms the rank-and-file officers who lack critical support.

483.     At every turn, Donlon was instructed to stand down, and it was clear to Donlon that Defendants KINSELLA, CHELL, DAUGHTRY, and SHEPPARD wielded more actual power than any Police Commissioner. In practice, they functioned as the de facto Police Commissioners of the NYPD, exercising operational control, authority, and influence well beyond what the law permitted them to do.

484.     As noted above and emphasized herein, Defendant ADAMS summoned Donlon to City Hall on Donlon's first day as the interim Police Commissioner to advise Donlon that Defendants MADDREY, CHELL, and DAUGHTRY were his three "best guys" and that Donlon was to "leave them alone."

485.     This above conversation was pursuant to Donlon advising the above Defendants and the entire NYPD staff about the use of social media and the abuses thereof, which needed to be authorized by the Legal Bureau before sending to the public.

486.     The message from Defendant ADAMS to Donlon was unmistakable. Donlon was shocked and confused by the statement(s) made by Defendant ADAMS.

487.     As stated above, Donlon had reviewed the backgrounds of the individual Defendants prior to taking the Commissioner position and did not see any evidence of major successful operational experience or a track record of success for any of the people Defendant ADAMS championed.

488.     As a result, Defendants ADAMS, KINSELLA, MADDREY, CHELL DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO and several other connected Chiefs connected to the Defendants were allowed to do whatever they wanted within the Police Department, and Donlon was powerless to stop it.

489.     This was further evidenced by the actions of Defendant SHEPPARD.

## F. Following a Police Officer Being Shot in the Line of Duty, Commissioner Donlon Discovers Widespread Incompetency in the Highest Ranks of the NYPD

490.     Donlon's leadership in a crisis was immediately tested on Saturday, September 14, 2024, when an NYPD patrol officer was shot in Brooklyn.

491.     While the officer thankfully recovered, Donlon's arrival at Brookville Hospital exposed a disturbing level of dysfunction within NYPD leadership.

492.     Despite observing numerous dedicated Members of Service (MOS) at the hospital, including high-ranking Chiefs, Inspectors, Captains, etc., and numerous Police Officers, a subsequent briefing with Defendants MADDREY, CHELL, and Police Surgeon Dr. Kleinman revealed critical deficiencies to Donlon.

493.     Defendant ADAMS's repeated phone calls to both Donlon and Defendant MADDREY for updates during this crisis underscored the urgent need for structured communication, a need that would be contemptuously ignored.

494.    Recognizing the potential for chaos and misinformation, Donlon explicitly directed Defendants MADDREY and CHELL to establish a centralized email communication system and chain of command for consistent and accurate updates to Defendant ADAMS and key stakeholders (NYPD supervisors) at the scene. This effort was to ensure that the NYPD had one correct, united message at the scene of a serious incident or event.

495.    This simple, crucial directive, designed to prevent the real danger of relaying unverified information to Defendant ADAMS and ensure collaborative communication, was met with blatant inaction. Defendants MADDREY and CHELL stated that when Defendant ADAMS calls them individually, they update him. Amazingly, they both missed Donlon's message. Donlon said Defendant ADAMS had been calling others at the scene, including Donlon, and all needed to have the latest information to provide to Defendant ADAMS. Donlon stated that he was certain that all other NYPD bosses at the scene, Borough Commander, ESU Chief, Precinct Commander and the Medical Division, Dr. Kleinman (who was present at the scene) and certainly the doctor would provide an excellent update to Defendant ADAMS. Lastly, Donlon stated that it would be embarrassing if the family of the injured officer were provided false information.

496.    Donlon issued a directive to ensure accurate and unified updates were provided to Defendant ADAMS during field operations. This was designed to prevent the dissemination of unverified or conflicting information.

497.    Defendants MADDREY and CHELL stated that they updated Defendant ADAMS when he called them directly. Donlon emphasized that this fragmented communication

was problematic, especially since Defendant ADAMS was also contacting others at the scene.

498.    Donlon then stated to both Defendants MADDREY and CHELL that the NYPD would look extremely disorganized if several different NYPD employees were providing updates directly to Defendant ADAMS that were incorrect, rather than getting information from those who were working closely with the hospital administration.

499.    Despite Donlon reiterating the necessity of this basic emergency planning organizational necessity, Defendants MADDREY and CHELL simply failed to act, demonstrating an early and alarming pattern of insubordination and operational neglect.

500.    At the following Monday's NYPD Executive Team meeting on September 16, 2024, Donlon's attempts to address these systemic failures were met with further evidence of profound incompetence.

501.    It became shockingly apparent that the Executive Team, specifically Defendants MADDREY and CHELL, possessed no structured Operational Plan for Brookville Hospital nor even a fundamental understanding of crisis management and emergency planning, not just for Brookville, but for any hospital facility responses, citywide.

502.    This deficiency was not a minor oversight but a gaping hole in preparedness for critical incidents involving an injured MOS, where standardized protocols for meeting areas, family assistance, traffic control, access restriction, communication, and media relations are paramount.

503.    When Donlon directly questioned Defendant CHELL about an Operational Plan ("OP") for Brookville Hospital, Defendant CHELL's cavalier and dismissive retort, "I think we had one; I will look for it; I'll dust it off," was not merely a sign of a lack of

urgency, but a clear exhibition of gross incompetence, neglectful indifference, and dereliction of duty it and meant he had no intention of looking for the OP.

504.     True to form, and despite two subsequent direct requests from Donlon, Defendant CHELL demonstrated a stunning disinterest and an utter lack of an operational planning mindset.

505.     Defendant CHELL's continued insubordination was evident as he willfully avoided addressing the issue and failed to produce any plan for Brookville Hospital.

506.     Furthermore, Defendant CHELL displayed an appalling lack of basic delegation skills critical for an NYPD Executive; rather than assigning the task to ensure its completion, he chose indolence and defiance.

507.     On three (3) occasions thereafter, Donlon inquired about the whereabouts of the OP he requested without receiving the requested documents.

508.     Defendant CHELL when asked for the plans by Donlon, had nothing to say.

509.     Frustrated by this blatant insubordination and slothful behavior, Donlon bypassed Defendant CHELL and other NYPD executives and directly tasked two- and three-star Chiefs to solicit operational plans from their precinct commanders.

510.     This initiative, born out of necessity due to the leadership vacuum, yielded results: weeks later, after Donlon instructed Defendant CHELL to follow up, well-structured plans were submitted by select commanders, proving that competence existed within the ranks, even if absent at the top. Again, Donlon asked Defendant MADDREY where the Operational Plans for all the hospitals in the five boroughs,  were, as requested well over approximately 5 weeks ago. Defendant MADDREY just looked at Donlon and said he would look into this matter.

511.     Donlon further directed Defendant SARACENO, at a later date, regarding the need for Operational Plans for all Hospitals in the five (5) boroughs. Within a couple of weeks Defendant SARACENO furnished Donlon all the operational plans for all the hospitals in the five boroughs. Donlon advised Defendant SARACENO to ensure these vital plans were accessible precinct-wide via a shared computer drive.

512.     However, indicative of the pervasive culture of inaction fostered by his superiors, this crucial step also saw no follow-up, leaving critical information siloed despite Donlon's clear mandate.

513.     The consistent failures in communication and response planning, spearheaded by the insubordination, incompetence, and indolence of key executives like Defendants MADDREY and CHELL necessitated Donlon's urgent call for immediate action to establish a standardized operational framework.

514.     In a move that highlighted his own commitment to collaboration, a stark contrast to the indolence he faced internally, Donlon personally provided copies of the gathered operational plans to the Commissioners of the NYC, OEM, and FDNY. These plans provided measures to safeguard the MOS, first responders, NYC residents, and the above-mentioned agencies despite the internal resistance, apathy, and incompetence of the Defendants.

## G. Defendant SHEPPARD Interferes With the Police Commissioner's Security Detail

515.     The Police Commissioner ("PC") is assigned a dedicated security detail of approximately 15 to 20 members of the NYPD. While the security detail is established upon the PC's appointment, whoever is acting as the Police Commissioner retains full discretion over its composition.

516.    Upon assuming his role as interim Police Commissioner, Donlon exercised this discretion by personally selecting and approving his security detail, consisting of one (1) Lieutenant, two (2) Sergeants, and approximately 15 Detectives.

517.    It was Donlon's explicit intention to meet with all members of the detail personally.

518.    Shortly after Donlon assumed his post, unbeknownst to Donlon, Defendants SHEPPARD and SARACENO called a meeting of Donlon's Security Detail.

519.    Donlon was not present for the meeting, nor did he authorize it.

520.    At the meeting, Defendants SHEPPARD made clear he was in charge, not Donlon, as the Police Commissioner of the NYPD.

521.    At the meeting, Defendants SHEPPARD and SARACENO told the approximately fifteen (15) members of service that they were not to follow the orders of Donlon.

522.    Donlon was further undermined by Defendant SHEPPARD who stated, "PC Donlon is an interim and will be gone soon, but I will still be here," thereby positioning himself as the de facto authority figure. Per the meeting's attendees, Defendant SARACENO endorsed this statement.

523.    Defendant SHEPPARD thereafter directed personnel to bypass the Office of the Police Commissioner entirely for matters including transfers, requests, or other administrative needs, instructing them to report directly to him instead, as though he were the Police Commissioner.

524.    Even in the absence or disability of the Police Commissioner, no one, including a Deputy Police Commissioner, had "the power of making appointments and transfers" (NYC Charter § 432).

525.    Critically, Defendant SHEPPARD purportedly threatened the assembled security team that any attempt to bring such matters to Donlon's attention would result in punitive transfers to undesirable assignments.

526.    Defendants SHEPPARD and SARACENO had held the meeting with Donlon's security detail without Donlon's knowledge or authorization and now controlled the Security Detail through fear and intimidation.

527.    Donlon was only informed of this unauthorized meeting after it had concluded.

528.    Donlon immediately and repeatedly complained to Defendants ADAMS and MADDREY about the actions of the NYPD Defendants herein and was retaliated against as a result of his protected speech. It became quite clear that it was truly pointless for Donlon to speak to Defendant ADAMS regarding Defendants MADDREY, CHELL, DAUGHTRY, SHEPPARD, or the remaining Defendants.

529.    The deviation from the paramilitary structure is well documented.

530.    This deliberate circumvention of established protocols necessary for security within the highest level of the NYPD, combined with Defendant SHEPPARD's coercive directives and Defendant SARACENO's dismissive attitude, constituted a grave breach of professional conduct and insubordination. When Donlon did speak with Defendant SARACENO, SARACENO dismissed his concerns, asserting that "you know PC's Come and go and you are an interim," implying Donlon's authority was diminished due to his interim status.

531.    Donlon asked Defendant SARACENO to expound on that statement and he, Defendant SARACENO, could not elaborate any further.

532.    This justification was not only inadequate, but profoundly disrespectful to the Office of the Police Commissioner, the established security structure, and Donlon's need to have trusted and qualified individuals in these highly sensitive security positions.

533.    Defendant SARACENO's rationale failed to address the core issue of the unauthorized meeting and appeared intended to deflect accountability, manipulation, and insubordination from Defendant SHEPPARD.

534.    In short and in reality, Donlon continued as Police Commissioner in name only, with no power to perform any of his designated job duties.

535.    These actions actively undermined the integrity of the NYPD's chain of command, fostered an environment of intimidation within Donlon's security detail, and compromised the fundamental principles of leadership, chain of command, and accountability essential within the NYPD.

536.    This situation warrants a formal investigation to address the improper exertion of influence and ensure adherence to professional ethics and departmental regulations, specifically as to who empowered the NYPD Defendants to comfortably act so contemptuously and reprehensibly without accountability.

537.    It is widely reported in the media that Commissioner Sewell left due to the many breakdowns in the paramilitary structure and lack of real power and authority.

538.    Donlon attempted to address this significant breach of protocol as detailed above regarding the security detail with Defendant ADAMS and Defendant MADDREY but was met with obstruction, contempt, and insubordination.

539.    Defendant SHEPPARD repeatedly failed to respond to Donlon's calls and deliberately avoided direct communication regarding the matter. He would just walk away

when Donlon attempted to speak with him. Due to Donlon's lack of support from Defendants ADAMS and MADDREY, he had to tolerate this behavior, as complaining would not have changed anything.

540.    Shortly after Donlon was named interim Police Commissioner, the FBI conducted a search of his residence.

541.    The FBI confiscated decades old documents, some over thirty years old, related to Donlon's law enforcement career.

542.    Donlon cooperated fully in the investigation.

543.    The FBI incident caused Donlon and his family to suffer severe embarrassment and humiliation.

544.    Following the search, rumors were circulated that Donlon was going to step down as the interim Police Commissioner. These rumors reached Defendant ADAMS who telephonically contacted Donlon regarding these rumors. Donlon stated that he had no intention of stepping down, unless of course Defendant ADAMS requested it.

545.    Thereafter, Donlon chose his own NYPD employees to join the Police Commissioner's Office, which was the historical practice within the agency.

546.    Defendant ADAMS repeatedly failed to discipline the NYPD Defendants herein, emboldening them to further violate Donlon's rights.

547.    The repeated failure on the part of Defendant ADAMS to discipline the NYPD Defendants herein, and or allow Donlon to do so, is extreme, outrageous, and has far reaching and incalculable consequences for the safety and security for the inhabitants of New York City.

548. Around this time, as a result of the false rumors being spread, a former NYPD Police Commissioner contacted Defendant ADAMS to inform him that Donlon should be replaced and that he had a candidate to replace him.

## H. **The Culture of Corruption: How Donlon Was Sabotaged by a Corrupt Command Staff Enabled by Defendant ADAMS**

549. From the moment Donlon assumed his duties, Donlon was confronted by a deeply entrenched culture of corruption, insubordination, and sabotage within the NYPD's senior ranks. His efforts to support the hardworking, honest members of the department and instill a merit-based system to justify promotions were continuously thwarted by a clique of self-serving officials.

550. A sign of this systemic rot came from Defendant MARINO. His official duties in the Police Commissioner's Office were administrative, such as tasking others with requests and Orders from the Police Commissioner, processing invoices, liaising with the Chief of Personnel, and handling routine matters. The above-cited duties were the protocol and procedures authorized by previous Police Commissioners.

551. Whilst Defendant MARINO ostensibly exercised these duties and authorities, his true power lay in his control over processes and his willingness to operate opaquely. In a blatant breach of professional protocol, Defendant MARINO deliberately concealed from Donlon that he possessed a rubber stamp signature bearing Donlon's full official signature. Every Police Commissioner has an official rubber stamp signature made upon assuming their duties. It was only through notification from a senior NYPD MOS that Donlon discovered that Defendant MARINO was in possession of said stamp signature stamp and abused its usage to authorize a fraudulent and unmerited promotion of Defendant SHEPPARD described below.

552.     When Donlon confronted Defendant MARINO, he offered a weak excuse that the stamp being utilized by administrative staff who had ranks such as Defendant MARINO held, was a long-standing practice to "alleviate backlog."

553.     Each of the promotional lists that were fraudulently altered by the Individual Defendants had officers selected by Donlon removed from the promotional list and replaced with officers that were not approved by Donlon. On paper, Defendant MARINO illegally stamped Donlon's name to the promotional lists to make it appear, falsely, that Donlon had approved the promotional lists.

554.     Defendant MARINO failed to even provide Donlon with a copy of the final list after promotions were falsified and fraudulently approved.

555.     While Donlon understood this need and agreed to the procedure for efficiency, he demanded to review the process himself and any and all documents that Defendant MARINO had utilized the signature stamp for. After this review by Donlon, he agreed to the protocol. That said, the fact that Defendant MARINO never advised Donlon beforehand that he had a copy of the signature stamp was disturbing. The initial deception was a clear red flag. Defendant MARINO had demonstrated his allegiance was not to transparency and efficiency, or his new superior, but to the established power structure created and maintained by the NYPD Defendants and Defendant ADAMS.

556.     Defendant MARINO had kept Donlon completely in the dark as to which members of service were being promoted and by whom. Defendant MARINO had allowed Defendants SHEPPARD and MADDREY to control the promotional lists and then fraudulently used Donlon's stamp to solidify the promotions. What resulted was a transfer of wealth in the millions of dollars at the hands of the Defendants herein who

falsified NYPD records to make it seem like Donlon had agreed to the promotional list when he had no idea who was being promoted or why.

I. **Donlon Gains Knowledge of the Defendants' First RICO Predicate Felony and Tells Defendant ADAMS, Who Does Nothing**

557.    Shortly after Donlon became aware of the misuse of his Police Commissioner stamp signature, Donlon noticed to his surprise that Defendant SHEPPARD began to wear a third star on his collar when dressed in uniform. This would mean that Defendant SHEPPARD had been elevated from the rank of Assistant Chief (two stars) to Bureau Chief (three stars). However, Donlon had never promoted or authorized the promotion of Defendant SHEPPARD. Ergo, Defendant SHEPPARD was fraudulently functioning as an NYPD Bureau Chief.

558.    Promotions of NYPD employees can only be made by the Police Commissioner.

559.    Defendant SHEPPARD's fraudulently functioning as a Bureau Chief occurred after Donlon took over, in name only, as Police Commissioner. Again, Donlon did not promote Defendant SHEPPARD to Bureau Chief.

560.    Without Donlon's permission, Defendant SHEPPARD obtained control of Donlon's Police Commissioner's signature stamp from Defendant MARINO and fraudulently imprinted Donlon's signature onto a memorandum to promote himself to the rank of Bureau Chief.

561.    Defendant MARINO was the only person in the NYPD who had access to Donlon's Commissioner's stamp.

562.    Donlon confronted Defendant SHEPPARD about the promotion because he, Donlon, did not sign any promotion memorandum with respect to Defendant

SHEPPARD, nor did Donlon authorize anyone to use his Police Commissioner's signature stamp for any memorandum regarding promotions.

563.    As a result of the lack of authorization, Defendant SHEPPARD forged Donlon's signature.

564.    Donlon asked Defendant SHEPPARD who authorized his promotion to Bureau Chief.

565.    Defendant SHEPPARD, in a vitriolic tone and arrogant manner, denied that he took Donlon's stamp to get promoted. Donlon advised MADDREY and he did absolutely nothing in handling SHEPPARD's self-imposed promotion.

566.    Days later, when asked by Donlon again who promoted him, Defendant SHEPPARD advised that Defendant ADAMS was the one who promoted him to a three-star Chief.

567.    Donlon then spoke in person with Defendants ADAMS and MADDREY about Defendant SHEPPARD's stealing his Police Commissioner signature stamp and promoting himself to Bureau Chief.

568.    Defendant ADAMS informed Donlon that he, Defendant ADAMS, did not authorize the promotions of Defendant SHEPPARD.

569.    Defendant ADAMS took no action to discipline Defendant SHEPPARD following actual notice of Defendant SHEPPARD's unlawfully egregious acts.

570.    When Donlon returned to the Police Department from City Hall (after meeting with Defendant ADAMS), he spoke with Defendant MADDREY who confirmed that Defendant SHEPPARD did not have any authorization to promote himself to the rank of Bureau Chief, but that he, Defendant SHEPPARD, had done exactly that.

571.    Defendant MADDREY also told Donlon that Defendant ADAMS did not promote Defendant SHEPPARD.

572.    Defendant MADDREY advised Donlon that he would speak with Defendant SHEPPARD about the incident and rescind the falsified promotion.

573.    Donlon instructed Defendant MADDREY to report the matter to the Internal Affairs Bureau.

574.    Upon information and belief, Defendant MADDREY failed to report the crimes to IAB, nor did he speak with Defendant SHEPPARD.

575.    After Donlon learned of Defendant SHEPPARD's unlawful self-promotion, he confronted Defendant MARINO, who is the only person who had access to the Police Commissioner's signature stamp.

576.    It is unknown to Donlon whether Defendant MARINO willingly gave Defendant SHEPPARD the Police Commissioner's signature stamp or whether Defendant SHEPPARD took it from the possession of Defendant MARINO with his knowledge.

577.    Donlon then confronted Defendant SHEPPARD directly.

578.    Defendant SHEPPARD denied that he took Donlon's stamp, telling him "I did not take your damn stamp. Hell no."

579.    Donlon specifically ordered Defendant SHEPPARD to stop wearing the third star on his collar, but he refused.

580.    To Donlon, this fraudulent promotion by Defendant SHEPPARD was "stolen valor" and was a crime.

581.    It is also a slap in the face to every Chief who earned their third star on merit.

582.    It is unclear whether or not Defendant SHEPPARD received increased compensation from the Defendant CITY following his fraudulent promotion in addition to wearing the third star he did not earn.

583.    Defendant SHEPPARD was temporarily allowed to work as a Bureau Chief after he falsified documents and forged Donlon's signature to promote himself to that rank. This meant that SHEPPARD would have received a higher salary from public monies than he was lawfully entitled to receive during the time that he was masquerading as a Bureau Chief. This is theft. This is a crime. This has never been resolved.

584.    Defendant SHEPPARD, at all times herein, was emboldened to act in an unlawful manner by Defendant ADAMS and the other NYPD Defendants.

585.    It would not be until Defendant SHEPPARD threatened to kill Donlon in November 2024, specifically stating to Donlon "I will fucking kill you," that Defendant SHEPPARD would be demoted from his stolen Bureau Chief rank.

**J.  <u>Defendant ADAMS Is Indicted on Corruption Charges</u>**

586.    On September 25, 2024, Defendant ADAMS was indicted on federal criminal charges.

587.    The indictment charged Defendant ADAMS with one count of conspiracy to defraud the United States; one count of wire fraud; two counts of soliciting campaign contributions from foreign nationals; and one count of soliciting and accepting a bribe.

588.    Following the indictment, Defendant ADAMS refused to resign from his position as New York City Mayor.

589.    New York State Governor Kathy Hochul threatened to remove Defendant ADAMS from office as he refused to resign.

590.    Governor Kathy Hochul forced Defendant ADAMS to terminate several bad actors from his staff which he previously refused to do.

591.    Based on the Order of New York State Governor Kathy Hochul, Tim Pearson was forced to resign on September 30, 2024.

592.    On October 7, 2024, Phillip Banks and Winnie Greco resigned from Defendant ADAMS's administration due to their respective pending criminal investigations.

## K.    The NYPD Roosevelt Avenue Task Force Is Created as a Result of a Dream of Defendant DAUGHTRY

593.    In October 2024, there was extensive news coverage regarding the crime-ridden areas surrounding Roosevelt Avenue in Corona, Queens.

594.    Defendant DAUGHTRY told Donlon that he proposed a "task force" to address all the "quality of life issues" in the Roosevelt Avenue area, in particular human trafficking, prostitution, and illegal vendors.

595.    He further explained that the "task force" would include the NYPD, Fire Department, NYS Environmental Protection Agency, Department of Sanitation, Office of Emergency Management, and the Queens District Attorney's Office.

596.    Defendant DAUGHTRY claimed to Donlon, in his office, that he had conceived of the task force in "a dream."

597.    Defendant DAUGHTRY was assigned by Defendants ADAMS and MADDREY to lead this task force.

598.    Donlon was not impressed with Defendant DAUGHTRY, who had virtually no experience or proven track record supervising police operations, and who regularly belittled NYPD employees under his supervision.

599.    On several occasions, while on Roosevelt Avenue and in other venues, Donlon was compelled to confront Defendant DAUGHTRY about his mistreatment of all ranks of NYPD personnel. Defendant DAUGHTRY was routinely rude and disrespectful to MOS in front of Donlon. Defendant DAUGHTRY's response to Donlon was "you have to speak with them that way." This response left no doubt as to why Defendant DAUGHTRY had a reputation among MOS of being rude and disrespectful when addressing them.

600.    It was clear to Donlon that Defendant DAUGHTRY, as evidenced by his actions, lacked meaningful leadership experience and/or operational experience regarding major investigations or training.

601.    In or around October 2024, the City of New York launched "Operation Restore Roosevelt" (ORR), a 90-day multi-agency initiative intended to address public safety and quality-of-life issues—such as prostitution, illegal vending, and retail theft—along Roosevelt Avenue in Queens. This was announced in a press conference conducted by Defendant ADAMS.

602.    Despite its stated goals, the ORR task force was fundamentally flawed in its design and execution by deliberately excluding federal law enforcement partners.

603.    Donlon repeatedly recommended and advised that the task force collaborate with federal agencies to address the serious and transnational nature of the criminal activity alleged to be occurring in the area, specifically the complaints of illegal weapons, drugs, and gang activities. With these recommendations, Donlon made certain to all the above NYPD Defendants and the two- and three-star Chiefs at Donlon's weekly meetings, that he was not criticizing the abilities and capabilities of the NYPD.

604.    However, history has shown that working with federal agencies and other law enforcement agencies has been extremely successful in targeting the above-mentioned violent criminal activities and organizations.  It should be noted that the NYPD is a partner in several successful task forces with federal, state, and other law enforcement and intelligence agencies. Again, the frustrating and debilitating factors with this ORR initiative was that  Defendants MADDREY, CHELL, and DAUGHTRY, or for that matter ADAMS,  have never been involved working on or with a task force comprised of federal law enforcement agencies.

605.    As usual, the NYPD Defendants, with their inexperienced, ineffective, and insubordinate efforts, refused to listen to anyone with experience in these investigations. Their collective response was that they always knew better.  Unfortunately, the men and women of the NYPD who dedicated their time and effort to this ORR initiative, and the residents of the area, suffered.

606.    Donlon's recommendations included a strategic intelligence-sharing protocol:

   a.  First: Systematically collect identifying information from all individuals arrested, summonsed, or otherwise identified during ORR operations.

   b.  Second: Provide this data to federal agencies to be checked against their national and international databases.

   c.  Third: This process would have effectively identified individuals wanted on federal warrants or those linked to ongoing federal investigations involving narcotics trafficking, human trafficking, gang activity (RICO), and other serious crimes.

607.    This collaboration would have provided a significant strategic advantage. Federal prosecution for such offenses carries substantially stricter penalties than state or local

charges, including mandatory minimum sentences, thereby offering a more effective deterrent and a more lasting solution to the area's chronic crime problems. For example, if convicted, the defendants would have to serve 85% of their sentence as opposed to lesser imposed sentences by state and city courts.

608.     Despite these clear strategic benefits, senior NYPD leadership, the collective NYPD Defendants, involved in the ORR task force expressly rejected any collaboration with federal agencies.

609.     The approach formulated by the NYPD Defendants proved to be a short-term, reactive enforcement blitz driven by media attention and Defendant DAUGHTRY's personal zeal for publicity, rather than combatting crime and gathering intelligence.

610.     While ORR focused on visible, low-level offenses, serious violent crime escalated. During this period, robberies along the Roosevelt Avenue corridor surged 44% and assaults rose 46% compared to the prior year. This misalignment of resources occurred while local precinct staffing was simultaneously in decline, making any long-term success unsustainable.

611.     Consequently, the operation failed to produce lasting results, although ADAMS showed impressive questionable statistical accomplishments. As predicted by critics and reported in the media, upon the conclusion of the ORR, the same criminal activity, including open prostitution and illegal markets, promptly returned to Roosevelt Avenue, demonstrating the ineffectiveness of the collective Defendant's chosen strategy. The abject incompetence of NYPD executive leadership, specifically Defendants MADDREY, CHELL, and DAUGHTRY, all of whom as always, had their incompetence

enabled and supported by Defendant ADAMS, was, and remains detrimental to public safety.

612.     Despite its stated goals, ORR was fundamentally flawed in design and execution due to the deliberate exclusion of federal law enforcement partners.

## L. Defendant DAUGHTRY'S Arrogance and the Politicization of the NYPD Drone Program

613.     Despite public praise from Donlon following well-received demonstrations of the NYPD's drone technology—events attended by Defendant ADAMS and senior officials—Donlon privately harbored grave concerns about the program's leadership. While the public optics suggested innovation and collaboration, the internal reality was one of dysfunction, obstruction, and retaliation.

614.     Donlon, a former member of the FBI's Senior Executive Service (SES), which constitutes the top 1% of its FBI nationwide staffing, has a wealth of experience working, managing and coordinating criminal; domestic/international terrorism; and domestic/international counterintelligence cases. Moreover, Donlon is acutely familiar with counterintelligence efforts utilizing aviation/aerial surveillance relative to National Security investigations. Donlon made multiple respectful overtures to Defendant DAUGHTRY regarding this topic to ensure its success.

615.     Defendant DAUGHTRY made many utterances to Donlon privately, publicly, and at meetings with executive NYPD personnel that he, Defendant DAUGHTRY, wanted to implement the "latest cutting edge technology."[4] Donlon, at one of his Monday morning executive meetings, always attended by two- and three-star Chiefs, and other uniform

---

[4] Defendant DAUGHTRY also stated the same when he was appointed Deputy Mayor, Office of Public Safety in February 2025.

ranks, along with civilian personnel, proposed leveraging his national security contacts to connect the NYPD with law enforcement and intelligence agency experts. These agencies and individual(s) were at the forefront of drone integration and usage and the "latest cutting-edge technology," which Daughtry expressed an interest in numerous times. This was an offer rooted in collaboration and public safety from criminal and terrorist matters. Moreover, on a personal level, Donlon saw this as having the potential to foment a better working relationship with Defendant DAUGHTRY.

616.    Defendant DAUGHTRY rebuffed these efforts not with substantive feedback, but with a flippant and egotistical dismissal: "No thanks, we got it covered." His refusal to engage was emblematic of a toxic pattern, not only from DAUGHTRY but from Defendants KINSELLA, MADDREY, CHELL, and SHEPPARD. Defendant DAUGHTRY routinely rejected assistance from any individuals with superior qualifications in favor of preserving his own unearned authority. Donlon never could understand just who Defendant DAUGHTRY was referring to when he said "...we got it covered." Any decisions regarding the technology and usage of drones would have ultimately been authorized by the Office of the Police Commissioner.

617.    Again, no collaboration with the Office of Police Commissioner ever took place. When Donlon inquired of Defendant DAUGHTRY to explain "cutting edge technology," Defendant DAUGHTRY could never bring forth any example to Donlon. Donlon asked Defendant DAUGHTRY if he was coordinating efforts or seeking technical expertise and support from NYPD, but the Technical Assistance Response Unit (TARU) received no answer. TARU is an outstanding unit which is equipped to provide sophisticated technical support and specialized investigative equipment and also assist other cities, states, and

many Federal agencies. During Donlon's tenure with the JTTF, Donlon had the pleasure of working with TARU along with JTTF members, on several occasions. TARU's history shows their capabilities of utilizing drones with search and rescue cases, documentation of crime scenes, and many other services.  Again, due to Donlon's imposed lack of authority, leadership, implementation, and experience on critical, crucial, and lifesaving matters, by orders from ADAMS, Donlon was seen as just a figurehead not to be respected or listened to regarding any police matters.

618.    While serving as Police Commissioner, one of Donlon's main objectives and concerns was to focus on the safety of MOS, and of course, the safety of our NYC residents. However, with ADAMS's directives to Donlon and the defendants, Donlon was obviously left powerless which was clearly seen by the MOS. Defendant DAUGHTRY's position was protected not by merit or performance, but by a direct pipeline to Defendants MADDREY and ADAMS. When challenged, Defendant DAUGHTRY would run to his political benefactors, ensuring his mismanagement was never questioned, and his insubordination to Donlon or any Police Commissioner was rewarded.

619.    Donlon found it quite transparent that Defendant DAUGHTRY's disdain for him stemmed from personal envy and resentment over not being selected as Police Commissioner by Defendant ADAMS. Rather than rise above those emotions in service to the NYPD, and NYC residents, Defendant DAUGHTRY allowed it to dictate his professional conduct—even when doing so placed public safety and operational success at risk.

620. After Donlon's tenure, reliable sources informed him that Defendant ADAMS privately admitted regret over not forcing Defendant DAUGHTRY to cooperate and set aside his arrogance. By that point, however, the damage was done.

621. The drone program's potential was lost, and another opportunity for innovation was squandered—yet another casualty of Defendant ADAMS's loyalty-first, merit-last approach to governance. This again demonstrated ADAMS's lack of administrative and operational skill.

622. This episode underscores a broader pattern: qualified professionals offering constructive reform were sidelined or retaliated against, while incompetent loyalists were protected and promoted. The NYPD, under the collective Defendants' direction, had become a place where good faith collaboration was treated as insubordination and personal vendettas were allowed to sabotage public safety initiatives. This theme was echoed throughout the NYPD by every disheartened MOS who believed promotions were given based on merit.

**M. Contrary to Their Stated Goals of Reducing Crime Along the Roosevelt Avenue Corridor, the Defendants Refused Federal Assistance Through Dereliction of Duty**

623. As stated previously, Donlon had extensive experience with multi-agency law enforcement operations and contacted several federal law enforcement agencies about initiating a joint investigation with respect to ORR.

624. Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, and GERBER, through their incompetent and obstructionist leadership, deliberately undermined this effort by Donlon to ensure the success of ORR.

625.     Donlon repeatedly recommended and advised the task force to collaborate with federal agencies to address the serious and transnational nature of the criminal activity in the area.

626.     Donlon's recommendations included a strategic intelligence-sharing protocol as stated above. Such collaboration, as Donlon emphasized, would have offered a significant strategic advantage. Federal prosecution for these offenses carried substantially stricter penalties, where defendants would have to serve 85% of their imposed sentences including mandatory minimum sentences—offering a more effective deterrent and lasting solution.

627.     The individual Defendants summarily rejected Donlon's recommendations. As a result, the residents and businesses along Roosevelt Avenue continued to face pervasive and escalating crime, including but not limited to the trafficking of illegal drugs and weapons, gang violence, prostitution, and harassment of store owners and pedestrians.

628.     During an executive meeting in the Commissioner's office, Donlon directly confronted Defendant DAUGHTRY about the inadequacy of the task force he had assembled.

629.     Donlon requested the names of investigative subjects, meaning those questioned, detained or arrested during ORR, so they could be vetted through federal databases, emphasizing the importance of avoiding interference with ongoing federal investigations.

630.     Donlon unequivocally stated that addressing violent crime, illegal weapons, and gang activity required immediate inclusion of federal law enforcement.

631.    At a minimum, Donlon insisted that meaningful discussions with federal partners were necessary to explore joint efforts. Donlon stated clearly this would be a partnership between the NYPD and the respective federal agencies.

632.    Donlon emphasized that inter-agency collaboration is a cornerstone of modern policing, especially in the post-9/11 era, as outlined in the 9/11 Commission Report.

633.    Despite Donlon's consistent and forceful advocacy at weekly NYPD executive meetings, his recommendations were met with obstruction by Defendant DAUGHTRY and deliberate resistance by Defendants MADDREY, CHELL, SHEPPARD, and GERBER.

634.    Donlon also demanded adherence to intelligence-sharing principles.

635.    He urged the NYPD Defendants to compile and transmit to federal agencies the names of individuals arrested, detained, or credibly linked to weapons seizures and gang activity by the NYPD, which were not related solely to ORR.

636.    Donlon explained that this data was vital for federal agencies to cross-reference with their databases.

637.    This process could identify suspects or weapons connected to active federal cases, leading to more productive enforcement through federal warrants and statutes.

638.    These professional, evidence-based recommendations—crucial to public safety— were met with contempt and personal hostility.

639.    Defendant DAUGHTRY, in a display of arrogance and disregard for law enforcement norms, stated to Donlon and other attendees at the Monday Executive meeting: "I don't like the Feds," and Defendant CHELL also arrogantly stated in front of all the two- and three-star Chiefs and other ranks, "Come on the Feds—try getting them out of bed at 2:00 a.m. on a Saturday morning to come out and work with us."

640.     This attitude epitomized Defendant DAUGHTRY's insular approach, which was endorsed and or tolerated by the other individual NYPD Defendants. It was also disheartening and embarrassing to hear the above ignorant statements from Defendants CHELL and DAUGHTRY.[5]

641.     As a result, any meaningful progress with respect to ORR was sabotaged.

642.     Undeterred, Donlon continued to emphasize the benefits of federal collaboration at a few Monday morning meetings, explaining that it would support both the NYPD and the community.

643.     The flippancy of the Individual Defendants toward the joint NYPD and Federal task forces was extremely disparaging and hurtful. These comments further undermined the efforts of current and past officers and diminished their roles in fighting terrorism and stopping crime.

644.     Defendant GERBER, a former U.S. Federal prosecutor, known as an Assistant United States Attorney (AUSA), later falsely claimed after one of the Monday executive meetings, when asked by Donlon about inviting federal agencies to join the ORR Task Force, "I don't remember any conversation(s) at this particular meeting or at any other Monday meetings about inviting the "FEDS to join the ORR Task Force."

645.     This statement by Defendant GERBER was knowingly false and intended to conceal the collective dereliction of duty by the NYPD Defendants.

---

[5] Most concerning as of this date, Defendants CHELL and DAUGHTRY are the two faces of the NYPD representing the organization in their joint effort with Thomas Douglas Holman, White House Border Czar and his regaining the migrant/illegal issues.

646.     Donlon asked Defendant GERBER, "Were you sleeping at this meeting and at other Monday meetings?" Astonishingly, GERBER had no response—and he stopped offering comments at future meetings.

647.     Throughout Donlon's tenure, Defendant GERBER displayed contempt, deception, and subversion. Donlon was shocked that Defendant GERBER, a former Assistant United States Attorney ("AUSA"), showed no interest in authorizing federal agencies—such as the U.S. Marshals Service, ATF, FBI, or DEA—to support ORR.

648.     This refusal undermined a major initiative and left Donlon baffled.

649.     Donlon found it extremely disturbing that Defendant GERBER—despite his prior experience as a federal prosecutor—resisted involving federal agencies in a high-profile initiative like ORR.

650.     His resistance wasn't strategic or legal—it was personal, rooted in ego and control. This behavior not only impeded interagency cooperation but also increased risks to NYPD officers and the public.

651.     Donlon made repeated attempts to address this issue, but Defendant GERBER continued to act with insubordination and disregard for operational effectiveness.

652.     This reinforced Donlon's belief that Defendant GERBER was being dishonest. It was hard to comprehend, especially given Defendant GERBER's background as a former AUSA, that he failed to understand the benefit of cooperating with federal authorities on ORR. It remains unclear whether his actions were based on directives from Defendant ADAMS or influenced by Defendant CHELL's earlier comments about not working with "FEDS."

653.    ORR, as implemented under Defendant DAUGHTRY with support from MADDREY, CHELL, SHEPPARD, and GERBER, failed to meaningfully reduce crime—despite NYPD claims to the contrary.

654.    Media reports and community members indicated that prostitution, drug activity, and gang presence quickly returned. One local leader even called for FBI and DEA involvement to address the worsening criminal activity.

655.    Donlon identified a dangerously outdated mentality among the collective NYPD Defendants, who erroneously believed that the NYPD could not or should not collaborate with federal agencies.

656.    This view, rooted in misconceptions decades out of date, ignored essential strategies of modern law enforcement.

657.    Their resistance to federal partnerships obstructed opportunities for coordinated investigations and enforcement.

658.    This refusal squandered crucial intelligence opportunities and had a devastating effect on the Roosevelt Avenue community.

**N.    The Incompetence of Operation Restore Roosevelt Results in Failure**

659.    Ultimately, ORR—defectively conceived and incompetently executed—failed to reduce crime. Due to the collective NYPD Defendants' willful neglect, the operation focused only on what can be deemed trivial offenses while violent criminals continued operating with impunity, directly endangering the public.

660.    As Donlon predicted, ORR failed to produce lasting results proving the strategy's ineffectiveness and exposing the incompetence of NYPD leadership—specifically

Defendants MADDREY, CHELL, and DAUGHTRY—all enabled by Defendant ADAMS.

O. **Defendant ADAMS Further Solidifies Donlon's Lack of Authority as the Defendants Maneuver for Control**

661.     Defendants CITY, ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO, through their direct conversations with Defendant ADAMS, knew that Donlon was Police Commissioner strictly in name only, had no real power whatsoever, and ignored the orders of Donlon as Police Commissioner, interim or permanent.

662.     Donlon was deeply disheartened by his complete lack of authority within the NYPD, rendering his position effectively ceremonial.

663.     Donlon regularly tried to go through Defendant ADAMS for assistance in dealing with these problematic employees, but his efforts were pointless.

664.     Each time Donlon raised a concern with Defendant ADAMS, he was further stripped of his authority and denied the ability to perform his job, as the individual NYPD Defendants became increasingly emboldened by the ineffectiveness of Donlon's efforts.

665.     Following a private meeting that Donlon had with Defendant ADAMS at City Hall, numerous individuals, including several placed in positions by Defendant MADDREY, visited Donlon's office to elicit information about the meeting.

666.     The questions were led by Defendant SARACENO.

667.     Shortly after the meeting where Donlon did not disclose the circumstances of the meeting with Defendant ADAMS, Defendant MADDREY called Donlon to see if everything was alright. While this may seem minor to the casual observer, it was and is at

the sole discretion of the Police Commissioner to disseminate or not, the private conversations with the Mayor.

668.　　Defendant ADAMS regularly made comments to Donlon that he, Donlon, needed to get the NYPD "in order" as that is the only way he, Defendant ADAMS, would get re-elected.

669.　　Donlon learned that Defendant ADAMS had expressed to individuals that he Defendant ADAMS "wished" that Defendant DAUGHTRY was nicer to Donlon and "didn't give him such a hard time." That said, Defendant ADAMS's leadership failed to actually intervene to stop Defendant DAUGHTRY's insubordination, irresponsible behavior, unmanageability, and inability to listen to experienced individuals.

670.　　Defendant ADAMS's lack of action and lack of respect for Donlon in front of others, at all times herein, condoned and acquiesced to the unlawful actions of the NYPD Defendants herein.

671.　　Despite Donlon's qualifications and Defendant ADAMS's need to get the NYPD "in order," Defendant ADAMS continued to empower Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO. In short, Defendant ADAMS allowed them to do whatever they wanted, which directly undermined Defendant ADAMS's request to Donlon to get the NYPD "in order."

672.　　Upon information and belief, Donlon was further stripped of his authority as a result of his complaints about Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO to Defendant ADAMS.

673.     The interactions described throughout this complaint underscored the ongoing pattern of internal maneuvering and information control within NYPD leadership.

**P.  <u>Actual Police Work and Public Safety Are a Secondary Concern for the Defendants</u>**

674.     Defendants SHEPPARD and SARACENO and other NYPD employees, despite making no positive or relevant contribution operationally to the Police Commissioner's Office or the NYPD, continued to be positioned strategically within the Police Commissioner's Office.

675.     During three separate executive Monday meetings, Donlon addressed the importance of the Violent Gang and Terrorist Organization File ("VGTOF") database, developed by FBI Headquarters ("FBIHQ") in 1995.

676.     At the time of its creation, Donlon was permanently assigned to the Violent Crime Section/Safe Streets Unit, where he played a role in its implementation alongside the Counterterrorism Section and the Terrorist Screening Center at FBIHQ.

677.     VGTOF serves as a critical national database that tracks known and wanted terrorist and gang members, documenting their affiliations and case types. Individuals entered into this system must meet specific criteria for inclusion.

678.     During the meetings, Donlon specifically instructed Defendants MADDREY, CHELL, DAUGHTRY, and GERBER, who were surprisingly unaware of the VGTOF, to review and use this resource as an investigative tool, particularly in relation to the NYPD's newly created ORR.

679.     Donlon urged the NYPD Defendants to obtain access to the file, review its requirements, and incorporate its use in their enforcement activities.

680.     Given that VGTOF is an invaluable tool, Donlon emphasized the importance of checking the names and groups encountered, detained, arrested, or interviewed during operations (by ORR in particular) against the VGTOF database.

681.     Despite these discussions, Donlon was surprised to learn that Defendants MADDREY, CHELL, DAUGHTRY, and GERBER had not engaged with the VGTOF file. Donlon formally requested the above-mentioned individuals to examine the database and verify whether any of the individuals they encountered, detained, or arrested appeared in VGTOF.

682.     Over the course of three separate meetings, Donlon received no substantive response. In an effort to follow up, he later asked Defendant GERBER about the review, to which he, Donlon, received a noncommittal response, "I will look into it." from Defendant GERBER.

683.     In contrast, the NYPD Counterterrorism Division was well aware of the VGTOF database and actively utilized it in their investigations. This discrepancy highlighted a significant gap in awareness among top NYPD executives and the need for further engagement with this critical resource.

Q. **Defendant SHEPPARD Undercuts and Embarrasses Donlon**

684.     In a blatant act of professional sabotage, Donlon was unexpectedly summoned from his 14th-floor office mid-afternoon by Defendant SHEPPARD, via one of Donlon's own security detectives.

685.     During the elevator ride to the 8th floor conference room, Donlon's detective could offer no insight into why Defendant SHEPPARD demanded his presence, only that a

massive assembly of approximately one hundred MOS – Chiefs, Inspectors, Captains, Lieutenants, and Sergeants awaited.

686.     Donlon walked into an ambush. Before him was a significant departmental gathering for which he, as the Police Commissioner, had received zero invitation, zero prior notice, and which was conspicuously absent from his official schedule.

687.     Defendant SHEPPARD, arrogantly presided over this meeting dressed in full uniform, parading an unearned and unauthorized three-star insignia – a testament to his disregard for regulation and unequivocally stolen valor. It was evident this was a ceremony for newly promoted Chiefs, yet Defendant SHEPPARD offered Donlon no courtesy of an explanation for either his attendance or the event itself.

688.     Forced to improvise in this orchestrated spectacle of disrespect, Donlon offered genuine congratulations to the promoted MOS and apologized for an apparent lateness he could not have avoided, given Defendant SHEPPARD's deliberate exclusion of the Police Commissioner's office from any planning or invitation. The depths of Defendant SHEPPARD's malice became undeniable when, as the meeting concluded, he was overheard contemptuously remarking to others, "Donlon doesn't even know where to sit." This was a calculated, public insult designed to inflict maximum embarrassment.

689.     Donlon's subsequent apologies to the Chiefs, explaining his lack of prior knowledge, only underscored the deviousness of Defendant SHEPPARD's scheme. This entire charade was nothing more than a despicable and manipulative ploy by Defendant SHEPPARD to humiliate Donlon, and paint him as incompetent, disorganized, and unfit for the office of Police Commissioner.

690.     Defendant SHEPPARD's conduct was a flagrant abuse of his position, a reprehensible display of insubordination, and a malicious attack on Donlon's leadership. It was also a continuous illustration of vindictiveness of someone who acted like he, Defendant SHEPPARD, was the Police Commissioner when Defendant SHEPPARD was not even a three-star Chief, as he deviously had stolen the title and criminally earned the salary associated with it.

**R.  The Promotion Process Is Hijacked by Corruption and Collusion, Resulting in Several RICO Predicate Acts**

691.     The corruption within the NYPD's upper ranks was undeniably revealed during Donlon's promotion process. Donlon had made his intentions clear to Defendants MADDREY, SHEPPARD, and MARINO: All promotions would be based on merit, fairness, and integrity. Donlon sought a collaborative, transparent process, relying on recommendations from trusted senior leaders. Donlon was assured by Defendants MADDREY, SHEPPARD, and MARINO that his proposed promotion list, composed of carefully vetted candidates, would be submitted to the Mayor's Office and specifically to Defendant ADAMS.

692.     This assurance was a calculated lie by Defendants MADDREY, SHEPPARD, and MARINO. In a stunning act of betrayal and sabotage, numerous names submitted by Donlon and his trusted advisors were removed from the final list. Defendants MADDREY, SHEPPARD, and MARINO had secretly replaced the list with their own selections, promoting cronies and dismantling Donlon's authority in the process.

693.     These illegal acts likely constitute honest services fraud as well as mail and wire fraud.

694.     The next round of promotions descended into open defiance. After Donlon finalized the list in coordination with Defendants MADDREY and MARINO, he witnessed Defendants SHEPPARD and MARINO, who had no formal role in the promotion process, emerge from a private meeting on the 14th floor.  When confronted, Defendant SHEPPARD brazenly told Donlon he had "finished the promotion list" and submitted it, then indignantly walked away from Donlon. Donlon asked Defendants SHEPPARD and MARINO for a copy, which he never received.

695.     Under a mayor with integrity and leadership, Donlon would never have had to tolerate the NYPD Defendants' behavior. The appropriate response would have been to terminate those individuals and restore proper chain of command.

696.     While Donlon could have chosen to resign in frustration, that was the outcome the Defendants were hoping for. Instead, he remained committed to improving the NYPD and supporting the rank-and-file officers, especially the Department's future leaders.

697.     Donlon immediately reported Defendant SHEPPARD's insubordination to both Defendants ADAMS and MADDREY. He demanded a copy of the revised list from Defendant MARINO, who refused and walked away, signaling the protection he enjoyed from the collective NYPD Defendants. Defendant MADDREY merely offered vague promises to "look into it" which was nothing more than a stalling tactic used repeatedly to shield misconduct.

698.     Defendant MADDREY, a clear protector of Defendant SHEPPARD, said to Donlon, "Oh. Now you are going to blame Defendant SHEPPARD, again?"

S. **Forgery, Fraud, and the Theft of Command Authority**

699.     Defendant SARACENO who worked in Defendant MADDREY's Office was also one of MADDREY's acolytes.

700.     In his role as interim Police Commissioner, Donlon attempted to execute legitimate promotions within the NYPD on three separate occasions.

701.     Defendant MADDREY and SHEPPARD, with the help of MARINO, deliberately removed Donlon's selected candidates from the promotion list and replaced them with their own handpicked individuals. MARINO was also aware of these changes and failed to advise Donlon during all three promotions when Donlon was Police Commissioner. Donlon also asked MADDREY, SHEPPARD, and MARINO to send Donlon the finalized list but never received it. ADAMS was fully aware of this action but did absolutely nothing to rectify these criminal acts.

702.     These individuals were never selected, vetted, or approved by Donlon.

703.     This unauthorized interference directly violated the New York City Charter and Administrative Code, both of which solely vest exclusive authority to make NYPD promotions to the Police Commissioner.

704.     To complete the deception, Defendant SHEPPARD forged the revised lists by unlawfully using Donlon's signature stamp, without his knowledge or consent. It should be noted, Donlon personally observed  the promotion memo with his signature stamp on the memo signifying that SHEPPARD was promoted to a three-star Chief.

705.     Defendant SHEPPARD's actions constituted multiple crimes, including forgery, falsifying business records, grand larceny, and official misconduct.

**T.  Retaliation and Conspiracy to Silence a Whistleblower**

706.    Donlon's internal objections to Defendant SHEPPARD's criminal conduct were met with a conspiracy to force him, Donlon, out of the NYPD.

707.    Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO coordinated a retaliatory campaign to cover up their misconduct and protect their criminal enterprise.

708.    The fraudulent promotions were never rescinded. As a result, the City of New York continues to pay inflated salaries, benefits, and pensions to unlawfully promoted officers, despite knowing those promotions were never authorized by the Police Commissioner.

709.    This ongoing fraud has cost the City of New York hundreds of thousands, if not millions, of dollars in misappropriated public funds.

**U.   Defendant ADAMS Refuses to Act, Further Undermines Donlon**

710.    Donlon informed Defendant ADAMS directly about Defendant SHEPPARD's felonious conduct, including the forgery of his signature stamp.

711.    These disclosures involved criminal conduct and matters of public concern, far beyond the scope of Donlon's ordinary job duties.

712.    Defendant ADAMS refused to take any corrective action.

713.    Instead, Defendant ADAMS further isolated Donlon, allowing Defendant SHEPPARD's insubordination to escalate unchecked.

714.    Defendant SHEPPARD ignored lawful orders, including refusing to attend weekly meetings of two- and three-star Chiefs.

715.    Donlon was stripped of any power to discipline him.

716.    Defendants MADDREY, CHELL, and DAUGHTRY each embittered by being passed over for the role of Police Commissioner, aligned themselves with Defendant SHEPPARD in a coordinated effort to target Donlon.

717.    Their resentment was widely known throughout the NYPD and fueled their coordinated effort to sabotage Donlon's tenure.

718.    Their actions were not isolated acts of retaliation, but calculated moves designed to further their criminal enterprise from within the NYPD's highest ranks.

719.    Defendant SHEPPARD became the principal face of this contempt, repeatedly undermining Donlon with impunity, secure in the knowledge that Defendant ADAMS would protect him.

## V.    A Toxic Environment Engineered by Defendant ADAMS

720.    Defendant SHEPPARD's misconduct included refusing to respond to Donlon's communications, ignoring directives, and engaging in flagrant disrespect.

721.    Defendant ADAMS actively enabled this behavior by shielding Defendant SHEPPARD from accountability and preventing Donlon from disciplining him.

722.    Defendants MADDREY, CHELL, and DAUGHTRY lodged repeated complaints to Defendant ADAMS behind Donlon's back. Donlon was excluded from these discussions and denied the opportunity to respond.

723.    Defendant ADAMS acknowledged to Donlon that these complaints were coordinated, yet continued to undermine Donlon's authority.

724.    On two occasions, Defendant ADAMS told Donlon that his command was in "chaos." When pressed for specific examples, Defendant ADAMS admitted he had none, merely parroting unsubstantiated grievances from Donlon's saboteurs.

725.     Donlon repeatedly warned Defendant ADAMS that the unchecked insubordination was corroding the department's chain of command. Defendant ADAMS did nothing.

726.     The collective Defendants refused to recognize Donlon's authority, deliberately stripping the role of Police Commissioner of its legitimacy and effectiveness.

727.     Despite this campaign of abuse, Donlon never lost composure or retaliated. His professional restraint contrasted sharply with the collective NYPD Defendants' belligerence.

728.     In his long and distinguished career, including service with the FBI, Director of Homeland Security for New York State, and senior roles in the private sector, Donlon had never endured this level of hostility.

729.     The deliberate and coordinated misconduct by Defendants, coupled with Defendant ADAMS's silence, created a toxic and intolerable workplace.

730.     Sources confirmed to Donlon that Defendant ADAMS was aware of the criminal conduct and corruption but chose to do nothing, telling Donlon he would "make good" on promotions later, an implicit admission of his complicity.

731.     Ultimately, the same officials Defendant ADAMS protected, including Defendant SHEPPARD, turned on him. Defendant SHEPPARD reportedly aligned with the Cuomo campaign, seeking to become Police Commissioner himself.

732.     Donlon's experience illustrates the cost of speaking out against a corrupt political machine: a system built on loyalty to power, not the law or the public.

**W. NYPD Leadership Acts to Shield Compromised Personnel and Obstruct Federal Corruption**

    **a. Defendant GERBER'S Pattern of Deception, Retaliation, and Hostility Toward Collaboration With Federal Agencies**

733.    Defendant GERBER's actions throughout Donlon's tenure as interim Police Commissioner revealed a deeply rooted pattern of contempt, deception, and subversion. Donlon was quite surprised and dumbfounded that Defendant GERBER, a former U.S. Federal Assistant United States Attorney (AUSA) had no interest or desire to authorize a small number of U.S. Federal law enforcement agencies such as the U.S. Marshals Service, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), FBI, DEA etc. to work in conjunction with and support the NYPD in their efforts on this major initiative called Operation Restore Roosevelt ("ORR").

734.    Donlon clearly and concisely stated his opinion and reasoning as to why the federal agencies should be involved with ORR and fully support the NYPD. This was explained on a few occasions at the Monday morning Executive meeting attended by Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, and GERBER. Two reasons were as follows: NYPD would provide the names or any other identifying information on the offenders to the above-mentioned respective federal agencies who in turn would check their criminal and terrorism databases to determine if the offenders were wanted by one of the above Federal Agencies or perhaps another federal agency. It would then be determined in consultation and in conjunction with the NYPD what the logical course of action would be, which would benefit the residents in the vicinity of this major ORR initiative. If there were positive results of the federal checks, it would then be determined whether the offenders would be charged federally or

by the NYPD for their respective offenses. If jail or prison time would be warranted for the offender, a joint decision would be made by the respective federal agency and NYPD, examining what would be the best avenue to pursue this matter for the benefit of the community. It would be determined whether the person would be charged federally or through the NYPD. One factor to consider would be jail or prison time for offender. If the individual were sentenced by the federal agency , the offender would have to serve 85% of their sentence as opposed to what would happen in the city and state court which results in the criminal service much less of any imposed sentence.

735.    City and State governments do not possess the same information as federal law enforcement, which would allow the NYPD to check criminal/terrorism databases to determine if any of the individuals described and/or arrested by the NYPD had federal pending charges against them.

736.    Defendant GERBER being a former Federal Prosecutor was Donlon added that the ORR Task Force was served to go after quality of life matters (possession, illegal street vendors, noise violations, etc.) (NYPD, FDNY, OEM, SANITATION EPA, and other city-based agencies) and a host of others to combat the quality-of-life issues at the Operation Rescue Roosevelt. As a result of this limited approach, the NYPD was prevented from truly stopping crime in the area.

737.    The NYPD Legal Division had absolutely no interest in allowing a number of federal law enforcement agencies, such as the U.S. Marshals Service, Alcohol, Tobacco and Firearms, Drug Enforcement Agency, and other federal groups to assist them in the law enforcement task force.

738.     Defendant Gerber being a former Federal Prosecutor surely hindered this ORR initiative from being successful. It is shameful with his alleged experience, which would have immensely helped and protected the residents in the ORR area who depend on the NYPD to keep them safe and secure.

739.     His conduct was not merely unprofessional but constituted a sustained effort to undermine the integrity of NYPD leadership and to obstruct Commissioner Donlon's attempts at reform and transparency.

740.     Despite claiming he intended to "clean house" of officials affiliated with the prior administration, Defendant GERBER selectively shielded those who served his own and the Defendants' political interests.

741.     Defendant GERBER refused to allow Donlon to transfer Sergeant Special Assignment Danielle A. Venus, an individual closely associated with the prior regime of Commissioner Keechant Sewell, and who Donlon later discovered was surreptitiously monitoring him and transmitting his calendar and internal information to Defendant MADDREY.

742.     Donlon reported this breach of trust and called for an internal investigation— requests that were deliberately ignored by Defendant GERBER.

743.     Instead, Defendant GERBER described Sergeant Venus as a "great person" and refused to reassign her, further undermining Donlon's authority and operational control.

744.     With Defendant ADAMS's blessing, Defendant GERBER even removed one of Donlon's most trusted colleagues from internal communications and banned him from the 14th floor. The 14th floor at One Police Plaza is exclusively the domain of the Office of the Police Commissioner.

745.    Defendant GERBER's insubordination extended to his interactions with outside agencies.

746.    Although he publicly supported the concept of interagency collaboration, in private Defendant GERBER repeatedly expressed disdain for federal authorities.

747.    In one instance, Defendant GERBER told Donlon he "hated the Feds" and later reiterated this sentiment in front of others, stating that he did not want to work with them.

748.    These views directly contradicted the administration of Defendant ADAMS's publicly espoused efforts to build a unified task force with federal partners.

749.    Throughout Donlon's administration, Defendant GERBER routinely withheld key information, avoided eye contact when confronted, and consistently refused to answer direct questions. These are all hallmarks of a manipulative and untrustworthy actor.

750.    Defendant GERBER's behavior culminated in a stunning breach of protocol when he leaked confidential information about internal personnel changes to Defendant ADAMS, triggering a public reprimand in which Defendant ADAMS scolded Donlon: "You are to bring no one in."

751.    Defendant GERBER's conduct was not the product of bureaucratic misjudgment or simple disorganization—it was a calculated, ongoing campaign to sabotage Donlon's leadership, shield politically connected insiders, and curry favor with corrupt individuals at the top of the NYPD hierarchy.

**b.    <u>Defendant MADDREY Uses Strategically Placed Spies, Like Defendant GERBER, in the NYPD Legal Bureau to Prevent Donlon From Performing His Job as Police Commissioner</u>**

752.    When Donlon arrived officially to the NYPD, he attempted to perform the duties of the Police Commissioner.

753.    Donlon had befriended an NYPD Chief (whom Donlon had known from his prior government service), who began to help him navigate his way through the NYPD.

754.    This NYPD Chief was met with great resistance from Defendant MADDREY and the other NYPD Defendants due to, one can only surmise, their worry that Donlon would be able to effect reforms of the Police Department in his role.

755.    The NYPD Chief who befriended Donlon was suddenly banned from going on the 14th floor of One Police Plaza and was labeled a bad influence on Donlon by Defendant MADDREY.

756.    Plaintiff Donlon was informed by Defendants MADDREY and ADAMS that the NYPD Chief he befriended had little operations experience and should not be consulted on police matters, in an effort to discredit him.

757.    Donlon found the NYPD Chief to be highly competent, intelligent, and he communicated extremely well with everyone in the Department.

758.    Prior to the NYPD Chief being banned from the 14th Floor, Donlon allowed him and only him, access to his emails to assist him in his work as Police Commissioner.

759.    The NYPD Chief was the only person that Donlon could trust within the NYPD.

760.    Due to the overwhelming number of emails the Police Commissioner receives, several assistants and staff had access to Donlon's emails.

761.    Defendant MADDREY controlled several of the NYPD employees who had access to Donlon's schedule.

762.    When Donlon learned that Defendant MADDREY or his subordinates had removed this NYPD Chief from his schedule and banned him from the 14th Floor, Donlon had a heated discussion with Defendant MADDREY.

763.     During the discussion, Donlon explained that the NYPD Chief had far more experience than the people Defendants MADDREY and ADAMS were championing.

764.     Defendant MADDREY responded to Donlon saying that the NYPD Chief was "not good for you."

765.     Donlon responded by saying, "I will be the judge of that."

766.     The heated discussion then touched on the interference of staff with Donlon's schedule and calendar.

767.     Following the discussion, Defendant MADDREY continued to unlawfully interfere with Donlon's business as the Police Commissioner.

768.     Donlon attempted to visit different communities and NYPD facilities (Precincts, Transit Districts, Housing Service Areas) on a regular basis in his role as the Police Commissioner, which Police Commissioners throughout the history of the NYPD had done.

769.     Numerous employees had access to Donlon's daily schedule, calendar, and emails.

770.     The change in the Police Commissioner's daily schedule to remove the NYPD Chief ordered by Defendant MADDREY, made Defendant MADDREY the de facto Police Commissioner of the NYPD.

771.     Defendant MADDREY regularly had the NYPD Chief he befriended removed from Donlon's schedule.

772.     When the NYPD Chief was banned from the 14th Floor, Defendant MADDREY also removed his access to Donlon's emails without Donlon's permission.

c.    **Sergeant Venus Overrules the Police Commissioner Over His Holiday Party**

773.     Around this time, Donlon was planning the Police Commissioner's Christmas party, a small event for select guests.

774.     Donlon's Christmas party was being sponsored by Susan Birnbaum, CEO of the NYPD Police Foundation, and she contacted Donlon as to why the invitations had not yet been sent out.

775.     The invitations for the event were subsequently created, approved, and made ready for distribution.

776.     The invitations were supposed to be disseminated two weeks prior, but they had not yet been sent out.

777.     Donlon informed Mrs. Birnbaum that he had instructed his staff to send the invitations out two weeks prior to Donlon's conversation with Birnbaum.

778.     Donlon immediately inquired with his staff as to the status of the delinquent invitations.

779.     A visibly nervous staff member then responded to Donlon, hesitantly explaining that Venus had ordered that the invitations not be mailed until she gave further direction.

780.     Donlon subsequently confronted Venus who claimed that she had given the order because the invitations were going out too early and needed to be distributed closer to the party date. Donlon told Venus that for the Commissioner's holiday party in the past, invitations had always been disseminated months prior. Donlon advised this was the case with most holiday events.

781.     Donlon asked Venus why she had  not consulted with him prior to making the decision. Venus provided no explanation.

782.     Donlon continued to press Venus as to who authorized her orders.

783.    While Venus continuously stated that she made the decision on her own, it was clear to Donlon that she was lying.

784.    Donlon further stated that he checked the date where past Police Commissioners mailed their party invitations and found it was the same time as his invitations were supposed to be mailed.

785.    Venus again had no answer.

786.    Upon information and belief, Defendants MADDREY and GERBER controlled the actions of Venus.

787.    Venus's direct Orders to Donlon's staff not to follow the orders of the Police Commissioner were confusing to Donlon's staff and placed them in a very awkward position. Donlon apologized to the staff apologized. Donlon told them not to worry and that they had been placed in a difficult position by Venus.

788.    Donlon's administrative assistants were outstanding and supported Donlon during Donlon's tenure as Police Commissioner.

789.    Shortly thereafter, Donlon learned that an NYPD Chief was removed from Donlon's schedule/access by Venus, (Sergeant Special Assignment) who was also assigned to Commissioner Caban's office during Caban's tenure.

790.    Donlon learned that the removal of the Chief was ordered by Defendant MADDREY.

791.    Donlon attempted to secure his daily schedule and discovered that it was Defendant MADDREY's office who had access to Donlon's daily calendar, schedule, and emails.

792.    Donlon was informed by the technician that Venus, a Defendant MADDREY acolyte, had access to Donlon's schedule, calendar, and email.

793.    The technician showed Donlon proof of Venus's access and inquiries of Donlon's schedule, calendar, and email contents and who had access.  Donlon was also provided the email reflecting this information from Venus's possession.

794.    Donlon also learned that Venus was also responsible for controlling access to the schedules, calendar, and emails of former Commissioner Caban and Chief of Staff Raul Pintos. Venus played a vital role in the administration of Commissioner Caban's Office but as stated above, GERBER stated Venus was not compromised and her phone was not seized or "dumped" by law enforcement authorities. As mentioned before, GERBER said Venus is "good people" and can be trusted and should remain with Donlon's administration.

795.    Donlon confronts Defendant MADDREY about altering his (Donlon's) schedule without permission and removing the Chief from receiving Donlon's schedule, calendar, emails.  Additionally, MADDREY per Venus also advised that MADDREY had direct access to Donlon's emails. However, MADDREY did not inform DONLON that MADDREY had access to Donlon's emails, but Venus confirmed that MADDREY did in fact have access to Donlon's emails. Donlon was not surprised as MADDREY and the Defendants had a history of lying, cheating, and stealing and being involved in scandals. Amazingly, they all have trouble being honest and forthright.

796.    Defendant MADDREY admitted to Donlon, after a lively conversation with MADDREY, he was able, through Venus, to view Donlon's schedule, calendar, and email; access which he received from Venus.

797.     Donlon was unaware that Defendant MADDREY had direct access to his schedule, calendar, and emails until this revelation. The full extent of MADDREY's and the Defendants' interference with Donlon's schedule, calendar, and email access was unknown at this time. Donlon mentioned this to the IT individual who was extremely honest and understood the violation of Donlon's privacy.

### d.  Defendant MADDREY Alters Donlon's Schedule Without Permission

798.     Defendant MADDREY advised Donlon that he removed the Chief from his schedule, calendar, and email access, as MADDREY advised the Chief was not helpful to Donlon.

799.     Donlon told Defendant MADDREY the person (Chief) who was removed was not Defendant MADDREY's concern and Donlon's main worry was related to Defendant MADDREY's unlawful actions and the actions of the Defendants.

800.     Donlon further informed Defendant MADDREY that the NYPD Executives he, Defendant MADDREY, removed from Donlon's schedule had more integrity, honesty, and police experience than Defendants MADDREY, CHELL, DAUGHTRY, and SHEPPARD combined. When Donlon learned of the widespread corruption and interference with his calendar, he went to the NYPD Information and Technology Bureau ("ITB") to speak with a technician.

801.     Donlon then stated that he did not want Defendants MADDREY, CHELL, DAUGHTRY, and SHEPPARD having continued access to his schedule and email.

802.     To Donlon, it was clear that Sergeant Venus was beholden to Defendant MADDREY who felt comfortable enough due to her protection from the Chief of

Department, Defendant MADDREY, to remove a meeting with a one-star Chief from Donlon's schedule without fear of discipline.

**e.  IT Technician in Donlon's Office Exposes Venus and Defendant MADDREY**

803.    When the ITB technician left Donlon's office, Donlon witnessed Venus scrambling and running from her desk to the ITB technician's desk.

804.    Donlon subsequently asked the technician what Venus wanted and was informed that she wanted to know what the technician and Donlon had discussed in their private meeting.

805.    The technician advised Donlon that Venus instructed him to contact her whenever Donlon instructs him regarding any tasks.

806.    Venus was one of the few individuals allowed to remain in the Police Commissioner's Office following the termination of Commissioner Caban.

807.    Defendant GERBER advised Donlon to get rid of several people but advised Donlon to retain Venus. It was unknown by Donlon at the time that Venus was an acolyte of Defendant MADDREY whose sole purpose was to inform Defendant MADDREY of Donlon's every move, coupled with SARACENO who DONLON observed them both often speaking.

808.    It was learned by Donlon that Venus repeatedly questioned the ITB technician who informed Donlon of the many people who had access to his schedule, calendar, and emails.

809.    Donlon confronted Venus in his (Donlon's) office, and she admitted to questioning the ITB technician about Donlon. Venus advised that she spoke to the technician to simply assist him with any tasks requested by Donlon.

810.    Donlon further asked Venus if there were other occasions Venus spoke to the technician concerning tasks requested by Donlon.

811.    Venus became rather emotional and denied she decided to assist Donlon in any manner and had no nefarious reasons to work with the technician to help Donlon. Donlon told Venus that he did not believe her, and she had to be directed by someone.

812.    Venus began crying and denied any wrongdoing and advised Donlon she was upset that she could be disciplined and was upset that Donlon didn't believe her. Due to Venus's continual emotional state and crying, Donlon discontinued the interview. Venus departed Donlon's office and proceeded to a room in the lobby of 1 PP, still upset and crying while telling MOS she was upset "because the Commissioner doesn't believe me." Donlon advised that the last time she had any contact with Venus was in Donlon's office. Additionally, Venus never returned Donlon's calls and retired within a week.

   f.    **Former Chief of Staff, Raul Pintos, Also Uses Venus to Gather Information on Donlon**

813.    Donlon was advised that Venus was seen meeting with Raul Pintos, Caban's, Chief of Staff, inside his NYPD vehicle parked inside the lower basement at NYPD Headquarters parking garage of One Police Plaza on multiple occasions.

814.    Following knowledge of these meetings, Donlon confronted Venus about the purpose of these clandestine meetings with Pintos.

815.    Venus told Donlon that they were just friends, and she reported to him in her previous role.

816.    That said, Donlon was and is of the belief that Pintos was gathering information regarding Donlon. For just whom is unknown.

### g. **Exposing Defendants MADDREY and SARACENO**

817.     Defendant SARACENO was assigned to Donlon's office by Defendant MADDREY. At the time of Defendant SARACENO's assignment to Donlon's office, Donlon was told by Defendant MADDREY about the expert and unique qualifications and record of Defendant SARACENO.

818.     However, from a review of Defendant SARACENO's records by Donlon, it was documented that Defendant SARACENO had retired approximately one year prior due to a scandal in which Defendant SARACENO was found to have falsified his time and attendance records and misconduct. Defendant SARACENO was eligible to retire at the time and did so. He retired with the rank of Inspector.

819.     Within one year of Defendant SARACENO's retirement, Defendant MADDREY welcomed Defendant SARACENO back to the NYPD as an Inspector assigned to Defendant MADDREY's office.

820.     To add incredulity, Defendant SARACENO told Donlon that he had retired in order to be closer to his family. It defies logic that Defendant SARACENO could openly provide false statements to Donlon knowing Donlon's ability to verify the information.

821.     On two (2) separate occasions, Donlon deliberately gave Defendant SARACENO inaccurate information to test whether SARACENO could be trusted.

822.     On both occasions, the inaccurate information came back to Donlon through Defendant MADDREY, confirming Donlon's suspicions about Defendant SARACENO.

823.     Given the circumstances, Donlon strongly believed that Defendant MADDREY placed Defendant SARACENO in close proximity to Donlon so that he (Defendant SARACENO) could gather information and report back to Defendant MADDREY.

824.    In conversations with Defendant SARACENO and Donlon, Defendant SARACENO openly praised Defendant MADDREY, stating that he "never encountered a more ethical, honest, and dedicated NYPD member," and stated how much respect he had for him (Defendant MADDREY).

825.    Defendant SARACENO repeatedly tried to solicit Donlon's opinion of Defendant MADDREY, which suggested to Donlon that Defendant SARACENO had an ulterior motive.

826.    Defendant SARACENO also tried to solicit information from Donlon about Defendants CHELL, DAUGHTRY, SHEPPARD, and even Defendant ADAMS.

827.    Donlon declined to share his opinion but specifically mentioned that he noticed Defendants CHELL, DAUGHTRY, and SHEPPARD had an aversion to working with federal law enforcement agencies on Roosevelt Avenue.

828.    Donlon attempted to discuss with Defendant SARACENO how the FBI could be brought into the task force and was met with silence.

829.    Donlon continued to be surprised by the collective Defendants' refusal to use the full law enforcement resources at their disposal to address the crime problems facing the Defendant CITY.

## X.  Internal Espionage and Institutional Sabotage

### a.  Defendant SHEPPARD Spreads False Narrative to NYPD Police Foundation to Undermine Donlon

830.    On or about Monday, October 10, 2024, Defendant SHEPPARD called Susan Birnbaum, the President and Chief Executive Officer of the NYPD Police Foundation, to inform her that Donlon would be terminated that coming Friday, October 11th.

831.     Upon information and belief, Defendant SHEPPARD did this to further undermine Donlon's authority in the NYPD and in law enforcement circles.

832.     On October 10, 2024, WPIX 11 News reported that Donlon was likely to resign.

833.     At this time, Defendant SHEPPARD led the NYPD's Public Information office, which worked closely with the press.

834.     Upon information and belief, the rumor that Donlon would be relieved of his duties as Police Commissioner, which was published by WPIX 11 News, came from Defendant SHEPPARD in retaliation against Donlon for his complaints and protected speech.

835.     The termination did not happen although Defendant SHEPPARD had falsely spread the rumor. Donlon learned of SHEPPARD's conversation with Mrs. Birnbaum during the week of October 14, 2024, when Donlon met with Mrs. Birnbaum.

   **b.  Donlon's Conversation With and Warnings From Chief Pintos**

836.     Thereafter in October, prior to his last day, Raul Pintos, former Chief of Staff for Commissioner Edward Caban, met with Donlon.

837.     In the meeting, Pintos told Donlon that "he wished he knew him (Donlon) better" and heard about and witnessed "several targeted attacks against" him (Donlon).

838.     Pintos warned Donlon in the meeting that he was surrounded by "bad people" who wished Donlon harm and were actively trying to undermine him.

839.     Donlon thanked Pintos, who was very pleasant and friendly, for his honesty and for warning him about the conspiracy of the collective Defendants to harm him.

   **c.  WPIX Interview Organized by Defendant SHEPPARD**

840.    On October 28, 2024, Donlon was led into a WPIX 11 table top conversation with Defendants CHELL, DAUGHTRY, and SHEPPARD, which had been organized by Defendant SHEPPARD.

841.    Donlon was very hesitant to participate in this round table discussion as it was orchestrated by Defendant SHEPPARD who was very close with the female television host. (Donlon was also advised by some MOS that Defendant SHEPPARD was setting Donlon up and looking to embarrass him.)

842.    It was also obvious to Donlon that Defendant SHEPPARD had something in mind for this round table discussion. At first, Donlon told Defendant SHEPPARD that he didn't want to participate, and Defendant SHEPPARD became stressed and rather angry. Donlon, at first, was hesitant to partake in the discussion but finally agreed, as he was repeatedly told by Defendant ADAMS to "work with these guys" in reference to the Defendants MADDREY, CHELL, DAUGHTRY, and SHEPPARD.

843.    Defendant SHEPPARD stated that Defendant ADAMS was aware of this round table discussion and would not be happy if Donlon didn't participate, along with the MOS. Defendant SHEPPARD said it was important for Donlon to partake in these discussions and participate as a part of the team. Before the round table discussion, Defendant SHEPPARD escorted Donlon over to the reporter, at which time the reporter and Defendant SHEPPARD wanted Donlon to first submit to a one-on-one interview before the round table discussion.

844.    Donlon looked at both of them and asked why he wasn't advised of this previously and received no answer from either the reporter or Defendant SHEPPARD. Obviously, this was a set up by Defendant SHEPPARD and the reporter and they truly believed that

Donlon wasn't aware of their sneaky, dishonest, childish, and amateurish stunt. Donlon agreed to the one-on-one interview and sat down with the reporter with Defendant SHEPPARD standing by the side listening attentively to the questions and, of course, Donlon's answers.

845.     The first question in the interview was about the search of Donlon's home by the FBI, which was a question that Donlon found too obvious and unusual for an NYPD initiated press interview. The reporter asked Donlon if he was able to perform his official duties as Police Commissioner and how would this affect his daily duties and responsibilities.  Donlon answered the question and said he was entirely focused on being the Police Commissioner and the above search would not affect his position. Donlon further stated that the documents were 20 to 30 years old and related mainly to cases Donlon was involved with during his career.

846.     Donlon further stated that he was not at liberty to discuss an ongoing FBI investigation. Surprisingly , the reporter excused herself and went directly to speak with Defendant SHEPPARD. After a few minutes after her private discussion with Defendant SHEPPARD, she continued the interview. Surprisingly, the reporter asked Donlon basically the same question, again, and Donlon provided her with the same answer. It was obvious to Donlon that the reporter wasn't happy with his first answer, nor his second, which mirrored the first. After Donlon answered the question he was asked to expound on his answer, but he advised the reporter that the investigation was ongoing and Donlon could expand on the answer. The reporter was obviously frustrated and appeared angry.

847.     During the segment preceding a commercial break, WPIX 11 broadcast favorable coverage of Defendant SHEPPARD, effectively portraying him in a positive light.

848.    The round table discussion resumed with Defendants CHELL, DAUGHTRY, and SHEPPARD joining Donlon. Donlon was not surprised that he was interrupted by the three in an attempt to gain air time.  This was truly narcissistic behavior at its best from these three individual Defendants who continued to embarrass the NYPD with the strong backing of Defendants ADAMS and MADDREY.

849.    Donlon also at this time thought about Defendant SHEPPARD's overall behavior toward him and how he would resort to any means to force Donlon to resign or be fired. It should be noted that Defendant SHEPPARD was in his NYPD white shirt uniform fraudulently wearing the third star on his uniform collar during the Pix 11 interview.

### d.  Defendant SHEPPARD'S Devious Insubordination of Donlon

850.    To Donlon, it was pathetic to watch Defendant SHEPPARD constantly engage in devious behavior in order to attempt to undermine him as Police Commissioner.

851.    It was obvious to Donlon, that Defendant SHEPPARD was angling to undermine Donlon and secure his position as the 48th NYPD Police Commissioner.

852.    Donlon was subsequently informed that Defendant SHEPPARD truly believed that as a result of his insubordinate and criminal actions against Donlon and his repeated efforts to humiliate, embarrass, and spread lies about Donlon, Donlon would resign in disgrace.

853.    Defendant SHEPPARD also believed that Defendant ADAMS would observe and be told about all this alleged turmoil surrounding Donlon and that Defendant ADAMS would have no choice but to terminate Donlon. Thereby, he would appoint Defendant SHEPPARD as the 48th Police Commissioner in spite of his (Defendant SHEPPARD'S) own dismal NYPD record.

**Y.  Donlon Complains Directly to Defendant ADAMS, Who Takes No Action**

854.    Donlon thereafter spoke with Defendant ADAMS about what he viewed as repeated insubordination, if not sabotage, of his (Donlon's) work and the operations of the NYPD.

855.    Defendant ADAMS told Donlon that he had to be prepared to answer these questions and ignored his complaints about the illegalities of the NYPD Defendants herein. Donlon asked ADAMS if he found it unusual that he was separated by Defendant SHEPPARD and interviewed one-on-one by the reporter, which was not previously arranged.

856.    Defendant ADAMS responded by telling Donlon that the NYPD was in a state of "chaos."

857.    It was clear to Donlon that the individual NYPD Defendants were feeding Defendant ADAMS false information without any evidence.

858.    Donlon asked Defendant ADAMS several times to define chaos, but Defendant ADAMS refused.

859.    It was clear that Defendants MADDREY, CHELL, DAUGHTRY, and SHEPPARD had a direct line to Defendant ADAMS and used this connection to undermine Donlon.

860.    In reality, the "chaos" within the NYPD was a direct result of Defendant ADAMS's corrupt appointments, promotion of unqualified personnel, and tolerance for misconduct at the highest levels—factors that systematically undermined institutional stability and threatened the safety and security of inhabitants and visitors to New York City.

861.    Each of the unlawful actions of Defendant ADAMS, the highest policy maker of

the Defendant CITY, were condoned and adopted by the Defendant CITY.

## Z.  Donlon Discovers Glaring Problems in the NYPD Evidence Warehouses: A Crisis of Neglect and Failed Leadership

862.    Before Donlon assumed his role, a significant incident occurred on or around

December 13, 2023, when a fire broke out at one of the NYPD's warehouses. Fire

marshals concluded that the blaze quickly escalated into a three-alarm fire on Columbia

Street, sending thick black smoke over the Red Hook neighborhood. The inferno

destroyed an unknown quantity of biological evidence—some dating back two or three

decades—including crucial DNA tied to burglaries, shootings, and other unsolved crimes.

Shockingly, the evidence was stored in cardboard boxes, barrels, and paper bags,

materials that may have contributed to the fire's intensity.

863.    Troublingly, when Donlon assumed the role of Police Commissioner, he requested

a final comprehensive report on the warehouse fire from Defendant MADDREY—yet the

report was never provided. Despite specifically seeking detailed information on the

incident, Donlon was informed that the NYPD had no final report available. Although the

Fire Department of New York (FDNY) ultimately attributed the fire to an "electrical

blowout," that determination does not excuse the NYPD's apparent failure to thoroughly

investigate such a critical event.

864.    Recognizing the NYPD's long-standing issues with disorganization, poor

oversight, and unreliable record-keeping systems, Donlon chose to personally inspect the

department's evidence warehouses. This decision stemmed from his awareness of

persistent management failures and systemic dysfunction. For members of service (MOS),

the conditions of these facilities were hardly a surprise—they had long been aware, at least in part, of the inadequate and often chaotic environments where critical investigative evidence was stored. Shockingly, none of these warehouses had ever been visited NYPD senior leadership, despite their responsibility for overseeing warehouse operations. Donlon's visit marked a rare and necessary effort to confront an issue that had been neglected for far too long.

865.    This alarming incident, coupled with reports of systemic disrepair, compelled Donlon to personally inspect NYPD warehouse facilities, an action he was told no Police Commissioner or high-ranking Chief had ever undertaken. Donlon's findings were appalling.

- At the Erie Basin warehouse, Donlon discovered decades of evidence, vital to countless cases, haphazardly piled in cardboard boxes and paper barrels, devoid of proper labeling, fireproof storage, or any systematic categorization.

- Aisles were unmarked; logs were non-existent. Evidence from the NYPD's Information Technology Bureau, known as the MISD, regarding cases dating back to 1981, sat in decaying cardboard boxes, a profound risk to justice.

- The absence of secure, fireproof containment was a shocking dereliction of duty and did not represent the professionalism or the ideals of the NYPD.

866.    Donlon saw no effort to protect the invaluable work of hard-working NYPD investigators nor evidence which might exonerate the innocent. Donlon saw long-standing, unaddressed issues, which included but are not limited to, a lack of safety protocols, fire prevention, proper building inspections, and deplorable working conditions. Hazardous materials, including drugs, tobacco, other substances and contraband, were stored with dubious assurances and no verifiable documentation, endangering our personnel and again severely diminishing the administration of justice.

Donlon was told that the air quality in the warehouse was monitored, and there were no issues.

867.     Donlon also found, which was known throughout the NYPD for years, that the warehouses were a literal dumping ground for MOS, for the most part,  who were being disciplined or punished in some way. This is a practice that has unfortunately gone on for many years.

868.     Donlon stated then—and reaffirms now—that this pattern of systemic negligence has handed defense attorneys a tactical advantage, undermining prosecutions and denying justice to victims and their families. It represents a blatant disregard for the tireless efforts of officers, detectives, crime scene units, first responders, supervisors, and others whose work has been consistently compromised. Following this, Donlon addressed the issue during his scheduled meeting with two- and three-star Chiefs, and spoke directly with Defendants KINSELLA, MADDREY, CHELL, and DAUGHTRY about the deplorable conditions he witnessed at both warehouse facilities.

869.     There are approximately 6 or 7 other facilities that Donlon was informed had the same conditions.

870.     These locations were all neglected and appeared to have the same quality issues as the warehouses visited by Donlon.

871.     Donlon was further informed that some of the NYPD warehouses did not have working heat and others lacked air conditioning. Donlon determined that a supervisor was forced to bring air conditioner equipment to one of the warehouses to provide workable conditions for the NYPD employees.

872.     Following Donlon's inspections, Donlon demanded immediate action from NYPD leadership and the NYPD Defendants to rectify these critical failures.

873.     Donlon was informed that Defendant Maddrey was aware of his visits and was reportedly "livid"—not only about the inspections themselves but also the exposure of a long-standing, well-known problem. Donlon was further told that Maddrey promptly discussed the matter with Adams, who was likewise said to be upset. Although Adams professes to be an honorable, responsible, and compassionate leader, he made no effort to speak with Donlon directly—an action that would have been both appropriate and expected under the circumstances. In reality, Donlon never anticipated any meaningful engagement from Adams regarding the issue.

874.     Yet, neither ADAMS nor Defendants KINSELLA, MADDREY, CHELL, and DAUGHTRY addressed Donlon about his findings or initiated any meaningful reform.

875.     This silence and inaction are proof of ongoing incompetence, apathy, and a profound leadership crisis within the NYPD.

   7.    Key revelations from Donlon's two warehouse inspections included:
   - No verifiable link between physical evidence and active cases.
   - No functional tracking system to locate evidence for NYPD or prosecutors.
   - Evidence scattered, exposed, and inconsistently marked, violating all protocols.
   - Disorganized storage that directly benefits defense challenges to evidence integrity.
   - Questions about the functioning fire suppression system (Donlon was expressly informed of this deficiency by an MOS concerned about the vulnerabilities).

876.     Donlon asked direct questions such as, "Why is the evidence not maintained in metal containers?" and "What system is used to organize the evidence?"

877.    Donlon received no answers to his inquiries—only silence from the NYPD personnel assigned to the warehouses. He came to the realization that it was the upper leadership—Defendants ADAMS, MADDREY, CHELL, and DAUGHTRY—who were all fully aware of the deplorable situation that had persisted for over a decade. This horrific and embarrassing mess demanded immediate attention, yet those at the highest levels failed to act. Donlon asserted that there was a complete absence of leadership within the NYPD's top ranks, including Defendant ADAMS himself.

878.    While a supervisor, at a subsequent event, later claimed some minor improvements, such as acquiring a few metal containers, the vast majority of evidence remained vulnerable.

879.    The scale of necessary reforms is massive and absolutely essential.

880.    Donlon was primarily concerned about a fundamental breakdown in the chain of custody, a direct threat to successful prosecutions, and a blatant disregard for decades of investigative work rather than simply reorganizing the evidence warehouses.

881.    It is disgraceful that all of the painstaking hours, days, weeks, months, and years on an investigation would be squandered due to the deplorable conditions in which evidence is maintained.

882.    Donlon expressed this to multiple NYPD Executives and there was no response or follow-up. Donlon said "if you really cared and respected all the hard work committed by these officers, defensive bosses you would all look to examine the matter for the in you would." Defendants KINSELLA, MADDREY, CHELL, and DAUGHTRY, the NYPD Chief of Operations, had absolutely nothing to say. Defendant MADDREY did say he would look into this matter.

883.     Unfortunately, Donlon was replaced shortly thereafter and was unable to visit the approximate six other warehouses with the same reported conditions. Donlon had the opportunity to speak with personnel at these warehouses and confirmed these irreparable and deplorable conditions.

884.     Donlon was shocked by the lack of concern by the individual NYPD Defendants following his discovery.

885.     Contrarily and incredulously, Donlon learned that the individual Defendants were angry that he visited the warehouses.

886.     Without immediate, sweeping corrective measures, this system will continue to fail victims, embolden criminals, and betray the trust placed in the NYPD.

**AA.   Madison Square Rally, NYC, for Presidential Candidate President Donald J. Trump**

887.     On October 24, 2024, then presidential candidate, President Donald J. Trump, held a rally inside Madison Square Garden (MSG), New York City. The rally was widely reported by media outlets as there were significant concerns about potential issues with protestors and other disruptions.

888.     For that reason, it was standard procedure, protocol, and policy that the NYPD provide police protection at this event and other similar major events taking place throughout the NYC area. Additionally, at these major events, NYPD cooperation and liaison with federal and state law enforcement and intelligence agencies at these events are outstanding. The NYPD needed to be represented at the event for liaison purposes or in the event of any unforeseen criminal, civil, or terrorist issues.

889.    Prior to arriving at this event, Donlon was fully aware that he was not to meet or engage directly with President Donald Trump or with his security detail. Within NYPD circles, it was widely understood that Defendant ADAMS was not supportive of President Donald Trump or his policies and opinions, and he did not want the NYPD MOS to make any contact or speak with President Trump or the President's administration. (Defendant ADAMS's unfavorable public comments and personal attacks against Trump's policies and opinions were also widely reported by the media.)

890.    At the event, Donlon met with roughly ten NYPD units—including ESU, Bomb Squad, Intelligence, and Counterterrorism—to provide support and gather updates.

891.    He thanked them for their service, a standard practice consistent with his prior appearances at events like the U.N. General Assembly.

892.    Donlon arrived at the event accompanied by Defendant SARACENO and a one-star Chief.

893.    Donlon, a consummate leader, was fully cognizant about the then current situation involving ADAMS when he went to the Trump rally at MSG. Donlon's intention was to meet with all the NYPD Chiefs, Inspectors, Captains, etc. along with the numerous patrol officers assigned to the event and in the area.

894.    However, in an event like this, the normal protocol would be to visit with the U.S. Secret Service and Trump's security team, but that would not be proper. Historically, NYPD Police Commissioners had undertaken such actions at similar events and Donlon had also beforehand.

895.    Defendant CHELL in full uniform attended the rally and was interviewed by Newsmax media about the rally, and Defendant ADAMS didn't provide any feedback or

concerns with Defendant CHELL. It is clear that Defendant CHELL did not, and does not, operate, under the same set of rules as imposed on Donlon.

896.    While at the rally, Donlon had suspected that Defendant SARACENO was monitoring his activities on behalf of Defendant MADDREY or any of the above-mentioned NYPD Defendants. The Trump Rally incident removed any lingering doubt, as Defendant SARACENO proved his intentions on many occasions being a source for Defendants MADDREY and ADAMS. It was quite transparent that Defendant MADDREY, supported by Defendant ADAMS, had Defendant SARACENO monitor Donlon's activities.

897.    There were also heads of various federal, state, and local law enforcement agencies in attendance. Actually, while Police Commissioner, Donlon received a call from the SAC ICE, who covers this region, who wanted to meet with Donlon. Due to Defendant ADAMS's disdain and displeasure with ICE policies, he did not meet with ICE, even for an initial meet and greet.

898.    Donlon was at the event for a total of one hour.

899.    Upon information and belief, Defendants MADDREY and SARACENO informed Defendant ADAMS that Donlon went to the event.

900.    While at the event, Donlon received a text message from Defendant ADAMS who questioned Donlon's presence at the event.

901.    Defendant ADAMS specifically texted that it was "not a smart decision going to the Trump rally tonight."

902.    Defendant ADAMS then wrote that the unnamed NYPD MOS who advised Donlon to attend the rally acted "poorly."

903.    Donlon immediately telephonically contacted Defendant ADAMS who in a very nasty and disrespectful manner, as usual as he spoke to Donlon, addressed his concerns, explaining that his attendance was in his official capacity and not as a spectator or private citizen.

904.    Donlon asked Defendant ADAMS why he objected to his attendance at the rally but received no response.

905.    Donlon clarified that he did not meet with Trump, his staff, or the Secret Service. To this day, Donlon does not understand why ADAMS was concerned about his presence. It was critical for the Commissioner to attend given the event's national importance and the history of threats against President Trump.

906.    On the call, it was clear that Defendant ADAMS was upset that Donlon went to the Trump rally. Moreover, Defendant ADAMS expressed concern about the alleged presence of the wife of an NYPD MOS in a suite that Donlon had visited at MSG. Donlon asked Defendant ADAMS if there was a problem attending and fulfilling his duties and responsibilities attending such a major event. Ironically, Defendant CHELL was front and center at the event being interviewed by NEWSMAX with Trump posters behind him.

907.    Neither Defendant ADAMS nor Defendant MADDREY ever mentioned a word about Defendant CHELL's interview. Conversely, if Donlon had given the interview with NEWSMAX, he would have likely been terminated.

908.    Donlon corrected Defendant ADAMS, stating that the person he referred to was not the wife of an NYPD MOS.

909.    Defendant ADAMS acknowledged that he may have received "bad information." Donlon replied yes.

910.      During the rally, Donlon was accompanied by Defendant SARACENO, who witnessed the conversation between the Chief, Donlon, and the purported wife of an NYPD MOS.

911.      Donlon later learned that it was Defendant MADDREY, sourced by Defendant SARACENO, who relayed this inaccurate information directly to Defendant ADAMS.

## BB.  **Defendant SHEPPARD Publicly Makes Terroristic Threats (Another Felony) Toward Donlon, Which Are Covered Up by the Defendants**

912.      On November 3, 2024, the New York City Marathon was held.

913.      At the marathon, Defendant SHEPPARD continued to wear the unearned third star on his collar.

914.      At the finish line at the marathon, Donlon and Defendants DAUGHTRY and SHEPPARD had a photo opportunity with the NYPD Road Runners club.

915.      The only space available in the photo for Donlon was next to Defendant SHEPPARD.

916.      Donlon approached Defendant SHEPPARD and politely asked him to move a bit so he could fit into the photo.

917.      Defendant SHEPPARD refused the request.

918.      The photos were taken.

919.      When the pictures had concluded, Defendant SHEPPARD stepped back and suddenly began shouting loudly and aggressively that Donlon had grabbed his arm.

920.      Defendant SHEPPARD became irate over the inadvertent touch and began to berate Donlon in full view of the public and media.

921.　　　Defendant SHEPPARD, one of the highest-ranking sworn police officers in the NYPD, proceeded to yell at Donlon, stating "I will fucking kill you."

922.　　　As Defendant SHEPPARD made this threat, he was lunging toward Donlon in an aggressive manner, appearing intent on initiating a physical confrontation. Defendant SHEPPARD's physical actions toward Donlon constituted the crime of menacing (by physical menace) because it placed Donlon, the interim Police Commissioner of the City of New York, in fear of physical injury.

923.　　　Defendant MADDREY was forced to intervene at this point and physically restrained Defendant SHEPPARD to prevent him from escalating to a full-blown assault against Donlon at the marathon.

924.　　　Despite Defendant SHEPPARD's criminal conduct, Donlon kept his composure and did not escalate the situation with the clearly emotionally disturbed Defendant SHEPPARD.

925.　　　Donlon instructed Defendant SHEPPARD, his alleged subordinate, to calm down and stated, "let's discuss this in private, away from the crowd."

926.　　　Defendant SHEPPARD again refused.

927.　　　Donlon walked away from the scene.

928.　　　Donlon's daughter was at the event and was terrified due to the criminal conduct of Defendant SHEPPARD.

929.　　　Donlon's daughter began to cry as a result of the actions of Defendant SHEPPARD and was frightened for the safety of her father, which continues to date.

930.     Donlon was rightly irate over the insubordination, the criminally physical threat, and for being physically menaced in front of his daughter and the many other witnesses at this heavily attended public event.

931.     As Donlon departed, he gave Defendant MADDREY a direct order to notify the NYPD's Internal Affairs Bureau about Defendant SHEPPARD's criminal conduct and criminal threat against him (Donlon).

932.     However, per Defendant ADAMS, a mass email was sent to NYPD Members of Service and the media to notify them that the incident was an in-house event and a disagreement between co-workers.

933.     This was not what took place.

934.     The repeated threats were witnessed by several high-ranking NYPD officers including Defendants MADDREY and DAUGHTRY, each of whom refused to take action or even report the incident to Internal Affairs Bureau, as required by NYPD rules and regulations.

935.     The incident was also witnessed by several NYPD officers and private citizens who were shocked by the criminal acts they just witnessed.

936.     The incident was then repeatedly lied about to protect all the Defendants herein.

937.     From this point forward, based on the violent outburst of Defendant SHEPPARD, both Donlon's daughter and wife were concerned for his safety.

938.     This fear continues to date.

939.     Upon information and belief, this incident was not even investigated, and the criminal actions of Defendant SHEPPARD were never addressed.

**CC.** **Donlon Complains to Defendant ADAMS About Defendant SHEPPARD's Crime—but No Action Is Taken**

940.    On or about November 4, 2024, following the above-cited "marathon incident," Donlon spoke directly with Defendant ADAMS at City Hall in Defendant ADAMS's office.

941.    Specifically, Donlon detailed the repeated unlawful and corrupt acts that Donlon witnessed Defendant SHEPPARD commit. To wit Donlon specifically spoke with Defendant ADAMS regarding the menacing incident at the marathon and the previously cited fraud that took place when Defendant SHEPPARD stole and unlawfully used the Police Commissioner's signature stamp.

942.    Defendant ADAMS barely responded to Donlon's complaints and took no corrective action toward any of the NYPD Defendants.

943.    By repeatedly failing to correct the unlawful actions of the NYPD Defendants herein, Defendant ADAMS knowingly deprived Donlon of his constitutional rights.

944.    This conversation consisted of Donlon speaking not only as the interim Police Commissioner but also as a private citizen to Defendant ADAMS about the corruption and alleged criminal behavior and actions of the Defendants CITY, ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO.

945.    This conversation, and the others Donlon had with Defendant ADAMS, are in fact and substance Donlon reporting crimes to Defendant ADAMS.

946.    As a result of Donlon's meeting with Defendants ADAMS, a conference call was subsequently held among Defendants ADAMS, SHEPPARD, and Donlon.

947.    On the call Defendant SHEPPARD first stated, unprovoked, that "No one had to hold me back during the argument." This was a clear lie. In Donlon's experience and interpretation, this unprovoked utterance by Defendant SHEPPARD clearly indicated the lack of truthfulness of his statement.

948.    Defendant ADAMS was clearly angry on the call about the "marathon incident" and told Donlon and Defendant SHEPPARD that they needed to "patch up their disagreement" as the election was near.

949.    Defendant ADAMS stated on the call that they, indicating the Press Office of City Hall, would be drafting a statement to characterize the "marathon incident" as a simple disagreement.

950.    Donlon was subsequently informed by various NYPD executives who were outraged over Defendant SHEPPARD's actions, that Defendant SHEPPARD should have been removed from his position and disciplined for his crimes but that he was protected by Defendant ADAMS.

**DD.    <u>Defendants KINSELLA and MADDREY Scold Donlon for Reporting Crimes</u>**

951.    Following the incident and phone call, Donlon met privately with Defendants KINSELLA and MADDREY.

952.    The purpose of the meeting was to discuss with Donlon the "marathon incident" with Defendant SHEPPARD.

953.    At the meeting, Defendants KINSELLA and MADDREY each told Donlon that he should not have acted in the manner he did with Defendant SHEPPARD.

954.    Donlon was told by Defendants KINSELLA and MADDREY that the level of detail he included in reporting the criminal actions of Defendant SHEPPARD to Defendant ADAMS was unacceptable.

955.    In efforts to cover for Defendant SHEPPARD's physically menacing threat and insubordination, Defendants KINSELLA and MADDREY advised Donlon that he had "gone too far" in explaining the details of the incident at the marathon.

956.    Defendants KINSELLA and MADDREY expressed that Donlon's initial mention of the incident was acceptable, but the level of detail was excessive.

957.    In response to Donlon's clear perplexity, neither Defendant KINSELLA nor Defendant MADDREY were able to explain what portion of Donlon's objections to Defendant SHEPPARD's threatening to kill him and having to be held back, was excessive in any way.

958.    The "marathon incident" received widespread news coverage, but the narrative was controlled by the collective Defendants herein.

959.    Donlon reiterated to Defendants KINSELLA and MADDREY that the New York Post's account of the incident was false and that he needed to share the truthful version to protect his reputation and integrity.

960.    Donlon repeated that he did not argue, scream, yell, or charge at Defendant SHEPPARD.

961.    The story also falsely claimed that Donlon engaged in a verbal argument with Defendant SHEPPARD, which did not take place.

962.    In fact, it was Defendant SHEPPARD that screamed, yelled, and charged at Donlon.

963.     During the meeting, Donlon directed a statement to Defendant MADDREY, telling him, "you should remember—you held him back from physically attacking me."

964.     Defendant MADDREY did not respond to the substance of the comment but tried to deflect by stating that Donlon "says things about Kaz and Chell."

965.     Donlon asked Defendant MADDREY what he meant, but he failed to elaborate.

966.     The comment by Defendant MADDREY made little sense.

967.     It appeared to Donlon that Defendants KINSELLA and MADDREY were trying to silence him in order to further the criminal actions of the Defendants herein.

968.     Under normal circumstances, Defendant SHEPPARD would have been terminated for his unlawful misconduct, but under Defendant ADAMS, the unlawful misconduct of Defendant SHEPPARD was willfully and purposely ignored, and no corrective actions were or would be taken.

**EE.**     **Donlon Has His Transfers Rescinded, Suffering Further Retaliation**

969.     Thereafter, Donlon submitted documents to have several NYPD employees transferred, but the transfers were stopped. Under the law (NYC Charter § 432), no one except for the Police Commissioner had the power to effectuate the transfer of an NYPD employee. This is so even if the Police Commissioner is absent or unavailable due to disability, and one of her/his duly appointed "Deputy Commissioners" temporarily assumes the duties of the Police Commissioner.

970.     Donlon meticulously prepared and personally approved a critical transfer list for several NYPD employees.

971.     Donlon believed the list was paramount to bolstering severely damaged officer morale and optimizing command efficacy.

972.     Donlon transmitted the transfer list to the Chief of Personnel.

973.     Donlon was then informed that the officially sanctioned transfer directive had been brazenly tampered with and illicitly subverted by Defendant SHEPPARD.

974.     The perpetrators of this egregious act were later identified as Defendant SHEPPARD, acting in a highly irregular and unauthorized collaboration with Camille Joseph Varlack, who is Defendant ADAMS's former secretary and current Deputy Mayor of New York City for Administration.

975.     Varlack, leveraging her position with Defendant ADAMS, improperly empowered Defendant SHEPPARD to usurp Donlon's authority.

976.     Their conspiratorial actions directly resulted in the unlawful cessation of approximately ten (10) Member of Service transfers.

977.     This was not merely an administrative error, but a calculated act of defiance constituting a flagrant and continuous act of insubordination against the explicit directives of the sitting interim Police Commissioner.

978.     By the time Donlon's transfers were rescinded, the NYPD employees had already been informed of their transfers by Donlon, which were a reward for their stellar work performance.

979.     To those officers, and those who hoped that Donlon would have had real power to change the NYPD for the better, this was a devastating blow to morale.

980.     The already suffering morale of the affected officers, and indeed the NYPD writ large, the collective Defendants further decimated this arbitrary and disrespectful reversal and interference with the office of the Police Commissioner.

981.    An NYPD Chief advised Donlon that this unauthorized rescission of approved transfers precipitated major operational problems and turmoil across numerous NYPD commands. Officers who had, in good faith, begun transitioning to their new, Police Commissioner approved assignments, were abruptly and humiliatingly ordered back to their previous commands. This created an unconscionable level of embarrassment, unprofessionalism, and logistical havoc.

982.    Donlon was advised by a wide range of NYPD personnel, both current and retired, that this reprehensible usurpation of a Police Commissioner's approved transfer directives was entirely unprecedented in the annals of the NYPD and marked a scandalous departure from established order and respect for the chain of command.

983.    The fabric of NYPD procedure(s) was torn asunder when officially sanctioned transfers were summarily nullified by subordinates, namely Defendant SHEPPARD and Camille Joseph Varlack, operating outside their authority, all under the explicit control of Defendant ADAMS.

984.    When Donlon confronted Defendant MADDREY about this malicious injustice, and the clear undermining of his office by Defendant SHEPPARD and Varlack, Defendant MADDREY stated that he would "take care of it."

985.    Defendant MADDREY's previous assurance to "take care of it" proved hollow, necessitating crisis management calls to individual commands to address the chaos created by Defendant SHEPPARD's and Varlack's insubordination and arrogant, malicious, capricious intervention.

986.    The actions of Defendant SHEPPARD, in collusion with Varlack, represent a direct and intolerable assault on the authority and office of the Police Commissioner.

987.    This was a calculated act of insubordination, an abuse of position, and a deliberate undermining of the chain of command, abetted by external political interference, which cannot be tolerated.

988.    The damage inflicted upon NYPD morale, operational stability, and the integrity of the Commissioner's office demands immediate and thorough investigation, and appropriate disciplinary action against all culpable parties.

989.    This flagrant defiance of a Police Commissioner's legitimate orders is an affront to the entire command structure of the NYPD and warrants the most serious review and decisive action.

**FF. President Trump Wins the 2024 Presidential Election**

990.    On November 5, 2024, President Donald Trump won the United States Presidential election.

991.    Donlon learned that on the next day after the election, Phillip Banks arrived at Police Headquarters and met with the Internal Affairs Bureau.

992.    Donlon subsequently learned that Phillip Banks was meeting with the Internal Affairs Bureau in order to lobby for a pass on his investigations.

993.    Donlon was told that Phillip Banks was heard stating in the meeting that "He (Defendant ADAMS) is getting a pass now. What about me?"

**GG.    Overtime Scandal in the Office of Defendant MADDREY**

994.    Around this time, an overtime scandal was uncovered and widely reported, publicly involving the authorization of unwarranted overtime for certain individuals in the office of Defendant MADDREY. The individuals who received these overtime benefits included Lieutenant Quathisha Epps and Detectives Ingrid Sanders and Ada Reyes, each

of whom worked directly for and were promoted by Defendant MADDREY to be on his official staff.

995.     Despite Defendant MADDREY's direct involvement, blame for his actions was diverted publicly by Defendant MADDREY's attorneys at a news conference stating that his then assigned Inspector, Defendant SARACENO, was responsible for signing all the overtime slips for the three above-mentioned individuals: Epps, Sanders, and Reyes. The NYPD overtime program was ultimately the total responsibility of Defendant KINSELLA, who failed at controlling the overtime not only within Defendant MADDREY's office but throughout the entire NYPD.

996.     Neither Defendant KINSELLA nor Defendant MADDREY were held accountable by Defendant ADAMS despite Donlon's efforts to reign in overtime.

997.     To date, the NYPD has failed to discipline Defendant KINSELLA for the rampant abuse of overtime that occurred.

998.     The fraudulent authorization of overtime—allegedly in exchange for sexual favors by Lieutenant Epps on behalf of Defendant MADDREY—is criminal in nature.

999.     The payments came from FEMA funds controlled by the U.S. Department of Homeland Security. NYPD Defendants MADDREY, SARACENO, and KINSELLA allegedly used administrative codes to divert FEMA money. This constitutes fraud. This is a federal crime.

## HH.   Defendant MADDREY Unlawfully Manipulates the NYPD Promotion List, Usurping the Authority of the Police Commissioner

1000.     Later in November 2024, Defendant MADDREY had Defendant SARACENO promoted to Deputy Chief by manipulating the list containing the names of employees

selected for promotion, in the same manner that Defendant SHEPPARD had previously engaged in the fraud.

1001.    Defendant SARACENO was placed on the list for promotion by Defendant MADDREY while the promotion list was finalized.

1002.    Donlon did not select, approve, or authorize the promotion of Defendant SARACENO in any way, shape, or form.

1003.    During this process, Donlon, again, submitted his list of NYPD employees to be promoted to Defendant MARINO, who joined Donlon and Defendants KINSELLA and MADDREY throughout the process.

1004.    A day later, Donlon was called by Defendant MARINO and informed that the list of employees that Donlon had authorized for promotions was securely "locked into the system."

1005.    Donlon asked whether the employees that he had designated for promotions would remain on the list for promotion or would they be removed by the collective Defendants, and in particular, Defendant SHEPPARD. Defendant MARINO offered no response.

1006.    Defendant MARINO, who witnessed the crime of Defendant SHEPPARD's fraudulent promotion of himself, failed to report this criminal activity to the Internal Affairs Bureau despite being mandated to do so by NYPD rules and regulations. In short, Defendant MARINO failed to take any action after becoming aware of Defendant SHEPPARD's fraud.

1007.    It was clear to Donlon that Defendant MARINO was, at best, deceptive and dishonest toward Donlon throughout the promotion process.

1008.     Donlon surmised that Defendant MARINO had actually participated in such criminal, fraudulent, and blatant disregard for the established rules and protocols for promotion because he, Defendant MARINO, had finalized the promotion list without Donlon's knowledge, permission, or authority.

1009.     Any manipulation or falsification of the Police Commissioner's promotion lists would have had to be signed off and finalized by Defendant MARINO, making him complicit in the criminal enterprise.

1010.     By withholding from the Police Commissioner information that subordinates, like Defendant SHEPPARD, had manipulated or falsified the Commissioner's promotion list, Defendant MARINO would have had final say on each promotion list.

1011.     Either Defendant MARINO signed off on Defendant SHEPPARD's fraudulent promotion or Defendant SHEPPARD coerced or manipulated Defendant MARINO into believing he, Defendant SHEPPARD, and others should be fraudulently promoted.

1012.     Despite assurances for the November 2024 promotions, the employees designated for promotions by Donlon were ultimately discarded.

1013.     A day later, Defendant SARACENO's name remained, a decision made by Defendant MADDREY.

1014.     Defendant SARACENO, who reported to Defendant MADDREY regarding Donlon's daily activities, was promoted for "a job well done."

1015.     Defendant SARACENO, himself, would later be terminated for his role in an overtime abuse scandal where he signed off on hundreds of thousands of dollars in overtime payments involving work that was never performed.

1016.    Defendant SARACENO, despite having a history of "stealing job time" and other performance issues, was rewarded for his subterfuge and insubordination against Donlon at the behest of Defendant MADDREY.

1017.    Defendant MADDREY's unlawful handling of promotions proved inconsistent and capricious, demonstrating hypocrisy in his selection process.

1018.    Donlon did not authorize the final list of promotions, which bore his signature from the Police Commissioner signature stamp.

1019.    Upon information and belief, the improper and fraudulent promotions of employees who were not designated by the Police Commissioner over those who earned it, constitutes honest services fraud, mail fraud, wire fraud, and likely several other crimes.

1020.    During this time period and its aftermath, Donlon learned that Defendant MARINO added his paramour to the list of promotions, which resulted in a promotion to first Grade Detective.

1021.    This constitutes honest services, wire, and mail fraud.

1022.    Following the incident, where Donlon's promotion list was improperly altered, Donlon confronted Defendant MARINO and advised him that he, Donlon, was fully aware of Defendant MARINO's dishonest activities.

1023.    Despite witnessing the many crimes of the Defendants herein and reporting it to Defendant ADAMS, no actions were taken to discipline the Defendants in any way.

## II. <u>The Betrayal of the Badge: Corruption at the Top of the NYPD</u>

1024.    The relentless, 24/7 campaign to undermine a leader of integrity was a profound moral travesty, a slap in the face to every dedicated, rank-and-file member of the NYPD.

1025.    This was not random dysfunction; it was a calculated assault carried out by a corrupt cabal of senior NYPD leaders, including Chief of Department Defendant MADDREY, and enabled by a complicit New York City Mayor, Defendant ADAMS.

1026.    The rot starts at the very top. Defendant MADDREY's reckless and immoral sexual escapades were not secrets; they have been widely documented in the media, exposing a man whose character is fundamentally unfit for leadership.

1027.    Ironically, many of the same individuals who defied Donlon because of his integrity were themselves complicit—either through acts of omission or direct support—in the widely reported corruption of former Commissioner Caban's administration. They attacked a man for the very virtues they lacked.

1028.    This moral bankruptcy was on full display in the shameless manipulation of the promotion process. When Donlon submitted his promotion lists, he included two exemplary detectives for promotion to First Grade. These individuals, with stellar records, had provided security for the former commissioner and for Donlon and his family. They had earned their advancement through merit.

1029.    However, merit means nothing to the corrupt. NYPD Attorney Defendant GERBER, in a stunning display of hypocrisy, unilaterally vetoed these promotions. Defendant GERBER's stated reason for doing so was a supposed need to "distance" the department from the Caban administration, claiming, "We don't know if they were involved with Caban in a criminal or inappropriate manner."

1030.    Defendant GERBER's cynical goal was to purge anyone affiliated with the previous administration, regardless of their unblemished records.

1031.    However, in a paradoxical and self-serving move, Defendant GERBER protected two other individuals from Caban's detail who remained seated outside Donlon's office— including one named Sergeant Venus, whom Donlon subsequently learned was acting under the direction of Defendant MADDREY.

1032.    The message was clear: loyalty to the corrupt regime, not integrity, was the currency of survival and reward. As cited supra, Venus was clearly exposed by Donlon with concrete evidence of her providing Defendant MADDREY all of Donlon's daily activities without Donlon's permission.

1033.    The promotion process was hijacked. Donlon's merit-based lists were sent to the Mayor's Office without his approval.

1034.    Defendants MADDREY, CHELL, and MARINO eliminated qualified candidates and advanced unqualified individuals—including MARINO's alleged romantic partner.

1035.    An examination of the paramour's work record revealed what many already knew: she had no major investigative or notable accomplishments to her name. She was utterly unqualified for a coveted position that demands the highest integrity. This promotion was a senseless and reprehensible reward for a personal relationship, an insult to every detective who earns their shield through sacrifice and skill. This matter should be immediately reported to the Internal Affairs Bureau and to the Chief of Detectives Office where Defendant MARINO was assigned.

1036.    Shortly after this undeserved promotion by Defendant MARINO, as overtime was being scaled back, the newly promoted paramour conveniently retired.

1037.    This blatant injustice demands a serious investigation into everyone who was denied a deserved promotion, and conversely, of every undeserving person who was elevated by favoritism as perpetrated by the collective Defendants.

1038.    Defendants MADDREY, CHELL, and MARINO did not possess the minimal basic integrity to inform Donlon that his selections were gutted, even after personally assuring him they would be promoted. The Mayor, Defendant ADAMS, was not an innocent bystander; he was a silent accomplice. After Donlon texted him directly about these abuses, Defendant ADAMS refused to respond, yet hypocritically assured others he would "rectify" the situation—a promise he never kept.

1039.    The corruption was transactional. Defendant MADDREY promoted Defendant SARACENO for spying on Donlon—despite SARACENO's history of misconduct.

1040.    After media coverage of Defendant MADDREY's corruption, his attorney publicly blamed Defendant SARACENO for authorizing the overtime. Donlon's advice to Defendant SARACENO: contact the FBI and tell the truth.

1041.    When Defendant MADDREY assigned Defendant SARACENO to Donlon's office, it defied credulity that Defendant SARACENO was there to assist Donlon due to Defendant SARACENO's impressive NYPD career, as Donlon was advised by Defendant MADDREY. Donlon had the opportunity to examine Defendant SARACENO's NYPD record, and he did not read about any major accomplishments which would warrant such a prestigious assignment to the Office of the Police Commissioner.

1042.    It was also obvious to Donlon from the beginning that Defendant MADDREY placed Defendant SARACENO in the Police Commissioner's office to funnel information on Donlon's daily activities etc., to Defendant MADDREY and one could logically

conclude to Defendant ADAMS. By all accounts, Defendant SARACENO's duties were to follow around Donlon throughout the day, which he did, and report Donlon's activities back to Defendant MADDREY and logically, of course, Defendant ADAMS.

1043.     It was quite sad, and in many ways comical, that the NYPD dedicated an Inspector full time to follow Donlon during the course of his entire day to obviously report back to Defendant MADDREY, and of course, Defendant ADAMS.

1044.     Defendant SARACENO was referred to by many as "Donlon's shadow," as it was quite evident that was Defendants MADDREY's and SARACENO's intention. During Donlon's time with Defendant SARACENO, there were very pleasant discussions about family and children.

1045.     Defendant SARACENO advised Donlon that he "took off one year" after retirement, before coming back to the NYPD, after spending time with family. Obviously, Defendant SARACENO never advised Donlon of the true story, that the NYPD forced him to resign due to his misconduct. These actions by Defendants ADAMS, MADDREY, and SARACENO clearly depict what Donlon was forced to confront on a daily basis, not only with the above three defendants but the other five defendants.

1046.     Again, what a sad commentary of the constant devious, lying, underhanded, dishonest, and unethical behavior of not only Defendant SARACENO but Defendants MADDREY and ADAMS, who allegedly led the greatest, and Donlon wholeheartedly agrees, the greatest law enforcement agency in the world. It is only logical that Defendant SARACENO had conversations with Defendants KINSELLA, CHELL, and DAUGHTRY etc. about his assignment targeting Donlon and what was uncovered on him.

1047.    During Defendant SARACENO's time assigned to the Police Commissioner's Office, Defendant SARACENO never contributed any logical thoughts, ideas, initiatives, projects, or programs to assist Donlon and/or benefit the NYPD, our personnel, and the public we serve. Upon advising Donlon that he was temporarily appointing Defendant SARACENO to Donlon's office, without even asking Donlon's permission, Maddrey raved about Saraceno being a very experienced MOS with a vast operational and administrative skill set which would immensely benefit Donlon.

1048.    At this time, Donlon witnessed how Defendant MADDREY forced Defendant SARACENO into Donlon's office.

1049.    Defendant MADDREY failed to inform Donlon that Defendant SARACENO had been forced to retire for "stealing time."

1050.    Defendant SARACENO later returned to the NYPD and was assigned to both Donlon's and Defendant MADDREY's offices. He was used to sign Lieutenant Epps's overtime slips, helping to conceal Defendant MADDREY's involvement.

1051.    At a press conference, MADDREY's attorneys claimed only SARACENO signed the overtime slips.

1052.    As mentioned before, Defendant SARACENO's first self-appointed "official duty" was to secretly meet with Donlon's new security team, in conjunction with Defendant SHEPPARD, without Donlon's knowledge. Defendant SARACENO told Donlon he saw nothing wrong with Defendant SHEPPARD and himself having this secret meeting with Donlon's new security detail.

1053.    For Defendant MADDREY, a known sexual predator who perpetually blames others for his own failings, character is a foreign and alien concept. His despicable

activities, consistently covered up by his acolytes, reveal a deep moral rot at the heart of NYPD leadership—a rot that dishonors the badge and betrays the public's trust and dishonors the countless Chiefs, Inspectors, Captains etc. and Police Officers who retired in good standing from the NYPD.

1054.    Following one of Donlon's final Monday executive meetings, Donlon confronted Defendant MADDREY head-on regarding the Emergency Service Units (ESUs) critical duties and responsibilities during their Federal Emergency Management Agency ("FEMA") deployment.

1055.    Donlon believed that the NYPD ESU team should be recognized and honored for their stellar work performance as Donlon sought documentation from Maddrey and ESU to ensure that the unit, along with officers and bosses, would receive the recognition they deserved for their twelve (12) out of state deployments over a three-year period.

1056.    Donlon repeatedly raised the issue with Defendant MADDREY and other Chiefs, including ESU, during Monday NYPD executive meetings. He demanded documentation of ESUs 12 FEMA deployments over a three-year period.

1057.    This included specifics such as the assignments, scope of work, accomplishments, and interactions with other agencies (Police, Fire, EMTs, OEM, and first responders). FEMA had requested NYPD participation in these humanitarian deployments, and Donlon made it clear that proper documentation was essential.

1058.    Such records would help demonstrate the NYPD's contribution to the public, FEMA, and other stakeholders. They could also strengthen funding applications and highlight the NYPD's standing as a global law enforcement leader.

1059.    Donlon's demands at these meetings were met with deafening silence, especially by Maddrey.

1060.    Donlon personally tasked Defendants MADDREY, CHELL, and DAUGHTRY with providing the requested documentation.

1061.    They failed to deliver, and continued with their consistent apathetic, insubordinate, and incompetent response (when they actually did respond) to each and every task/order of Donlon.

1062.    At Donlon's final Monday meeting, with Donlon's departure imminent and widely known—particularly by Defendant MADDREY—Donlon confronted Defendant MADDREY directly afterward.

1063.    Donlon stated, "I demanded this documentation on the 12 FEMA deployments by the NYPD from you on numerous occasions."

1064.    Defendant MADDREY, initially smirking, then put on a transparently false show of seriousness, summoning a one-star Chief and theatrically ordering him to complete the assignment Donlon had long requested.

1065.    Donlon responded to this blatant ineptitude, apathy, and incompetence, "Defendant MADDREY, are you actually serious? Your charade does not fool me, nor anyone else in your incompetent clique. You know I am leaving and being replaced by Tisch."

**JJ.** **Donlon Is Terminated as Police Commissioner, Replaced by Tisch**

1066.    Less than a few days later, on November 25, 2024, Defendant ADAMS removed Donlon as Police Commissioner.

1067.    Donlon was not officially informed by Adams but heard many strong rumors that Donlon was being replaced by Tisch. Adams called a Press Conference at City Hall and 10 minutes before the Press Conference started Adams called Donlon into his office and informed Donlon that Tisch was assuming the Police Commissioner position. Adams said to Donlon "You can either leave or stay for the conference." Being polite and a true professional, Donlon stayed for the Press Conference and congratulated Tisch.

1068.    Donlon was ushered into Adam's office where he observed Jessica Tisch in another room reviewing papers.

1069.    Donlon was relieved of his duties as Police Commissioner, less than three (3) weeks following his last reporting directly to Defendant ADAMS the criminal acts of Defendant SHEPPARD and the failure of Defendants MADDREY, CHELL, and DAUGHTRY to take corrective action.

1070.    Jessica Tisch was named Police Commissioner replacing Donlon.

1071.    Donlon was unlawfully removed as Police Commissioner due to his numerous attempts to bring honesty, integrity, and ethical standards to the forefront of the NYPD. Donlon sought to expose the criminal corruption, ineptitude, and insubordination of the Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO which Defendants ADAMS and CITY ignored willfully and purposely.

1072.    Donlon is not referring to the everyday, dedicated, and honorable Police Officers, Detectives, Squad Commanders, Borough Chiefs, and NYPD civilian staff he was privileged to work with during his tenure.

1073.    Rather, he specifically condemns the criminal, incompetent, and morally bankrupt conduct of Defendant ADAMS and the NYPD Defendants and their inner circle. Their behavior was not only noticed—it was rejected by the NYPD rank-and-file officers and the public alike.

1074.    The collective Defendants were entrusted with positions of immense power, achieved through election or appointment.

1075.    They squandered that privilege. They betrayed the public trust and violated the social contract between those who govern and the governed.

1076.    The collective Defendants displayed, even to the most casual and distant observer, a shameful naivety that their criminally foolish behavior and actions were disguised or protected and not at any risk of exposure. Donlon, and those dedicated to true public service, saw through their vile attempts to hide such treacherous and unlawful behavior. Long after the collective Defendants retire in shame, and fade into obscurity (save for Defendant CITY), they will hopefully possess the temerity for contriteness and wistfully rue their criminal, corrupt, and contemptuous actions.

1077.    At the swearing in ceremony for Jessica Tisch, every former living NYPD Police Commissioner was invited and given a place to sit to witness the proceedings except Donlon, who did not receive an invitation. Donlon stood on the sidelines of the hall where the ceremony took place.

**KK.    Donlon Is Relegated to City Hall, Where He Works in Public Safety, a Demotion**

1078.    To mask the unlawful nature of Donlon's termination as interim Police Commissioner, he was advised he would be moved to the position of Senior Advisor, Mayor's Office of Public Safety, reporting to the Deputy Mayor, Public Safety, which is

under Defendant ADAMS's administration. Specifically, Donlon was told it would be similar to Tim Pearson's position, a clear demotion.

1079.    In that position, Donlon was mainly tasked and responsible for coordinating and managing grant applications in conjunction with agencies within Public Safety. These coordinated efforts were essential in submitting applications for U. S. Federal and New York State available grants which were critical in enhancing the Public Safety Agencies.

1080.    Donlon arduously approached the task of developing the new position while completing a booklet made available to Public Safety Agencies providing guidance and the application process, containing numerous links with background and the names of the many Federal, FEMA and NYS grants. It is shameful and extremely ignorant of ADAMS in his decision which is a reflection on his very limited administration and operational background.

1081.    Initially, Donlon was advised he would be receiving an experienced analyst to assist in developing the Public Grant Program. However, he was without any assistance for a couple of months. John Gunn, Public Safety, joined Donlon and was invaluable with his long-term connection with the Public Safety Agencies, followed by Kevin Clarke, NYCOEM, who brought a wealth of experience in administrative and operational knowledge regarding the overall complicated Federal and NYS Grant Program.

## LL.    Donlon's Security Team Is Further Punished

1082.    It is common for some members of the NYPD Police Commissioner's security detail to be promoted as a result of their dedicated time and efforts in protecting the Police Commissioner and his/her family.

1083.    However, it has always been customary for all members of the Police Commissioner security detail, when that assignment is concluded to receive a transfer to a command they would like to be transferred to or one of their top choices. It has always been called "a soft landing" by all former Police Commissioners and their Administration.

1084.    However, Donlon's security team was not afforded the benefit of rewarding the hardworking security detail composed of one (1) Lieutenant, three (3) Sergeants, and approximately fifteen (15) Detectives, who protected Donlon and his family 24/7 during Donlon's tenure.

1085.    To this date, Donlon's security team has not received their transfer requests and have returned to their old commands. Unfortunately, all have not been able to return to former commands.  Additionally, when addressing Donlon's security team during the transition period, it would have been appropriate and respectful to have a supervisor address them during the transition. Additionally, some of the new security team members were present in the same conference room with Donlon's former detail, which was awkward for them, not appropriate or respectful.

1086.    Chief Burke, who served under Commissioner Kelly's administration and is presently assigned to Tisch's administration, fully understands how the security detail should be treated.

1087.    The disrespectful treatment Donlon's security team was given would not have been allowed under Commissioner Kelly's administration and the Chief is fully aware of this which has been tradition for decade.

1088.     Uniformed officers operate under a paramilitary structure with rigorous rules, rotating shift assignments, and frequent last-minute changes. Many are single parents or caregivers to family members with health or educational needs. The cumulative effect of back-to-back shifts and unpredictable scheduling created a "stress poison" that undermined officer well-being, morale, and, ultimately, public safety.

1089.     The utter disregard for the dedicated rank-and-file officers who worked diligently under the Defendant ADAMS administration is deplorable.

**MM.  <u>Donlon Repeatedly Attempts to Contact Commissioner but Is Ignored</u>**

1090.     After his removal as interim Police Commissioner, Donlon made multiple attempts to contact his successor, Police Commissioner Jessica Tisch, to ensure that individuals who had been intentionally and unlawfully removed from the NYPD promotion list during Donlon's tenure be reinstated on the list and rightfully promoted.

1091.     To date, disappointingly, neither Police Commissioner Tisch, nor any members of her administration, have promoted the NYPD employees who Donlon determined were deserving of discretionary promotions. To date, the Tisch administration, despite knowing of the fraud that took place previously, has failed to contact Donlon to undo the injustice prevailed upon these proud and dedicated NYPD officers, detectives, and supervisors who were on his promotion list.

1092.     These officers were removed in direct violation of the rules and regulations governing the NYPD and the rights inherently conferred upon the Office of the Police Commissioner.

1093.     Having been closely and intimately involved with the NYPD for over three decades, with many close and dear friends, Donlon had never heard of or witnessed an

instance in which officers identified and submitted by the Police Commissioner for promotion had been deliberately taken off the list.

1094.    Defendant ADAMS has direct knowledge of these crimes but has failed to correct or rectify them.

1095.    For the sake of justice, it is Donlon's sincere hope that individuals promised promotions under his tenure will have those promotions realized. It is also unfortunate that the MOS who Donlon was promoting have lost monetary gains in salary and future available promotions or assignments.

1096.    The officers who Donlon came to rely on during his tenure as the interim Police Commissioner have all been removed from their positions.

1097.    There is no way of knowing the full extent of the NYPD promotion abuse that occurred beginning on January 1, 2022, when Defendant ADAMS was sworn in as Mayor.

1098.    Upon information and belief, the full extent of the NYPD's corruption under Defendant ADAMS will not be known until Phillip Banks, Timothy Pearson and Defendants ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO are indicted.

1099.    It is common for the NYPD Police Commissioner's security detail to get promoted as a result of their work.

1100.    Donlon is not afforded the benefit of rewarding the hardworking NYPD Officers, detectives, Sergeants, and Lieutenant who protected Donlon and his family 24/7 during Donlon's tenure.

1101. The matter was so important to Donlon that he had an unidentified NYPD Executives speak with Defendant ADAMS to try to give his former NYPD security detail the accolades he promised, and they earned.

1102. Donlon was told that Defendant ADAMS "promised to make it right" and ensured that any of the promotions removed from the list would be reinstated.

1103. To date, Defendant ADAMS has not acted on his promise to reinstate the promotions previously authorized by Donlon that were removed from the list by Defendants MADDREY, CHELL, and SHEPPARD.

1104. NYPD employees who should have been promoted under Donlon have not received their promotions, costing them millions of dollars in lost income and pension benefits.

1105. After his removal as interim Police Commissioner, Donlon made multiple attempts to contact his successor – Commissioner Tisch- to ensure that qualified and vetted MOS who had been intentionally, deliberately, and cruelly removed from the NYPD promotion list would receive their promotions. Donlon also wanted to discuss some potential issues with Commissioner Tisch and her administration regarding the warehouse in Brooklyn.

1106. MOS advised Donlon that Tisch was fully aware of the above-mentioned criminal action, but her position was simply: "that was the past and we are moving in a different direction."

1107. Donlon strongly believed, and still does, that Tisch should have had the common courtesy to return his texts and calls to discuss the matter of the denied promotions. As the new Police Commissioner, she was already aware of these criminal acts and should

have been willing to fight the injustice on behalf of the MOS who were denied rightful promotions.

1108.    Despite knowing of the fraudulent removal of qualified officers from Donlon's promotion list, Police Commissioner Tisch and her administration have taken no action to correct the injustice.

1109.    Donlon has not been contacted to restore the merit-based list, and those deserving of advancement remain sidelined in violation of NYPD rules and regulations.

1110.    Having been intimately involved with the NYPD for over three decades, with many close and dear friends, Donlon had never witnessed such a grave injustice, where promises made by the office of the Police Commissioner were blatantly disregarded and broken.

1111.    Donlon attempted to reach Adams to inform him that Tisch refused to communicate with him, but Adams also failed to answer texts and calls concerning this grave injustice committed by Defendants MADDREY, SHEPPARD, MARINO, GERBER, and the remaining Defendants.

1112.    For the sake of justice, it is Donlon's sincere hope that individuals promised promotions under his tenure will have those promotions reinstated. Donlon had many slated for promotion only for the Defendants to unfairly overrule him, causing not just a loss in salary but also in employee morale and confidence in NYPD leadership.

1113.    There is no easy way to quantify just how many rightfully earned and promised promotions to have been denied or reversed since January 1, 2022, when Defendant ADAMS was sworn in as Mayor.

**NN.    Additional RICO-Predicate Criminal Acts Uncovered by Defendants**

1114.    As described earlier in November 2024, it was uncovered that Defendant MADDREY personally authorized overtime pay for Lieutenant Quathisha Epps. This resulted in Lieutenant Epps earning more than $400,000 in 2024. More than half of the $400,000 consisted of overtime compensation.

1115.    The overtime in Defendant MADDREY's office is actually overseen by Defendant KINSELLA.

1116.    While Donlon was the interim Police Commissioner, the serious issue of overtime was discussed at a meeting with Defendants MADDREY, CHELL, and DAUGHTRY, two- and three-star Chiefs, Inspectors, Captains, and civilian employees.

1117.    Defendant KINSELLA stood up and spoke at the above-mentioned meeting and instructed Maddrey et al that the overtime "must be reined in."

1118.    As the Defendant KINSELLA delivered her speech on the recent overtime scandal involving mainly Maddrey and others, Donlon observed Defendant MADDREY smirking and appearing very uncomfortable with Defendant KINSELLA looking directly at Defendant MADDREY, reiterating that "overtime was out of control, and we have to watch it better."

1119.    Unbelievably, Defendant KINSELLA, with such a serious topic, was also smirking while discussing the overtime and again looking over at Defendant MADDREY. Defendant MADDREY's response was, "We have to watch it, and it won't happen again."

1120.    While continuing to speak about the abuse of overtime, Defendant KINSELLA advised that "we all have to be more careful with the use of overtime." Defendant KINSELLA, being the First Deputy Commissioner, failed to advise all present that she is

solely in charge and responsible for the distribution and monitoring of the NYPD overtime budget. Donlon stated to Defendant KINSELLA and all in the room, "You need to place a 'tickler system' (Fed terminology) daily, weekly, or whatever timeframe you choose to closely monitor the use and possible abuse of overtime."

1121.    Donlon told her that when overtime goes over the limit, "the bells and whistles will go off, and you will be surely notified," no guessing. Donlon reiterated to Defendant KINSELLA that when "you place an electronic and/or software system in place, you will be immediately notified of the present overtime status, thus avoiding possible abuse of the overtime." As Defendant KINSELLA began to sit down, she muttered, "They wouldn't listen to me."

1122.    This was the same comment Defendant KINSELLA made to Defendant ADAMS when he questioned her about the criminal abuse of overtime. Donlon was well aware from a few MOS who spoke to him confidentially that even prior to this apparent abuse of overtime, Defendant ADAMS was not satisfied with Defendant KINSELLA's work performance and was looking to transfer her to another position within the NYPD.

1123.    It is still difficult to understand how Defendant KINSELLA, who failed to monitor the overtime budget, which cost the NYPD millions in abuse of overtime and the countless lawsuits to follow, was allowed to remain in her position as the First Deputy Commissioner in the NYPD.

1124.    It is inconceivable that Defendants KINSELLA and CHELL have been allowed to remain in their current high-profile NYPD positions despite years of documented abuse in their respective positions.

1125.    After her speech, Donlon told Defendant KINSELLA, "You have to have a tickler system (a term used by the FBI) in place to monitor overtime." Defendant KINSELLA told Donlon, "These guys will never listen to me."

1126.    In the midst of the very public news coverage of the overtime abuse, Donlon met privately with Defendant KINSELLA.

1127.    Donlon told Defendant KINSELLA she needed to exercise vigilance and strictly control overtime writ large in the NYPD.

1128.    Donlon relayed to Defendant KINSELLA how overtime is handled in the FBI. Overtime is managed, regulated, and verified bi-weekly through what's referred to as a "tickler system."

1129.    In the FBI, electronic notifications are made when overtime raises above a predetermined number, and overtime is immediately halted to remain on budget.

1130.    No system is in place for the NYPD.

1131.    Neither Defendant KINSELLA nor Defendant MADDREY were held accountable by Defendant ADAMS despite Donlon's efforts to rein in overtime abuse.

1132.    As scrutiny surrounding Defendant MADDREY's actions intensified, it became clear that blame for his actions was shifted.

1133.    This was done, in particular, due to the media coverage.

1134.    These decisions and political maneuverings had long shaped leadership appointments within the department, highlighting the intricate and often opaque dynamics of the NYPD's internal structure.

1135.    During the week of the November 2024 Presidential election, Donlon had another conversation with Defendant ADAMS.

1136.    In that conversation, Donlon again detailed the criminal actions of the Defendants herein, specifically Defendant SHEPPARD's attack on him and being held back by Defendant MADDREY. Defendant ADAMS had no response.

1137.    Defendant ADAMS took no actions to fix the problems and instead retaliated against DONLON for his complaints.

1138.    Donlon's complaints are protected by the First Amendment of the United States Constitution.

1139.    The Defendants CITY, ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO retaliated against him because he spoke out, which he claims violated his constitutional rights.

1140.    Following widespread news coverage of the overtime scandal, Defendant MADDREY was not disciplined in any way and was allowed to continue in his position.

**OO.    Defendant ADAMS Asks Defendant MADDREY to Submit His Retirement Papers, and He Refuses**

1141.    Following news coverage of the overtime scandal, Defendant ADAMS told Defendant MADDREY that he should go to the pension board and submit his retirement papers.

1142.    Defendant MADDREY, being his own person, ignored the request of Defendant ADAMS and continued in his position as Chief of the Department. It was certainly seen as a defiant act by Maddrey, who obviously thought he was untouchable. A number of MOS were aware of his claims, and ADAMS requested that he just leave and retire quietly.

1143.    Defendant MADDREY had so much power within the NYPD and Defendant CITY that he directly ignored Defendant ADAMS's order to retire.

Defendant ADAMS failed to discipline Defendant MADDREY for ignoring his request to retire and failed to remove him as the Chief of the Department. Appointing Defendant MADDREY as Chief of the Department was a deplorable and irresponsible appointment by Defendant ADAMS. Donlon recalls that Defendant MADDREY was constantly boastful in the media and with MOS that he and Defendant ADAMS were "best friends." Defendant MADDREY publicly stated that he (Defendant MADDREY) would be appointed as Chief of the Department. When Defendant MADDREY was appointed, it came as no surprise to MOS and the public. Defendant MADDREY was seen boasting and telling all that he and Defendant ADAMS were close friends, and he was certainly going to be appointed as Chief of the Department. As a result of Defendant MADDREY's relationship with Defendant ADAMS, it was not shocking that he was rewarded through the broken NYPD discretionary promotional system. The appointment of Defendant MADDREY to Chief of Department given his horrific record reflects poorly on Defendant ADAMS and the NYPD.

## PP. DOI Determines Community Response Team Had No Oversight

1144.    On November 26, 2024, the Defendant CITY's Department of Investigation released a report following the conclusions of their investigation into the Community Response Team (CRT).

1145.    Defendant CITY's Department of Investigation announced that they found that the CRT had operated for more than two (2) years without written policies, procedures and operational guides and without any required training for its members.

1146.    Defendant CITY's Inspector General Jeanene Barrett separately stated that the lack of transparency regarding NYPD's CRT risked non-compliance with the law, ethical breaches, and negative policing outcomes.

1147.    Inspector General Barrett further stated, "The recommendations in this report encourage the creation of public policies and procedures that will enhance knowledge of and confidence in CRT's mission, as well as facilitate future oversight."

**QQ.    Donlon's Wife, Deirdre O'Connor-Donlon, Is Falsely Arrested**

1148.    On December 16, 2024, Donlon's wife, Mrs. Deirdre O'Connor-Donlon, was driving in her personally owned vehicle on 56th Street and First Avenue in bumper-to-bumper traffic when she was rear-ended, which in turn caused her to tap an Uber van, which was in front of her, in the rear.

1149.    The vehicle that struck Mrs. O'Connor-Donlon fled the scene.

1150.    The incident was minor and did not require police assistance, but the gentleman in the back of the Uber van showed a Police Benevolent Association card and demanded that a "bus" (the colloquial term for an ambulance) be called. Due to a 911 call being made by the passenger, that automatically caused the NYPD to respond as well.

1151.    Police Officers Su and Saleem arrived from the 17th Precinct.

1152.    These officers were kind and treated Mrs. O'Connor-Donlon with great respect.

1153.    After the police arrived, the officer asked both Mrs. O'Connor-Donlon and the driver of the Uber van for their respective driver's licenses, registrations, and proof of insurance. Mrs. O'Connor-Donlon produced her New York State driver's license for the officers but had trouble locating her registration and insurance. Moreover, Mrs.

O'Connor-Donlon was shockingly informed that her driver's license was in suspended status.

1154.    Mrs. O'Connor-Donlon called Donlon, who had a copy of the insurance and registration documents and who happened to be six (6) blocks away.

1155.    Mrs. O'Connor-Donlon let the officers know, as a courtesy, that her husband, Thomas G. Donlon, is the former interim Police Commissioner and now works in City Hall for Public Safety, so they wouldn't be surprised when he arrived.

1156.    The officers then called the 17th Precinct and requested the presence of the Supervisory Patrol Sergeant on duty. The officers explained that they needed to call the said Sergeant due to standard operating procedures when an incident involves the apparent involvement of a "high-profile individual" or something that would clearly end up being in the media.

1157.    Sergeant McDermott arrived at the scene a short time later.

1158.    The officers informed Sergeant McDermott of what had transpired and that Donlon had been called and would be arriving shortly.

1159.    While waiting for Donlon to arrive, Mrs. O'Connor-Donlon, Police Officers Su and Saleem, and Sergeant McDermott had a friendly conversation.

1160.    During the conversation, Mrs. O'Connor-Donlon applauded the NYPD officers and how great her husband's security detail was while Donlon was the interim Police Commissioner.

1161.    When Donlon arrived at the scene, he greeted Police Officers Su and Saleem and Sergeant McDermott, who referred to him as "Commissioner" and "Sir."

1162.    The interaction with Donlon and the collective NYPD personnel could not have been better.

1163.    Donlon came to the scene and explained that he must have left the registration at the auto body shop when the car had been in for other repairs.

1164.    Donlon exchanged pleasantries with Sergeant McDermott and explained that he was the former interim Police Commissioner, now at the Mayor's Office of Public Safety, and that Deirdre was his wife and that he stopped by to check on her.

1165.    Initially, Sergeant McDermott could not have been nicer, and there were no issues whatsoever.

1166.    Mrs. O'Connor-Donlon told her husband, Donlon, that he could leave since everything was in order.

1167.    After Donlon departed, Police Officers Su and Saleem continued talking with Mrs. O'Connor-Donlon. By this time, the ambulance had arrived and departed. Officers Su and Saleem told Mrs. O'Connor-Donlon that they spoke with the EMTs and the passenger, and that the passenger was not injured in any way, shape, or form.

1168.    Sergeant McDermott then looked down at his phone and said, "Excuse me, I have to take this call."

1169.    Officer Su suggested to Mrs. O'Connor-Donlon that she retrieve proof of insurance on her phone.

1170.    Mrs. O'Connor-Donlon followed the direction of Officer Su and retrieved proof of insurance.

1171.    Sergeant McDermott returned from having the phone call with an unknown individual(s) and had changed his demeanor drastically. As he approached Mrs.

O'Connor-Donlon, he started to badger her with questions in a hostile manner regarding her insurance status and advised her that her New York State driver's license was in suspended status.

1172.    Sergeant McDermott, furthermore, asked Mrs. O'Connor-Donlon if she lived at multiple old addresses.

1173.    Mrs. O'Connor-Donlon sensed that something had changed and asked Sergeant McDermott and the police officers, "What is wrong?" She did not receive a reply.

1174.    Mrs. O'Connor-Donlon then held up her phone to show proof of insurance to the officers.

1175.    Mrs. O'Connor-Donlon had maintained the same insurance for twenty (20) years without a lapse and was shocked to hear of the accusation by Sergeant McDermott that Mrs. O'Connor-Donlon did not have insurance coverage and had a suspended driver's license.

1176.    Despite showing clear proof of insurance, Sergeant McDermott refused to look at the proof of insurance on her phone.

1177.    Instead, Sergeant McDermott accused Mrs. O'Connor-Donlon of having a suspended license dating back to October 2021 and a current lapse of insurance on the vehicle she was driving at that moment.

1178.    Although Sergeant McDermott refused to look at Mrs. O'Connor-Donlon's proof of insurance, she was able to show it to the police officers on the scene. Mrs. O'Connor-Donlon further told Sergeant McDermott that she had never received any notice whatsoever from the New York State Department of Motor Vehicles regarding her driver's license suspension.

1179.    Mrs. O'Connor-Donlon was surprised and confused by the allegations.

1180.    A short time later, Sergeant McDermott shouted to the officers, "CUFF HER."

1181.    Officer Su audibly responded with a confused, "What?"

1182.    Mrs. O'Connor-Donlon said to Sergeant McDermott, "Are you kidding me? What am I being arrested for?"

1183.    Sergeant McDermott did not respond to Mrs. O'Connor-Donlon and had to repeat the Order multiple times to Officer Su, who was clearly objecting to the improper course of action.

1184.    The shocked police officers were noticeably taken aback by the Order.

1185.    The officers begrudgingly handcuffed Mrs. O'Connor-Donlon and placed her in the back of their police vehicle.

1186.    While in the back of the police vehicle, both officers profusely apologized to Mrs. O'Connor-Donlon and told her that they had never arrested anyone for an alleged lapse of insurance before, nor for a suspended driver's license.

1187.    The officers further lamented that they "are going to get in trouble" for the arrest of Mrs. O'Connor-Donlon.

1188.    From this point until her release from custody, two (2) hours later, Mrs. O'Connor-Donlon was falsely imprisoned by the NYPD.

1189.    The rationale for Mrs. O'Connor-Donlon's false imprisonment and arrest, namely that she had a lapse of insurance and a suspended driver's license, was pretextual, illegal, and a violation of her rights as enshrined in the 4th and 14th Amendments of the U.S. Constitution.

1190.    Mrs. O'Connor-Donlon was transported to the 17th Precinct for processing.

1191.    Mrs. O'Connor-Donlon, during her unlawful detainment, repeatedly asked any NYPD personnel in her immediate view what she was being arrested for and why she was still handcuffed.

1192.    Mrs. O'Connor-Donlon received no answer to her questions and was further denied a phone call by all the NYPD personnel she had directed her questions to.

1193.    Next, Mrs. O'Connor-Donlon was approached by Police Officer Vargas, who informed her that she would be conducting a search of her.

1194.    Officer Vargas searched Mrs. O'Connor-Donlon.

1195.    At the end of the search, police officer Vargas placed a $100 bill in Mrs. O'Connor-Donlon's pocket, which had been in Mrs. O'Connor-Donlon's pocketbook. O'Connor-Donlon was confused and asked what she needed this for.

1196.    Vargas told Mrs. O'Connor-Donlon that the money was for when she "goes downtown" to Central Booking.

1197.    Mrs. O'Connor-Donlon, who was extremely polite up to this point, had had enough and began to get emotional in the Precinct as a result of being denied a phone call and not being told what she had done wrong to warrant being arrested.

1198.    Mrs. O'Connor-Donlon asked repeatedly what she was arrested for, but was not provided with the information.

1199.    Mrs. O'Connor-Donlon's repeated requests for a phone call continued to be ignored.

1200.    Mrs. O'Connor-Donlon was then told (BY WHO?) that she would be taken to the holding cell.

1201.    Mrs. O'Connor-Donlon objected to this and refused to be taken to the holding cell.

1202.     The Desk Sergeant, identity unknown, ignored Mrs. O'Connor-Donlon's questions and objections, and ordered Officer Su to place her in the holding cell.

1203.     Mrs. O'Connor-Donlon continued to object, at which point, Officer Su attempted to intervene on behalf of Mrs. O'Connor-Donlon.

1204.     The Desk Sergeant begrudgingly thereafter agreed to place Mrs. O'Connor-Donlon in the Juvenile Room, which they referred to as the "Juvie Room."

1205.     When Mrs. O'Connor-Donlon entered the Juvie Room, Officer Su began to take off her handcuffs.

1206.     Mrs. O'Connor-Donlon told Officer Su that she was relieved to finally have her handcuffs off but was informed by Officer Su that he must remove one handcuff only and then affix it to the bench in the room.

1207.     Mrs. O'Connor-Donlon was chained to the metal bench like a common criminal.

1208.     As Officer Su was leaving the room, Mrs. O'Connor-Donlon asked again, "Why are they doing this to me?"

1209.     Officer Su responded to Mrs. O'Connor-Donlon, "I do not know. This had never happened before." This was an admission that the arrest of Mrs. O'Connor-Donlon was not based on probable cause.

1210.     Mrs. O'Connor-Donlon overheard an upset and distraught Officer Su that they were going to be ultimately blamed for the whole incident.

1211.     Later during the false imprisonment, Sergeant McDermott walked into the Juvie Room holding a cell phone, and the Commanding Officer of the 17th Precinct, Deputy Inspector Maggie Clamp, was on the phone.

1212.     Deputy Inspector Clamp profusely apologized to Mrs. O'Connor-Donlon.

1213.    Mrs. O'Connor-Donlon explained to Deputy Inspector Clamp that Sergeant McDermott was the person responsible for her unlawful arrest and treatment, having her in handcuffs for more than an hour and a half.  Mrs. O'Connor-Donlon specifically asked Deputy Inspector Clamp for the identity or identities of the individuals Sergeant McDermott had received a call from that then led to her unlawful arrest, when McDermott received the call as he walked to the middle of the street to speak. Donlon also observed McDermott on the call but left the scene while he was still on his phone.

1214.    Deputy Inspector Clamp continued to apologize and said the officers would be held responsible.

1215.    Mrs. O'Connor-Donlon stated that Officers Su and Saleem had been respectful and that the problem she had had stemmed entirely from Sergeant McDermott.

1216.    Donlon, who was called by an unknown officer, arrived at the precinct.

1217.    When Donlon arrived, the Desk Sergeant was unpleasant to him. Donlon greeted him with "Hello, Sergeant." The unidentified desk Sergeant did not reply and wouldn't even look at Donlon. This was witnessed by Police Officer Vargas and one of the other Officers.

1218.    Donlon then spoke with Sergeant McDermott, who was standing by the side.

1219.    Sergeant McDermott blatantly lied to Donlon and said he "did not know that Mrs. O'Connor-Donlon was his wife," and if he had known, he "wouldn't have treated her this way."  This statement defies logic and credulity since Sergeant McDermott and Donlon had spoken at the scene, along with the two Police Officers, at the accident. Moreover, Sergeant McDermott had addressed Donlon as "Commissioner" during their conversation.

1220.    Mrs. O'Connor-Donlon ultimately was given a summons for lapse of insurance and then released from custody, and thus allowed to leave the 17th Precinct. She was NOT given a summons for a suspended driver's license.

1221.    As Donlon left the Precinct, he said to the Desk Sergeant, "Is this how you treat people? In my 30 years in law enforcement, I never hurt a cop."

1222.    The Desk Sergeant did not respond.

1223.    Fifteen minutes after leaving the 17th Precinct, Mrs. O'Connor-Donlon was contacted by the New York Post about the incident.

1224.    Within minutes, Mrs. O'Connor-Donlon received another phone call, this time from the New York Daily News regarding the incident.

1225.    Donlon also received phone calls from the media immediately after leaving the precinct.

1226.    The New York Post published the story about Mrs. O'Connor-Donlon and Donlon online that evening by 11:00 pm and in the following day's paper.

1227.    The unusually lengthy story specifically questioned the relationship status of Donlon and Mrs. O'Connor-Donlon and stated that they live at separate addresses, which was incorrect.

1228.    This information was only known to the NYPD.

1229.    The news story was subsequently picked up by several news outlets.

1230.    Upon information and belief, Defendant SHEPPARD, the former Deputy Commissioner of Public Information, and who worked closely with the press, along with Defendants DAUGHTRY and GERBER, ordered the arrest of Mrs. O'Connor-Donlon,

and then leaked the arrest to the media to embarrass Donlon and Mrs. O'Connor-Donlon, in retaliation for Donlon's complaints regarding Defendant SHEPPARD's crimes.

1231.    These actions were taken purposefully to interfere and disrupt the union between Donlon and Mrs. O'Connor-Donlon and their rights to privacy and marital relationship. The emotional harm to Mrs. O'Connor-Donlon was devastating and traumatic.

1232.    Mrs. O'Connor-Donlon was subsequently called by Assistant Chief James McCarthy, who apologized for the ordeal. McCarthy is the Chief of the Patrol Borough of Manhattan South ("PBMS"), meaning that he is the highest-ranking NYPD official in PBMS and oversees the ten (10) police precincts within that Patrol Borough.

1233.    Mrs. O'Connor-Donlon had met McCarthy previously with Donlon during Donlon's tenure as interim Police Commissioner.

1234.    Chief McCarthy told Mrs. O'Connor-Donlon, "I called as soon as I heard to apologize."

1235.    It was later discovered that Mrs. O'Connor-Donlon's license suspension issue stemmed from her stepson in Texas trading in a vehicle back in 2021 that was previously registered to Mrs. O'Connor-Donlon in New York.

1236.    Donlon drove this vehicle to Texas and gifted it to his son from his first marriage. Thereafter, Donlon's son opted to trade in the vehicle for another one at a dealership.

1237.    Texas's policy is that license plates must be destroyed by a dealership upon the trade-in of a vehicle.

1238.    New York State requires the vehicle's registrant to return the license plates to the New York State Department of Motor Vehicles (NYSDMV).

1239.     The dealership in Texas issued a receipt to Donlon's son acknowledging the trade-in and the receipt of the license plates received by the Texas car dealership. This receipt was to be submitted to the NYSDMV. The dealership informed Donlon's son that they would destroy the license plates and mail the proof of the transaction to NYSDMV.  The receipt handed to Mr. Donlon's son was for his record-keeping purposes only. Per the Texas dealership, no action was required on his part nor on the part of Mrs. O'Connor-Donlon. Once this transaction was completed by Donlon's son, Donlon removed the vehicle from the family insurance policy.

1240.     New York State suspended Mrs. O'Connor-Donlon's driver's license in 2021 due to a lack of notification from the Texas car dealership regarding the destruction of her New York license plates.

1241.     Donlon had removed the vehicle from the family's insurance policy under the mistaken belief that the dealership had destroyed the plates and notified the NYSDMV. Unbeknownst to any Donlon family member, the DMV automatically suspended her license when that notification was never received.

1242.     The incident on December 16, 2024, was purely related to paperwork, easily remedied, and not a crime warranting arrest.

1243.     The following day, Mrs. O'Connor-Donlon went to the NYSDMV and easily rectified the license issue by paying $50.

1244.     Mrs. O'Connor-Donlon was informed by an employee at the NYSDMV that the administrative issue was "not a big deal."

1245.     Mrs. O'Connor-Donlon informed the DMV employee that she was arrested over the lapse in paperwork.

1246.    The DMV employee expressed shock to learn of the arrest and said she had never heard of anything like that before, and that the police officers who arrested her should have been able to see that the issue was purely administrative and not worthy of an arrest when she was stopped.

1247.    After the incident, Donlon learned that during the time Mrs. O'Connor-Donlon was being unlawfully held by the NYPD, Defendants DAUGHTRY, SHEPPARD, and GERBER were on a three (3) way call determining what to impose and to do with Mrs. O'Connor-Donlon.

1248.    Upon information and belief, Donlon later learned that Defendant DAUGHTRY recommended that Mrs. O'Connor-Donlon be issued a Desk Appearance Ticket, which is more severe than the summons she was ultimately issued.

1249.    In late February 2025, Mrs. O'Connor-Donlon filed a notice of claim informing the Defendant CITY of her intent to sue.

1250.    The filing of the Notice of Claim became known throughout City Hall.

**RR.    <u>Defendant MADDREY's Sexual Abuse and Overtime Violations Exposed</u>**

1251.    On December 19, 2024, Defendant ADAMS's former Chief Adviser, Ingrid Lewis-Martin was arrested, along with her son, for taking $100,000 in bribes from two businessmen in exchange for intervening with city regulators on the businessmen's behalf.

1252.    On December 21, 2024, Defendant MADDREY was forced to resign when Lieutenant Epps accused him of sexual abuse, rape, and sodomy while working in his office.

1253.    It was further alleged that Defendant MADDREY engaged in a quid pro quo relationship where he approved overtime only if Lieutenant Epps engaged in sexual relations with him, Defendant MADDREY.

1254.    Following allegations regarding Defendant MADDREY's misconduct and his removal from the NYPD, his attorney issued a statement at a press conference as noted above.

1255.    As stated previously, Defendant MADDREY's attorney claimed that Defendant MADDREY did not sign off on critical overtime documents, instead shifting responsibility onto Defendant SARACENO, who was the Commanding Officer of Defendant MADDREY's office and responsible for approving overtime for personnel such as Lieutenant Epps.

1256.    In reality it was Defendant KINSELLA who was ultimately responsible for overseeing and approving the overtime in Defendant MADDREY's office.

1257.    Defendant KINSELLA was not disciplined in any way.

1258.    On January 2, 2025, Defendant MADDREY had his home searched by the FBI.

1259.    That same day the FBI executed search warrants on the residences of Lieutenant Epps and Detectives Reyes and Sanders related to the abuse of overtime in Defendant MADDREY's office.

1260.    Following the search, it became known that Defendant MADDREY was being investigated for using federal overtime codes to falsely justify overtime in order to steal federal money, potentially perpetuate sexual abuse, or possibly rape, or at a minimum, conspiring to commit fraud.

1261.    Specifically, as stated previously, the NYPD uses overtime codes to keep track of what the overtime is being paid for. The federal government provides the NYPD with overtime codes to utilize when officers are performing overtime tasks which are paid for by the Federal government.

1262.    Upon information and belief, Defendant MADDREY allowed his staff to fraudulently use federal overtime codes including but not limited to Federal Emergency Management Agency ("FEMA") overtime codes for overtime they did not work.

1263.    Unsurprisingly, as a result of the unchecked power afforded to the Defendants KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO by Defendant ADAMS, they used the Police Department as they pleased in order to regularly and unlawfully encroach on NYPD employees' constitutional rights, enrich themselves, and put the public at risk.

1264.    Upon information and belief, the misuse of federal overtime codes to fraudulently report overtime within the NYPD was a common practice amongst the individual Defendants herein.

1265.    Upon information and belief, Defendants CHELL and DAUGHTRY allowed officers who worked in CRT to use federal overtime codes to earn excess overtime, fraudulently.

1266.    Upon information and belief, Defendants CHELL and DAUGHTRY allowed officers to improperly use JTTF overtime codes while working in CRT.

**SS. Department of Investigation Finds Social Media Abuse Similar to Donlon's Prior Determinations**

1267.    On January 28, 2025, the CITY's Department of Investigation (DOI) released its findings following an investigation into the NYPD's misuse of social media.

1268.    The DOI reached the following conclusions:

1269.    Certain social media posts made by members of the NYPD executive staff from official Defendant CITY accounts were unprofessional, fostered unproductive public discourse, and violated NYPD policies requiring courteous and civil conduct. These social media missives also raised concerns about potential prohibited political activity, though DOI made no formal finding on that issue.

1270.    Several of the NYPD's social media practices were found to be noncompliant with the citywide (Defendant CITY's) social media policy which governs and supersedes each respective New York City agency's policies.

1271.    The NYPD's official social media policy, dated December 2, 2022, had not been updated to reflect the requirements of the most recent citywide social media policy issued in June 2023. Additionally, the policy lacked clear rules or guidance regarding appropriate content and language for official NYPD accounts.

1272.    NYPD executives with individual accounts operated them without adequate oversight and outside the supervision of the Office of the Deputy Commissioner for Public Information. That said, the NYPD Defendants were adults with very serious positions of responsibility to preserve public order and maintain trust. It is beyond the pale to even attempt to excuse their unprofessional and sophomoric behavior and practices regarding social media because the NYPD manual had not been updated since June 2023.

1273.    The NYPD failed to provide formal training to executive staff on appropriate social media content and the broader public impact of their communications to the public.

1274.    Donlon's earlier efforts to address and reform the NYPD's social media practices closely aligned with the DOI's findings and recommendations.

1275.    However, these efforts were ultimately blocked by Defendant ADAMS, which allowed and caused public confidence in the NYPD to erode.

## TT.    After the Incident, the NYPD Destroys Evidence of the Summons Issued to Mrs. O'Connor-Donlon and Retaliates Against Donlon

1276.    In March 2025, Mrs. O'Connor-Donlon telephonically contacted the 17th Precinct to figure out how to challenge her ticket as she was unable to challenge the summons online (via the internet). Mrs. O'Connor-Donlon was told, by an as of yet unidentified NYPD employee who answered the phone, that the summons she inquired about is "no longer in the system" and was completely removed.

1277.    Specifically, to wit, Mrs. O'Connor-Donlon stated that she had been trying to challenge the merits of the summons and had been unable to locate it online via the official NYPD portal for such activity.

1278.    Mrs. O'Connor-Donlon was informed that there was no record of the summons in the NYPD database and that she was essentially "in the clear."

1279.    Mrs. O'Connor-Donlon directly asked the officer if this failure to upload the ticket meant she would have an unknown issue, similar to what just happened related to her license, in the future.

1280.    Mrs. O'Connor-Donlon was then told by the individual on the phone that "sometimes it takes a couple months to upload."

1281.    In response to this statement, Mrs. O'Connor-Donlon explained that it had already been three (3) months.

1282.    Mrs. O'Connor-Donlon was then told that the ticket was unlikely to be uploaded at a later date.

**UU.    <u>Donlon Is Placed in an Administrative Position and Set Up to Fail</u>**

1283.    As stated earlier and repeated herein, Donlon was removed as the interim Police Commissioner and installed in the Mayor's Office of Public Safety, in a position previously held by Tim Pearson.

1284.    In that role, Donlon, as Mr. Pearson before him, was in charge of the coordination and filing of applications for grant money from the federal government to be utilized by Defendant CITY for law enforcement related programs and expenditures.

1285.    Donlon received no formal training for the role and opted to teach and train himself.

1286.    Through his efforts, Donlon added two (2) team members and worked closely with the New York City Office of Emergency Management to properly prepare grant requests, which would ensure the Defendant CITY received the full amount of financial compensation they were entitled to from the federal government.

1287.    Defendant DAUGHTRY was named the Deputy Mayor of Public Safety in early March 2025.

1288.    This was done following the mass resignation of four (4) Deputy Mayors following their perception of a quid pro quo arrangement between Defendant ADAMS and the United States Department of Justice which led to the dismissal of federal charges against Defendant ADAMS.

1289.    While Defendant ADAMS would never stand trial relative to the federal charges that were dismissed, he was a co-conspirator in the crimes committed by the other Defendants as described herein by Donlon.

1290.    As stated previously, Defendant DAUGHTRY became Donlon's direct supervisor at the Office of the Deputy Mayor for Public Safety.

1291.    On April 3, 2025, Defendant ADAMS's federal criminal charges were formally dismissed with prejudice.

1292.    On April 17, 2025, Defendant SARACENO was terminated from the NYPD for signing off on overtime claimed by and paid to Lieutenant Epps, for work that was never performed.

1293.    On April 22, 2025, the Defendant CITY sent Lieutenant Epps a letter stating that she was overpaid more than $230,000 in 2024 for work she did not perform under the direction of Defendant MADDREY.

1294.    The Defendant CITY was well aware of the crimes that had been committed by the Defendants herein since Defendant ADAMS had become Mayor of New York City.

## VV.    Final Retaliation against Donlon—Termination of Employment From Defendant CITY

1295.    On April 24, 2025, Donlon was telephonically contacted by Human Resources to inform him that his position had been eliminated and that his last day would be May 9, 2025.

1296.    Donlon asked if he would be provided written documentation surrounding and justifying his termination but was told that he would not be provided any since Donlon

was not being dismissed for any cause, but rather the position itself was being eliminated in its entirety.

1297.     Upon information and belief, Defendant DAUGHTRY's retaliatory actions led to the termination of Donlon without any substantive due process or cause whatsoever. The supposed "elimination of the position" was a lie.

1298.     Donlon was notified of his termination less than two (2) months after Defendant DAUGHTRY became his direct supervisor as the Deputy Mayor of Public Safety.

1299.     It is unequivocal that Defendant DAUGHTRY terminated Donlon in retaliation using the ruse that the position of Donlon was being eliminated.

1300.     Donlon's co-workers at the Mayor's Office of Public Safety were surprised by the news as they had grant applications which needed to be completed and submitted to the federal government on behalf of Defendant CITY's respective Public Safety Agencies. The federal grant money would be jeopardized due to the elimination of the position held by Donlon. The elimination of the position could only be authorized by Defendant CITY and Defendant ADAMS.

1301.     In reality, Donlon was terminated without substantive due process in retaliation for his protected speech complaints of crimes committed by collective Defendants and association with his wife, Mrs. O'Connor-Donlon.

1302.     The termination of Donlon which occurred on May 9, 2025, was unlawful and violated established law.

1303.     Donlon had his constitutional rights repeatedly trampled due to the condoning of unlawful actions by Defendant ADAMS committed by the Defendants CITY, ADAMS,

KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO .

1304. Donlon's complaints are protected by the First Amendment of the United States Constitution. The Defendants CITY, ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO retaliated against him because of his speech, which he claims violated his constitutional rights.

1305. As described in depth herein, Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a violation of a custom, usage, practice, procedure, or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

1306. The acts complained of by Donlon were carried out by the aforementioned individual NYPD Defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the CITY OF NEW YORK and the NYPD, all under the supervision of Defendant ADAMS and Defendant CITY.

1307. Plaintiff Donlon incorporates all preceding paragraphs as if fully set forth herein.

1308. The collective Defendants, acting individually and in concert, violated Donlon's rights under the First and Fourteenth Amendments, 42 U.S.C. § 1983, 18 U.S.C. § 1962(c)-(d), and New York Civil Service Law § 75-b.

1309. These were not isolated violations, but part of a coordinated pattern of retaliation, obstruction, and systemic abuse carried out by a criminal enterprise embedded within City government.

1310. At the heart of this enterprise was the cover-up surrounding Defendant SHEPPARD, a senior NYPD official who engaged in serious misconduct that was

concealed and rewarded rather than investigated or disciplined. The deliberate suppression of these criminal acts, and the use of institutional power to shield Defendant SHEPPARD from accountability, exemplify the racketeering activity at issue. When Donlon sought to expose this misconduct, he became the target of the machinery he had been brought in to lead and reform.

1311.    Defendants operated and directed an enterprise under 18 U.S.C. § 1961(4), engaging in a pattern of racketeering activity as defined in § 1961(1).

1312.    Predicate acts included obstruction of justice, retaliation against an informant, and wire fraud—each carried out to silence Donlon, protect insiders, and maintain political control.

1313.    This coordinated misconduct was continuous, structured, and carried out through official channels in furtherance of the enterprise's unlawful goals.

1314.    In addition, the City of New York (Defendant CITY), through its policymakers and decisionmakers, maintained customs, policies, and practices that enabled, emboldened, and rewarded this misconduct. Under *Monell v. Department of Social Services*, the City of New York is liable for its failure to discipline lawbreaking NYPD officers, its tolerance of retaliation against internal critics, and its systemic use of the NYPD as a political enforcement tool for City Hall.

**COUNT I**
**18 U.S.C. § 1962(d)**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT (18 U.S.C. § 1962(c))**

1315.     Plaintiff Donlon repeats and realleges all prior paragraphs as if fully set forth herein.

1316.     Defendants ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO each qualify as "persons" under 18 U.S.C. § 1961(3).

1317.     Each is liable under § 1962(c) for conducting the affairs of the enterprise through a pattern of racketeering activity.

1318.     At all relevant times, the Defendants, together with others known and unknown, formed an "enterprise" within the meaning of 18 U.S.C. § 1961(4), namely the New York City Police Department.

1319.     As shown herein, under Defendant ADAMS, the NYPD is an organization engaging in crime, unlawful acts, deception, fraud, counterfeiting, and terroristic threats.

1320.     Upon information and belief, the full extent of the crimes that had been undertaken by the NYPD, the Mayor of the City of New York (Defendant ADAMS), former NYPD employees Phillip Banks and Timothy Pearson, and the individual Defendants herein, remains unknown.

1321.     The enterprise had a distinct structure, continuity of purpose, and operated through a coordinated pattern of decision-making among its members. The Defendants participated in the operation and management of the enterprise.

1322.     The Defendants engaged in a pattern of racketeering activity by committing numerous predicate acts.

1323.    These acts constituted a pattern of racketeering activity as defined in 18 U.S.C. §

1961(1), including but not limited to:

- **Wire fraud (18 U.S.C. § 1343):** The use of interstate email and telecommunications by Defendants to misrepresent Donlon's authority, conceal material facts, and coordinate a scheme to marginalize and disempower him;
- **Obstruction of justice** (18 U.S.C. § 1503): Interference with potential or actual investigations triggered by Donlon's whistleblowing, including efforts to silence or isolate him;
- **Retaliation against a witness or informant** (18 U.S.C. § 1513): Adverse employment actions taken against Donlon in retaliation for his protected disclosures about misconduct, corruption, and threats to public safety;
- **Tampering with a witness or informant** (18 U.S.C. § 1512): Acts designed to prevent Donlon from reporting ongoing criminal conduct, including pressure, demotion, and removal of responsibilities;
- **Bribery (18 U.S.C. § 201):** On information and belief, Defendants engaged in or condoned acts of bribery or quid pro quo arrangements to secure loyalty, suppress dissent, and shield individuals within the administration from exposure;
- **Interference with commerce by threats or extortion (18 U.S.C. § 1951 – Hobbs Act):** The use of official authority to coerce and intimidate Donlon into silence, thereby interfering with his professional career, future employability, and economic livelihood.
- 

1324.    The racketeering acts were related and continuous, forming a coordinated scheme

to retaliate against Plaintiff Donlon and suppress his lawful reporting of misconduct.

1325.    These acts occurred over an extended period and pose an ongoing threat of

repetition, satisfying the continuity requirement under 18 U.S.C. § 1961(5).

1326.    Each of these acts was related, continuous, and part of a broader scheme to profit

off of the citizens of the City of New York illegally through the NYPD, their criminal

enterprise, and their own criminal organization, and retaliate against Plaintiff Donlon for

protected speech and deprive him of economic opportunities and constitutional rights.

1327.    These acts occurred over a substantial period and pose a continuing threat of future

harm, satisfying both the "closed-ended" and/or "open-ended" continuity requirements

under RICO.

1328.    As a direct and proximate result of the collective Defendants' racketeering activities, Plaintiff Donlon suffered injury to his business and property, including but not limited to termination, loss of income, professional damage, and reputational harm.

1329.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Donlon is entitled to recover treble damages, costs of suit, and reasonable attorneys' fees.

## COUNT II
## RICO CONSPIRACY (18 U.S.C. § 1962(d))

1330.    Plaintiff Donlon repeats and realleges all prior paragraphs as if fully set forth herein.

1331.    The collective Defendants agreed to and did knowingly enter into a conspiracy to violate 18 U.S.C. § 1962(c), with the purpose of furthering the affairs of the enterprise through a pattern of racketeering activity.

1332.    Each Defendant knowingly agreed to facilitate the operation and management of the enterprise and took overt acts in furtherance of the conspiracy, including but not limited to the predicate acts alleged above.

1333.    As a result of this conspiracy, Plaintiff Donlon suffered the injuries described herein and seeks relief as provided under 18 U.S.C. § 1964(c).

## COUNT III
## (FIRST AMENDMENT RETALIATION 42 U.S.C. § 1983)

1334.    Plaintiff Donlon repeats and realleges all prior paragraphs as if fully set forth herein.

1335.    As set forth above, Plaintiff Donlon engaged in protected speech as a private citizen as a matter of public concern and suffered retaliation for his speech, which included, but was not limited to, termination of employment.

1336.    The collective Defendants herein intentionally retaliated against Plaintiff Donlon for protected speech provided to him under the First Amendment of the United States Constitution.

1337.    Specifically, Plaintiff Donlon engaged in protected activity when he reported the unlawful conduct of the Defendants herein.

1338.    In response to making those complaints, Plaintiff Donlon was retaliated against.

1339.    Plaintiff hereby demands compensatory and punitive damages against the collective Defendants in an amount to be proven at trial that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction against each Defendant, individually and severally.

1340.    As a result of the foregoing, Plaintiff Donlon is entitled to compensatory and economic damages in an amount to be fixed by a jury and is further entitled to punitive damages against the individually named Defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs, and disbursements of this action.

### COUNT IV
### (MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983)
### <u>DEFENDANT CITY OF NEW YORK- MONELL CLAIM</u>

1341.    Plaintiff Donlon repeats and realleges all prior paragraphs as if fully set forth herein.

1342.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

1343.    The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and NYPD included, but were not limited to, suppressing speech by Department members about NYPD's failings through harassment and retaliations, committing crimes within the NYPD and failing to discipline those officers.

1344.    These practices were so persistent and widespread that they constituted the constructive acquiescence of policymakers. Further, as detailed herein, individual policymakers directly participated in and/or tacitly condoned the retaliation which Plaintiff Donlon was subjected to.

1345.    The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the NYPD constituted deliberate indifference to the constitutional rights of Plaintiff.

1346.    The foregoing of the customs, policies, usages, practices, procedures, and rules of the City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by the plaintiff Donlon.

1347.    The foregoing of the customs, policies, usages, practices, procedures, and rules of the City of New York and the NYPD were the moving force behind the constitutional violations suffered by the Plaintiff Donlon.

1348.    As a result of the foregoing of the customs, policies, usages, practices, procedures, and rules of the City of New York and the NYPD, Plaintiff Donlon was subjected to harassment, demoted, and constructively fired.

1349.    As a result of the foregoing, Plaintiff Donlon is entitled to compensatory and economic damages in an amount to be fixed by a jury and is further entitled to punitive

damages against the individually named Defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

### COUNT V
### 42 U.S.C. § 1983
### SUBSTANTIVE DUE PROCESS CLAIM

1350.    Plaintiff Donlon repeats and realleges all prior paragraphs as if fully set forth herein.

1351.    The Defendants CITY, ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO and MARINO, in their official capacities, acting under color of law, are liable to the Plaintiff for subjecting Plaintiff Donlon to conduct that violated Plaintiff's right to substantive due process of law guaranteed by the Fourteenth Amendment to the United States Constitution, enforceable by 42 U.S.C. §1983.

1352.    The conduct of the Defendants herein, collectively and individually, was extreme and outrageous and caused Plaintiff Donlon to be deprived of his property right to employment.

1353.    Plaintiff Donlon did not receive proper notice of his termination as Police Commissioner or as Senior Advisor to Defendant ADAMS on Public Safety.

1354.    The above-described violation of Plaintiff Donlon's right to due process of law, committed by Defendants CITY, ADAMS, KINSELLA, MADDREY, CHELL, DAUGHTRY, SHEPPARD, GERBER, SARACENO, and MARINO, violated Plaintiff Donlon's right to due process of law guaranteed by the Fourteenth Amendment of the United States Constitution, enforceable through 42 U.S.C. § 1983 and was the direct, proximate cause of Plaintiff's damages.

<u>COUNT VI</u>
<u>VIOLATIONS OF RIGHT TO FREEDOM OF INTIMATE ASSOCIATION</u>
<u>42 U.S.C. § 1983 U.S. CONSTITUTION-FOURTEENTH AMENDMENT</u>

1355.     Plaintiff Donlon repeats and realleges all prior paragraphs as if fully set forth herein.

1356.     Following Plaintiff Donlon's repeated complaints covered by the First Amendment, he was retaliated against when his wife was falsely arrested following a car stop where she was accused of having a lapse in insurance and a suspended NYS driver's license following a car accident on December 11, 2024.

1357.     Plaintiff Donlon's wife, Mrs. Deidre O'Connor-Donlon, was only arrested due to her association with Plaintiff Donlon, which was done purposefully to harm Plaintiff Donlon and prevent his right to freely associate with his wife. Plaintiff Donlon's wife filed a Notice of Claim declaring her intention to sue the Defendant CITY, alleging violations of her civil rights in February 2025.

1358.     Through the conduct of the collective Defendants, specifically the adverse actions taken against Plaintiff Donlon, as a result of his wife's actions (i.e.., filing a lawsuit against Defendant CITY), Plaintiff Donlon's rights to freedom of intimate association with his wife, as guaranteed and protected by the Fourteenth Amendment to the United States Constitution were disrupted and violated.

1359.     Defendant ADAMS had and had at the time of this instant filing, final policy-making authority as to personnel matters within the Defendant CITY OF NEW YORK. Defendant ADAMS was aware of and condoned the actions of the other collective Defendants herein.

1360.    Accordingly, the violation of Plaintiff Donlon's constitutional rights arose from Defendant CITY policy.

1361.    Plaintiff Donlon's rights were clearly established at the time, and no reasonable person would have believed that the conduct herein would not violate Plaintiff Donlon's clearly established rights.

1362.    As a result of the violations of his rights, Plaintiff Donlon has suffered loss of employment and income.

1363.    As a result of the foregoing, Plaintiff Donlon is entitled to compensatory and economic damages in an amount to be fixed by a jury and is further entitled to punitive damages against the individually named Defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

1364.    As a result of the violation of his rights, Plaintiff Donlon was humiliated and his reputation injured, and, thus, suffered non-pecuniary damages.

## COUNT VII
## VIOLATION OF NEW YORK STATE CIVIL SERVICE LAW §75-B
## (AGAINST DEFENDANT CITY OF NEW YORK)

1365.    Plaintiff Donlon repeats and realleges all prior paragraphs as if fully set forth herein.

1366.    The collective Defendants retaliated against Plaintiff Donlon for engaging in protected activity in violation of New York State Civil Service Law §75-b.

1367.    Specifically, Plaintiff Donlon engaged in protected activity when he reported the unlawful conduct of the Defendants herein.

1368.    In retaliation for those complaints, Plaintiff was retaliated against.

1369.    Plaintiff Donlon hereby demands compensatory and punitive damages against the collective Defendants in an amount to be proven at trial that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction against each Defendant, individually and severally.

1370.    Civil Service Law § 75-b provides, in pertinent part: "A public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action.

1371.    "Improper governmental action" shall mean any action by a public employer or employee, or an agent of such employer or employee, which is undertaken in the performance of such agent's official duties, whether or not such action is within the scope of his employment, and which is in violation of any federal, state, or local law, rule, or regulation.

1372.    Upon receiving Plaintiff Donlon's multiple complaints of corruption related to courtesy cards made to several different governmental bodies, Defendant retaliated against Plaintiff Donlon as a public employee. Plaintiff Donlon filed several reports that attempted to redress Defendant's corrupt practices as described herein.

1373.    These acts, as defined by Civil Service Law § 75-b, are classified as improper governmental action by a public employee. Plaintiff Donlon filed these complaints based

on tangible evidence that caused him to reasonably believe Defendant engaged in improper governmental action.

1374.    As a result of the foregoing, Plaintiff Donlon's career is irreparably damaged, and he sustained serious emotional distress and financial harm.

1375.    As a result of Defendant CITY OF NEW YORK's willful actions, they are liable to Plaintiff for their actions.

## **PRAYER FOR RELIEF**

A.  Defendants, acting individually and collectively, violated Donlon's constitutional rights under the First and Fourteenth Amendments, as well as his statutory rights under 42 U.S.C. § 1983, 18 U.S.C. § 1962(c)-(d), and Civil Service Law § 75-b.

B.  An order appointing an independent federal monitor with full authority to oversee and report on NYPD internal disciplinary processes, whistleblower protections, and promotion decisions, to ensure compliance with federal and state law and to prevent further retaliation, obstruction, or abuse.

C.  The Defendants operated an enterprise, as defined under 18 U.S.C. § 1961(4), that engaged in a pattern of racketeering activity under § 1961(1), including but not limited to obstruction of justice, retaliation against a witness or informant, and wire fraud. The pattern was continuous, related, and directed by persons employed by the City of New York for the purpose of retaliating against Donlon for exposing misconduct and refusing to participate in unlawful conduct.

D.  The City of New York maintained customs, policies, and practices that enabled and emboldened the retaliation Donlon endured, constituting Monell liability. These include a

long-standing policy of punishing whistleblowers, protecting high-ranking abusers, and

using the NYPD as a political enforcement tool for City Hall.

E. Plaintiff Donlon respectfully requests that this Court grant judgment in his favor on all

causes of action and award compensatory, emotional, and punitive damages; injunctive

relief where appropriate; pre- and post-judgment interest; attorneys' fees and costs pursuant

to 42 U.S.C. § 1988; and such other and further relief as this Court deems just and proper.

Dated: New York, NY
         July 16, 2025

Respectfully submitted,

By:____/s/_____
       John Scola

Law Office of John A. Scola, PLLC
Attorneys for Plaintiff Thomas G. Donlon
90 Broad Street, 10th Floor
New York, New York 10004
(917) 423-1445
jscola@johnscolalaw.com