Docket No. 25 Civ. 5831 (JHR)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOMAS G. DONLON,

Plaintiff

-against-

CITY OF NEW YORK, ERIC ADAMS, TANIA
KINSELLA, Individually, JEFFREY MADDREY,
Individually, JOHN CHELL, Individually, KAZ
DAUGHTRY, Individually, TARIK SHEPPARD,
Individually, MICHAEL GERBER, Individually, PAUL
SARACENO, Individually, and ANTHONY MARINO,
Individually,

Defendants

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

### MURIEL GOODE-TRUFANT
*Corporation Counsel of the City of New York*
Attorney for City Defendants
100 Church Street
New York, New York  10007-2601

Of Counsel:  Eric Eichenholtz, Maxwell D. Leighton
Tel:  (212) 356-2430
eeichenh@law.nyc.gov
Matter No.: 2025-059032

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ....................................................................................... 8

    POINT I ....................................................................................... 8

        PLAINTIFF'S CLAIMS SHOULD BE
DISMISSED FOR FAILURE TO COMPLY WITH
RULE 8 ................................................................................. 8

    POINT II ...................................................................................... 11

        PLAINTIFF FAILS TO STATE A CLAIM
UNDER THE FEDERAL RACKETEER
INFLUENCED AND CORRUPT
ORGANIZATIONS LAW ...................................................... 11

        A.   Plaintiff fails to establish a coordinated
criminal enterprise amongst the defendants ............................. 12

        B.   Plaintiff fails to allege a pattern of racketeering
activity .................................................................................. 15

        C.   Any alleged harm was caused by plaintiff
himself as, during his tenure as Interim Police
Commissioner, he had the power to mitigate all
alleged harm but did not do so ................................................ 16

    POINT III ..................................................................................... 19

        PLAINTIFF'S FIRST AMENDMENT
RETALIATION CLAIM MUST BE DISMISSED ................................ 19

        A.   Plaintiff's alleged speech, made pursuant to his
official duties, was unprotected ............................................... 20

        B.   Plaintiff cannot plausibly claim his speech
caused his termination ............................................................ 23

    POINT IV ..................................................................................... 25

        PLAINTIFF CANNOT LEGALLY ASSERT A
SUBSTANTIVE DUE PROCESS CLAIM ................................ 25

    POINT IV ..................................................................................... 26

PLAINTIFF'S MONELL CLAIM MUST BE
DISMISSED BECAUSE HE HAS NOT
ESTABLISHED A PLAUSIBLE CLAIM HIS
CONSTITUTIONAL RIGHTS WERE VIOLATED............................... 26

POINT V ........................................................................................... 27

PLAINTIFF'S SECTION 75-b CLAIM SHOULD
BE DISMISSED BECAUSE IT IS PARTIALLY
TIME-BARRED, PLAINTIFF FAILS TO
ALLEGE CAUSATION, AND SECTION 75-b
DOES NOT PERMIT SUITS AGAINST
INDIVIDUALS........................................................................... 27

POINT VI ......................................................................................... 28

THE INDIVIDUALLY NAMED DEFENDANTS
ARE ENTITLED TO QUALIFIED IMMUNITY................................... 28

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Pages**

7 W. 57th St. Realty Co. v. Citigroup, Inc., 771 F. App'x 498 (2d Cir. 2019)………………………7

Anderson v. Recore, 317 F.3d 194 (2d Cir. 2003)……………………………………………28-29

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)……………………………………………………7-8

Bell Atl. Corp. v. Twombly, 550 U.S. 554 (2007)………………………………………………7

Black v. Ganieva, 619 F. Supp. 3d 309 (S.D.N.Y. 2022)………………………………...…13

Branti v. Finkel, 445 U.S. 507 (1980)………………………………………………………21

Brooke v. Cty. of Rockland, 2022 U.S. App. LEXIS 28210 (2d Cir. Oct. 11, 2022)…………20

Bruce v. Martin, 691 F. Supp. 716………………………………………………………15-16

Burroughs v. Mitchell, 325 F. Supp. 3d 249 (N.D.N.Y. 2018)…………………………...…26

Danahy v. Buscaglia, 134 F.3d 1185 (2d Cir. 1997)……………………………………...…22

Elrod v. Burns, 427 U.S. 347 (1976)……………………………………………………...…21

Feliciano v. City of N.Y., 2015 U.S. Dist. LEXIS 92623 (S.D.N.Y. 2015)……………...…26-27

Flexborrow LLC v. TD Auto Fin. LLC, 255 F. Supp. 3d 406 (E.D.N.Y. 2017)…………………11

Fierro v. City of N.Y., 2022 U.S. Dist. LEXIS 24549 (S.D.N.Y. Feb. 10, 2022)……………20-21

Frooks v. Town of Cortlandt, 997 F.Supp. 438 (S.D.N.Y. 1998)………………………...…11

Garcetti v. Ceballos, 547 U.S. 410 (2006)………………………………………………20

Garcia v. Doe, 779 F.3d 84 (2d Cir. 2014)………………………………………………...…7

Giacalone v. Abrams, 850 F.2d 79 (2d Cir. 1988)………………………………………28

Gordon v. County of Rockland, 110 F.3d 886 (2d Cir. 1997)…………………………………22

Gruber v. Gilbertson, 2019 U.S. Dist. LEXIS 159793 at *15 (S.D.N.Y. Sep. 17, 2019)…………11

Hart v. FBI, 2025 U.S. Dist. LEXIS 110084 (S.D.N.Y. June 10, 2025)…………………………7

Henry v. City of N.Y., 2007 U.S. Dist. LEXIS 24763 (E.D.N.Y. Mar. 30, 2007)……………14-15

**Cases**                                                                                          **Pages**

Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649 (S.D.N.Y. 1996)…………………………11

King v. City of N.Y., 581 F. Supp. 3d 559 (S.D.N.Y. 2022)……………………………………25

Kim v. Kimm, 884 F.3d 98 (2d Cir. 2018)……………………………………………………12

Lane v Franks, 573 U.S. 228 (2014)……………………………………………………...…20

Lewis v. Cowen, 165 F.3d 154 (2d Cir. 1999)……………………………………………...…28

Looney v. Black 702 F.3d 701 (2d Cir. 2012)…………………………………………………20

Matthews v. City of N.Y., 779 F.3d 167 (2d Cir. 2015)…………………………………………19

McNamara v. City of N.Y., 2007 U.S. Dist. LEXIS 25015 (E.D.N.Y. Mar. 30, 2007)…………12

Miller v. N.Y. City Dep't of Educ., 71 F. Supp. 3d 376 (S.D.N.Y. 2014)…………………………25

Montella v. Bratton, 93 N.Y.2d 424 (N.Y. 1999)……………………………………………..…16

Morrow v. Safir, 242 A.D.2d 217 (App. Div. 1st Dept. 1997)…………………………………18

Pappanikkolaou v. New York City., 2005 U.S. Dist. LEXIS 39201 (E.D.N.Y. July 14, 2005)...…7

Payson v. Bd. of Educ. of Mount Pleasant Cottage Sch., 2017 U.S. Dist. LEXIS 154296 (S.D.N.Y. 2017)………………………………………………………………………..……27

Perez v. City of N.Y., 2025 U.S. Dist. LEXIS 59027 (E.D.N.Y. Mar. 28, 2025)……………..…20

Pleener v. N.Y.C. Bd. of Educ., 311 F. App'x 479 (2d Cir. 2009)………………………………24

Ross v. Breslin, 693 F.3d 300 (2d Cir. 2012)……………………………………………...…19-20

Salahuddin v. Cuomo, 861 F.2d 40 (2d Cir. 1988)…………………………………………..…7-8

Salzmann v. Prudential Securities, Inc., 1994 U.S. Dist. LEXIS 6377 (S.D.N.Y. 1994)……...…8-9

Schmidt v. Fleet Bank, 16 F. Supp. 2d 340 (S.D.N.Y. 1998)…………………………………..…12

Schulz v. Commack Union Free Sch. Dist., 664 F. Supp. 3d 296 (E.D.N.Y. 2023)…………..…26

Sulehria v. City of N.Y., 670 F. Supp. 2d 288, 322 (S.D.N.Y. 2009)…………………….…....…28-29

United States v. Turkette, 452 U.S. 576 (1981)…………………………………………….…12

Velez v. Levy, 401 F.3d 75 (2d Cir. 2005)…………………………………………………..…25

**Cases**                                                                                      **Pages**

Vezzetti v. Pellegrini, 22 F.3d 483 (2d Cir. 1994)………………………………………...…22

Weintraub v. Bd. of Educ., 593 F.3d 196 (2d Cir. 2010)……………………………………20

Yu v. City of N.Y., 2018 U.S. Dist. LEXIS 202796 (S.D.N.Y. 2018)………………….....26-27


**Statutes**

Fed. R. Civ. P. 8…………………………………………………………………...….7-8

Fed R. Civ. P. 9……………………………………………………………………...……..7

Fed. R. Civ. P. 12………………………………………………………………….....7-8

New York City Charter §422…………………………………………………………1

New York City Charter §432…………………………………………………………1

New York City Charter §815…………………………………………………………..17

New York City Administrative Code §14-114……………………………………………1

New York City Administrative Code §14-115……………………………………………1

## PRELIMINARY STATEMENT

The New York City Police Commissioner is one of the most powerful and revered positions in global law enforcement, commanding a force of 34,000 uniformed officers and an additional 16,000 civilians, and not every person is up to the task.  While serving as Interim Police Commissioner, plaintiff Thomas G. Donlon ("plaintiff") was the "Chief Executive Officer of the police force," and was responsible for "execution of all laws and the rules and regulations of the department," with the exclusive legal authority and authorization to hire, fire, transfer, promote and discipline subordinate employees of the NYPD. See Charter §434(b), 422; New York City Administrative Code §14-114 (promotions "shall be made by the Commissioner") and §14-115(a) (giving exclusive power to discipline NYPD officers to the NYPD Commissioner); see also Amended Complaint ¶¶524, 703. During his tenure as Interim Police Commissioner, "no one" other than plaintiff, and not even the Mayor of the City of New York, had the power of making appointments and transfers within the NYPD.  Amended Complaint ¶¶406, 524.

But in his two-month tenure, plaintiff was so ill-suited to lead the NYPD that he was, in his own words, "powerless," Id. ¶¶358, 488, 618, "sabotaged," Id. ¶¶40, 421, 549, 641, 684, 691, 717, 751, 854, and "effectively ceremonial," Id. ¶662, while his subordinates allegedly "act[ed] with insubordination and disregard for operational effectiveness," Id. ¶651, and were "increasingly emboldened by the ineffectiveness of Donlon's efforts," Id. ¶664.  Indeed, plaintiff's performance and leadership was so poor that he alleges that "a former NYPD Police Commissioner contacted [Mayor Adams] to inform him that [plaintiff] should be replaced." Id. ¶548.  Rather than conclude that he was removed from the temporary position of Interim Police Commissioner as a result of such feckless and ineffective leadership, plaintiff instead contends that his termination must be the result of retaliation and, somehow, a racketeering conspiracy.

Without setting forth a plausible claim for legal relief, plaintiff wastes the Court's time by spending paragraphs complaining about personal gripes that "may seem minor to the casual observer," Id. ¶667, and allegations unrelated to plaintiff that are so irrelevant and prolix that his pleading fully warrants dismissal under Rule 8. Plaintiff grouses in his 1,340 plus-paragraph complaint that he was "disheartened," Id. ¶¶640, 662, "disturbed," Id. ¶649, and "frustrated," Id. ¶509, during his 72 days as Police Commissioner. He spends eleven paragraphs noting his embarrassment, Id. ¶¶421, 425, 436, 444, 543, 640, 688, 841, 853, 984, 1234, and six times references his feelings of humiliation, Id. ¶¶14, 543, 689, 853, 984, 1368. Notably, plaintiff's embarrassment and humiliation are not grounds for any of plaintiff's claims, but may reflect plaintiff's brief, ineffective tenure as Interim Police Commissioner. Beyond petty grievances, the amended complaint is riddled with half-sentences and jumbled, repetitive, and demonstrably false allegations. It is a clear violation of Rule 8's "short and plain statement" requirement, utterly disrespectful of the Court's time and resources, and should be dismissed for that reason alone.

Moreover, notwithstanding the alarming and obvious deficiencies in form, the 1,375 paragraph amended complaint is somehow also devoid of substance. Plaintiff complains about conduct that he alone had the power to address and fails to plead allegations that credibly establish any of the elements of his claims. Plaintiff's Racketeer Influenced and Corrupt Organizations Act ("RICO") claim fails because he does not plausibly allege that the defendants were a racketeering enterprise or that any alleged enterprise caused him damage. To the contrary, the amended complaint portrays the individual defendants as staking out separate agendas and motivations, with the only commonality being plaintiff's distaste for those agendas. Similarly,

plaintiff claims the alleged "criminal acts" harmed the City and, ultimately, himself, but, as a matter of law, plaintiff had the legal authority to address and remediate those acts. He did not.

For similar reasons, plaintiff's First Amendment and Civil Service Law whistleblower claims also fail. Plaintiff complains he brought issues of corruption to Mayor Adams which were not addressed. However, as a matter of law, the Police Commissioner, and not the Mayor, has both the power and obligation to the public to take remedial action, including to reassign, discipline and issue orders to address any unlawful or improper acts. Plaintiff cannot claim he was a whistleblower to his own failure to act on behalf of the City and its citizens. Accordingly, plaintiff's amended complaint fails to meet the pleading requirements of Rule 8, fails to state a claim, and is, in many respects, legally insufficient, and should be dismissed in its entirety.[1]

## STATEMENT OF FACTS[2]

Plaintiff Thomas Donlon was appointed Interim NYPD Commissioner in September 2024. See Amended Complaint ¶5. Plaintiff understood he would need to develop working relationships with both the Mayor and NYPD executives during his time with the NYPD. Id. ¶390. Plaintiff alleges that from almost day one, while some managers were initially supportive of him, others under his command displayed bad attitudes and, on multiple occasions, were silent

---

[1] The undersigned appears on behalf of the City, Mayor Adams, Tania Kinsella, John Chell, Michael Gerber and Anthony Marino (the "City Defendants"). Upon information and belief, the other individually named defendants have not yet been properly served and/or have not yet requested representation from the Corporation Counsel. However, the grounds for dismissal would apply to all individual defendants and therefore the City defendants use the more generic "defendants" throughout this memorandum of law.

[2] This statement of relevant facts is derived in part from the allegations of the amended complaint and the documents referenced therein.

when plaintiff articulated his policy vision for the NYPD at meetings. While plaintiff makes conclusory claims that this was the result of an unlawful and criminal conspiracy, the facts pleaded in the amended complaint show instances of his own poor management, hesitation to use plaintiff's lawful and authorized authority to take remedial action, as well as multiple instances of off-putting conduct by plaintiff toward his subordinates.

Despite the Mayor's request to "work with" senior NYPD staff, the facts pleaded in the amended complaint show that plaintiff was instead, on many occasions, confrontational and unprofessional with his subordinates. Perhaps the most egregious example of this was plaintiff's "confrontation" and treatment of Sergeant Danelle A. Venus, who worked in plaintiff's office. Plaintiff avers he became upset with Sergeant Venus because she did not send out the invitations to his holiday party after being told to because Venus felt it was too early. See Amended Complaint ¶773-779. This resulted in plaintiff concluding that defendants Maddrey and Gerber must "control" her. Id. at 786. Plaintiff claimed he "learned" that Venus, who held responsibility for facilitating the administration and coordination of the Commissioner's Office and schedules with other NYPD officials, had access to his e-mail and calendar and shared that information with other senior staff. Id. at 794. Because of this, plaintiff decided that "it was clear" Sergeant Venus was beholden to those staff members and not him. Id. at 802.

Plaintiff decided to "confront" Sergeant Venus in his office because she told an NYPD IT technician to let her know when plaintiff instructed them to do technical work. See Amended Complaint ¶¶805, 809. Sergeant Venus assured plaintiff that she had no malevolent motive and was simply trying to assist him. Plaintiff told her he "did not believe her" and that she "had to be directed by someone," which made Sergeant Venus upset. Id. ¶¶809-811. The result of this "confrontation" was that Sergeant Venus "proceeded to a room in the lobby of [NYPD

headquarters], still emotionally upset and crying" while being mystified why plaintiff did not believe her.  Amended Complaint ¶812.  Sergeant Venus retired within a week of this emotional confrontation.  Id.  Plaintiff acknowledged that – to this day – he remains "of the belief" that Sergeant Venus, who plaintiff admittedly had "confronted" in a manner that made her so "emotionally upset" that she retired less than a week later, "was gathering information regarding [plaintiff]." Id. ¶¶812-816.  Most disturbing, however, is plaintiff's acknowledgment that his suspicions were always based on little more than a hunch, as, in plaintiff's words "For just whom [Sergeant Venus was gathering information], is unknown."  Id. ¶816.

On another occasion, when Deputy Commissioner Michael Gerber was allegedly unable to recall a comment plaintiff had made about partnering with federal agencies, plaintiff responded in a snide and unprofessional manner by retorting "Were you sleeping at this meeting and at other Monday meetings?"  Amended Complaint ¶646.  Plaintiff claimed to be "[a]stonish[ed]" that this snide remark was not responded to and that Gerber was not as willing to participate in future meetings. Id.  It is hardly "astonishing" that making a snide remark like that to a subordinate would have a chilling effect on their active participation in future meetings.

Plaintiff complained about the conduct of his subordinates to Mayor Adams who, on at least one occasion, asked plaintiff's subordinates to treat plaintiff better. See Amended Complaint ¶669.  But the way in which plaintiff talked to and treated his subordinates, readily acknowledged in the amended complaint, understandably led to, as Mayor Adams advised plaintiff, his command of NYPD being in "chaos."  Id. at 724.

Plaintiff alleges that he consistently witnessed criminal conduct in the NYPD, as breathlessly recounted over 240 pages and 1,375 paragraphs of his pleading. But nowhere does he allege, on any occasion, that he used his sole and exclusive authority to discipline subordinates for

misconduct or remediate the alleged fraudulent promotions he claimed he observed. Instead, plaintiff consistently claims that his sole recourse was to complain to Mayor Adams about his subordinates. In turn, plaintiff assails the Mayor for not disciplining defendants – who reported directly to plaintiff – or taking some remedial action on plaintiff's behalf. These allegations wholly ignore that plaintiff, and not Mayor Adams, was the individual with the power and authority to initiate disciplinary or remedial actions. Tellingly, plaintiff does not allege that Mayor Adams ever sought to countermand or rescind any lawful orders issued by plaintiff. Indeed, on the rare occasions that plaintiff acknowledged he was actually willing to exercise his authority (more to address personal disputes about policy and protocol rather than alleged crimes), he admits the results were positive. See e.g., Amended Complaint ¶¶507-510.

Plaintiff's interim tenure as Commissioner ended when Mayor Adams appointed a permanent NYPD Commissioner, Jessica S. Tisch. Amended Complaint ¶1072. Despite conclusory statements to the contrary stated throughout the amended complaint, plaintiff concedes that, following her appointment, Commissioner Tisch exercised the power of the Police Commissioner to discipline, transfer, and remove officers as she deemed appropriate. See e.g., Amended Complaint ¶¶1295 and, 1256; see also Police Benevolent Association of the City of New York, Inc. et al. v. City of New York et al., Supreme Court, New York County, Index No. 158777/2025 (use of Commissioner's authority to rescind improper appointments after IAB investigation).

After his removal from the role of Commissioner, plaintiff was reassigned to the role of Senior Advisor to the Deputy Mayor for Public Safety. Amended Complaint ¶1078. He was informed that his position would be eliminated on May 9, 2025, which he dismisses as a "ruse." Id. ¶1299.

## STANDARD OF REVIEW
### RULE 8

A pleading must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A court may dismiss a complaint under Rule 8 where it "is so prolix and 'so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.'" Hart v. FBI, 2025 U.S. Dist. LEXIS 110084, at *6 (S.D.N.Y. June 10, 2025) (quoting Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988)). "Complaints which ramble, which endlessly speculate, accuse and condemn, and which contain circuitous diatribes far removed from the heart of the claim do not comport with [the goals of Rule 8]." Id. (quoting Pappanikkolaou v. New York City., 2005 U.S. Dist. LEXIS 39201, at *10 (E.D.N.Y. July 14, 2005)).

### RULE 9(b)

Where a civil RICO claim is premised on predicate acts involving fraud, the complaint must also satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b). 7 W. 57th St. Realty Co. v. Citigroup, Inc., 771 F. App'x 498, 501 (2d Cir. 2019) (summary order).

### RULE 12(b)(6)

On a motion to dismiss made under Fed. R. Civ. P. 12(b)(6), the Court must accept as true the well-pleaded factual allegations set forth in the Complaint, to the extent that those facts are not contradicted by any documentary evidence referenced therein, and draw any reasonable inference in Plaintiff's favor. See Garcia v. Doe, 779 F.3d 84, 88 (2d Cir. 2014). The Complaint must plead "enough facts to state a claim for relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 554, 574 (2007), which "allow[ ] the court to draw upon the reasonable

inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Although the Court is obligated to accept the factual allegations as true, that obligation is "inapplicable to legal conclusions" and "threadbare recitals" of the elements of a cause of action. <u>Iqbal</u>, 556 U.S. at 678.

## **ARGUMENT**

### **POINT I**

### **PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO COMPLY WITH RULE 8**

The amended complaint violates Rule 8 because, among its many deficiencies, it is prolix, burdensomely disorganized, and often incoherent. Rule 8(a)(2) requires that a pleading present "a *short and plain* statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added).  The Second Circuit has noted that "unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." <u>Salahuddin</u>, 861 F.2d at 42 (internal quotation marks and citations omitted).  A court may even dismiss an action with prejudice because of a prolix pleading, especially if both the original pleading and amended pleading are too verbose and filled with irrelevant material, as is the case here.  *Id.* at 42-43.

Indeed, pursuant to Rule 12(f), "the court may," on its own initiative, "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); <u>Salahuddin</u>, 861 F.2d at 42 ("When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial."); <u>Salzmann v. Prudential Securities, Inc.</u>, 91 Civ. 4253 (KTD), 1994 U.S. Dist. LEXIS 6377, at *13 (S.D.N.Y. 1994) ("A

court may strike a pleading when it appears beyond peradventure that it is . . . devoid of factual basis.").

Even after amendment, the complaint here is a morass of over 240 pages and 1,375 paragraphs of allegations that are riddled with contradictions, repetition and indecipherable and incomprehensible allegations all while devoting scores of pages to matters unrelated to this case. Plaintiff's attempts to connect these digressions to the central allegations of his claims are, quite charitably, a histrionic stretch. More practically, these tangents are "full of sound and fury, signifying nothing." William Shakespeare, Macbeth, Act V, Scene V, lines 17–28.

For example, Paragraphs 182 through 195 of the amended complaint purport to establish Monell liability against the City of New York for alleged constitutional violations of other, unnamed "New Yorkers" that plaintiff has not asserted and does not have standing to assert. Paragraphs 1152 through 1254 of the amended complaint amount to a lengthy detour from plaintiff's claims to discuss, at length, his assertion that his wife was falsely arrested after she was found to have a suspended license and told the officer who stopped her "as a courtesy" that she was the wife of the former NYPD Commissioner.

Meanwhile, Paragraphs 257 through 274 describe plaintiff's counsel's legal advocacy on behalf of another client and the assertions of that client. Paragraphs 342 through 352 discuss the Corporation Counsel's representation decisions concerning defendants in other lawsuits brought by plaintiff's counsel herein. Dozens of other paragraphs similarly restate the assertions made in other pending and resolved cases brought against the City by plaintiff's counsel whose only connection appears to be that those plaintiffs also worked for the NYPD and are represented by the same counsel as plaintiff. His attorney's dubious use of an already prolix filing for counsel's own self-serving publicity tour lends plaintiff's claims no appreciable support.

Moreover, the amended complaint is unnecessarily repetitive. For example, plaintiff's claims that his subordinates approved alleged fraudulent NYPD promotions are discussed first in paragraphs 63 through 68, then revisited in paragraphs 549 through 553, revisited again in paragraphs 710 through 719, and revisited a fourth time in paragraphs 1003 through 1026.

Finally, as any first-year law student is cautioned in civil procedure class, prolix complaints of this nature run the risk of pleading a plaintiff out of court. That is certainly the case here. For example, plaintiff alleges in numerous paragraphs that his successor, Jessica Tisch, "did nothing" to address ongoing concerns with the NYPD. The facts pleaded show the opposite is true. Similarly, as discussed in point II below, plaintiff's factual averments undermine his conclusory theories of his case, including claiming he was removed to "protect" high ranking NYPD officials who were subsequently reassigned or removed under Commissioner Tisch.

Whatever the reason for the prolix nature of this complaint may be, whether poor and careless legal drafting, an attempt to obfuscate the weakness of plaintiff's claims by combining them with the allegations of others, an attempt to publicly embarrass and shame the individual defendants, or some other ill-advised reason, is of no matter. The length and structure of the amended complaint does not comply with Rule 8. The defendants and this Court should not have to waste their time and resources navigating hundreds of pages of allegations, some completely unrelated to this case, some restated again and again and again, to unearth the plain factual basis for plaintiff's legal claims. The amended complaint should be dismissed for failure to comply with Rule 8.

**POINT II**

**PLAINTIFF FAILS TO STATE A CLAIM UNDER THE FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS LAW**

Plaintiff's first cause of action claims a violation of 18 U.S.C. §1964, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), against the individually named defendants,[3] and alleges his termination is part of a sprawling criminal conspiracy.   Courts have frequently observed that "[c]ivil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device"  Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 655 (S.D.N.Y. 1996).  Due to the potency of a Civil RICO claim, including the availability of treble damages and other alluring incentives, plaintiffs frequently attempt to shoehorn RICO claims into matters ill-suited to their use.   As a result, "[P]laintiffs wielding civil RICO claims almost always miss the mark." Gruber v. Gilbertson, 2019 U.S. Dist. LEXIS 159793 at *15 (S.D.N.Y. Sep. 17, 2019), quoting  Flexborrow LLC v. TD Auto Fin. LLC, 255 F. Supp. 3d 406, 414 (E.D.N.Y. 2017).

Because of their frequent misapplication, Civil RICO claims are often adjudicated – and dismissed – on a Rule 12(b)(6) motion.  "[C]ourts should strive to flush out frivolous RICO allegations at an early stage of the litigation." Katzman, 167 F.R.D. at 655.  This case presents yet another misapplication of Civil RICO.  Indeed, plaintiff attempts to squeeze civil misconduct as well as criminal allegations into the case, despite their having little to no connection to the named

---

[3] "[A] municipality cannot form the requisite criminal intent to establish a predicate act . . ." Frooks v. Town of Cortlandt, 997 F.Supp. 438, 457 (S.D.N.Y. 1998), aff'd, 182 F.3d 899 (2d Cir. 1999) (collecting cases).  This principle also applies to RICO claims against municipal employees in their official capacities.  Id.

- 11 -

defendants herein, throwing everything against the wall in the hope that a RICO claim somewhat sticks.

To establish a RICO claim, a plaintiff must show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Kim v. Kimm, 884 F.3d 98, 103 (2d Cir. 2018). Plaintiff's RICO claim immediately stumbles, and must be dismissed, because he fails to plausibly allege an enterprise amongst the named defendants, he cannot show the defendants engaged in a pattern of racketeering activity, and he fails to plausibly show how this alleged enterprise caused his contended damages.

A.    **Plaintiff fails to establish a coordinated criminal enterprise amongst the defendants**

In order to plausibly plead the existence of a racketeering enterprise, particularly where, as here, plaintiff is claiming an informal enterprise created by coordinated conduct, the complaint must provide facts that, if true, plausibly demonstrate coordinated conduct and motivation amongst the members of the alleged enterprise. A RICO enterprise is a "group of persons associated together for a common purpose of engaging in a common course of conduct . . . ." Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 349 (S.D.N.Y. 1998), quoting United States v. Turkette, 452 U.S. 576, 583 (1981).  The plaintiff must demonstrate the existence of "an ongoing organization, either formal or informal, and evidence that the associates function as a continuing unit." Id.  "The Supreme Court has further explained that under RICO, an enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct,' proven by 'evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" Id. quoting United States v. Turkette, 452 U.S. 576, 583, (1981); see also McNamara v. City of N.Y., 2007 U.S. Dist. LEXIS 25015, at *14-15 (E.D.N.Y.

Mar. 30, 2007). Undeniably, where defendants pursue their own independent interests, rather than acting in furtherance of a shared goal, no enterprise can be deemed to exist under RICO.

Plaintiff's claims that the individual defendants form a single RICO enterprise are both incoherent and absurdly inconsistent. To be sure, plaintiff states in conclusory fashion that there is a vast conspiracy to operate the NYPD unlawfully and that the individually named defendants worked in coordination to "consolidate political power, obstruct justice, and punish dissent." Amended Complaint ¶1. However, the facts and admissions plead in the amended complaint completely undermine any conclusion that these individuals formed a functioning enterprise. "RICO's common purpose requirement demands more than general synchronicity or shared enmity." Black v. Ganieva, 619 F. Supp. 3d 309, 333 (S.D.N.Y. 2022) (collecting cases). While plaintiff alleges all the defendants possessed a shared desire to undermine his leadership, that cannot be the basis of a RICO enterprise. Id. This is especially true where, as here, plaintiff cannot even show synchronicity. Indeed, he pleads myriad facts about the defendants' individual interests, conflicting actions and lack of coordination.

For example, while plaintiff claims that the goal of the enterprise was to "consolidate power" within the City, he pleads that other alleged members of the enterprise wanted Mayor Adams to appoint them Commissioner, but that, as an alleged co-conspirator, the Mayor instead vested that power in plaintiff, presumably not a member of this alleged criminal enterprise. See Amended Complaint ¶391 ("Defendants MADDREY, CHELL, DAUGHTRY, and SHEPPARD, all wanted to be appointed as Police Commissioner and were disappointed when Donlon was named [by alleged co-conspirator Adams].") Accordingly, plaintiff's own pleading argues that, when an alleged co-conspirator had the opportunity to vest the powerful position in someone within the alleged enterprise, he chose not to do so, instead appointing plaintiff and

Commissioner Tisch.  This is literally the opposite of power consolidation, underscoring the implausibility of unity and coordination between the individuals necessary for a RICO claim.

Through the amended complaint, plaintiff also undercuts the allegations of coordinated criminal intent through affirmative averments that the motivation of the various members of the alleged enterprise was actually to undermine plaintiff because of individualized, personal animus against him, and not out of a desire to further any alleged criminal enterprise or to commit a crime.  See e.g., Amended Complaint, ¶478 (defendants' desire to undermine plaintiff was allegedly because some "resented the FBI and Donlon's federal background and did not want to work with federal law enforcement authorities."), ¶619 ("Donlon found it quite transparent that Defendant DAUGHTRY's disdain for him stemmed from personal envy and resentment."), ¶650 (defendant Gerber's "resistance" to plaintiff based was "personal – rooted in ego and control").  Moreover, throughout the amended complaint, plaintiff recounts members of the alleged enterprise being supportive of him, even in opposition to other members of the alleged enterprise.  See e.g., Amended Complaint, ¶480 (describing a cordiality and willingness to support plaintiff), ¶¶669, 807 (defendant Gerber advising plaintiff on people he should remove to improve his office).  Also, while plaintiff alleged the members of the enterprise sought to protect each other, the factual averments of the amended complaint demonstrate otherwise.  See e.g., id. ¶1295.

The inconsistency, non-coordination, and separate personal motivations for each of the defendants renders plaintiff's claims of a coordinated criminal enterprise utterly implausible.  See Henry v. City of N.Y., No. 05 CV 6023 (SJ)(RML), 2007 U.S. Dist. LEXIS 24763 (E.D.N.Y. Mar. 30, 2007) ("The complaint alleges no facts showing that individual defendants, by their words or actions, manifested a conscious agreement to commit any predicate acts. Nor does the complaint

- 14 -

allege facts showing knowledge by each of the defendants of the existence of the other alleged predicate acts.").

**B.**      **Plaintiff fails to allege a pattern of racketeering activity**

Plaintiff also does not properly allege a pattern of racketeering activity. To be sure, like an episode of *Law and Order*, plaintiff rips from the tabloid headlines various stories of investigations of criminal misconduct with sparse connection to the named defendants, beyond the general notion that the New York City government is involved. Plaintiff's factual allegations about his clashes with the defendants and their actions (at least those that directly involve him), do not even appear to allege crimes at all. Instead, they form a litany of policy disagreements, such as how best to collaborate with federal agencies, how best to position the NYPD to perform public outreach, and how best to balance policing with the needs of the community the NYPD serves. See e.g., Amended Complaint ¶644-46 (claiming that defendant Gerber's failure to remember a comment made by plaintiff at a staff meeting constitutes an act of fraud).

Plaintiff raises purported criminal acts that, in fact, are nothing of the sort, but rather are allegations recast from other civil lawsuits previously launched by plaintiff's counsel. And plaintiff also manufactures sheer hyperbole to animate his wild theories, deeming a defendant's forgetfulness regarding a previous comment plaintiff had made to support abject criminality, surmising that it *must* have been remembered and, therefore, nothing less than fraud attended any statement that he did not. Throughout the amended complaint, fraud is pleaded only generally and not with the particularity required by Rule 9, including dozens of general statements that nameless promotions were made without authorization. And, even if stated with particularity, the allegedly fraudulent promotions contended in the complaint cannot form the basis of a RICO claim. See Bruce v. Martin, 691 F. Supp. 716, 728 (S.D.N.Y. 1988) ("civil RICO's treble damage provision

was never intended to permit recovery for what amounts to common law fraud.") Transmutations abound throughout plaintiff's pleading. Indeed, simple policy disagreements between NYPD managers become the federal crime of "theft of honest services." This is precisely the sort of shoehorning of non-RICO allegations into a RICO claim that courts in this district frequently reject. Desperate as plaintiff might be to claim otherwise, the facts in the complaint show that his allegations sound solely in employment claims, and do not support any sort of racketeering case.

**C.    Any alleged harm was caused by plaintiff himself as, during his tenure as Interim Police Commissioner, he had the power to mitigate all alleged harm but did not do so**

Finally, even if plaintiff could establish all of these elements, his RICO claims fail because he cannot claim that the alleged enterprise caused him damage. As Police Commissioner, plaintiff had undisputed legal authority to approve or disapprove the allegedly unlawful actions and revoke any action he found unlawful or outside his authority. As Police Commissioner, it was plaintiff – not the Mayor, the Deputy Mayor, or anyone else within any alleged "shadow" chain of command within the New York City government – who held full legal authority over the New York City Police Department, and the functional responsibility for its actions:

> As chief executive officer of the police force, the [plaintiff was] vested with "cognizance and control" over the discipline of uniformed officers. *New York City Administrative Code § 14-115 (a)* broadly empowers the Commissioner to "punish" members of the force for a wide range of infractions, including "any criminal offense, or neglect of duty, violation of rules, or neglect or disobedience of orders, or absence without leave, or any conduct injurious to the public peace or welfare, or immoral conduct or conduct unbecoming an officer, or any breach of discipline." The Commissioner is authorized to discipline officers "by reprimand, forfeiting and withholding pay for a specified time, suspension, without pay during such suspension, or by dismissal from the force."

Montella v. Bratton, 93 N.Y.2d 424, 429 (N.Y. 1999).

Moreover, under Section 815 of the City Charter, the authority to appoint, promote, assign and reassign NYPD personnel was conferred squarely on the plaintiff himself.    Thus, as the duly appointed Interim Police Commissioner, and as a matter of law, plaintiff held the power to make final choices and bind the City with respect to all of the individual appointments, promotions and assignments that he now complains were improper.  He also had the power to revoke and mitigate any actions he found unjustified or unlawful.[4]

Complaining about the official acts taken under his command is, on its face, patently absurd.  Claiming that plaintiff, who possessed all the legal powers described above, was somehow powerless to remove or reassign personnel he found to be acting unlawfully and improperly is utterly implausible.  For example, while plaintiff alleged, in multiple sections of the complaint, that his subordinates fraudulently approved promotions under his name, he provides no explanation as to why he did not rescind them under his authority to do so, and promote worthy officers instead.  See Amended Complaint ¶¶554, 974-991.[5]  It is beyond dispute that, as discussed above, plaintiff's successor utilized her authority as Commissioner in ways plaintiff either would not or did not.

Presumably understanding the implausibility and abject absurdity of RICO claims being brought by the very Police Commissioner under whose command many of the alleged unlawful acts occurred, plaintiff tries to disclaim that he ever was Interim Police Commissioner.

_____

[4] If, as plaintiff alleges, he was aware of the extent of the criminal enterprise by the time of the appointment of Commissioner Tisch, there is no reason he should have agreed to stay on to advise and aid this alleged enterprise.

[5] Bizarrely, in yet another example of plaintiff deflecting his own responsibility, he criticizes his successor for not calling him so that she could cure his inaction by rescinding the promotions made under his command.  See Amended Complaint ¶1090.

In conclusory fashion and in the face of legal and factual support for the contrary, plaintiff tries to recast himself as "Commissioner in name only," claiming to be a powerless bystander and hapless City employee who merely observed unlawful conduct, but was helpless to correct it beyond "blowing the whistle."  In what can only be described as gaslighting, plaintiff laments throughout his amended complaint that, had he possessed the very lawful authorization that was granted to him, and him alone, when Mayor Adams appointed plaintiff Interim Police Commissioner, he could have made things right.  But he *did* have that legal authority, he was officially appointed, took an oath, and was vested with all the powers, duties, and *obligations* of the Police Commissioner.

As the duly appointed Interim Police Commissioner, plaintiff was responsible for, and accountable to the public for, any allegedly corrupt actions taken by the Police Department under his leadership as a matter of law. See Morrow v. Safir, 242 A.D.2d 217, 218 (App. Div. 1st Dept. 1997) (noting the Police Commissioner's "accountability to the public for the integrity of the Police Department."). By taking the oath as Police Commissioner, plaintiff took on a role that did not afford him the luxury of being merely a passive whistleblower; he had a legal obligation to take action.  A Police Commissioner has an obligation to do more to ensure lawful operation of the NYPD than complain to the Mayor and refrain from taking action himself, even if, as plaintiff claims, the political climate of doing so was fraught.  Plaintiff does not allege that he took a single official action to correct what he now claims was rank lawlessness that occurred under his watch. See Amended Complaint ¶425 (plaintiff "tolerated" the behavior of the defendants).[6]  Nor does

---

[6] Plaintiff relies heavily on the fact that the Mayor expressed, at the beginning of his tenure, his confidence in various NYPD officials as effective in fighting crime and a desire that plaintiff work with them.  That reliance is misplaced.  While plaintiff may well have eschewed taking actions he

he, throughout his sprawling amended complaint, ever identify a single occasion where the Mayor took any action to prohibit plaintiff from using his authority as he saw fit.    That factual silence is deafening, and damning to the plausibility of plaintiff's RICO claims.    In plaintiff's own words, his "inaction [to address these] issue[s] speaks louder than any pledge" he makes in the conclusory sections of the complaint. Amended Complaint ¶69.

Regardless of his excuses or self-serving rationales, plaintiff chose not to exercise the authority granted to him by law to address what he alleges was unlawful and corrupt action by NYPD personnel.  This represents a legal dereliction of his duties and entirely undermines his claims.  Because of that he cannot – as a matter of law – claim to be entitled to damages from his own inaction.

Because plaintiff does not plausibly allege the elements of liability or damages attendant to his RICO claim, that claim must be dismissed.

## POINT III

### PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM MUST BE DISMISSED

A plaintiff asserting a First Amendment retaliation claim must establish that: "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." Matthews v. City of N.Y., 779 F.3d 167, 172 (2d Cir. 2015). A public

---

believed the Mayor would find disagreeable, leadership requires such decisions being made by those responsible for making them.  Plaintiff does not obtain a viable cause of action against the City because, as alleged in this paragraph, he elected to abdicate his role, and the Mayor did not intercede and do plaintiff's job for him when plaintiff found it uncomfortable to do it himself.

employee's speech is only protected by the First Amendment when the employee is speaking as a citizen on a matter of public concern. Ross v. Breslin, 693 F.3d 300, 305 (2d Cir. 2012). When a public employee's statements are made pursuant to his official duties, he is not speaking as a citizen for First Amendment purposes. See Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). This is true even when the subject matter of the employee's speech is of public concern.  See Looney v. Black 702 F.3d 701, 710 (2d Cir. 2012); Ross, 693 F.3d at 305.

### A.    Plaintiff's alleged speech, made pursuant to his official duties, was unprotected

Here plaintiff's alleged "whistleblowing" was speech that was unambiguously pursuant to his official duties and therefore is not protected speech. "A public employee's speech can properly be said to have been made pursuant to . . . official duties where the speech . . . owes its existence to a public employee's professional responsibilities, or where the speech is part-and-parcel of [the employee's] concerns about [the employee's] ability to properly execute his duties." Fierro v. City of N.Y., 2022 U.S. Dist. LEXIS 24549, at *13-14 (S.D.N.Y. Feb. 10, 2022) (quoting Weintraub v. Bd. of Educ. Of City Sch. Dist. of City of New York, 593 F.3d 196, 203 (2d Cir. 2010) (internal quotations omitted); Perez v. City of N.Y., 2025 U.S. Dist. LEXIS 59027 (E.D.N.Y. Mar. 28, 2025). The critical question is whether the speech is "'ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.'" Brooke v. Cty. of Rockland, 2022 U.S. App. LEXIS 28210, at *6 (2d Cir. Oct. 11, 2022) (summary order), quoting Lane v Franks, 573 U.S. 228, 240 (2014).

Whether a public employee's speech was made pursuant to his official duties involves a practical determination that looks at the "nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." Ross, 693 F.3d at 306. "[I]n some cases, the parameters of the employee's official duties are so well established and the allegations

in the complaint are so specific as to permit such a determination to be made upon a motion to dismiss." Fierro, 2022 U.S. Dist. LEXIS 24549, at *14 (internal quotations and citation omitted).

Plaintiff's speech is clearly pursuant to his official duties. As noted above, plaintiff, as Interim Police Commissioner, was specifically enjoined by law to ensure the proper, lawful and efficient operation of the NYPD. As Senior Advisor, plaintiff was expressly retained to provide advice and counsel to the Mayor. There is no "civilian analogue" to the context of plaintiff's speech – no civilian gets direct access to the Mayor or is entrusted with the legal authority plaintiff had to formulate policy on the very issues he was speaking on.

Moreover, in evaluating the extent to which plaintiff's alleged "whistleblowing" and other speech is protected, the Court must also consider plaintiff's status as a "policymaker," as that term is defined in the Supreme Court's decisions in Elrod v. Burns, 427 U.S. 347 (1976), Branti v. Finkel, 445 U.S. 507 (1980), and the line of cases in the Second Circuit which have followed. Those cases govern a public employee's right to political affiliation or association. In Elrod, the Supreme Court considered the limits to the associational rights of public employees. The Court recognized that public employers have a "vital" interest in ensuring that the political loyalty of employees so "that representative government is not undercut by tactics obstructing the implementation of policies of the new administration." Elrod, 427 U.S. at 363. Therefore, it held that the dismissal of employees because of their political affiliation does not necessarily violate the First Amendment. However, the Court also held that the State's interest is adequately protected by limiting such political patronage dismissals to "confidential" or "policymaking" positions, because "non-policymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party." Id at 367.

Whether a person is a policymaker is a question of law.  Gordon v. County of Rockland, 110 F.3d 886, 888 (2d Cir. 1997); Danahy v. Buscaglia, 134 F.3d 1185, 1191 (2d Cir. 1997) (noting that the "policymaker inquiry" "presents a question of law informed solely by the job description and powers of the office").  In Vezzetti v. Pellegrini, 22 F.3d 483 (2d Cir. 1994), the Second Circuit identified eight factors to be considered in determining whether an employee is a policymaker.  These factors are whether the employee: "(1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders."  Vezzetti, 22 F.3d at 486.  These factors are not "an exhaustive list of indicators, nor is any one factor or group of them dispositive."  Id.

Applying the Vezzetti factors to this case, there is no question that plaintiff was a policymaker.  First, plaintiff's job was exempt from civil service protection.  Second, plaintiff's position clearly required substantial technical competence or expertise.  Third, plaintiff was the Chief Executive of the Police Department.  Fourth, as Interim Police Commissioner, one of plaintiff's obligations was to articulate the policies of the NYPD to members of the NYPD, to other stakeholders and to the public.  Fifth, plaintiff, as the Interim Police Commissioner, would no doubt be perceived as a policymaker by the public.  Sixth, the Police Commissioner has significant influence over policing policy in New York City.  Seventh, plaintiff had contact with elected officials, including the Mayor, the City Council, the District Attorneys and the like, concerning law enforcement issues within the City.  Finally, plaintiff had to be responsive to local

political leaders and directly reported to the Mayor. Accordingly, the Court should find that, as a matter of law, plaintiff was a policymaker.[7]

Thus, even assuming plaintiff is correct that the Mayor removed him as Interim Police Commissioner and subsequently fired him as a City Hall advisor because they did not see eye-to-eye on policing policy or the operations of the department, Elrod and its progeny do not provide First Amendment protection for the termination of a high-ranking policymaker because of an alleged non-alignment with the Mayor's agenda.

## B.    Plaintiff cannot plausibly claim his speech caused his termination

Finally, even if plaintiff's speech is protected, plaintiff cannot plausibly establish that his speech caused his termination. The core of plaintiff's causation argument is that when his subordinates refused to enthusiastically carry out his vision and directions, he complained to the Mayor and, upon doing so, somehow had a "constitutional right" to have the Mayor of the City of New York correct that insubordinate behavior on his behalf. Amended Complaint ¶943. However, as plaintiff readily admits in his amended complaint, Mayor Adams lacked the direct legal authority to address plaintiff's workplace complaints. Indeed, plaintiff acknowledges Mayor Adams responded by doing the only thing he had the ability to do under the circumstances, which is to use his position to express a desire for the people plaintiff was complaining about to be more responsive and respectful to plaintiff. See e.g., Amended Complaint ¶669. Once again, plaintiff is hiding from the legal reality that it was solely plaintiff himself who possessed the authority to address the subject of his complaints but patently failed do so.

---

[7] Plaintiff's Senior Advisor role also was a high-ranking policymaker role that easily continued to satisfy the first, second, fifth, sixth, seventh and eighth factors.

Plaintiff argues, in conclusory fashion, that the challenging political environment prevented him from managing the NYPD as the Police Commissioner is required to by law. However, that argument is unavailing.  As discussed above, plaintiff, who claims the mantle of a brave fighter and opponent of corruption, was under a legal duty to act.  Quoting plaintiff's own amended complaint, "Leadership demands more than rhetoric; it requires courage to right a profound wrong."  Amended Complaint ¶69.  Nowhere in the amended complaint has plaintiff met his own standard for leadership and resorted to "more than rhetoric."  Plaintiff cannot cite to a single disciplinary action or remedial order issued to address the alleged matters he claims were criminal and corrupt.

Indeed, far from establishing a plausible First Amendment claim, plaintiff's admitted inaction actually undermines any such claim by admitting to a legitimate basis for his removal.  Plaintiff's repeated unwillingness or inability as a high-ranking manager to – on his own and independently – navigate and manage any necessary reform amidst challenging political environment is, itself, a legitimate, non-retaliatory reason for removing plaintiff.  Cf. Pleener v. N.Y.C. Bd. of Educ., 311 F. App'x 479 (2d Cir. 2009) (summary order) (holding that a School Principal's failure to manage allegedly discriminatory community response to her leadership could legitimately be viewed as evidence of poor leadership). Contrasting plaintiff's inaction to his successor's action only further shows the only plausible conclusion from the facts advanced in the complaint: plaintiff's own feckless and timid leadership, and not retaliation for any allegedly protected speech, plausibly caused his removal as Interim Police Commissioner.[8]

---

[8] It need only be added that plaintiff's temporary appointment to the position of Police Commissioner, on an interim basis, undermines his claim that his removal upon appointment of a permanent Police Commissioner was motivated by unlawful considerations.

Based on the foregoing, the amended complaint fails to plausibly establish the first or third element of a First Amendment retaliation claim, and therefore that claim should be dismissed against the defendants.

**POINT IV**

**PLAINTIFF CANNOT LEGALLY ASSERT A
SUBSTANTIVE DUE PROCESS CLAIM**

Plaintiff's substantive due process claim is frivolous. "[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process.'" Miller v. N.Y. City Dep't of Educ., 71 F. Supp. 3d 376, 385 (S.D.N.Y. 2014), aff'd 2015 U.S. App. LEXIS 20028 (2d Cir. Nov. 19, 2015), quoting Velez v. Levy, 401 F.3d 75, 94 (2d Cir. 2005). Here, any substantive due process claim would be entirely subsumed within plaintiff's first amendment claims. See King v. City of N.Y., 581 F. Supp. 3d 559, 576 (S.D.N.Y. 2022), aff'd King v. City of N.Y., No. 22-231, (2d Cir. Mar. 8, 2023) (summary order).

Even if plaintiff could maintain such a claim, his substantive due process claim fails on its merits, because as set forth above, his RICO and First Amendment retaliation claims fail, and below, his state whistleblower claim fails. Finally, plaintiff's claim that he was allegedly terminated due to his wife's decision to file a notice of claim against the City is also erroneously plead as a Fourteenth Amendment substantive due process claim. As stated above, because the First Amendment already protects freedom of association, plaintiff cannot assert a substantive due process claim using this theory. Even if plaintiff's freedom of association theory was properly construed as a First Amendment claim, it fails because of a failure to plead even the minimum facts needed to establish such a claim. The amended complaint briefly mentions his wife filed a notice of claim against the City and concludes, without pointing to any supporting facts, that the

filing of this notice of claim "became known throughout City Hall" and resulted in his termination. Amended Complaint ¶¶1249-1250, 1301, 1357.

Despite outlining in more than 100 paragraphs of the amended complaint completely unnecessary detail regarding his wife's arrest and the circumstance thereof, including recounting several individual interactions regarding the incident, plaintiff does not offer a single fact that could plausibly show the defendants herein knew his wife filed a notice of claim or connect that fact with his termination. Plaintiff fails to plead a single statement, interaction, comment or circumstance that could allow this Court to infer each of these defendants would know of a legal document typically filed with the Comptroller. "[W]hile factfinders can infer a causal connection from the temporal proximity of protected speech to a challenged employment action . . . that inference is only permissible if there is reason to believe that the decisionmakers taking the allegedly retaliatory action were aware of the plaintiff's protected speech." Schulz v. Commack Union Free Sch. Dist., 664 F. Supp. 3d 296, 309 (E.D.N.Y. 2023). Plaintiff does not plead or otherwise establish that any of the defendants were even made aware she was doing so, which is required to state a plausible First Amendment claim of this nature. See Burroughs v. Mitchell, 325 F. Supp. 3d 249, 282 (N.D.N.Y. 2018). And even if he could do so, his claim fails because of the numerous causation issues discussed herein concerning his employment with the City overall.

### POINT IV

### PLAINTIFF'S MONELL CLAIM MUST BE DISMISSED BECAUSE HE HAS NOT ESTABLISHED A PLAUSIBLE CLAIM HIS CONSTITUTIONAL RIGHTS WERE VIOLATED

Plaintiff's Monell claim fails because, as described above, plaintiff has not plausibly established his constitutional rights were violated. In the absence of even a "bare

- 26 -

allegation" or "any facts suggesting that a [municipal] policy or practice caused or contributed to the alleged deprivation of Plaintiff's constitutional rights," Plaintiff's claims must be dismissed. Yu v. City of N.Y., 2018 U.S. Dist. LEXIS 202796, at *25 (S.D.N.Y. 2018); Feliciano v. City of N.Y., 2015 U.S. Dist. LEXIS 92623, at *43-44 (S.D.N.Y. 2015).

**POINT V**

**PLAINTIFF'S SECTION 75-B CLAIM SHOULD BE DISMISSED BECAUSE IT IS PARTIALLY TIME-BARRED, PLAINTIFF FAILS TO ALLEGE CAUSATION, AND SECTION 75-B DOES NOT PERMIT SUITS AGAINST INDIVIDUALS**

To state a claim for unlawful retaliation under Section 75-b, plaintiff must allege: "(1) an adverse personnel action; (2) disclosure of information to a governmental body [regarding an improper governmental action], and (3) a causal connection between the disclosure and the adverse personnel action." Payson v. Bd. of Educ. of Mount Pleasant Cottage Sch., 2017 U.S. Dist. LEXIS 154296, at *85 (S.D.N.Y. Sep. 20, 2017) (internal quotations and citation omitted).

Plaintiff cannot plausibly establish the third element of his whistleblower claim for substantially the same reasons he cannot plausibly establish causation as to his First Amendment claims. The alleged omissions plaintiff "blew the whistle" about were the alleged failure of the City to carry out duties that plaintiff himself had the sole legal power and obligation to address on the City's behalf. Indeed, plaintiff did not even take the basic step, required of all public servants, to report potential misconduct to the City's investigative body. In what can only be described as rank hypocrisy, plaintiff chides certain defendants for not reporting the conduct he observed to the NYPD's Internal Affairs Bureau, correctly noting that they had an obligation to do so. See e.g., Amended Complaint ¶936. Yet plaintiff, who was under the exact same obligation as those

defendants, failed to report it to IAB as well and, under his leadership, "no actions were taken to discipline the Defendants in any way." Id. ¶1026.

If anything, as discussed above, the appropriate remedy for any alleged failure of the NYPD to properly address corruption would be removal of the Police Commissioner so that, as was the case here, a successor would better exercise those duties in appropriate circumstances.

### POINT VI

### THE INDIVIDUALLY NAMED DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

With respect to the individual defendants, no basis exists for individual liability and, in any event, they would be entitled to qualified immunity. As detailed above, the constitutional claims plaintiff espouses are very narrow and the facts upon which he is supporting his theories are a decided stretch. Even if some claims are viable, which they are not, qualified immunity would be appropriate. See e.g., Lewis v. Cowen, 165 F.3d 154, 166-67 (2d Cir. 1999) ("relevant inquiry is not whether the defendants should have known that there was a federal right, in the abstract, to 'freedom of speech,' but whether the defendants should have known that the specific actions complained of violated the plaintiff's freedom of speech"), cert. denied, 528 U.S. 823 (1999); Giacalone v. Abrams, 850 F.2d 79, 85 (2d Cir. 1988) (saying "a public employee retains First Amendment rights" is . . . "too general to be controlling in the qualified immunity inquiry").

Given the complex nuances of the parties' policymaking roles, including the rather unprecedented theories advanced by plaintiff, qualified immunity is plainly appropriate. "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct."

Sulehria v. City of N.Y., 670 F. Supp. 2d 288, 322 (S.D.N.Y. 2009), quoting Anderson v. Recore,

317 F.3d 194, 197 (2d Cir. 2003).

## **CONCLUSION**

For the foregoing reasons, City defendants respectfully request that the Court grant

their motion to dismiss the amended complaint, that the amended complaint be dismissed in its

entirety and that City defendants be granted costs, fees, and disbursements together with such other

and further relief as this Court deems just and proper.

Dated:         New York, New York
                September 4, 2025

                                     **MURIEL GOODE-TRUFANT**
                                     Corporation Counsel of the
                                       City of New York
                                     Attorney for City Defendants
                                     100 Church Street, Room 5-100
                                     New York, New York 10007-2601
                                     (212) 356-2430
                                     eeichenholtz@law.nyc.com

                By:         *Eric Eichenholtz*
                                       Eric Eichenholtz
                                     Assistant Corporation Counsel

Eric Eichenholtz,
Maxwell D. Leighton
Of counsel.

## **CERTIFICATION**

I hereby certify, pursuant to Local Civil Rule 7.1(b) and Rule 5(B) of the Individual Practices of the Hon. Jennifer H. Rendon, that the attached memorandum of law contains less than 8,750 words, not including the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates.

Dated:         New York, New York
               September 4, 2025



_____
                 Eric Eichenholtz
            Assistant Corporation Counsel