UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————X

THOMAS G. DONLON,

        Plaintiff                **Docket #:1:25-cv 005831(JHR)**

        -against-

CITY OF NEW YORK, ERIC ADAMS, TANIA KINSELLA,
Individually, JEFFREY MADDREY, Individually, JOHN
CHELL, Individually, KAZ DAUGHTRY, Individually,
TARIK SHEPPARD, Individually, MICHAEL GERBER,
Individually, PAUL SARACENO, Individually, and
ANTHONY MARINO, Individually

        Defendants
———————————————————————————**X**

## MEMORANDUM OF LAW IN OPPOSITIONS OF DEFENDANTS' MOTION TO DISMISS

John Scola, Esq.
Law Office of John A. Scola, PLLC
Attorneys for Thomas Donlon
90 Broad Street, Suite 1023
New York, New York 10004
(917) 423-1445

**Table of Contents**

Preliminary Statement                                                                        7

Statement of Facts                                                                           8

Argument

    Point I: The FAC Complies with Rule 8 and Rule 9(b)                        12

    Point II: The FAC Plausibly Pleads a RICO Enterprise and Pattern          14

    Point III: The FAC States a First Amendment Retaliation Claim ……..        19

    Point IV: The FAC Adequately Pleads a Substantive Due Process Claim ..     22

    Point V: The FAC States a Monell Claim Against the City of New York ..      25

    Point VI: The FAC States a Claim Under Civil Service Law § 75-b            28

    Point VII: Qualified Immunity Does Not Bar Plaintiff's Claims              30

    Point VIII: In the Alternative, Plaintiff Respectfully Requests

       Leave to Amend                                                       32

Conclusion                                                                                   32

Certificate of Compliance                                                                    34

**Table of Authorities**

Cases

*Ashcroft v. al-Kidd*,

 563 U.S. 731 (2011)   31

*Azima v. Dechert LLP,*

 2024 WL 4665106 (S.D.N.Y. Sept. 26, 2024)   17

*Boyle v. United States*,

 556 U.S. 938 (2009)   14, 16

*Black v. Ganieva,*

 619 F. Supp. 3d 309 (S.D.N.Y. 2022)   14, 16, 19

*Field Day, LLC v. County of Suffolk,*

 463 F.3d 167 (2d Cir. 2006)   30

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*

 385 F.3d 159 (2d Cir. 2004)   15

*First Nationwide Bank v. Gelt Funding Corp.,*

 820 F. Supp. 89 (S.D.N.Y. 1993)   15

*Garcetti v. Ceballos,*

 547 U.S. 410 (2006)   19, 20

*Gill v. Pidlypchak,*

 389 F.3d 379 (2d Cir. 2004)   21

*Green v. City of Mount Vernon,*

 96 F. Supp. 3d 263 (S.D.N.Y. 2015)   13

*Hayes v. Dahlke,*

976 F.3d 259 (2d Cir. 2020)                                                     21

*Lane v. Franks,*

    573 US 228 (2014)                                                       19, 22

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*

    797 F.3d 160 (2d Cir. 2015)                                                32

*McKenna v. Wright,*

    386 F.3d 432 (2d Cir. 2004)                                          22, 30, 32

*Miller v. N.Y. City Dep't of Educ.,*

    71 F. Supp. 3d 376, 385 (S.D.N.Y. 2014),

    aff'd 2015 U.S. App. LEXIS 20028 (2d Cir. Nov. 19, 2015)                    25

*Mills v. Polar Molecular Corp.,*

    12 F.3d 1170 (2d Cir. 1993)                                                13

*Monell v. Dep't of Soc. Servs.,*

    436 U.S. 658 (1978)                                                 25-28, 32

*Montero v. City of Yonkers,*

    890 F.3d 386 (2d Cir. 2018)                                          20, 22, 31

*Moss v. Morgan Stanley Inc.,*

    719 F.2d 5 (2d Cir. 1983)                                                13, 14

*Pembaur v. City of Cincinnati,*

    475 U.S. 469 (1986)                                                        27

*Raymond v. City of New York,*

    317 F. Supp. 3d 746 (S.D.N.Y. 2018)                                      20, 31

*Ricciuti v. N.Y.C. Transit Auth.,*

124 F.3d 123 (2d Cir. 1997) ............................................................ 31

*Rodriguez v. Trs. of Columbia Univ.,*

    No. 03 Civ. 4072 (TPG), 2006 WL 2521323

    (S.D.N.Y. Aug. 30, 2006) .......................................................... 12

*Salahuddin v. Cuomo,*

    861 F.2d 40 (2d Cir. 1988) ........................................................ 13

*Shlafer v. Wackenhut Corp.,*

    837 N.Y.S.2d 607 (2d Dep't 2007) ............................................ 29

*Spool v. World Child Int'l Adoption Agency,*

    520 F.3d 178 (2d Cir. 2008) ...................................................... 18

*Tipaldo v. Lynn,*

    26 N.Y.3d 204 (2015) ............................................................... 29

*United States v. Angelilli,*

    660 F.2d 23 (2d Cir. 1981) ........................................................ 16

*United States v. Cianci*

    378 F.3d 71 (1st Cir. 2004) ....................................................... 16

*United States v. Turkette,*

    452 U.S. 576 (1981) .................................................................. 14

*Velez v. Levy,*

    401 F.3d 75 (2d Cir. 2005) .............................................. 23, 25, 31

*Zahey v. Coffey,*

    221 F.3d 342 (2d Cir. 2000) ................................................ 24, 31

**Statutes**

18 U.S.C. §§ 1961–1968 (Civil RICO). 7, 17

18 U.S.C. § 1513(e) (Retaliation) 10

Fed. R. Civ. P. 8 12

Fed. R. Civ. P. 9(b) 12-14

Fed. R. Civ. P. 15(a)(2) 32, 33

N.Y. Civ. Serv. Law § 75-b 28-20, 33

## PRELIMINARY STATEMENT

This case arises from a campaign of retaliation and fraud orchestrated at the highest levels of City Hall and the New York City Police Department ("NYPD"). Plaintiff Thomas G. Donlon—a decorated federal law enforcement veteran brought in as Interim Police Commissioner—was stripped of all meaningful authority from the moment he assumed office. Defendants exploited the NYPD's infrastructure to commit fraud, obstruct oversight, and retaliate against the one official who refused to look the other way.

The First Amended Complaint ("FAC") sets forth in detail how Defendants used Donlon's Police Commissioner stamp without his consent to forge promotional lists, elevate unqualified loyalists, and trigger millions of dollars in unlawful salary increases and pension benefits. It alleges how spies were embedded in the Commissioner's office to intercept his schedule and communications, ensuring that his efforts to impose accountability were sabotaged from within. It describes how Defendant Tarik Sheppard fraudulently promoted himself, threatened to kill Donlon in public, and then orchestrated the retaliatory false arrest of Donlon's wife—a retired state attorney with no connection to his duties—whose arrest record later disappeared from the system. It recounts how the Defendants leaked the Donlons' private information to the press within hours of her release, launching a smear campaign designed to destroy their reputations. And it shows how these acts did not stop with Donlon's removal: instead, the enterprise continued to consolidate power and retaliate against those who stood in its way.

Defendants attempt to recast these allegations as prolix workplace disputes. That argument mischaracterizes both the length and the purpose of the FAC. Far from being repetitive or incoherent, the FAC is detailed because it must be under the Civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and the fraud-based retaliation

claims require particularity. The details in the FAC show the misconduct was systemic, coordinated, and deliberate. The City cherry-picks a handful of innocuous sentences while ignoring hundreds of paragraphs describing forged promotions, falsified signatures, retaliatory arrests, and public death threats. Rule 8 demands clarity—not brevity at the expense of substance—and the FAC provides precisely that.

At this stage, the Court must accept Plaintiff's allegations as true. Those allegations do not describe routine personnel disagreements. They describe a functioning criminal enterprise operating within City Hall and the NYPD, using the levers of government power to commit fraud, obstruct oversight, and retaliate against whistleblowers. From forged lists to retaliatory arrests, from spies in the Commissioner's office to orchestrated leaks to the press, the misconduct here is not only plausible—it is conscience-shocking. The City's motion should be denied in its entirety.

## <u>STATEMENT OF FACTS</u>

Plaintiff Thomas G. Donlon is a decorated federal law enforcement veteran, having served more than two decades with the FBI, where he held senior national security and counterterrorism posts. After retiring from federal service, Donlon was appointed by the Governor of New York to lead the State's Office of Homeland Security, where he distributed millions in federal funds to support public safety agencies, including the NYPD (Ex. A, FAC ¶¶25–42).

On September 13, 2024, amidst ongoing criminal investigations into City Hall, Defendant Mayor Eric Adams publicly appointed Donlon as Interim Police Commissioner, presenting him as a reformer who would restore integrity to the NYPD (Ex. A, FAC ¶¶38, 90–95). From the outset, however, Donlon's appointment was undermined. While he carried the public title of Commissioner, real authority remained with Adams's loyalists—Defendants Kinsella, Maddrey,

8

Chell, Daughtry, Sheppard, Gerber, Saraceno, and Marino—who retained control over promotions, internal investigations, and day-to-day operations (Ex. A, FAC ¶¶5–11, 104, 120). These Defendants used Donlon as a public-relations shield while continuing to subvert the Department's lawful functions for political and personal gain.

The most immediate scheme involved the falsification of official promotional lists by Defendants Maddrey, Kinsella, and Marino. Merit-based promotees were removed and replaced with Adams loyalists, and Donlon's signature block was forged to make it appear he had approved the changes (Ex. A, FAC ¶¶58–77, 144–146, 188, 191). These falsified lists were transmitted through NYPD and City systems and used to trigger salary, overtime, and pension increases for unqualified insiders. Such conduct constituted mail fraud, wire fraud, and honest services fraud, enriching the enterprise at the City's expense (Ex. A, FAC ¶¶3, 16, 19).

Defendant Sheppard further advanced the enterprise by fraudulently promoting himself using Donlon's official stamp to approve his own advancement (Ex. A, FAC ¶¶49–50). This act of self-dealing and honest services fraud diverted public resources for personal gain and was widely known inside the Department.

To neutralize Donlon's oversight, Defendants Saraceno and Venus were embedded as spies within his office, intercepting his emails, altering his calendar, and reporting directly to Maddrey and Gerber (Ex. A, FAC ¶¶155–163, 580–607). These deliberate acts sabotaged Donlon's directives and prevented him from exercising his authority, constituting obstruction of justice and witness tampering. The enterprise extended its obstruction to Donlon's personal safety when Sheppard and Saraceno interfered with his security detail, compromising his protection even as Commissioner (Ex. A, FAC ¶ 115).

The corruption also reached operational policy. Defendant Daughtry created the Roosevelt Avenue Task Force as a political vanity project, diverting NYPD resources away from legitimate public safety functions (Ex. A, FAC ¶¶126–138). When federal authorities offered assistance, Defendants rejected it to preserve political control, furthering the racketeering scheme by misusing City assets for personal and political purposes.

Defendant Gerber engaged in parallel misconduct by obstructing oversight, deceiving City leadership, shielding compromised personnel, and blocking cooperation with federal agencies (Ex. A, FAC ¶¶150–153). His actions went beyond insubordination: they were deliberate acts of obstruction of justice to insulate corrupt enterprise members from scrutiny.

The enterprise also relied on intimidation. In November 2024, during the New York City Marathon, Sheppard publicly threatened to kill Donlon (Ex. A, FAC ¶¶636–642). This was an act of witness intimidation, designed to silence Donlon's opposition to fraudulent promotions. Maddrey restrained Sheppard but shielded him from discipline, evidencing complicity at the highest levels. Donlon's efforts to transfer compromised personnel were also rescinded by Adams's loyalists (Ex. A, FAC ¶ 184), and Defendants went further by forging his name and stamp on transfer documents, creating the false appearance that he had approved changes he opposed. This conduct was part of the enterprise's pattern of forgery, mail fraud, and obstruction of justice.

The retaliation quickly spread to Donlon's family. In December 2024, Sheppard, Gerber, and Daughtry orchestrated the false arrest of Donlon's wife, retired Judge Deirdre O'Connor-Donlon (Ex. A, FAC ¶¶14, 233–266, 696–708). She was handcuffed, searched, and humiliated, then told her summons had disappeared from the system. This conduct constitutes retaliation under 18 U.S.C. § 1513(e) and obstruction of justice, as it sought to intimidate Donlon by targeting his spouse. Within minutes of her release, reporters began contacting the family using private phone

numbers and other details that had been unlawfully accessed from NYPD databases and leaked under Sheppard's supervision (Ex. A, FAC ¶¶15, 251–266). By 11:06 p.m., multiple outlets published articles containing the Donlons' home address, dates of birth, and other sensitive identifiers. This was a calculated act of retaliation and obstruction, weaponizing government databases against a whistleblower.

Finally, on July 17, 2025 — the day after this lawsuit was filed — Adams publicly defamed Donlon by telling business leaders and reporters that Donlon was "rapidly deteriorating mentally," suffering from "memory lapses," and fired because he refused to get help (Ex. D). These statements were timed to discredit both with this litigation and were designed to discredit Donlon's claims. The falsity of Adams's remarks is established by contemporaneous evidence: the official City Hall job description for the Senior Advisor for Public Safety (Ex. B), transmitted to Donlon on November 17, 2024, entrusted him with citywide public safety oversight, interagency coordination, and crisis management — responsibilities wholly inconsistent with any claim of decline. Text messages between Donlon and Mayor's Chief of Staff Camille Varlack (Ex. C) further confirm that Donlon had no discussions about mental decline and was offered this senior role at the Mayor's direction. There is no talk of termination for cause whatsoever. Against this backdrop, Adams's July 17 remarks (Ex. D) are exposed as deliberate lies. They establish pretext: Adams fabricated a story of "mental decline" only after the lawsuit was filed, to conceal the true unlawful motives for Donlon's termination and to mask the enterprise's broader scheme of falsification, retaliation, and obstruction.

Taken together, these events depict not ordinary personnel disputes but a coordinated criminal enterprise. The forged promotional lists, fraudulent misuse of the Commissioner's stamp, internal espionage, obstruction of federal cooperation, rescinded transfers, public death threats,

retaliatory arrest of a private citizen, malicious media leaks, destruction of official records, lawless creation of new police units, and false public statements all formed part of a deliberate campaign to consolidate power, silence dissent, and punish the one official who refused to condone corruption.

## ARGUMENT

## POINT I

## THE FAC COMPLIES WITH RULE 8 AND RULE 9(b)

Defendants begin by attacking the length of the First Amended Complaint ("FAC"), labeling it "prolix" and claiming it fails to provide fair notice. This argument is meritless. The FAC is detailed because it must be. RICO and fraud-based claims require particularity, and retaliation claims demand specificity. The detail here is not surplusage — it is the essence of the claims. The Federal Rules require only a "short and plain statement" of the claim, sufficient to give defendants fair notice of the allegations. Fed. R. Civ. P. 8(a)(2). But verbosity alone is not a ground for dismissal. Courts consistently hold that "verbosity alone does not require dismissal under Rule 8." *Rodriguez v. Trs. of Columbia Univ.,* No. 03 Civ. 4072 (TPG), 2006 WL 2521323, at *3 (S.D.N.Y. Aug. 30, 2006). The question is whether the complaint provides clarity and coherence — not whether it could have been written more concisely.

The FAC does exactly that. It is organized under sequentially numbered paragraphs with clear headings, separating RICO allegations, constitutional violations, and state law claims. Each subsection traces a specific scheme: forged promotional lists (FAC ¶¶101–165, 188, 191); the placement of spies in the Commissioner's office (FAC ¶¶580–607, 159–163); Sheppard's fraudulent self-promotion and death threats (FAC ¶¶49–50, 636–642); the retaliatory false arrest of Donlon's wife (FAC ¶¶14, 233–266, 696–708); and orchestrated media leaks (FAC ¶¶251–

266). Far from incoherent, the allegations follow a logical chronology that provides far more than "fair notice."

Moreover, Rule 9(b) requires that fraud-based RICO predicates be pleaded with particularity, specifying the "time, place, speaker, and content" of misrepresentations. *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). The FAC meets this standard in spades. It identifies:

- The dates of the forged promotional lists (September–November 2024) and the officials who disseminated them (FAC ¶¶101–165, 188, 191).
- The use of Donlon's Police Commissioner stamp without his consent, including by Sheppard and Marino (FAC ¶¶49–50).
- The death threat issued by Sheppard at the New York City Marathon in November 2024, witnessed by Maddrey (FAC ¶¶636–642).
- The retaliatory arrest of Mrs. Donlon on December 17, 2024, at the 17th Precinct, and the subsequent disappearance of her summons record (FAC ¶¶233–266, 696–708).
- The dissemination of private family information to the press within minutes of her release, followed by a defamatory article published at 11:06 p.m. the same evening (FAC ¶¶251–266).

These are precisely the types of "who, what, when, where, and how" allegations Rule 9(b) demands. See *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993). Defendants' suggestion that the FAC is too long ignores that every layer of detail serves a purpose: to satisfy the heightened pleading standard required for RICO and fraud claims.

Defendants rely on *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988), which cautioned against complaints that force courts to "select the relevant material from a mass of verbiage." But the FAC is the opposite. It presents relevant material in an organized fashion, tying each fact to a specific claim. Courts have refused to dismiss similarly detailed pleadings where allegations, though extensive, were necessary to provide context and particularity. See *Green v. City of Mount*

*Vernon*, 96 F. Supp. 3d 263, 281 (S.D.N.Y. 2015) (Rule 8 dismissal appropriate only where "the complaint's form or substance prevents the defendant from forming a fair understanding of the plaintiff's allegations"). Here, Defendants plainly understand the allegations — their motion responds to them one by one.

Accordingly, the prolixity argument should be rejected. The FAC not only complies with Rule 8, but it also exemplifies the type of particularized pleading required by Rule 9(b).

## POINT II

## THE FAC PLAUSIBLY PLEADS A RICO ENTERPRISE AND PATTERN

Defendants argue, citing *Black v. Ganieva*, 619 F. Supp. 3d 309 (S.D.N.Y. 2022), that Plaintiff merely describes "general synchronicity" or "shared enmity" and thus fails to plead a coordinated enterprise. That contention misreads both the law and the detailed allegations of the First Amended Complaint ("FAC").

### A. Governing Standard

To state a civil RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege (1) that the defendant (2) through the commission of at least two acts (3) constituting a pattern (4) of racketeering activity (5) participated in (6) an enterprise (7) the activities of which affect interstate commerce. *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). The FAC alleges each of these elements with specificity.

An "association-in-fact" enterprise requires: (1) a common purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to pursue that purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009); *United States v. Turkette*, 452 U.S. 576, 583 (1981). Critically, "the individuals must share a common purpose to engage in a particular

14

fraudulent course of conduct and work together to achieve such purposes." *First Nationwide Bank v. Gelt Funding Corp.,* 820 F. Supp. 89, 98 (S.D.N.Y. 1993), aff'd, 27 F.3d 763 (2d Cir. 1994) ; *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 174 (2d Cir. 2004). Courts reject vague allegations of parallel conduct or shared dislike but sustain pleadings where defendants consciously acted "in concert to further unlawful schemes."

## B. The Enterprise

The FAC describes an association-in-fact enterprise consisting of Defendants Adams, Maddrey, Kinsella, Chell, Daughtry, Sheppard, Gerber, Saraceno, Venus, and Marino, operating through City Hall and the NYPD (FAC ¶¶5–7, 17, 90–95, 580–607) .

Each member had a defined role advancing the unlawful purpose. Marino, Maddrey, and Kinsella falsified promotional lists by removing merit candidates, inserting Adams loyalists, and stamping the altered lists with Donlon's forged signature block, committing mail fraud, wire fraud, and honest services fraud (FAC ¶¶58–77, 144–146, 188, 191). Sheppard fraudulently promoted himself using Donlon's stamp and escalated to retaliation by threatening Donlon's life, orchestrating the false arrest of his wife, and leaking the Donlons' personal data to the press (FAC ¶¶49–50, 233–266, 251–266, 636–642, 696–708). Gerber obstructed oversight by directing and protecting spies in Donlon's office, intercepting communications, and shielding compromised personnel from accountability (FAC ¶¶150–163, 580–607). Saraceno and Venus acted as spies inside Donlon's office, altering his calendar and sabotaging his directives (FAC ¶¶155–163). Adams pressured Donlon to acquiesce to falsified promotions, instructed him to "work with" the perpetrators, and then retaliated by spreading false claims of "mental decline" to discredit him (FAC ¶¶93–97, 167–189, 622–624, 969–1007). Chell and Daughtry diverted NYPD resources away from legitimate public safety needs, including Daughtry's creation of the Roosevelt Avenue

Task Force as a political vanity project, while rejecting federal cooperation to preserve political control (FAC ¶¶111–120, 126–138). This arrangement satisfies *Boyle's* "purpose, relationships, and longevity" test. The enterprise was hierarchically organized and shared a common goal: subvert oversight, enrich insiders, and eliminate Donlon as an obstacle.

Courts have consistently recognized that municipal bodies corrupted by insiders may be RICO enterprises. In *United States v. Angelilli*, 660 F.2d 23, 32–33 (2d Cir. 1981), New York City's civil court qualified as a RICO enterprise where officials fixed auctions. In *United States v. Cianci*, 378 F.3d 71 (1st Cir. 2004), the City of Providence and its mayor were deemed an enterprise where public offices were repurposed for racketeering. The FAC alleges precisely that kind of systemic corruption here (FAC ¶¶1–4, 17–18).

## C. Distinguishing

In *Black v. Ganieva*, 619 F. Supp. 3d 309 (S.D.N.Y. 2022), the complaint failed because it alleged only a feud between private individuals with no collective unlawful purpose. Here, the FAC describes a coordinated scheme: Defendants falsified promotional lists using Donlon's Police Commissioner stamp without his consent, embedded spies in his office, promoted themselves and allies, obstructed federal oversight, threatened Donlon's life, and retaliated against his family when he resisted. That is the very definition of a conscious agreement to pursue an unlawful purpose. See FAC ¶¶49–50, 58–77, 144–146, 155–163, 188–191, 622–624, 636–642, 696–708 .

## D. Conscious Agreement and Common Purpose

The FAC provides the kind of factual detail that *Satinwood and Gelt Funding* require. Each Defendant's actions—Marino enabling forgery, Sheppard promoting himself, Saraceno and Venus spying, Gerber shielding compromised personnel, Maddrey physically restraining Sheppard

16

during a death threat and then protecting him from investigation—were not isolated acts of disloyalty but coordinated contributions to a fraudulent enterprise.

This conscious agreement distinguishes this case from ones where courts dismissed RICO claims for lack of common purpose. Here, the objective was unlawful from the outset: falsify promotions, suppress oversight, and consolidate control. See *Azima v. Dechert LLP*, 2024 WL 4665106, at *2 (S.D.N.Y. Sept. 26, 2024) (enterprise adequately pled where defendants "acted with a common unlawful purpose, had relationships with each other, and operated for a sufficient period of time").

### E. Pattern of Racketeering Activity

The predicate acts alleged are numerous, related, and fall squarely within the scope of 18 U.S.C. § 1961. They include mail fraud, wire fraud, and honest services fraud through the falsification of promotional lists bearing Donlon's forged signature block (FAC ¶¶58–77, 144–146, 188, 191); self-dealing and honest services fraud by Sheppard, who promoted himself using Donlon's stamp (FAC ¶¶49–50); obstruction of justice through the embedding of spies in Donlon's office, alteration of his calendar, sabotage of directives, and blocking of federal cooperation (FAC ¶¶115, 150–153, 155–163, 580–607); witness intimidation when Sheppard publicly threatened to kill Donlon during the Marathon (FAC ¶¶636–642); retaliation and obstruction through the false arrest of Donlon's wife and the destruction of her summons record (FAC ¶¶233–266, 696–708); and obstruction and retaliation through the unlawful leaking of the Donlons' personal information from NYPD databases to the press (FAC ¶¶251–266). The pattern also includes Adams's July 17, 2025 defamation (Ex. D), in which he falsely claimed Donlon was suffering from "mental decline" the day after this lawsuit was filed — a calculated smear designed to discredit Donlon and conceal the true unlawful motives for his termination (FAC ¶¶969–1007).

17

These acts were not one-off disputes but a systematic campaign. They share a common purpose—consolidating power, punishing dissent, and concealing corruption. They are related in method—fraud, espionage, intimidation, retaliation—and persisted beyond Donlon's removal. The scheme began no later than September 2024 with falsified promotions, escalated through obstruction, intimidation, and retaliation during Donlon's tenure, and continued after his termination with the destruction of Mrs. Donlon's summons record and Adams's July 17, 2025 defamatory smear (FAC ¶¶233–266, 696–708, 969–1007; Ex. D). This establishes both closed-ended continuity (a series of related acts over months) and open-ended continuity (an ongoing threat demonstrated by post-termination retaliation). Both closed-ended continuity (multiple predicate acts from September 2024 through at least July 2025) and open-ended continuity (ongoing misuse of NYPD structures and retaliation into 2025) are pled. See *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).

## F. Proximate Cause and Injury

Defendants claim Donlon's harm was "self-inflicted" because he supposedly had full statutory authority as Commissioner. But the FAC makes clear: Donlon was Commissioner in title only. From day one, his authority was stripped, his stamp hijacked, and his staff infiltrated. He could not exercise the powers the City says he had (FAC ¶¶104, 120, 155–163, 184, 228). The law does not immunize fraud simply because it is committed against an official with theoretical statutory authority but no practical ability to exercise it.

Unlike *Gelt Funding*, where injuries were speculative and tied to market collapse, Donlon's injuries are direct and concrete:

- Forgery of his signature block.
- Fraudulent promotions that diverted millions in City funds.
- Espionage neutralizing his ability to act.

18

- Retaliatory arrest of his wife.
- Defamatory leaks destroying his reputation.

These constitute injury to "business or property" under 18 U.S.C. § 1964(c) (FAC ¶¶19, 969–1007).

## H. Conclusion on RICO

Taken together, the FAC alleges with specificity: an enterprise with structure and purpose; conscious agreement among its members; a pattern of predicate acts spanning months and continuing into 2025; and direct, concrete injury to Donlon's business and property. These allegations far surpass the bare or speculative pleadings rejected in *Black*. They state a RICO claim that is not only plausible but compelling.

## POINT III

## THE FAC STATES A FIRST AMENDMENT RETALIATION CLAIM

The First Amended Complaint pleads in detail that Donlon engaged in protected speech on matters of profound public concern, and that Defendants retaliated against him with extraordinary severity. Defendants' reliance on *Garcetti v. Ceballos*, 547 U.S. 410 (2006), is misplaced, because Donlon's speech was not made pursuant to his ordinary job duties but as a citizen exposing systemic corruption and fraud. Donlon's disclosures were not part of his ordinary duties as Commissioner. His role did not require acquiescing to, or remaining silent about, the forgery of his name and signature block, the falsification of promotional lists, or the embedding of spies to obstruct oversight. When he objected to Adams and refused to "work with" the perpetrators (FAC ¶¶ 167–189), he was speaking as a citizen on matters of profound public concern: corruption at the highest level of the NYPD. See *Lane v. Franks*, 573 U.S. 228, 238–40 (2014) (speech about public corruption protected where it was not part of employee's ordinary job duties). Courts in this Circuit likewise hold that even high-ranking officials are protected when they speak out about unlawful

19

activity rather than policy disagreements. *Montero v. City of Yonkers*, 890 F.3d 386, 398 (2d Cir. 2018). Adams's July 17, 2025 fabrication that Donlon was suffering from "mental decline" (Ex. D) underscores retaliatory motive.

## A. Protected Speech on Matters of Public Concern

The FAC alleges that Donlon repeatedly spoke out against forged promotional lists bearing his falsified signature (FAC ¶¶101–165, 188, 191). He reported these forgeries and related obstruction directly to Mayor Adams (FAC ¶¶8–11, 122, 167–189, 622–624). He denounced Defendant Sheppard's fraudulent self-promotion as "stolen valor" (FAC ¶ 11). He complained about the placement of spies in his office, the obstruction of oversight, and the sabotage of his schedule and communications (FAC ¶¶155–167, 580–607). And he attempted to route information about corruption and misconduct to oversight bodies, including the Department of Investigation and federal authorities (FAC ¶¶706–717).

These disclosures were not part of Donlon's ordinary duties. The Supreme Court has made clear that the key inquiry under *Garcetti* is whether the employee spoke "pursuant to" official responsibilities. 547 U.S. at 421. Donlon was not hired to expose the Mayor's inner circle or denounce forged documents bearing his own falsified signature. His actions fall squarely within the line of cases holding that opposition to corruption is protected citizen speech. See *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018) ("Speech by a public employee on corruption and misconduct is protected when not part of official duties."); *Raymond v. City of New York,* 317 F. Supp. 3d 746, 783 (S.D.N.Y. 2018) (whistleblowing about NYPD misconduct constituted protected speech).

## B. Severe Retaliation

20

The retaliation Donlon faced was swift and severe. Defendants embedded spies in his office to surveil and undermine him (FAC ¶¶580–607). He was publicly threatened with death by Defendant Sheppard during the New York City Marathon, while Defendant Maddrey physically restrained Sheppard from attacking him (FAC ¶¶636–642). His wife was falsely arrested, searched, and humiliated in December 2024 — an act of retaliation directed not only at Donlon but at his family (FAC ¶¶233–266, 696–708). Within minutes of her release, private family information was leaked to the press by the NYPD's own public information office, resulting in defamatory articles published the same evening (FAC ¶¶251–266). Donlon himself was stripped of authority, sidelined from operational decisions, and ultimately terminated (FAC ¶¶969–1007).

The Second Circuit requires a plaintiff to show only that the adverse action "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004). Here, the alleged retaliation went far beyond deterrence — it was calculated destruction. Few things are more chilling than a senior NYPD executive threatening to kill the Commissioner, or orchestrating the arrest of his spouse.

## C. Causation

The FAC also alleges causation. The retaliatory actions closely followed Donlon's disclosures to Adams and others about forged promotions, fraudulent self-dealing, and obstruction of oversight (FAC ¶¶167–189, 622–624). The temporal proximity is striking forged lists were disseminated in September–November 2024; Donlon objected; and within weeks Sheppard threatened him, and his wife was arrested. The FAC also pleads explicit animus, including Donlon being told by Adams's deputies to "work with" the very officials he reported (FAC ¶¶167–189).

The Second Circuit has long recognized that objections to corruption constitute speech as a citizen, even when made internally. See *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020)

21

(internal complaints of misconduct protected where outside plaintiff's core duties); *Lane v. Franks*, 573 U.S. 228 (2014) (speech on corruption protected as public concern).

Defendants' reliance on the policymaker exception also fails. That doctrine addresses political or ideological disagreements, not retaliation for exposing unlawful conduct. See *Montero*, 890 F.3d at 398. Donlon was not terminated for clashing with Adams's policy preferences; he was retaliated against for refusing to bless forged lists, obstruction of oversight, and fraudulent misuse of City funds. Those acts had no legitimate governmental purpose. Fabricating a false narrative of "mental decline" the day after this lawsuit was filed (Ex. D) further shows that Defendants knew the real reason for Donlon's ouster could not withstand scrutiny.

Moreover, the fact-intensive nature of this inquiry itself precludes dismissal at this stage. Whether Donlon's disclosures were made pursuant to his official duties, or instead as a citizen exposing corruption, is a quintessential jury question. The FAC pleads detailed facts showing the latter, and those allegations must be accepted as true on a motion to dismiss. See *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004) (questions of motive and scope of duties are ill-suited to resolution at the pleading stage). Extensive fact-finding is required to resolve whether Donlon's speech was pursuant to official duties, precluding dismissal at this stage. Moreover, whether Donlon's speech was made pursuant to his official duties or as a citizen exposing corruption is a fact-intensive inquiry, which itself precludes dismissal at the Rule 12(b)(6) stage.

The FAC therefore states a claim under the First Amendment.


**POINT IV**

**THE FAC ADEQUATELY PLEADS A SUBSTANTIVE DUE PROCESS CLAIM**

Defendants argue that Plaintiff's substantive due process claim is barred because more specific constitutional provisions apply. This ignores the nature of the allegations. The FAC does

not merely describe ordinary workplace disputes or adverse employment actions. It alleges conduct so egregious, so threatening, and so personal that it "shocks the conscience." *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005).

## A. Death Threats Against the Commissioner

In November 2024, Defendant Sheppard publicly threatened to kill Donlon during the New York City Marathon, while Defendant Maddrey physically restrained him from escalating further (FAC ¶¶636–642). This was not an isolated outburst. It was a senior NYPD executive issuing a violent threat against the sitting Commissioner of Police, in a public setting, while acting under color of law. Few actions more directly undermine the integrity of public office and personal security. Such conduct, leveled at the head of the NYPD, plainly "shocks the conscience."

## B. The Retaliatory False Arrest of a Private Citizen

Just one month later, Defendants escalated their campaign by orchestrating the retaliatory arrest of Donlon's wife, Deirdre O'Connor-Donlon. Mrs. Donlon, a retired New York State Supreme Court attorney with no connection to her husband's duties, was handcuffed, searched, processed at the 17th Precinct, and threatened with transport to Central Booking (FAC ¶¶14, 233–266, 696–708). She was humiliated in a calculated display of power designed to punish her husband for exposing corruption.

The abuse did not end there. After her release, the family discovered that her summons record had "disappeared from the system," confirming that the arrest was fabricated and that records were deliberately destroyed to conceal the retaliation (FAC ¶¶696–708). Courts have repeatedly held that fabricating charges and manipulating judicial processes to retaliate against

23

whistleblowers constitutes conscience-shocking conduct. See *Zahrey v. Coffey*, 221 F.3d 342, 349–50 (2d Cir. 2000).

## C. Surveillance and Sabotage of the Commissioner's Office

The FAC further alleges that Defendants Maddrey and Gerber planted "spies" in Donlon's office, including Sergeant Venus and Defendant Saraceno, to intercept his emails, alter his schedule, and undermine his authority (FAC ¶¶155–167, 580–607). Donlon discovered that his directives were ignored, his official calendar was changed without permission, and his attempts at oversight were sabotaged from within. These covert operations were not tied to any legitimate governmental purpose. Their sole purpose was to silence and disable a Commissioner who resisted corruption.

## D. Malicious Media Leaks

The FAC also pleads that Defendants disseminated Donlon's and his wife's private information, including home address, phone numbers, and dates of birth, to the press within minutes of Mrs. Donlon's release from custody. By 11:06 p.m. that same evening, defamatory articles appeared in multiple outlets, syndicating sensitive details that could only have come from NYPD insiders (FAC ¶¶15, 251–266). The deliberate exposure of a Commissioner's family to targeted press harassment and reputational destruction goes well beyond the bounds of permissible conduct and squarely fits the category of conscience-shocking abuse.

## E. Termination and Career Destruction

Finally, the FAC alleges that Donlon was terminated in April 2025, his Senior Advisor position eliminated without explanation, and his career in law enforcement deliberately destroyed

after decades of public service (FAC ¶¶38–39, 969–1007). This was the culmination of a coordinated campaign to punish him for refusing to condone systemic corruption.

**F. Legal Standard and Application**

The Second Circuit has held that substantive due process protects against government conduct that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense." *Velez v. Levy*, 401 F.3d at 93. Defendants argue that this claim is subsumed by Plaintiff's other constitutional allegations, citing *Miller v. N.Y. City Dep't of Educ.*, 71 F. Supp. 3d 376, 385 (S.D.N.Y. 2014), aff'd 2015 U.S. App. LEXIS 20028 (2d Cir. Nov. 19, 2015), quoting *Velez v. Levy,* 401 F.3d 75, 94 (2d Cir. 2005). But those cases involved conduct already fully redressable under other, more specific constitutional provisions. Here, by contrast, the misconduct alleged— including death threats, fabrication of charges against a spouse, covert surveillance and sabotage, and malicious leaks of family information—cannot be neatly cabined within Plaintiff's First Amendment or other claims. These conscience-shocking abuses of governmental power fall outside the protections of any single constitutional guarantee and therefore remain independently actionable under substantive due process.

The allegations here meet that standard. Threatening to kill the Commissioner of Police, fabricating charges to arrest his spouse, sabotaging his office, and leaking his family's private information to the press are not mere employment grievances. They are conscience-shocking abuses of power, untethered from any legitimate governmental objective.

Accordingly, the FAC adequately pleads a substantive due process claim.

**POINT V**

**THE FAC STATES A MONELL CLAIM AGAINST THE CITY OF NEW YORK**

Defendants argue that the City cannot be held liable because the alleged misconduct reflects isolated acts by rogue officials. The FAC alleges the opposite. Donlon's constitutional injuries flowed directly from municipal policies, customs, and ratification by final policymakers — particularly Mayor Adams. These allegations easily satisfy the pleading standard for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

## A. A Policy and Custom of Retaliating Against Whistleblowers

The FAC pleads a systemic policy of punishing those who expose corruption. When Donlon reported forged promotional lists, fraudulent self-promotion, and obstruction, he was stripped of authority, spied upon, threatened, and ultimately terminated (FAC ¶¶155–167, 580–607, 636–642, 969–1007). His wife — a private citizen — was even arrested in retaliation for his disclosures (FAC ¶¶233–266, 696–708). These are not aberrations. They reflect a broader custom of silencing dissenters while rewarding loyalists, as detailed in the FAC's account of repeated retaliatory acts within the NYPD (FAC ¶¶414–420).

## B. A Custom of Manipulating Promotions for Political Ends

The FAC describes in detail how, between September and November 2024, promotional lists were disseminated with Donlon's falsified signature despite his ban on promotions (FAC ¶¶101–165, 188, 191). These forgeries elevated unqualified allies of Adams's inner circle, creating millions of dollars in unlawful compensation (FAC ¶¶3, 16, 19). Adams ratified this misconduct by instructing Donlon to "work with" the perpetrators rather than halt the practice (FAC ¶¶167–189, 622–624). The FAC further alleges that Maddrey manipulated promotional lists and usurped the Commissioner's authority, reflecting a deliberate municipal custom of politicizing promotions (FAC ¶¶144–146, 188, 191).

## C. Ratification by Final Policymakers

The Supreme Court has made clear that when final policymakers ratify unconstitutional conduct, municipal liability attaches. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986). Here, the FAC alleges that Donlon repeatedly informed Adams — the City's final policymaker — of forgeries, fraud, and obstruction. Instead of intervening, Adams directed Donlon to cooperate with the very officials responsible (FAC ¶¶167–189, 622–624). Adams also scolded Donlon for reporting Sheppard's death threat and took no action to discipline the offenders (FAC ¶¶181–182). Ratification at this level is indistinguishable from policy.

## D. Deliberate Indifference to Known Misconduct

The FAC further alleges deliberate indifference by City Hall. Even as lawsuits and public scandals exposed misconduct, Adams rewarded rather than disciplined the Defendants (FAC ¶¶223, 229). The City indemnified co-conspirators, manipulated the Law Department, and forced resignations of officials who resisted unlawful directives (FAC ¶¶84–86). This pattern reflects an entrenched municipal practice of protecting abusers and punishing reformers.

## E. Causation of Plaintiff's Injuries

As a direct and proximate result of these policies and customs, Donlon was stripped of authority, targeted through espionage and threats, subjected to the retaliatory arrest of his wife, and ultimately terminated (FAC ¶¶155–167, 233–266, 636–642, 969–1007). These injuries flowed from the City's systemic policy of retaliation and Adams's ratification of unconstitutional acts.

## F. Legal Standard Applied

Under *Monell*, a plaintiff must show that the alleged constitutional violations resulted from a municipal policy, custom, or decision of a final policymaker. 436 U.S. at 694. The FAC alleges all three: (1) a custom of retaliating against whistleblowers; (2) a policy of manipulating promotions for political ends; and (3) ratification by Mayor Adams of the very misconduct at issue.

These allegations set forth a well-pleaded Monell claim that more than satisfies the plausibility standard.

Accordingly, the City's attempt to avoid liability under *Monell* fails.

## POINT VI

### THE FAC STATES A CLAIM UNDER CIVIL SERVICE LAW § 75-b

New York Civil Service Law ("CSL") § 75-b protects public employees who disclose misconduct from retaliation by their employers. The statute prohibits a public employer from taking any retaliatory personnel action against an employee who discloses "a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or which constitutes improper governmental action." N.Y. Civ. Serv. Law § 75-b(2)(a). The FAC pleads each element: (1) protected disclosures of unlawful conduct; (2) retaliatory actions; and (3) causation between the two.

### A. Protected Disclosures

The FAC describes multiple disclosures made by Donlon that fall squarely within § 75-b. Among them:

- Donlon reported that promotional lists were forged with his falsified signature in violation of state and city civil service laws, and that unqualified candidates were unlawfully elevated (FAC ¶¶101–165, 188, 191).
- He objected to the fraudulent use of his Police Commissioner stamp by Defendant Sheppard, calling it "stolen valor" (FAC ¶ 11).
- He disclosed to Mayor Adams and others that spies had been planted in his office to intercept communications and obstruct oversight, in violation of criminal obstruction statutes (FAC ¶¶155–167, 580–607).
- He raised concerns to oversight bodies, including DOI and federal agencies, regarding obstruction and retaliation (FAC ¶¶706–717).

28

Each of these reports involved violations of law and "improper governmental action" as defined by the statute.

## B. Retaliatory Personnel Actions

The retaliation alleged in the FAC is extensive and severe:

- Donlon's authority as Commissioner was stripped, and his directives were ignored (FAC ¶¶155–167).
- Spies were placed in his office to sabotage his work (FAC ¶¶580–607).
- He was publicly threatened with death by a senior NYPD executive (FAC ¶¶636–642).
- His wife was falsely arrested, her summons record erased, and private family information leaked to the press (FAC ¶¶233–266, 251–266, 696–708).
- His requested transfers were rescinded, he was sidelined from operational decisions, and ultimately he was terminated (FAC ¶¶184, 969–1007).

These actions constitute adverse personnel actions under § 75-b. Termination alone is sufficient; here, the retaliation extended to threats, intimidation, and harm to Donlon's family.

## C. Causation

The FAC pleads a direct causal link between Donlon's protected disclosures and the retaliation. The forged promotional lists were disseminated in September–November 2024. Donlon objected to the misconduct and reported it to Adams in real time (FAC ¶¶167–189, 622–624). Within weeks, Sheppard threatened his life (FAC ¶¶636–642). Within one month, Donlon's wife was arrested (FAC ¶¶233–266). By April 2025, Donlon himself was terminated (FAC ¶¶969–1007). The sequence of disclosure followed by retaliation is textbook causation under § 75-b.

## D. Legal Standard Applied

Courts interpreting § 75-b have repeatedly emphasized that the statute protects precisely this type of whistleblowing. See *Tipaldo v. Lynn*, 26 N.Y.3d 204, 210 (2015) (statute protects employees who disclose improper governmental action to appropriate authorities); *Shlafer v.*

29

*Wackenhut Corp.*, 837 N.Y.S.2d 607, 609 (App. Div. 2d Dept 2007) (employee stated claim by alleging termination for reporting misconduct). The FAC alleges disclosures of unlawful activity, followed by a campaign of retaliation culminating in termination.

Accordingly, the FAC adequately pleads a claim under Civil Service Law § 75-b.

**POINT VII**

**QUALIFIED IMMUNITY DOES NOT BAR PLAINTIFF'S CLAIMS**

Defendants argue that the individual defendants are entitled to qualified immunity. That argument fails for two reasons. First, dismissal on qualified immunity grounds is generally premature at the motion to dismiss stage, where the Court must accept all allegations as true and draw reasonable inferences in Plaintiff's favor. Second, even on the face of the pleadings, no reasonable official could believe that threatening to kill the Commissioner of Police, forging promotional lists with his falsified signature, orchestrating the retaliatory arrest of his spouse, or leaking his family's private information to the press were lawful acts within the scope of official duties.

**A. Qualified Immunity Is a Fact-Intensive Defense Not Properly Resolved at the Pleading Stage**

The Second Circuit has made clear that qualified immunity is often inappropriate on a Rule 12(b)(6) motion. See *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004) ("[A] qualified immunity defense can be presented on a Rule 12(b)(6) motion, but the defense faces a formidable hurdle … and is usually not successful."). Because the Court must assume the truth of Plaintiff's allegations, dismissal on immunity grounds is proper only where "the facts supporting the defense appear on the face of the complaint." *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006). Here, the FAC describes conduct that, if proven, cannot plausibly be considered objectively reasonable.

30

**B. The Rights at Issue Were Clearly Established**

The constitutional rights at stake — free speech, freedom from retaliation, and substantive due process — were well established long before the events alleged in the FAC.

- **First Amendment**: By 2018, the Second Circuit had clearly held that public employees cannot be retaliated against for speaking out on corruption outside their core job duties. *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018); *Raymond v. City of New York*, 317 F. Supp. 3d 746, 783 (S.D.N.Y. 2018). Donlon's disclosures of forged lists, falsified signatures, and planted spies were plainly protected speech (FAC ¶¶8–11, 101–165, 155–167, 580–607).

- **Substantive Due Process**: It was clearly established that threatening a public official's life, fabricating charges, and retaliatory false arrests "shock the conscience." *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005); *Zahrey v. Coffey*, 221 F.3d 342, 349–50 (2d Cir. 2000). The FAC alleges Sheppard threatened to kill Donlon (FAC ¶¶636–642) and that his wife was falsely arrested in retaliation (FAC ¶¶233–266, 696–708).

- **Fourth Amendment**: By 2000, it was well settled that fabricating charges or destroying arrest records violated clearly established rights. See *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997). The FAC pleads that Mrs. Donlon's summons was deliberately erased from NYPD systems (FAC ¶¶696–708).

No reasonable official could believe these actions were lawful.

**C. The Conduct Alleged Was Not Objectively Reasonable**

Qualified immunity shields only those who make "reasonable but mistaken judgments." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The conduct here — forging the Commissioner's signature on promotional lists (FAC ¶¶101–165, 188, 191), embedding spies to intercept his communications (FAC ¶¶155–167, 580–607), threatening his life (FAC ¶¶636–642), arresting his wife on fabricated charges (FAC ¶¶233–266, 696–708), and leaking his family's private information to the press (FAC ¶¶251–266) — is not the product of mistaken judgment. It is the product of deliberate retaliation and abuse of power.

31

**D. Legal Standard Applied**

When viewed in the light most favorable to Plaintiff, the allegations describe knowing violations of clearly established law. As the Second Circuit has emphasized, "[o]nly extraordinary circumstances will justify the dismissal of a complaint for damages on the basis of qualified immunity." *McKenna*, 386 F.3d at 436. This is not such a case.

Accordingly, Defendants' qualified immunity defense must be rejected at this stage.

## POINT VIII

## IN THE ALTERNATIVE, PLAINTIFF RESPECTFULLY REQUESTS LEAVE TO AMEND

To the extent the Court determines that any allegation in the First Amended Complaint is insufficiently pleaded, Plaintiff respectfully requests leave to amend pursuant to Rule 15(a)(2). The Second Circuit has emphasized that leave to amend should be "freely given when justice so requires," particularly at the pleading stage. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015). Plaintiff has already alleged detailed facts spanning hundreds of paragraphs, but if the Court finds additional particularity necessary, Plaintiff can and will amend to cure any perceived deficiencies. Dismissal with prejudice at this early stage would be inappropriate.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. The First Amended Complaint sets forth in exacting detail a coordinated campaign of fraud, obstruction, and retaliation carried out through City Hall and the NYPD. Plaintiff has plausibly alleged RICO violations, First Amendment retaliation, substantive due process violations, *Monell*

32

liability, and whistleblower retaliation under Civil Service Law § 75-b, all supported by extensive factual allegations tied directly to the pleadings.

This case does not describe routine employment disputes. It describes the weaponization of municipal government to forge official documents, plant spies in the Commissioner's office, obstruct oversight, issue public death threats, arrest a Commissioner's spouse in retaliation, and leak private family information to the press. These allegations, taken as true as required at this stage, are more than sufficient to withstand dismissal.

In the alternative, should the Court find any allegation insufficiently pleaded, Plaintiff respectfully requests leave to amend pursuant to Rule 15(a)(2), consistent with the Second Circuit's instruction that such leave be freely given when justice so requires.

Accordingly, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety, together with such other and further relief as the Court deems just and proper.

Dated: September 23, 2025

New York, NY

Respectfully submitted,

By:_____/s/_____
        John Scola

Law Office of John A. Scola, PLLC
Attorneys for Plaintiff Thomas Donlon
90 Broad Street Suite 1023
New York, New York 10004
(917) 423-1445
jscola@johnscolalaw.com

33

## <u>COMPLIANCE CERTIFICATION STATEMENT</u>

The foregoing brief was prepared on a computer. A proportionally spaced typeface was used, as follows:

Name of typeface: Times New Roman

Point size: 12

Line spacing: Double


The total number of words in the brief is 7,946 Words.